IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: | Case No. 09-50779 |
| DENNIS E. HECKER, | Chapter 7 |
| Debtor. | Hon. Robert J. Kressel |
| ALLIANCE BANK | |
| Plaintiff, | Adv. Pro. No. |
| v. | |
| DENNIS E. HECKER, | |
| Defendant. | |

## COMPLAINT FOR DETERMINATION OF
## NONDISCHARGEABILITY OF CERTAIN DEBTS

Alliance Bank ("Alliance") brings this Complaint against Dennis E. Hecker ("Hecker") in order to obtain a determination that certain debts owed by Hecker to Alliance are nondischargeable pursuant to section 523(a) of the Bankruptcy Code because Hecker used false pretenses, made false representations, committed fraud and inflicted a willful and malicious injury to Alliance in order to obtain money from and take money belonging to Alliance. In support of this Complaint, Alliance alleges as follows:

### I. Parties

1.     Plaintiff Alliance is a Minnesota banking corporation with its principal office at 55 East Fifth Street, St. Paul, Minnesota.

2.      Defendant Hecker, on information and belief, is a resident and citizen of Minnesota. He is the Debtor in the above-captioned Chapter 7 bankruptcy case, which he commenced on June 4, 2009.

## II. Jurisdiction

3.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. 1334(b) because it is a civil proceeding that arises under 11 U.S.C. 523 (a) and Fed. R. Bankr. P. 4004 and 4007.

## III. Venue

4.      Venue lies in this district pursuant to 28 U.S.C. 1409(a), in that this proceeding arises under 11 U.S.C. 523 (a) and Hecker's bankruptcy case is pending in this district.

## IV. Core Status

5.      This proceeding is a core proceeding pursuant to 28 U.S.C. 157(b)(2)(1) because it seeks a determination as to the dischargeability of certain debts.

## V. Basis for Non-Dischargeability

6.      Under a series of loan agreements ("the Loan Agreements"), Alliance loaned Hecker, and a number of entities that he owns or controls ("the Hecker entities"), millions of dollars for business related and personal purposes. As a condition precedent to the loans, and in support of his request for financing, Hecker presented to Alliance written financial information, including annual or semi-annual personal financial statements, annual federal corporate or personal tax returns and credit reports ("the Hecker Financials").

7.    All of the Hecker Financials presented to Alliance consistently represented that Hecker's total personal and business assets far exceeded Hecker's total personal and business liabilities.

8.    In direct and reasonable reliance on the Hecker Financials, as well as oral representations made by Hecker about his finances and ability to meet his lending obligations, Alliance authorized financing to Hecker or a Hecker entity through a series of Loan Agreements, including the following transactions:

- *Dennis E Hecker – Loan #4785-01*

9.    Hecker prepared a Personal Financial Statement bearing a date of September 30, 2003, declaring his net worth at that time to be $92,591,300. This financial statement summarized personal assets and business assets and reported total assets of $136,626,300, offset by personal debt, business debt and current and deferred taxes with total liabilities of $44,035,000.

10.    The Personal Financial Statement dated September 30, 2003, was false in that it materially understated Hecker's liabilities by omitting complete information about significant obligations to Chrysler Financial or its predecessors or other creditors, including without limitations his personal guarantees on amounts loaned by Chrysler Financial to each Hecker borrower under any loan agreements with Chrysler Financial.

11.    Hecker presented his Personal Financial Statement dated September 30, 2003, to Alliance for the purpose of inducing Alliance to extend credit to Hecker during calendar year 2004.

12.    Hecker intended to deceive Alliance.

13.    Alliance relied upon Hecker's Personal Financial Statement dated September 30, 2003, for credit decisions and loans to Hecker or the Hecker entities during calendar year 2004 until the financial statement was superseded by Hecker's next financial statement.

14.    Alliance's reliance upon Hecker's Personal Financial Statement dated September 30, 2003 was reasonable.

15.    Alliance would not have made the loans to Hecker or his affiliated companies during calendar year 2004 had the financial statement not been inaccurate.

16.    On January 24, 2004, Alliance and Hecker executed a Note ("the Hecker Note") pursuant to which Alliance authorized a $1,000,000 loan ("the Hecker Loan") on certain specified conditions relating to, among other things, payment terms, interest and security for personal investments. Hecker signed the Hecker Note and thereby accepted the terms and conditions described therein.

17.    On January 24, 2004, Hecker and Alliance entered into a Consumer Security Agreement ("the Hecker Security Agreement") securing Hecker's obligations on the Hecker Note and the Hecker Loan and granting to Alliance an assignment of life insurance Policy No. L8095378 issued by Prudential Financial upon the life of Hecker ("the Hecker Insurance Policy") and limited to the amount of $1,000,000 plus interest and cost, or the outstanding balance of the loan.  Hecker signed the Hecker Security Agreement and thereby accepted the terms and conditions described therein.

18.    The Hecker Note, the Hecker Loan and the Hecker Security Agreement are collectively referred to herein as "the Hecker Loan."

- *Jacob Holdings of Waite Park – Loan # 4949-01*

19.     On July 19, 2004, Alliance issued a Loan Agreement ("the First Waite Park Agreement") to Jacob Holdings of Waite Park LLC ("Waite Park") pursuant to which Alliance authorized a $2,317,500 loan ("the First Waite Park Loan") on certain specified conditions relating to, among other things, payment terms, guaranty, covenants and conditions of loan proceeds for the purchase of certain real property. Gregory J. Smith ("Smith") as Manager and Vice President of Waite Park signed the Agreement and thereby accepted the terms and conditions described therein.

20.     On July 19, 2004, Waite Park executed a Promissory Note ("the First Waite Park Note") to Alliance agreeing and promising to pay the First Waite Park Loan pursuant to certain specified terms, covenants and conditions. The First Waite Park Note specified, among other things, that it was secured by the Mortgage, the Agreement and other collateral loan documents and also specified events of default. Smith, as Manager and Vice President of Waite Park, signed the First Waite Park Note and thereby accepted the terms and conditions described in the agreement.

21.     On July 19, 2004, Waite Park executed a Combination Mortgage and Security Agreement and Fixture Financing Statement ("the First Waite Park Mortgage"), securing its obligations pursuant to the First Waite Park Agreement, the First Waite Park Loan and the First Waite Park Note by granting to Alliance a mortgage on the real property ("the Property") described as follows:

Lots 1, 2 and 3, Block 1, Miller Park Plat Three*

(*Lot 1 was subsequently released by agreement. The property was subsequently replatted to Lot 2, Block 1, Miller Park Plat Four)

The First Waite Park Mortgage was recorded with the Office of County Recorder in Stearns County, Minnesota on July 26, 2004 as Document No. 1120718

22.    On July 19, 2004, Waite Park executed an Assignment of Leases, Rents, Profits, and Contracts ("the Waite Park Assignment"), further securing its obligations pursuant to the Waite Park Agreement, the Waite Park Loan and the Waite Park Note and assigning to Alliance all leases, rents, profits and contracts relating to the Property.

23.    The First Waite Park Agreement, the First Waite Park Note, the First Waite Park Mortgage and the Waite Park Assignment are hereinafter collectively referred to as the First Waite Park Loan.

24.    Pursuant to the First Waite Park Agreement and the First Waite Park Note, on July 19, 2004, Hecker, Waite Park's Chief Manager and President, executed a Guaranty to Alliance ("the Hecker Waite Park Guaranty") "irrevocably, absolutely and unconditionally" guaranteeing "the full payment of principal, interest and any other sums due" Alliance under the Waite Park Loan.

25.    The First Waite Park Loan and the Hecker Waite Park Guaranty were subsequently amended and reaffirmed to extend the maturity date of the First Waite Park Loan.

- *Jacob Holdings of Waite Park – Loan # 4949-03*

26.    On July 19, 2004, Waite Park executed a Promissory Note ("the Second Waite Park Note") to Alliance agreeing and promising to pay $772,500.00 ("the Second

6

Waite Park Loan") pursuant to certain specified terms, covenants and conditions. The Second Waite Park Note specified, among other things, that it was secured by the Mortgage, the Agreement and other collateral loan documents and also specified events of default. Smith, as Manager and Vice President of Waite Park, signed the Second Waite Park Note and thereby accepted the terms and conditions described in the agreement.

27.     On July 19, 2004, Waite Park executed a Combination Mortgage and Security Agreement and Fixture Financing Statement ("the Second Waite Park Mortgage"), securing its obligations pursuant to the Second Waite Park Agreement, the Second Waite Park Loan and the Second Waite Park Note by granting to Alliance a second mortgage on the real property ("the Property") described as follows:

Lots 1, 2 and 3, Block 1, Miller Park Plat Three*

(*Lot 1 was subsequently released by agreement. The property was subsequently replatted to Lot 2, Block 1, Miller Park Plat Four).

The Second Waite Park Mortgage was recorded with the Office of County Recorder in Stearns County, Minnesota on July 26, 2004 as Document No. 1120720.

28.     The Second Waite Park Agreement, the Second Waite Park Note and the Second Waite Park Mortgage are hereinafter collectively referred to as the Second Waite Park Loan.

29.     Pursuant to the Second Waite Park Agreement and the Second Waite Park Note, on July 19, 2004, Hecker, Waite Park's Chief Manager and President, executed a Guaranty to Alliance ("the Second Hecker Waite Park Guaranty") "irrevocably,

absolutely and unconditionally" guaranteeing "the full payment of principal, interest and any other sums due" Alliance under the Second Waite Park Loan.

30.    The Second Waite Park Loan and the Second Hecker Waite Park Guaranty were subsequently amended and reaffirmed to, among other things, extend the maturity date of the Second Waite Park Loan.

- *Jacob Holdings of Nestor Falls, Inc. – Loan #4978-04*

31.    Hecker prepared a Personal Financial Statement bearing a date of August 1, 2004, declaring his net worth at that time to be $128,449,120. This financial statement summarized personal assets and business assets and reported total assets of $189,092,120, offset by personal debt, business debt and current and deferred taxes with total liabilities of only $60,643,000.

32.    The Personal Financial Statement dated August 1, 2004, was false in that it materially understated Hecker's liabilities by omitting complete information about significant obligations to Chrysler Financial or its predecessors or other creditors, including without limitations his personal guarantees on amounts loaned by Chrysler Financial to each Hecker borrower under any loan agreements with Chrysler Financial.

33.    Hecker presented his Personal Financial Statement dated August 1, 2004, to Alliance for the purpose of inducing Alliance to extend or renew credit to Hecker during calendar year 2005.

34.    Hecker intended to deceive Alliance.

35.    Alliance relied upon Hecker's Personal Financial Statement dated August 1, 2004, for credit decisions and loans to Hecker or his affiliated companies during

calendar year 2005 until the financial statement was superseded by Hecker's next financial statement.

36.    Alliance's reliance upon Hecker's Personal Financial Statement dated August 1, 2004, was reasonable.

37.    Alliance would not have made or renewed the loans to Hecker or his affiliated companies during calendar year 2005 had the financial statement not been inaccurate.

38.    On April 18, 2005, Alliance and Nestor executed a Note ("the First Nestor Note") pursuant to which Alliance authorized a $600,000 loan ("the First Nestor Loan") on certain specified conditions relating to, among other things, payment terms, interest and security for the purchase of investment property in Canada. Givens, as President, and Daniel Turnquist ("Turnquist") as Vice President, signed the agreement on behalf of Nestor and thereby accepted the terms and conditions described therein.

39.    On April 18, 2005, Alliance and Nestor entered into a Commercial Security Agreement ("the First Nestor Security Agreement") through which Nestor secured its obligations to Alliance pursuant to the First Nestor Note and First Nestor Loan by granting to Alliance a security interest and an agreement not to sell or encumber certain real property located in the district of Kenora in Canada. Givens and Turnquist signed the First Nestor Security Agreement and the Agreement Not to Sell or Encumber Real Property on behalf of Nestor and thereby accepted the terms and conditions described therein.

40.    On April 18, 2005, Hecker executed a Guaranty to Alliance ("the First Hecker Nestor Guaranty") guaranteeing the payment and performance of each and every debt, liability and obligation of every type and description which Nestor owes or at any time thereafter may owe to Alliance.

41.    On April 18, 2005, Givens executed a Guaranty to Alliance ("the First Givens Nestor Guaranty") guaranteeing the payment and performance of each and every debt, liability and obligation of every type and description which Nestor owes or at any time thereafter may owe to Alliance.

- *Clearwater Retail Center LLC – Loan #29150-01*

42.    On May 26, 2005, Alliance and Clearwater Retail Center LLC ("Clearwater") executed a Note ("the Clearwater Note") pursuant to which Alliance authorized a $250,000 loan ("the Clearwater Loan") on certain specified conditions relating to, among other things, payment terms, interest and security to fund the build out of Clearwater Retail Center. Givens, as President, signed the agreement on behalf of Clearwater and thereby accepted the terms and conditions described therein.

43.    On May 26, 2005, Hecker executed a Guaranty to Alliance ("the Hecker Clearwater Guaranty") guaranteeing the payment and performance of each and every debt, liability and obligation of every type and description which Clearwater owes or at any time thereafter may owe to Alliance.

44.    In 2005, and in reliance upon Hecker's 2004 written personal financial statements, Alliance renewed the Hecker Loan and the First and Second Waite Park Loan at Hecker's request.

45.     Hecker prepared a Personal Financial Statement bearing a date of July 15, 2005, declaring his net worth at that time to be $151,574,680.  This financial statement summarized personal assets and business assets and reported total assets of $218,258,680, offset by personal debt, business debt and current and deferred taxes with total liabilities of only $66,684,000.

46.     The Personal Financial Statement dated July 15, 2005, was false in that it materially understated Hecker's liabilities by omitting complete information about significant obligations to Chrysler Financial or its predecessors or other creditors, including without limitations his personal guarantees on amounts loaned by Chrysler Financial to each Hecker borrower under any loan agreements with Chrysler Financial.

47.     Hecker presented his Personal Financial Statement dated July 15, 2005 to Alliance for the purpose of inducing Alliance to renew credit to Hecker during calendar year 2006.

48.     Hecker intended to deceive Alliance.

49.     Alliance relied upon Hecker's Personal Financial Statement dated July 15, 2005, for credit decisions and loans to Hecker or his affiliated companies during calendar year 2006 until the financial statement was superseded by Hecker's next financial statement.

50.     Alliance's reliance upon Hecker's Personal Financial Statement dated July 15, 2005, was reasonable.

51.     Alliance would not have renewed the loans to Hecker or his affiliated companies during calendar year 2006 had the financial statement not been inaccurate.

52.    In 2006, and in reliance upon Hecker's 2005 written personal financial statements, Alliance renewed the Hecker Loan, the First and Second Waite Park Loans, the First Nestor Loan and the Clearwater Loan at Hecker's request.

- *Jacob Holdings of Nestor Falls, Inc[1]. – Loan #4978-05*

53.    Hecker prepared a Personal Financial Statement bearing a date of June 1, 2006, declaring his net worth at that time to be $217,481,770.  This financial statement summarized personal assets and business assets and reported total assets of $294,831,770, offset by personal debt, business debt and current and deferred taxes with total liabilities of only $77,350,000.

54.    The Personal Financial Statement dated June 1, 2006, was false in that it materially understated Hecker's liabilities by omitting complete information about significant obligations to Chrysler Financial or its predecessors or other creditors, including without limitations his personal guarantees on amounts loaned by Chrysler Financial to each Hecker borrower under any loan agreements with Chrysler Financial.

55.    Hecker presented his Personal Financial Statement dated June 1, 2006 to Alliance for the purpose of inducing Alliance to renew credit to Hecker during calendar year 2007.

56.    Hecker intended to deceive Alliance.

57.    Alliance relied upon Hecker's Personal Financial Statement dated June 1, 2006, for credit decisions and loans to Hecker or his affiliated companies during calendar

---

[1] Nestor Falls is incorrectly spelled "Nester" on these loan documents.

year 2007 until the financial statement was superseded by Hecker's next financial statement.

58.     Alliance's reliance upon Hecker's Personal Financial Statement dated June 1, 2006, was reasonable.

59.     Alliance would not have made or renewed the loans to Hecker or his affiliated companies during calendar year 2007 had the financial statement not been inaccurate.

60.     On January 26, 2007, Alliance and Jacob Holdings of Nestor Falls, Inc. ("Nestor") executed a Note ("the Second Nestor Note") pursuant to which Alliance authorized a $48,883.87 loan ("the Second Nestor Loan") on certain specified conditions relating to, among other things, payment terms, interest and security for the purchase of two boats. Hecker, as Chief Executive Officer, and Michael Givens ("Givens"), as President, signed the agreement on behalf of Nestor and thereby accepted the terms and conditions described therein.

61.     On January 26, 2007, Alliance and Nestor entered into a Security Agreement ("the Second Nestor Security Agreement") through which Nestor secured its obligations to Alliance pursuant to the Nestor Note and Nestor Loan by granting to Alliance a security interest in two boats, a 2006 Crestliner 1850 Sportfish and a 2006 Crestliner 1850 Canadian. The Second Nestor Security Agreement contained Nestor's warranties that it "has, or will acquire, title to the collateral free of all liens, encumbrances, and security interest." Hecker, as Chief Executive Officer, and Givens, as

President, signed the agreement on behalf of Nestor and thereby accepted the terms and conditions described therein.

62.    On January 26, 2007, Alliance and Nestor entered into an Agreement to Provide Insurance ("the Nestor Insurance Agreement") on the two boats identified therein and in the Nestor Note, the Nestor Loan and the Second Nestor Security Agreement.

63.    On January 26, 2007, Hecker executed a Guaranty to Alliance ("the Second Hecker Nestor Guaranty") guaranteeing the payment and performance of each and every debt, liability and obligation of every type and description which Nestor owes or at any time thereafter may owe to Alliance.

64.    On January 26, 2007, Givens executed a Guaranty to Alliance ("the Second Givens Nestor Guaranty") guaranteeing the payment and performance of each and every debt, liability and obligation of every type and description which Nestor owes or at any time thereafter may owe to Alliance.

- *Jacob Holdings of Stimson – Loan #10146-01*

65.    In March 2007, Alliance issued a Loan Agreement ("the Stimson Agreement") to Jacob Holdings of Stimson LLC ("Stimson") and Hecker, pursuant to which Alliance authorized a $1,625,000 loan ("the Stimson Loan") on certain specified conditions relating to, among other things, payment terms, guaranty, covenants and conditions of loan proceeds to purchase a Membership Interest in Stimson Partners LLC. Hecker, as Chief Manager of Stimson, signed the agreement individually and on behalf of Stimson and thereby accepted the terms and conditions described therein.

66.     On March 9, 2007, Stimson and Hecker executed a Promissory Note ("the Stimson Note") to Alliance agreeing and promising to pay the Stimson Loan pursuant to certain specified terms, covenants and conditions. The Stimson Note specified, among other things, that it was secured by two Security Agreements and certain other collateral loan documents and specified events of default. Hecker, as Chief Manager of Stimson, signed the Stimson Note individually and on behalf of Stimson and thereby accepted the terms and conditions described in the agreement.

67.     In March 2007, Alliance and Hecker entered into a Security Agreement ("the Hecker Stimson Security Agreement) through which Hecker secured his obligations to Alliance pursuant to the Stimson Agreement and the Stimson Note by granting to Alliance all of Hecker's membership interest in Stimson. The Hecker Security Agreement also included, among other things, Hecker's representations, warranties and agreements with respect to his "absolute title to each item of Collateral" granted therein.

68.     In March 2007, Alliance and Stimson entered into a Security Agreement ("the Stimson Security Agreement") through which Stimson secured its obligations to Alliance pursuant to the Stimson Agreement and the Stimson Note by granting to Alliance all of Stimson's interest in its accounts, inventory, equipment and general intangibles. The Stimson Security Agreement also included, among other things, Stimson's representations, warranties and agreements with respect to its "absolute title to each item of Collateral" granted therein. Hecker, as Chief Manager of Stimson, signed the agreement on behalf of Stimson and thereby accepted the terms and conditions described therein.

69.    On March 7, 2007, Alliance and Hecker entered into a Commercial Security Agreement ("the Second Hecker Stimson Security Agreement) through which Hecker further secured his obligations to Alliance pursuant to the Stimson Agreement and the Stimson Note by granting to Alliance an assignment of the Hecker Insurance Policy and limited to the amount of $1,625,000 plus interest and cost, or the outstanding balance of the loan.

70.    On March 15, 2007, Alliance received Notice from Prudential that it had recorded and filed the assignment of the Hecker Insurance Policy.

71.    In 2007, and in reliance upon Hecker's 2006 written personal financial statements, Alliance renewed the Hecker Loan, the First and Second Waite Park Loans, the First Nestor Loan and the Clearwater Loan at Hecker's request.

- *Dennis E. Hecker – Wayne T. Belisle – Loan #10587-01*

72.    Hecker prepared a Personal Financial Statement bearing a date of June 1, 2007, declaring his net worth at that time to be $241,273,549.  This financial statement summarized personal assets and business assets and reported total assets of $333,148,549, offset by personal debt, business debt and current and deferred taxes with total liabilities of only $91,875,000.

73.    The Personal Financial Statement dated June 1, 2007, was false in that it materially understated Hecker's liabilities by omitting complete information about significant obligations to Chrysler Financial or its predecessors or other creditors, including without limitations his personal guarantees on amounts loaned by Chrysler Financial to each Hecker Borrower under any loan agreements with Chrysler Financial.

74.    Hecker presented his Personal Financial Statement dated June 1, 2007, to Alliance for the purpose of inducing Alliance to extend or renew credit to Hecker during calendar year 2008.

75.    Hecker intended to deceive Alliance.

76.    Alliance relied upon Hecker's Personal Financial Statement dated June 1, 2007, for credit decisions and loans to Hecker or his affiliated companies during calendar year 2008 until the financial statement was superseded by Hecker's next financial statement.

77.    Alliance's reliance upon Hecker's Personal Financial Statement dated June 1, 2007, was reasonable.

78.    Alliance would not have made or renewed the loans to Hecker or his affiliated companies during calendar year 2008 had the financial statement not been inaccurate.

79.    In early 2008, and in reliance upon Hecker's 2007 written personal financial statements, Alliance renewed the Hecker Loan, the First Nestor Loan and the Clearwater Loan at Hecker's request.

80.    On or about July 18, 2008, Hecker prepared a letter stating that he was working to prepare the "annual update of my Personal Financial Statement for 2008, last updated in June 2007." He made reference to the complications of the current state of his companies "based on the number of business lines, investments and transactions that I engaged in." He stated that he did "not anticipate any material adverse change" in his net worth.

81.   This statement was false in that it omitted mention of his significant obligations to Chrysler Financial or other creditors and defaults that had then occurred and the impending acceleration of loans by Chrysler Financial.

82.   Hecker prepared a Personal Financial Statement bearing a date of August 31, 2008, declaring his net worth at that time to be $192,614,000.   This financial statement summarized personal assets and business assets and reported total assets of $291,374,000, offset by personal debt, business debt and current and deferred taxes with total liabilities of only $98,760,000.

83.   The Personal Financial Statement dated August 31, 2008, was false in that it materially understated Hecker's liabilities by omitting complete information about significant obligations to Chrysler Financial or other creditors, including without limitations his personal guarantees on amounts loaned by Chrysler Financial to each Hecker borrower under any loan agreements with Chrysler Financial and defaults that had then occurred and the impending acceleration of loans by Chrysler Financial.

84.   Hecker presented his July 18, 2008 Letter and his Personal Financial Statement dated August 31, 2008, to Alliance for the purpose of inducing Alliance to extend or renew credit to Hecker during the latter part of calendar year 2008 and calendar year 2009.

85.   Hecker intended to deceive Alliance.

86.   Alliance relied upon Hecker's July 18, 2008 Letter and his Personal Financial Statement dated August 31, 2008, for credit decisions and loans to Hecker or

his affiliated companies during the latter part of calendar year 2008 and calendar year 2009.

87.    Alliance's reliance upon Hecker's July 18, 2008 Letter and his Personal Financial Statement dated August 31, 2008 was reasonable.

88.    Alliance would not have made or renewed the loans to Hecker or his affiliated companies during the latter part of calendar year 2008 and the early part of calendar year 2009 had the letter and financial statement not been inaccurate.

89.    On October 31, 2008, Alliance, Hecker and Wayne T. Belisle ("Belisle") executed a Note ("the Hecker-Belisle Note") pursuant to which Alliance authorized a $424,976.04 loan ("the Hecker-Belisle Loan") on certain specified conditions relating to, among other things, payment terms, interest and security to fund participation of loan. Hecker and Belisle signed the Hecker-Belisle Note and thereby accepted the terms and conditions described therein.

90.    On October 31, 2008, Hecker, Belisle and Alliance entered into a Commercial Security Agreement ("the Hecker-Belisle Security Agreement") securing Hecker and Belisle's obligations on the Hecker-Belisle Note and the Hecker-Belisle Loan and granting to Alliance all rights to any and all payments due under the Loan Participation Agreement dated October 31, 2008 between Alliance and Hecker and Belisle.  Hecker and Belisle signed the Hecker-Belisle Security Agreement and thereby accepted the terms and conditions described therein.

91.    On October 31, 2008 and in connection with the Hecker-Belisle Note, both Hecker and Belisle signed a Business Purpose Statement concerning the use of the

proceeds of the loan and averring that "all statements" in the Business Purpose Statement "are true, correct and accurate."

92.     In late 2008 and in early 2009, and in reliance upon Hecker's 2008 written personal financial statements, Alliance renewed the First and Second Waite Park Loans, the First Nestor Loan and the Clearwater Loan at Hecker's request.

## COUNT I

### The Debt is Excepted from Discharge Section 523(a)(2)(B) Because it is a Debt Incurred by False Statement in Writing

93.     Alliance repeats and realleges the allegations in all previous paragraphs, as though fully set forth at length.

94.     Section 523(a)(2)(B) of the Bankruptcy Code excepts a debt from discharge "to the extent" it was obtained by "use of a statement in writing" that was "materially false," "respecting the debtor's…financial condition," "on which the creditor to whom the debtor is liable…reasonably relied" and "that the debtor caused to be made or published with intent to deceive."

95.     Hecker submitted yearly written personal financial statements respecting his financial condition to Alliance.

96.     The written personal financial statements that Hecker submitted to Alliance were materially false.

97.     Hecker submitted the written personal financial statements to Alliance with the intent to deceive Alliance in order to obtain or renew financing from Alliance as reflected in the Loan Agreements.

98.   Alliance reasonably relied on the written personal financial statements.

99.   Alliance's injury is the proximate result of Hecker's materially false written personal financial statements.

100.   Based upon the foregoing, $5,247,445.30 of Hecker's debt to Alliance is nondischargeable pursuant to 11 U.S.C. §523 (a)(2)(B).

## COUNT II

**The Debt is Excepted from Discharge Section 523(a)(6) Because it is a Debt which Caused Willful and Malicious Injury**

101.   Alliance repeats and realleges the allegations in all previous paragraphs, as though fully set forth at length.

102.   Section 523(a)(6) of the Bankruptcy Code excepts a debt from discharge for "willful and malicious injury by the debtor to another entity."

103.   Hecker intentionally made misrepresentations and submitted materially false written personal financial statements to Alliance in order to obtain or renew financing as reflected in the Loan Agreements.

104.   Hecker knew that he did not have sufficient assets to meet his financial obligations and that his conduct would therefore cause harm to Alliance.

105.   Hecker's willful and malicious conduct necessarily caused injury to Alliance.

106.   Based upon the foregoing, $5,247,445.30 of Hecker's debt to Alliance is nondischargeable pursuant to 11 U.S.C. §523 (a)(6).

WHEREFORE, Alliance prays that this Court determine that $5,247,445.30 of Hecker's debt to Alliance is nondischargeable and for all such other relief as may be deemed appropriate or just.

Dated:  September 14, 2009                    GREENE ESPEL, P.L.L.P.


                                        /s/KathleenK. Statler
                                    Larry D. Espel, Reg. No. 27595
                                    Kathleen K. Statler, Reg. No. 161809
                                    200 S. Sixth Street, Suite 1200
                                    Minneapolis, MN  55402
                                    lespel@greeneespel.com
                                    kstatler@greeneespel.com
                                    (612) 373-0830

                                    Attorneys for Alliance Bank

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In Re:

DENNIS E. HECKER,

Debtor.

Case No. 09-50779

Chapter 7

Hon. Robert J. Kressel

---

## CERTIFICATE OF SERVICE

I, Kathleen K. Statler, declare, under penalty of perjury, that on September 14, 2009, I filed the following:

1.  Complaint for Determination of Nondischargeability of Certain Debts,

by enclosing in an envelope, postage prepaid, directed to the following via United States mail at their last known address:

Michael B. Lubic
Sonnenschein Nath & Rosenthal, LLC
601 South Figueroa Street, Suite 2500
Los Angeles, CA 90017

Linda M. Berreau
Leonard O'Brien Spencer
  Gale & Sayre Ltd.
100 S. 5th St., Ste. 2500
Minneapolis, MN 55376

Nicholas N. Nierengarten
Gray, Plant, Mooty & Bennett
500 IDS Center
80 S. Eighth Street
Minneapolis MN 55402

Michael M. Malter
Binder & Malter LLP
2775 Park Avenue
Santa Clara, CA 95050

Joseph W. Lawver
Carlton Financial Corporation
1400 Fifth Street Towers
100 S. Fifth St
Minneapolis, MN  55402

Dennis E. Hecker
PO Box 1017
Crosslake, MN 56442

Dated:  September 14, 2009

GREENE ESPEL, P.L.L.P.

_____/s/Kathleen K. Statler_____

Larry D. Espel, Reg. No. 27595
Kathleen K. Statler, Reg. No. 161809
200 S. Sixth Street, Suite 1200
Minneapolis, MN  55402
lespel@greeneespel.com
kstatler@greeneespel.com
(612) 373-0830

Attorneys for Alliance Bank

2