# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Case No. 09-50779 |
| DENNIS E. HECKER, | Chapter 7 |
| Debtor. | |
| HYUNDAI CAPITAL AMERICA | |
| Plaintiff, | |
| v. | Adv. Pro. No. |
| DENNIS E. HECKER | |
| Defendant. | |

## COMPLAINT FOR DETERMINATION OF
## NONDISCHARGEABILITY OF DEBTS

Hyundai Capital America ("HCA"), formerly known as Hyundai Motor Finance Company[1], brings this Complaint against Dennis E. Hecker ("Hecker") to obtain a determination that debts owed by Hecker to HCA are nondischargeable pursuant to multiple subsections of Section 523(a) of the Bankruptcy Code. Specifically, HCA argues and alleges that the Court should deem all debts alleged in HCA's proof of claim nondischargeable in their entirety because Hecker (i) knowingly submitted a false and misleading written financial statement in order to obtain credit on which HCA relied in extending Hecker credit, (ii) willfully and maliciously inflicted injuries to HCA and its property through the misuse and conversion of property pledged

---

[1]      On or about May 15, 2009, Hyundai Motor Finance Company ("HMFC") amended its Articles of Incorporation to change its name to Hyundai Capital America. HCA is the sole successor to HMFC's rights and interests, including all rights and interests relevant to the Debtor's Chapter 7 bankruptcy case.

739222

to HCA as collateral, and, (iii) misappropriated money due and owing to HCA and derived from the sale of HCA collateral.

## PARTIES

1.      Plaintiff HCA is a California corporation with a principal place of business located in Irvine, California.

2.      Defendant Hecker is a resident citizen of Minnesota, and is the Debtor in the above-captioned Chapter 7 bankruptcy case, which was commenced on June 4, 2009.

## JURISDICTION

3.      The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) because it is a civil proceeding arising under 11 U.S.C. § 523(a).

## VENUE

4.      Venue for this matter lies in this district pursuant to 28 U.S.C. § 1409(a) for two reasons:  (i) this adversarial proceeding arises under 11 U.S.C. § 523(a); and (ii) Hecker's bankruptcy case is pending in this district.

## STATUS AS A CORE PROCEEDING

5.      This adversarial proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(I) because HCA is seeking a determination of the nondischargeability of debts.

## GROUNDS FOR NON-DISCHARGEABILITY

6.      Prior to 2007, Hecker had a long-standing business relationship (in excess of ten years) with Hyundai Motor Company and Hecker owned and ran several profitable Hyundai dealerships.  As of mid-2007, however, Hecker had never done business with Plaintiff HCA (then known as Hyundai Motor Finance Company or, in documents, called HMFC).

7.     In approximately November 2007, Hecker initiated a relationship with HCA to obtain financing ("the HCA/Hecker loans") for companies that Hecker owned and controlled (the "Hecker Borrowers").

8.     The HCA/Hecker loans fell into three categories: (1) fleet financing in the aggregate amounts of $104,785,342.74 ("fleet financing" being loans to finance the purchase of Hyundai automobiles by Hecker Borrowers for the purpose of leasing the cars, ultimately, to Advantage Rent-a-Car, an entity owned and controlled by Hecker, to be used as part of Advantage's rental car fleet) (on February 4, 2008 and August 11, 2008); (2) floor plan financing in the amount of $2.7 million, a real estate loan in the amount of $2.3 million, and a working capital loan of $400,000 for a new Hyundai dealership in Brainerd, Minnesota (to two related Hecker-owned entities, Baxter Imports, LLC and Jacob Holdings of Upnorth LLC) (December 21, 2007); and (3) a capital loan and floor plan financing in connection with a dealership in Southern California ($1 million and $6.3 million, respectively) (July 28, 2008).

9.     In total, therefore, between November 2007 and August 2008, HCA extended loans to the Hecker Borrowers that, in the aggregate, exceeded $117.48 million with approximately 90% of the credit in the form of fleet financing.

10.     Hecker led HCA to believe that Chrysler Finance, which, up to that time had provided Hecker with fleet financing, was withdrawing from fleet financing and that Hecker urgently needed to replace his funding source.  Chrysler Finance had provided shorter term floor plan financing and Hecker told HCA that it was time-critical that he obtain new fleet financing.

11.     Given the size of the requested loans, and because Hecker was emphatic that his fleet lending transactions with HCA move forward quickly, it was particularly important to HCA that Hecker and the Hecker Borrowers provide adequate security for such loans – not only

3

granting liens on all collateral pledged to repay the loans (*e.g.*, the financed cars), but also giving HCA a full-recourse personal guarantee under which Hecker promised to personally repay the HCA/Hecker loans.

12.     In order to obtain the HCA/Hecker loans, Hecker (1) agreed to execute full-recourse, personal guarantees in connection with each of the loans, and (2) provided HCA a personal financial statement dated June 1, 2007 (the "Hecker Financial Statement") to demonstrate his ability to perform as guarantor.   A true and accurate copy of the Hecker Financial Statement is attached to this Complaint as Exhibit A.

13.     According to the Hecker Financial Statement (which was signed and dated by Hecker), as of June 1, 2007, Hecker had total assets of $348,148,549, liabilities of $106,875,000, and a total net worth of $241,273,549.

14.     After a review and analysis of the Hecker Financial Statement, HCA determined that HCA's security interest in its collateral and Hecker's personal guaranty, together, would provide sufficient security for loans to the Hecker Borrowers, and HCA thus proceeded, in reliance on the Hecker Financial Statement, to extend the HCA/Hecker loans.

15.     Between December 2007 and August 2008, Hecker personally executed loan agreements and full-recourse guarantees to obtain from HCA:  (i) floor plan financing, a real estate loan, and a working capital loan in the aggregate principal amount of $5.4 million for his automotive dealership in Brainerd, Minnesota, Baxter Imports, LLC; (ii) a capital loan and floor plan financing loan in the amount of $7.3 million for his automotive dealership, Advantage Motors – Airport LLC in Los Angeles, California; and (iii) two fleet financing loans in the aggregate principal amount of $104,785,342.74 to refinance the purchase of approximately 5,000 motor vehicles for his leasing company, Rosedale Dodge Inc. d/b/a Rosedale Leasing.  True and

accurate copies of the loan agreements and guarantees executed by Hecker are attached as
Exhibits B through K.

### A.    Material Omissions in the Hecker Financial Statement

16.    Unbeknownst to HCA at the time, Hecker failed to disclose, in the Hecker
Financial Statement or otherwise, that (1) he had previously granted a security interest in his
personal assets to secure loans to his businesses in the hundreds of millions of dollars to another
lender (Chrysler Financial), and (2) he had already personally guaranteed loans from Chrysler
Financial and other lenders in amounts that, in total, far exceeded Hecker's own stated net worth
in the Hecker Financial Statement.

17.    In particular, when Hecker sought and received the Hecker/HCA loans, Hecker
failed to disclose the following preexisting commitments, either in the Hecker Financial
Statement or otherwise:

 a.  Hecker executed a "Master Loan and Security Agreement" in his individual
 capacity on behalf of DaimlerChrysler Services North America, LLC on or
 around March 29, 2002 ("Chrysler Master Agreement"). A true and accurate
 copy of the Chrysler Master Agreement is attached as Exhibit M. The
 Chrysler Master Agreement is more than a personal guarantee – it creates
 direct, primary liability for Hecker as a joint and several borrower, and
 encumbers substantially all of Hecker's personal assets as security for
 multiple, large lines of credit from Chrysler to more than twenty (20) Hecker
 companies. The Chrysler Master Agreement secures hundreds of millions of
 dollars in debt owed to Chrysler by business entities owned and operated by
 Hecker.

 On information and belief, at the time Hecker provided HCA with the Hecker
 Financial Statement, the aggregate debt owed to Chrysler under the Chrysler
 Master Agreement greatly exceeded the aggregate, net value of Hecker's
 personal assets. For example, the Chrysler Master Agreement imposes direct
 and personal liability on Hecker for a February 16, 2006 promissory note
 executed by Hecker himself on behalf of his company Rosedale Dodge, Inc. in
 the amount of $660,000,000.00.

 b.  Hecker also executed an "All Encompassing Guarantee" on behalf of
 DaimlerChrysler Services North America, LLC on or around March 16, 2001,
 subsequently reaffirmed on multiple occasions (e.g., Amended and Restated

All Encompassing Guaranty on or around October 22, 2004) (collectively, the "Chrysler Guaranty"). A true and accurate copy of the Amended and Restated All Encompassing Guaranty executed by Hecker on or around October 22, 2004 is attached as Exhibit L.

The Chrysler Guaranty deems Hecker primarily, unconditionally, jointly, and severally liable for the debts owed to Chrysler by thirty-four (34) distinct business entities owned and controlled by Hecker in the event of a default. On information and belief, at the time Hecker provided HCA with the Hecker Financial Statement, the aggregate debt owed to Chrysler by the thirty-four entities listed on the Chrysler Guaranty may have exceeded Hecker's stated net worth.

c.   On information and belief, on or about January 12, 2007, Hecker executed a personal guaranty to Gelco Corporation, d/b/a GE Fleet Services in favor of GE Fleet to guaranty loans to Hecker borrowers in excess of $7 million ("Gelco Guaranty").

d.   On information and belief, Hecker executed three personal guarantees in favor of Carlton Financial Corporation in the aggregate amount of nearly $2 million. On information and belief, Hecker executed two of these guarantees in December 2004, and the third in April 2005.

e.   On or around February 15, 2007, Hecker executed a personal guarantee in favor of American Bank of St. Paul to secure a promissory note in the amount of $301,428.74.

f.   On or around June 1, 2007, Hecker executed a personal guarantee in favor of American Bank of St. Paul to secure a multi-advance, vehicle line of credit note in the amount of $3,000,000.00.

18.   None of the above liabilities were disclosed in the Hecker Financial Statement. At the time of the Hecker/HCA loans, HCA had neither actual nor constructive knowledge of Hecker's grant of a security interest in his personal property to Chrysler Financial, nor knowledge of the personal guaranties set forth in the preceding paragraphs.

19.   In addition to the foregoing, Hecker failed to disclose various liens and encumbrances on assets listed in the Hecker Financial Statement:

a.   Hecker identified himself as 50% owner of Jacob Holdings of Stimson LLC in the Hecker Financial Statement, but failed to disclose that his entire ownership interest in that company had been encumbered by a lien in the approximate amount of $2,524,976.04 in favor of Alliance Bank since approximately

March 15, 2007.  Hecker later disclosed the Alliance Bank lien in schedules filed in connection with this Chapter 7 case.

b.  Hecker failed to disclose a mortgage on his Northridge residence in the approximate amount of $250,000 executed in favor of U.S. Bank on or around August 5, 1999.  Hecker later disclosed U.S. Bank's mortgage on the Northridge residence in schedules filed in connection with this Chapter 7 case.

c.  Hecker failed to disclose a mortgage on his Plymouth residence in the approximate amount of $232,304 executed in favor of Washington Mutual Bank on or around August 13, 2004.  Hecker later disclosed Washington Mutual's mortgage on his Plymouth residence in schedules filed in connection with this Chapter 7 case.

20.  As the following table shows, by failing to disclose his pre-existing pledge of assets, his numerous preexisting guaranties, numerous encumbrances on claimed assets, and, moreover, by intentionally omitting these liabilities from the Hecker Financial Statement, Hecker presented false and misleading information to HCA on which HCA reasonably relied in extending the HCA/Hecker loans:

| Hecker's Claimed Net Worth on Financial Statement | Undisclosed Direct Liabilities[2] | Undisclosed Contingent Liabilities[3] | Undisclosed Liens and Encumbrances[4] |
|---|---|---|---|
| $241,273,549 | $660,000,000.00 | $12,301,428.74 | $3,007,280.04 |

---

[2]  Because HCA does not have access to all promissory notes and other loan documents subject to the Chrysler Master Agreement, the undisclosed direct liabilities set forth above reflect a conservative estimate of Hecker's actual undisclosed liabilities as of June 1, 2007.

[3]  Because HCA does not have access to all promissory notes and other loan documents to which Hecker's Chrysler Guaranty may be subject, and HCA does not have access to all records of Hecker's other contingent liabilities, the undisclosed contingent liabilities set forth above reflect a conservative estimate of Hecker's actual undisclosed liabilities as of June 1, 2007.

[4]  Because Hecker failed to provide dates on which many secured claims were incurred in his bankruptcy schedules, the list of undisclosed liens and encumbrances set forth herein may not include all liens and encumbrances Hecker failed to disclose in the Hecker Financial Statement. Accordingly, HCA submits the foregoing the list of undisclosed liens and encumbrances as a conservative estimate of those not disclosed by Hecker in the Hecker Financial Statement.

**B.      Conversion of HCA's Collateral**

21.     By the fall of 2008, each of the Hecker Borrowers had defaulted under its respective loan agreements with HCA by failing to make payments of principal and interest as required.

22.     On December 8, 2008, several entities associated with Advantage Rent-a-Car, each of which was controlled and primarily owned by Hecker, filed for bankruptcy in the U.S. Bankruptcy Court for the District of Minnesota, Case No. 08-46367 (the "Advantage Bankruptcies").  On the Petition Date for the Advantage Bankruptcies, the Debtors possessed, and were continuing to use, approximately 4,500 vehicles in which HCA held a perfected, first-priority security interest as a result of HCA's loans to the Hecker Borrowers.

23.     On April 8, 2009, the Debtors in the Advantage Bankruptcies ceased business operations and stopped renting HCA's collateral vehicles to their customers.  On April 15, 2009, the court issued an order detailing procedures for the orderly return of HCA's collateral.  (*See* Doc. No. 496, Case No. 08-46367).

24.     For the Debtors' vehicles identified as the Rental Vehicles (as defined in the motion filed by the Advantage Debtors), the Bankruptcy Court ordered the following:

> The Debtors will return Rental Vehicles to the Fleet Lenders as soon as possible and will return all Rental Vehicles no later than 30 days to the nearest facility permitted under the provisions of the leases and agreements described herein (collectively the "Return Locations"). All of the Hyundai Return Vehicles shall be returned in accordance with the terms and conditions of the August 11, 2008, agreements and related documents, provided that such terms and conditions address only the location for return of vehicles, unless the parties, with the consent of the Committee, otherwise agree in writing.

25.     Upon the issuance of a "Vehicle Condition Report" by the Return Location (and compliance with such other terms and conditions as required for return of the Hyundai Return

Vehicles), the Court ordered that the Debtors were to have met their obligation of returning those Rental Vehicles, and accordingly, the Court held the leases would be rejected with respect to those vehicles as of that date.

26.     The Court further ordered that Debtors could negotiate an alternative return procedure for returning the Rental Vehicles with the respective Fleet Lenders, in order to allow the Hecker Borrowers to sell the Rental Vehicles in a strategic process (the "Strategic Rental Plan"), which the Court concluded would maximize the sales proceeds for the estate and for the Fleet Lenders.

27.     In late July, 2009, the Advantage Debtors and HCA entered into a Voluntary Surrender Agreement in which the Debtors agreed "to deliver immediate control and possession of the Surrendered Collateral."

28.     At around the same time, Hecker personally initiated negotiations with HCA seeking an agreement that would allow him to retain and use numerous vehicles (the "Misused Vehicles") belonging to HCA for the benefit of a separate Hecker entity, Payless Rent-a-Car (Minneapolis).  Although negotiations of this potential transaction continued for several weeks, by early August, HCA ultimately determined it was not interested in the transaction and provided Hecker notice of its decision.

29.     Despite HCA's rejection of Hecker's proposal, Hecker failed to return HCA's vehicles as required by the April 15, 2009 Court Order, and pursuant to the parties' surrender agreement.  Moreover, Hecker failed to provide complete or verifiable information regarding the location or condition of the vehicles, despite multiple requests for such information by HCA.

30.     The information HCA has been able to obtain regarding the Misused Vehicles indicates that the Vehicles have continued to incur high mileage totals and consistent wear and

tear, even in the weeks after the Debtors in the Advantage Bankruptcies discontinued business operations and stopped renting the Misused Vehicles to its customers.

31.     On information and belief, upon conducting an investigation into the location and use of the Misused Vehicles, HCA now believes that Hecker, directly or indirectly, wrongly converted the Misused Vehicles to his exclusive use for a period of several months by renting the Misused Vehicles to customers of Payless Rent-a-Car, in exchange for payments from Payless Rent-a-Car in the amount of $500 per vehicle, per month.

32.     HCA did not provide Hecker with permission or authority to retain and use the Misused Vehicles, and Hecker did so in direct contravention of HCA's property rights.

33.     Hecker's retention, use, and wrongful conversion of the Misused Vehicles, and the proceeds thereof, violates the terms of the April 15, 2009 Court Order, the terms of the parties' voluntary surrender agreement, and the terms of HCA's original loan documents with Rosedale Dodge, Inc., which state, in relevant part:

> Each Financed Vehicle shall have been delivered to Advantage Rent-A-Car, or to a lessee approved by [HCA], pursuant to an executed vehicle lease approved by [HCA], the executed original of which lease must have to be delivered to and on file with [HCA]

34.     In addition to the conversion of HCA's Misused Vehicles, on information and belief, in or around June 2009, Hecker directly or indirectly facilitated the unauthorized sale of several vehicles in which HCA held a first-priority security interest in connection with its loans to Rosedale Dodge, Inc.

35.     On information and belief, Hecker converted proceeds from these wrongful and unauthorized sales to his own personal use.

36.     Hecker had neither permission nor authority to execute any sale of HCA's vehicles, and he had neither permission nor authority to direct the proceeds of any such sale to any account or entity other than HCA.

37.     Upon full execution of its rights to collateral under the HCA/Hecker Loans, HCA expects to hold a deficiency claim against Hecker, as guarantor of the HCA/Hecker Loans, in the approximate amount of $20 million.

## REQUEST FOR NON-DISCHARGEABILITY OF DEBTS

### COUNT 1
### (Use of False Written Statement re: Financial Condition under 11 U.S.C. § 523(a)(2)(B))

38.     HCA restates and re-alleges paragraphs 1-37 in their entirety.

39.     As described above, Hecker owes, or will owe, approximately $20,000,000 for funds and extensions of credit that he obtained by submitting a false and misleading financial statement to HCA, thereby inducing HCA to extend financing to the various Hecker Borrowers. Specifically, the Hecker Financial Statement failed to disclose:  (i) direct and primary repayment obligations and a pledge of substantially all of Hecker's personal assets to Chrysler that each greatly exceeded Hecker's stated net worth; (ii) millions of dollars in undisclosed liens and encumbrances (since acknowledged by Hecker) on assets listed in the Hecker Financial Statement; and (iii) multiple contingent liabilities that, in the aggregate, substantially exceeded Hecker's entire net worth.

40.     The Hecker Financial Statement was a statement of Hecker's financial condition in writing, was materially false and misleading, and Hecker knew it to be false and misleading at the time.  Hecker personally executed documents creating many of the liabilities he failed to disclose to HCA in the Hecker Financial Statement, and he personally executed other agreements under which he assumed personal and direct liability for liabilities he failed to disclose.  Hecker

also personally verified the alleged accuracy of the Hecker Financial Statement as of June 1, 2007.

41.    HCA reasonably relied on the Hecker Financial Statement in extending the Hecker Loans.  HCA's reasonable investigation did not, and could not have uncovered proof of Hecker's material omissions because the vast majority of the liabilities at issue were not publicly recorded, and the others were not publicly recorded until January 2009.

42.    Hecker caused the Hecker Financial Statement to be made and published to HCA with the intent to deceive HCA.

43.    But for the misrepresentations and omissions contained in the Hecker Financial Statement, HCA would not have extended credit to Hecker and the Hecker Borrowers.

44.    Hecker's false statements and omissions contained in the Hecker Financial Statement proximately caused damage to HCA.

## COUNT 2
### (Willful and Malicious Injury to HCA's Property under 11 U.S.C. § 523(a) (6))

45.    HCA restates and re-alleges paragraphs 1-44 in their entirety.

46.    As described above, Hecker converted HCA's Misused Vehicles, and the proceeds thereof, to his own exclusive use and for his own personal gain, by wrongfully retaining the Misused Vehicles and renting them to the customers of his company, Payless Rent-a-Car, for a period of several months.

47.    Hecker had neither permission nor authority to retain and convert the Misused Vehicles to his own exclusive use, and Hecker's conversion and failure to timely return the Misused Vehicles violated the express terms of HCA's loan documents, the Advantage Court's April 15, 2009 Order, and Hecker's voluntary surrender agreement with HCA.

48.     In addition to converting the Misused Vehicles to his own, exclusive use, on information and belief, Hecker directly or indirectly sold several of HCA's floor plan financed vehicles without remitting payment from sale proceeds to HCA.

49.     At all relevant times, Hecker was aware of HCA's interest in its collateral, and the proceeds thereof, and intentionally took steps to damage HCA's interest in its collateral.

50.     Hecker's conversion materially damaged HCA and its property by (i) excluding HCA from the possession, use, and execution upon its own collateral; (ii) depriving HCA of the proceeds of its collateral; and (iii) materially devaluing HCA's property by causing it to incur excessive mileage and other structural and mechanical damage, and by subjecting it to undue use and wear and tear without commensurate compensation.

**COUNT 3**
**(Nondischargeability Due to Embezzlement under 11 U.S.C. § 523(a) (4))**

51.     HCA restates and re-alleges paragraphs 1-50 in their entirety.

52.     In addition to converting the Misused Vehicles to his own, exclusive use, on information and belief, Hecker directly or indirectly sold several of HCA's floor plan financed vehicles without remitting payment from sale proceeds to HCA.

53.     At all relevant times, HCA's security interest in its collateral extended to and attached to all proceeds received from the sale of its collateral.

54.     Pursuant to the financing agreements between the parties, upon any sale of HCA's floor plan financed vehicles, Hecker was obligated to remit payment to HCA out of the vehicle sale proceeds.

55.     Hecker had neither permission nor authority to direct HCA's share of the proceeds of any such sales to any account or entity other than HCA.

56.     At all relevant times, Hecker was aware of HCA's interest in the proceeds of its collateral, and intentionally took steps to damage HCA's interest in such proceeds.

57.     By failing to remit payment of sale proceeds from the sales of such vehicles, Hecker's wilfully misappropriated HCA property.

WHEREFORE, based on the foregoing, Plaintiff HCA respectfully requests a determination of non-dischargeability for the entire amount of its deficiency under the Hecker Loans due to Hecker's obtaining the HCA loans by providing a false and materially misleading written financial statement on which HCA relied in extending credit to Hecker, for all amounts owed by Hecker for the wrongful conversion of HCA's Misused Vehicles, and the proceeds thereof, for  amounts owed by Hecker for the wrongful sale of HCA collateral and failure to remit proceeds, and for such other relief as the Court may deem appropriate or just.

Dated:  September 14, 2009                    FAFINSKI MARK & JOHNSON, P.A.


By:___/s/  Seth Leventhal_____
     Connie A. Lahn (#269219)
     David E. Runck (#289954)
     Seth Leventhal (#263357)
Flagship Corporate Center
775 Prairie Center Drive, Suite 400
Eden Prairie, Minnesota 55344
Telephone:  (952) 995-9500
Facsimile:  (952) 995-9577
Connie.Lahn@fmjlaw.com
David.Runck@fmjlaw.com
Seth.Leventhal@fmjlaw.com

ATTORNEYS FOR
HYUNDAI CAPITAL AMERICA