## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

In re:                                                              BKY No. 09-50779

Dennis E. Hecker,                                                          Chapter 7

      Debtor.

---

## TRUSTEE'S RESPONSE TO DEBTOR'S MOTION FOR PROTECTIVE ORDER RELATING TO 2004 EXAMINATION

---

      Randall L. Seaver, Trustee ("Trustee"), by and through his undersigned counsel, submits this Response to the Motion of the Debtor, Dennis E. Hecker, for a Protective Order Relating to 2004 Examination.  The Debtor seeks a protective order staying the Debtor's 2004 Examination, now set for October 22, 2009, until the conclusion of any criminal proceeding against the Debtor.

## FACTUAL BACKGROUND

      1.    The Debtor filed his petition for bankruptcy relief under Chapter 7 of the Bankruptcy Code on June 4, 2009 and obtained the benefit of the automatic stay of 11 U.S.C. §362.

      2.    On or about June 17, 2009, state and federal authorities searched the Debtor's business and homes in Medina and Crosslake, Minnesota pursuant to a search warrant.

      3.    The Debtor obtained an extension of time to file his schedules and statement of financial affairs, which were filed on July 1, 2009.

      4.    On July 8, 2009, a creditor, Chrysler Financial Services Americas, LLC ("Chrysler"), filed an adversary complaint against the Debtor, *Chrysler Financial Services Americas, LLC v. Dennis E. Hecker*, ADV No. 09-5019 ("Chrysler Adversary"), alleging false pretenses, false representation, actual fraud, fraud as fiduciary, embezzlement, larceny and

willful and malicious injury, and seeking an order determining that its debt to be non-dischargeable under 11 U.S.C. §523(a)(2), (4) and (6).

5.      On July 15, 2009, the Debtor testified at the meeting of creditors conducted pursuant to 11 U.S.C. §341.  The Trustee asked the Debtor questions about the Chrysler Adversary.  The Debtor's attorney in the Chrysler adversary, William F. Mohrman, advised him not to answer any questions regarding the Chrysler complaint, on the basis that "once an adversary proceeding is commenced, discovery may be had only pursuant to the discovery provisions of the Federal Rules of Civil Procedure."  *See* Transcript of 341 Meeting of Creditors at 83, attached as Exhibit A to the Affidavit of Randall L. Seaver, filed herewith (hereinafter, "Seaver Affidavit").

6.      The Debtor did not assert his Fifth Amendment privilege against self-incrimination with regard to any questions asked at the Section 341 Meeting.

7.      On July 30, 2009, the U. S. Attorney served a "Subpoena to Testify Before the Grand Jury upon Denny Hecker's Automotive Group, Inc." and any other entity owned or controlled by Dennis E. Hecker.

8.      On information and belief, the Debtor has an ownership interest and controlling interest in over 160 corporations and entities.  *See* Para. 14 to the Debtor's Schedule B-Personal Property and list attached thereto as Exhibit B-13.

9.      On August 21, 2009, the Debtor filed an Amended Schedule C.  On September 1, 2009, the Debtor filed a second Amended Schedule C.

10.     On September 17, 2009, the Trustee served his Notice of Examination of Dennis E. Hecker under Bankruptcy Rule 2004, setting the examination for October 14, 2009.

11.     On September 23, 2009, the Debtor filed the instant motion seeking a protective order relating to the 2004 Examination and seeking to stay all discovery until all criminal proceedings against him are concluded.

12.     Due to the filing of the Debtor's motion for a Protective Order, the Debtor's 2004 Examination has been postponed to October 22, 2009.

13.     On October 7, 2009, the Debtor filed a "Motion for Order Staying Adversary Proceeding Until Conclusion of Grand Jury Proceeding and/or any Indictments the Grand Jury Issues" in the following nine adversary proceedings: *Cornerstone Bank, et al. v. Hecker, ADV. No.09-5035; Carleton Financial Corporation v. Hecker,* ADV No. 09-5036*; Vision Bank v. Hecker,* ADV No. 09-5037*; Alliance Bank v. Hecker,* ADV No. 09-5038*; Gelco Corporation v. Hecker ,* ADV No. 09-5039*; US Bank v. Hecker,* ADV No. 09-5040*; Hyundai Capital America v. Hecker,* ADV No. 09-5041*; Seaver v. Jacob Holdings of Ventanas, LLC, et al,.* ADV No. 09-5042*;* and *Seaver v. Hecker, Midwest Motors, LLC, et al.*, ADV No. 09-5045.

14.     The deadline for the Trustee to file an objection to the Debtor's discharge is November 19, 2009.

## ARGUMENT

### INTRODUCTION

The Debtor has sought a protective order "staying Debtor's 2004 examination until the conclusion of any criminal proceeding against the Debtor."  In effect, the Debtor seeks to preclude the Trustee from gaining information from the Debtor regarding his business and financial affairs for an unspecified amount of time, which might be several years.  The Debtor claims such action is necessary to "protect his constitutional rights."  The Debtor requests

unwarranted relief that would prejudice the Trustee and would operate to the detriment of creditors in this case.

## I.   THE ADMINISTRATION OF THIS BANKRUPTCY CASE SHOULD NOT BE PUT "ON HOLD" FOR YEARS, FOR THE CONVENIENCE OF THE DEBTOR, WHO VOLUNTARILY FILED THE CASE.

This case was commenced by the voluntary filing of a Chapter 7 bankruptcy petition. The Debtor voluntarily submitted schedules and a statement of financial affairs in which he was required to provide truthful information regarding his businesses and all financial affairs.  The Debtor appeared at the §341 meeting and answered questions under oath about his business and finances. Even before he filed his schedules and statement of financial affairs and provided sworn testimony at the §341 meeting, law enforcement officials had executed search warrants at the Debtor's business property.

The Trustee and his counsel are engaged in exhaustive efforts to discover assets for the benefit of creditors of the Bankruptcy Estate.  To further that end, the Trustee obtained, without objection, Bankruptcy Rule 2004 authorization for the Debtor, and served a Notice of Examination upon the Debtor setting his examination for October 14, 2009.

The Debtor has now sought a protective order to prevent the Trustee from obtaining the Debtor's testimony, without ever having asserted his constitutional rights under the Fifth Amendment.  Debtor brought the Motion for Protective Order under the guise of "protecting his constitutional rights," however, the Fifth Amendment provides ample protection to the Debtor; he simply must avail himself of its protection.

The procedural context of this matter differs significantly from the cases where the Debtor cites in his Memorandum.  This is not civil litigation commenced against a defendant who then seeks a stay of proceedings pending the outcome of a criminal investigation or

4

indictment.  Rather, here the Trustee seeks financial and business information from the Debtor in

a voluntary bankruptcy case in which the Debtor has already disclosed, under penalty of perjury,

significant business and financial information.

## II. THE BANKRUPTCY CODE REQUIRES DEBTORS TO MAKE COMPLETE DISCLOSURE OF ASSETS AND FINANCIAL TRANSACTIONS TO OBTAIN THE EQUITABLE RELIEF OF DISCHARGE OF DEBT.

A.     <u>Debtor's Duties to Disclose All Financial Information and Transactions</u>

When a debtor voluntarily files for bankruptcy relief, he or she is requesting that the

bankruptcy court exercise its equitable powers and provide a discharge of debt.  To benefit from

this equitable relief, a debtor must completely disclose all obligations and financial transactions.

A Chapter 7 trustee is charged with investigating the debtor's financial affairs and administering

the debtor's estate to maximize the benefit to unsecured creditors which suffer the corresponding

losses from the debtor's discharge in bankruptcy.

Section 521 of the Bankruptcy Code requires that the debtor do the following:

(1) file a list of creditors, and unless the court orders otherwise, a schedule of
assets and liabilities, a schedule of current income and current expenditures, and a
statement of the debtor's financial affairs;
*       *       *
 (3) if a trustee is serving in the case. . .cooperate with the trustee as necessary to
enable the trustee to perform the trustee's duties under this title;

(4) if a trustee is serving in the case. . .surrender to the trustee all property of the
estate and any recorded information, including books, documents, records, and
papers, relating to property of the estate, whether or not immunity is granted
under section 344 of this title.

11 U.S.C. §521(a).  The debtor is also required to testify under oath in response to questions of

the trustee and creditors.

The debtor shall appear and submit to examination under oath at the meeting of
creditors under section 341(a) of this title. Creditors, any indenture trustee, or any
trustee or examiner in the case may examine the debtor.

5

11 U.S.C. §343.

The Fifth Amendment privilege against self-incrimination applies in the bankruptcy context. *See, Martin Trigona v. Belford (In re Martin Trigona),* 732 F.2d 170, 175 (2d Cir. 1984), cert. denied, 469 U.S. 859 (1984).   However, the assertion of the privilege by a debtor who has voluntarily sought equitable relief from the bankruptcy court may affect the scope of his or her discharge, as it may limit the requisite disclosures needed for the full and fair administration of the bankruptcy estate.   As the Court noted in the case, *In re Fairbanks,* 135 B.R. 717, 732-33 (Bankr. D. N.H. 1991),

> [In bankruptcy cases] disclosure is required as part of noncriminal statutory scheme for administration of bankruptcy estates which requires such disclosure for liquidation of the same and in no sense is aimed particularly at prospective criminal defendants.
> *        *        *
> It certainly would be an irrational spectacle to have an individual come into the bankruptcy courts and obtain a discharge from his liabilities without ever disclosing his assets on the grounds of self-incrimination.

*Id.* at 732-33.

> The Bankruptcy Code provides for discharge of a debtor's debts, allowing him or her to obtain a "fresh start" while at the same time providing for disclosure and examination so as to insure maximum recovery for creditors. Distribution and discharge are at the heart of the bankruptcy process.

*Charter Federal Savings Association v. Rezak (In re Lederman*), 140 B.R. 49, 52 (Bankr. E.D.N.Y.  1992) (citations omitted).

Moreover, a debtor must produce the records of any collective entity, including corporations and partnerships, which the debtor possesses in a representative capacity, even if the records incriminate him personally, as those entities are not privileged.   *See, Bellis v. United States,* 417 U.S. 85, 89-90 (1974).   "A few nonbusiness notations or similar indicia of personal use will not be sufficient to extend Fifth Amendment protection to documents that are entity

records." *In re Connolly*, 59 B.R. 421, 441 (Bankr. N.D. Ill. 1986), *citing United States v. MacKey*, 647 F.2d 898 (9th Cir. 1981); *see also, In re Mudd*, 95 B.R. 426, 431-32 (Bankr. N.D. Tex. 1989). Here, the Debtor is obligated to produce all records of his various business entities, including records of the 160 or more limited liability corporations which he owns or controls. A debtor's complete disclosure of information is critical to the full administration of the bankruptcy estate. A debtor's refusal to provide information may constitute cause for dismissal without prejudice under §707(a), even where the debtor has validly asserted his or her Fifth Amendment privilege. *See, In re Moses,* 792 F. Supp. 529 (E.D. Mich. 1992); *In re Peklo*, 201 B.R. 331 (Bankr. D. Conn. 1996); *In re Connelly,* 59 B.R. 421 (Bankr. N.D. Ill. 1986).

Should the Debtor assert his Fifth Amendment privilege with regard to any particular question or document, the Bankruptcy Court must assess the underlying factual basis for his Fifth Amendment claim. *See, Martin-Trigona v. Gouletas,* 634 F.2d 354, 361 (7th Cir. 1980), cert. denied, 449 U.S. 1025 (1980). The Debtor "must tender to the court some credible reason why fulfilling his statutory duties and disclosing specific information or surrendering certain property to the trustee poses a real danger of incrimination, not a remote and speculative possibility." *See, Connolly,* 59 B.R. at 445, *citing Martin-Trigona* at 360.

Here, the Debtor has yet to assert his Fifth Amendment privilege in response to any question posed by the Trustee. Until he attempts to assert his Fifth Amendment rights, this Court cannot determine whether the assertion is proper. The relief requested by the Debtor, far from merely protecting his constitutional rights, would endow this Debtor with rights far beyond his constitutional rights. If the Trustee's 2004 Examination were stayed, the Debtor would not have to provide further information to the Trustee for a period of time that may cover years, thus extending far beyond the statute of limitations for avoidance actions under by 11 U.S.C. §546,

and the time for the Trustee to object to the Debtor's discharge, which is November 19, 2009.

    B.    Where a Debtor Asserts the Fifth Amendment Privilege, the Factfinder May Draw A Negative Inference.

A debtor may be compelled to choose between asserting his rights under the Fifth Amendment and remaining silent, or alternatively, the equitable relief of a discharge of a debt in bankruptcy. The discharge of debt and "the relief of a fresh start is intended to benefit the honest debtor." *In re Lederman*, 140 B.R. at 53, *citing State Bank of India v. Chachra (In re Chachra),* 138 B.R. 397 (Bankr. S.D.N.Y. 1992). "A fact finder in a civil proceeding may to draw negative inferences from a defendant's invocation of the Fifth Amendment privilege." *National Acceptance Corp. v. Bathalter,* 705 F.2d 924, 929-30 (7th Cir. 1983). "[A]n individual debtor in a bankruptcy case, who is also a target of criminal investigation, might be required to relinquish a fifth amendment privilege against self-incrimination in order to avoid losing a discharge in bankruptcy." *Amsave Credit Corporation v. Marceca (In re Marceca)*, 131 B.R. 774, 778 (Bankr. S.D.N.Y. 1991); *see also, In re Vrusho,* 321 B.R. 607, 612 (Bankr. D. N. H. 2005); *Raymond James & Assoc. v. Metzgar (In re Metzgar),* 127 B.R. 708, 711 (Bankr. M.D. Fla. 1991).

> [A] debtor cannot enjoy the benefits of the bankruptcy process while avoiding its burdens. Any other approach would produce an unlevel playing field tilted in the debtor's favor. . . .The debtor cannot use the bankruptcy court to broaden the benefits afforded to an accused by the Fifth Amendment. To do so would allow the debtor to use the Fifth Amendment as a shield, while impermissibly using the Bankruptcy Code as a sword with which to take an unfair advantage of creditors. *Piperi v. Gutierrey (In re Piperi),* 137 B.R. 644, 647 (Bankr. S.D. Tex. 1991).

*In re Lederman*, 140 B.R. at 53. The *Lederman* Court noted further,

> Moreover, in §727(a)(6)(B), Congress specifically preserved a debtor's rights to raise the privilege against self-incrimination, absent a grant of immunity, with respect to oral examination and testimony without prejudice to the right to a discharge. The lack of a similar provision in §523 leads to the inescapable conclusion that none was intended.

> Moreover, in §727(a)(6)(B) Congress specifically preserved a debtor's rights to
> raise the privilege against self-incrimination, absent a grant of immunity, with
> respect to oral examination and testimony without prejudice to the right to a
> discharge. The lack of a similar provision in §523 leads to the inescapable
> conclusion that none was intended.

*Id.* at 53.  From the plain statutory language, the *Lederman* Court inferred that, absent a grant of

immunity, the Code does not intend to protect a debtor's right or opportunity to discharge a

particular debt.  As the *Connolly* Court noted,

> While a plaintiff has "a due process right to a judicial determination of his civil
> action," *Wheling v. Columbia Broadcasting System,* 608 F.2d 1084, 1087-88 (5[th]
> Cir. 1979), "[t]here is no constitutional right to obtain a discharge of one's debts
> in bankruptcy." *United States v. Kras,* 409 U.S. 434, 446 (1973). Therefore,
> requiring [the debtor] to forfeit the right to remain silent or face dismissal is not
> requiring him to "forfeit one constitutionally protected right as the price of
> exercising another." *Lefkowitz v. Cunningham,* 431 U.S. 801, 807-08, 97 S.Ct.
> 2132, 2137 (1977).

*Connolly,* 59 B.R. at 448.  Although the Debtor has a right against self-incrimination, he may

have to forego the right to remain silent in order to obtain a discharge of debt.

**III.    THERE IS NO CONSTITUTIONAL MANDATE FOR A BANKRUPTCY COURT
TO STAY DISCOVERY AND SUCH AN EXTRAORDINARY REMEDY IS
INAPPROPRIATE IN THIS PROCEEDING WHICH THE DEBTOR
COMMENCED TO OBTAIN EQUITABLE RELIEF.**

A.    <u>There Is No Constitutional Mandate That a Bankruptcy Court Stay Discovery.</u>

In his Motion for a Protective Order, the Debtor seeks a stay of the Trustee's 2004

Examination until any criminal proceeding is concluded.  This time period may cover years.  The

Debtor cites several non-bankruptcy cases where a defendant in a civil action sought a stay of

discovery while a parallel criminal investigation or litigation was proceeding.  *See, e.g., Doe v.

City of Chicago*, 360 F. Supp. 880 (N.D. Ill 2005); *Bridgeport Harbour Place I, LLC v. Ganim*,

269 F. Supp. 2d 6 (D. Conn. 2002).  In some cases, courts have concluded that the ongoing

discovery in the civil matter could compromise the defendant's ability to assert and obtain

protection under the Fifth Amendment privilege in the federal matter.  Similarly, governmental bodies pursuing the criminal matters may argue that witness testimony and evidence may be compromised due to the differing procedural standards in civil and criminal proceedings.  These cases are of little relevance to the issue before this Court.  The issue here is whether an individual who commenced a bankruptcy case can prevent the trustee from obtaining information needed for the administration of the bankruptcy estate.

There are few bankruptcy court cases where a debtor obtains a stay of discovery in bankruptcy litigation during the pendency of a criminal investigation.  Although bankruptcy courts recognize that they have the equitable and statutory authority to stay discovery under 11 U.S.C. §105, courts are hesitant to do so.  *See, Hale, et al. v. Carlson (In re Hale)*, 980 F. 2d 1176, 1179 (8th Cir. 1992); *Carroll, et al. v. Unicom AP Chemical Corp., et al. (In re MGL Corporation),* 262 B.R. 324, 328 (Bankr. E.D. Pa. 2001) (stay denied as it would impede trustee's ability to recover assets for unsecured creditors); *accord, Kozyak v. Poindexter, et al. (In re Financial Federated Title & Trust, Inc.),* 252 B.R. 834, 839 (Bankr. S.D. Fla. 2000*); see also, Amsave Credit Corporation v. Marceca (In re Marceca)*, 131 B.R. 774, 778 (Bankr. S.D.N.Y. 1991) ("stay of pending civil action until the outcome of related criminal proceeding is an extraordinary remedy").   The *Hale* Court stated,

> We are dissuaded here from finding that the bankruptcy court had an affirmative obligation to exercise its equitable power to enter a stay in the bankruptcy proceeding below. The appellants provide us with no authority indicating a bankruptcy court is compelled to grant a stay of proceedings, when such testimony constitutes an election between protecting civil interests in a bankruptcy proceeding and safeguarding fifth and seventh amendment rights in a criminal action.

> The appellants were free to protect or further their interests in the bankruptcy court *by choosing to testify or not* at the October 4 hearing. Their testimony there was neither compelled nor would such testimony have abridged or contradicted previous statements or positions held by them in the civil proceeding.

10

*Hale*, 980 F. 2d at 1179 (italics added).

There is a critical difference between a defendant who seeks a stay of discovery in non-bankruptcy civil cases and a debtor who seeks a stay of the trustee's 2004 examination. The defendants in the non-bankruptcy cases cited in the Debtor's Memorandum were sued in a civil proceeding and were compelled to testify and produce documents under the applicable rules of civil procedure, which offer less protection than the rules of criminal procedure in the parallel criminal investigation. The Debtor here, like the debtors in the *Hale* and *Marceca* cases, **voluntarily** filed for bankruptcy, seeking the equitable relief of discharge of debt. The Debtor chose to file for bankruptcy relief.

Section §704(a) of the Bankruptcy Code requires the Trustee to collect and reduce to money property of the estate, and to close the estate as expeditiously as is compatible with the best interests of parties-in-interests, to investigate the financial affairs of the debtors, and, if advisable, to oppose the discharge of the debtor. 11 U.S.C. §704(a)(1), (4), and (6). The Debtor seeks a stay of discovery that would prevent the Trustee from investigating the Debtor's financial affairs and also would prevent or delay, perhaps for years, the collection of estate assets. The Debtor has not cited a single case where a debtor, who filed a voluntary Chapter 7 petition, obtained an order preventing the trustee from examining the debtor under Bankruptcy Rule 2004. The Debtor requests relief that would prevent the Trustee from fully investigating the Debtor's financial affairs, while leaving the Debtor free to dispose of, conceal, or otherwise dissipate assets which may be recoverable for creditors.

When coupled with the protective order which the Debtor seeks against Chrysler Financial Services, Inc. and other plaintiffs, staying various adversary proceedings, the relief requested would be unparalleled. The Debtor would benefit from the automatic stay while, for a

period of years, the Trustee would be precluded from investigating the Debtor's financial affairs and collecting monies for the Estate. Creditors seeking exception to discharge would be prevented from pursuing the Debtor's post-petition assets. This result would be a perversion of the bankruptcy system.

The Debtor cites no case which provides legal support for stay of a Rule 2004 examination of a debtor in a voluntary bankruptcy proceeding. As the Court stated in the *Lederman* case, "distribution and discharge are at the heart of the bankruptcy process, and a debtor cannot enjoy the benefits of the process while avoiding its burdens." *In re Lederman*, 140 B.R. at 53.

> B.    The Factors Cited By Some Courts, Even If Applicable in a Bankruptcy Case, Would Not Warrant a "Stay of Debtor's 2004 Examination."

In his supporting memorandum, the Debtor has cited certain cases which list factors to be considered in determining whether to "stay" a civil proceeding pending outcome of a criminal investigation or indictment. The cases cited are of little relevance to this case because this is a bankruptcy voluntarily commenced by the Debtor. Nonetheless, even if those factors were analyzed, the Debtor would not be entitled to a "stay" of the 2004 Examination.

The first factor is the "similarity" of issues presented. The "issues" being furthered by the Trustee's 2004 examination of the Debtor are the discovery of assets, and information regarding the Debtor's business and financial affairs. The Debtor voluntarily agreed to allow the Trustee to investigate his affairs when he filed his Chapter 7 petition. Indeed, 11 U.S.C. §521 and Bankruptcy Rule 4002 require the Debtor to cooperate with the Trustee in that endeavor. The scope of the Trustee's investigation of estate assets and the Debtor's business and financial affairs may include issues being addressed by the Federal Grand Jury, because, as noted by the Debtor himself, "the precise parameters" of the focus of the Grand Jury are not known. Debtor's

Memorandum at 3. While there could be some overlap, the Debtor already authorized the Trustee to pursue this inquiry when he voluntarily filed his Chapter 7 Petition, Schedules and Statement of Financial Affairs. The Debtor argues that the very existence of a Grand Jury precludes the Trustee from questioning the Debtor about his business or financial affairs. Again, the fact that there is an on-going Grand Jury investigation does not relieve the Debtor from his obligation to answer questions about his business and financial affairs. Of course, this Court has no way of now knowing what questions will be put to the Debtor at the Rule 2004 examination, because no such questions have been asked. If the Debtor desires to assert his Fifth Amendment rights at the 2004 examination, he can certainly attempt to do so.[1]

The Debtor claims that the Trustee would "suffer little prejudice by stay of the 2004 examination." That argument is, at best, without basis. Counsel for the Debtor cites only one case where a debtor obtained a stay of civil litigation during the pendency of a criminal investigation, *Amsave Credit Corporation v. Marceca (In re Marceca)*, 131 B.R. 774 (Bankr. S.D.N.Y. 1991). In the *Marceca* case, on the last day to file objections to discharge, a creditor filed an adversary complaint objecting to discharge and dischargeability under 11 U.S.C. §§523 and 727(a)(2). The court determined that the adversary complaint failed to plead fraud and concealment with sufficient particularity. The creditor sought leave to amend the complaint. The debtor sought a stay of the adversary proceeding during the pendency of a criminal investigation based on the same facts, to protect his constitutional privilege against self-incrimination. While noting that "there is no constitutional mandate for a stay of civil proceedings", the *Marceca* Court ordered a stay of the civil litigation until the earlier of the

---

[1] It may well be that by signing and filing of his schedules and statement of financial affairs, and through his testimony at the §341 meeting, all of which occurred after the warrants were executed, the Debtor has waived his Fifth Amendment rights. *See, Krasny v. Nam (In re Nam)*, 245 B.R. 216, 227 (Bankr. E.D. Pa. 2000) (privilege waived by failure to timely assert rights); *see also, In re Brandenburg*, 2007 WL 117391 (Bankr. E.D. Tenn. (Jan. 10, 2007) (debtor may invoke fifth amendment at §341 meeting).

conclusion of the U.S. Attorney's investigation or an indictment, or four months time. *Id.* at 778.

The *Marceca* court determined that a stay for a maximum of four months would not prejudice

the creditor, as the creditor would be allowed to amend its complaint to cure its defective

complaint, while obviating the debtor's immediate need to choose between asserting his Fifth

Amendment privilege and putting on a full defense in the adversary proceeding. *Id.*

      C.      <u>Time is of Paramount Importance in Obtaining the Testimony of the Debtor.</u>

Unlike the situation in the *Marceca* case, in this case, it is critical that the Trustee

immediately obtain discovery.  The Debtor has full and complete knowledge of his financial

dealings and the Trustee must obtain information from him to collect assets and pursue avoidable

transfer claims.  The Trustee is vigorously investigating Debtor's financial affairs and attempting

to locate and liquidate assets and to identify avoidable transfers, which are potential sources of

recovery for creditors' claims.

The Trustee's discovery of assets is time sensitive for at least two reasons.  First, the

Trustee's ability to secure and liquidate estate assets diminishes as time passes.  The Trustee

must identify those items immediately so that he can obtain value for creditors of the estate.

Speedy discovery is particularly important for the recovery of avoidable transfers.  If the

immediate transferees still possess the property fraudulently or preferentially transferred, the

Trustee may be able to recover the property.  If the items are gone, the Trustee's only remedy is

to obtain a monetary judgment, the value of which may be limited by the value of the assets of

the immediate transferee.  Therefore it is critical that the Trustee discover the Debtor's assets and

pursue avoidance actions as quickly as possible. *See, Carroll, et al. v. Unicom AP Chemical

Corp. et al. (In re MGL Corporation),* 262 B.R. 324, 328 (Bankr. E.D. Pa. 2001) (stay would

hinder trustee's expeditious prosecution of claims and would hinder recovery for unsecured

creditors); *accord, Kozyak v. Poindexter, et al. (In re Financial Federated Title & Trust, Inc.),* 252 B.R. 834, 839 (Bankr. S.D. Fla. 2000*)*.

Second, there is a two-year statute of limitations under 11 U.S.C. §546 for the Trustee to commence avoidance claims.  Because of the Debtor's complex financial affairs, the Trustee needs immediate information from the Debtor so that he can attempt to unravel the web created by the Debtor, identify avoidable transfers, and commence actions in a timely fashion.

To apprise the Court of at least one portion of Debtor's financial practices, by way of example, the Trustee has included as Exhibit B to his Affidavit several pages of the TCF Bank personal account statement for Dennis Hecker for March 2009, for an account ending in the numbers 008.  A U.S. Bank personal account statement for Dennis Hecker dated March 19, 2009, for account ending in numbers 2088 is also attached as Exhibit C.  Because of the extent and complexity of the Debtor's financial affairs, time is of the essence in obtaining the Debtor's detailed testimony on these matters.

Time is also of paramount importance because the deadline for filing a complaint under 11 U.S.C. §727 is November 19, 2009.  The Trustee needs the Debtor's testimony so that he has accurate information for filing the complaint on a timely basis.

The Debtor would not be "irreparably prejudiced" if forced to proceed with the 2004 examination as he claims.  The Debtor voluntarily commenced this Chapter 7 case and he and his counsel were aware that the Debtor would be required to disclose financial and business information under oath.   In fact, the Debtor has already done so in filing all of his schedules and statement of financial affairs, and in offering §341 testimony, all of which occurred after law enforcement officials executed search warrants  at the Debtor's residences and business.

The Debtor voluntarily chose this course of action.  It is not clear in what context the Debtor is worried that the Trustee would make inferences against the Debtor and jeopardize the Debtor's ability to obtain a discharge.  This is not a §727 proceeding.  Further, if it were a §727 proceeding, 11 U.S.C. §727(a)(6) protects the Debtor's right against self-incrimination.  Again, the Debtor was aware of all of these risks when he filed his bankruptcy petition, and when he filed with this court his schedules and statement of financial affairs, and offered testimony under oath.  There is no prejudice to the Debtor in providing further information to the Trustee under oath.

The Debtor's assertion that the "interest of the Court and public will be advanced by a stay of the 2004 examination" is simply silly.  Sections 521 and 704 of the Bankruptcy Code set forth, with specificity, the duties of the Debtor and of the Trustee, so as to serve the interests of the Court and the public.  The granting of a stay of the Debtor's 2004 examination would contravene the interests of the Court and the public as established by these statutes.

The Debtor has requested unparalleled relief.  He wants bankruptcy relief, while refusing to disclose information as the Bankruptcy Code mandates.  He apparently wants to conduct his life as if the bankruptcy doesn't exist, while his creditors are stayed by the automatic stay.  He would have to do nothing to help the Trustee identify assets of the estate.  He would not have to provide any testimony to the Trustee for the identification of assets and collections of funds for the benefit of his creditors.  Apparently this "free pass" which the Debtor requests, could last for years.  The relief requested by the Debtor, if granted, would undermine the bankruptcy system and the public perception of the integrity of the bankruptcy system.

IV.    **THERE SHOULD BE NO PRE-EXAMINATION LIMITATIONS ON THE SCOPE OF RULE 2004 QUESTIONS.**

The Debtor requests that if the 2004 examination is not "stayed," that "the scope should be constrained and certain topics should be declared off limits."  The Debtor suggests that "at a minimum, the Trustee should not be able to ask any question relating to the eight adversary proceedings commenced against him under 11 U.S.C. §523 by various creditors.  As dubious support for that position, the Debtor cites a New Jersey bankruptcy case, *In re 2435 Plainfield Avenue, Inc.*, 223 B.R. 440 (Bankr. D.N.J. 1998).  Again, the Debtor's argument is without merit.

The *Plainfield Avenue* case has no relevance to the issues before this Court.  In this case, the Trustee has issued a Rule 2004 subpoena to the Debtor.  There is no pending action by the Trustee against the Debtor other than an action seeking the turnover of non-exempt property.  In the *Plainfield Avenue* case, the Chapter 11 debtor-in-possession attempted to use the "broad scope of Rule 2004 instead of the more limited scope of the Federal Rules of Civil Procedure for discovery in an adversary proceeding."  *In re Plainfield Avenue*, <u>supra</u> at 445.  Even if the *Plainfield Avenue* case is correctly decided, the facts upon which the decision is based differ from the facts in this case.  Here, the Trustee is seeking financial information to collect and administer assets of the estate.  The broad scope of Rule 2004 is necessary because of the Debtor's very extensive and complicated financial affairs.

There should be no topics that are "off limits" at the Rule 2004 examination.  If the Debtor desires to attempt to assert his Fifth Amendment rights in response to questions by the Trustee, which questions are, as of yet, not before the Court, the Debtor can do so, and the Court can later rule whether those assertions should be sustained.  The Rule 2004 examination of the Debtor should proceed as scheduled with no limitations.

## CONCLUSION

For the reasons stated above, Randall L. Seaver, Trustee, respectfully requests that the

Court deny the Debtor's Motion for Protective Order Relating to 2004 Examination.

**LEONARD, O'BRIEN**
**SPENCER, GALE & SAYRE, LTD.**

/e/ Matthew R. Burton

Dated: October 16, 2009                    By_____
                                              Matthew R. Burton, #210018
                                              Attorneys for Randall L. Seaver, Trustee
                                              100 South Fifth Street, Suite 2500
                                              Minneapolis, Minnesota  55402-1234
                                              (612) 332-1030

409842

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

------------------------------------------------

BKY No. 09-50779

In re:

Dennis E. Hecker,

**AFFIDAVIT OF RANDALL L. SEAVER**

      Debtor.

------------------------------------------------

STATE OF MINNESOTA   )
                    )
COUNTY OF DAKOTA   )      Randall L. Seaver, being first duly sworn,

deposes and states as follows:

      1.     I am the Trustee in the above matter and have knowledge of the facts contained herein.

      2.     Attached hereto as Exhibit A is a true and correct copy of the Transcript of 341 Meeting of Creditors in this bankruptcy proceeding.

      3.     Attached hereto as Exhibit B is a true and correct copy (with redaction) of a TCF Bank account statement for a Dennis E. Hecker personal account ending in numbers 1008, dated April 10, 2009.

      4.     Attached hereto as Exhibit C is a true and correct copy (with redaction) of a US Bank account statement for a Dennis E. Hecker personal account ending in numbers 2088, dated April 7, 2009.

      5.     Attached hereto as Exhibit D is a true and correct copy (with redaction) of deposit records received from TCF relating to a $500,000 deposit.

6.      I believe that obtaining the testimony of the Debtor through a Rule 2004

examination is of critical importance in the timely administration of this case including the

identification of avoidable transfers and assets.

**FURTHER YOUR AFFIANT SAYETH NOT.**



Randall L. Seaver

Subscribed and sworn to before me
this ⟨3⟩ day of October, 2009.

_____
Notary Public

```
KARI L. FOGARTY
Notary Public-Minnesota
My Commission Expires Jan 31, 2010
```

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MINNESOTA

---------------------------------------------------------

In re:                          Case No. 09-50779

DENNIS E. HECKER,

                 Debtor.

---------------------------------------------------------

        341 Meeting of Creditors held in the

above-entitled matter on the 15th day of July, 2009,

at ten o'clock in the morning, before Julie A. Rixe,

court reporter and notary public,  at the United

States Courthouse, Room 1017, 300 South Fourth Street,

Minneapolis, Minnesota.

                   *      *      *

# EXHIBIT A

Page 2

1   APPEARANCES:
2        RANDALL L. SEAVER, Trustee,
3   12400 Portland Avenue South, Suite 132,
4   Burnsville, Minnesota  55337, appeared as
5   Trustee.
6        CLINTON E. CUTLER, Attorney at Law,
7   Fredrikson & Byron, P.A., 200 South Sixth Street,
8   Suite 4000, Minneapolis, Minnesota  55402-1425,
9   appeared for and on behalf of the Debtor.
10        WILLIAM F. MOHRMAN, Attorney at Law,
11   Mohrman & Kaardal, P.A., 4100 Multifoods Tower,
12   33 South Sixth Street, Minneapolis, Minnesota
13   55402, appeared for and on behalf of the Debtor.
14
15
16
17
18
19
20
21
22        WHEREUPON, the following proceedings
23   were duly had and entered of record, to wit:
24
25

Page 3

1             I N D E X
2   WITNESS                        PAGE
3   DENNIS E. HECKER
      Examination by the Trustee      4, 123, 133
4     Examination by Mr. Clifton           94
      Examination by Mr. Cutler           130
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1        THE TRUSTEE:  Good morning, folks.  My
2   name is Randy Seaver.  I'm the Chapter 7 panel
3   trustee appointed by the United States Department
4   of Justice to administer the Denny Hecker
5   bankruptcy case.
6        This questioning is tape-recorded, and
7   the recording goes next door to the Office of the
8   U.S. Trustee.   Anyone can get a copy, I believe,
9   from the Office of the U.S. Trustee.  There's
10   some small cost.
11        And I'm also having it -- a court
12   reporter taking down the testimony, and her name
13   is Julie Rixe and you can get a card from her.
14   She'll transcribe it and you can buy a copy from
15   her, which would be more expensive than just
16   getting the disc.  But those are options for
17   getting this.
18        Would you raise your right hand,
19   please, Mr. Hecker.
20        DENNIS E. HECKER,
21   after having been first duly sworn, was
22   examined and testified on his oath as follows:
23             EXAMINATION
24   BY THE TRUSTEE:
25   Q   And state your name for the record, please.

Page 5

1   A   Dennis Hecker.
2   Q   And where do you live, Mr. Hecker?
3   A   17600 Cross Avenue, Cross Lake, Minnesota.
4        THE TRUSTEE:  Here, I'm going to
5   circulate a signature sheet, too, and I'd
6   appreciate it if folks would sign in and give me
7   a phone number.
8        And, also, before I start this
9   questioning, you'll see my contact information on
10   that sheet that's going around.  If anybody has
11   any information they believe would be of
12   assistance to me in administering this case,
13   please feel free to contact me using any of that
14   contact information.
15   BY THE TRUSTEE:
16   Q   Mr. Hecker, how long have you lived at the Cross
17       Lake address that you just gave?
18   A   Approximately 45 days.
19   Q   Which would be what day; what day did you move in
20       there?
21   A   I've owned it for three years.  I don't recall
22       exactly which day.
23   Q   Well, you filed on June 4, just to give you some
24       perspective.  Did you move in before that or
25       after that?

Page 6

1  A   I believe, to the best of my knowledge, before,
2      shortly after.
3  Q   A couple of days before?
4  A   I don't really remember.
5          THE TRUSTEE:  Okay.  Say, let me also
6      state this.  Since this case has been filed, my
7      attorneys, who are representing me in this case,
8      and I have had almost daily conversations or
9      communications through e-mail or telephone with
10     Mr. Hecker's attorney, Mr. Cutler's office.  I've
11     requested various information and we have
12     received substantial information through
13     Mr. Cutler's office.  So a lot of the information
14     has been exchanged prior to this meeting today.
15         And I have reviewed the driver's
16     license, Social Security proof from Mr. Hecker
17     and they're appropriate.
18 BY THE TRUSTEE:
19 Q   Mr. Hecker, have you read the bankruptcy
20     information sheet provided by the U.S. Trustee?
21 A   Yes, I have.
22 Q   Did you sign the petitions, schedules, statements
23     and related documents that you filed with the
24     Court and is the signature on those yours?
25 A   Yes.

Page 7

1  Q   Did you read those documents before you signed
2      them?
3  A   Yes.
4  Q   Are you personally familiar with the information
5      contained in those documents?
6  A   Yes.
7  Q   To the best of your knowledge, is that
8      information true and correct?
9  A   Yes.
10         MR. CUTLER:  Mr. Trustee, there are
11     some corrections and additions.  And we'll
12     probably file amendments on this, but we have --
13     as I disclosed to you this morning, we have
14     discovered some additional bank accounts and have
15     given you the bank account forms, the most recent
16     statements for those.
17         In connection with the turnover of the
18     jewelry and the watches yesterday, there was some
19     additional watches that were discovered by
20     Mr. Hecker and have been turned over.
21         And then there's an error on Schedule C
22     with respect to the homestead exemption, and
23     we'll amend that.  It has a zero dollar amount
24     listed and it should be listed up to $300,000.
25         THE TRUSTEE:  Okay.

Page 8

1          MR. CUTLER:  Those are the only
2      transfers or the only -- Oh, there was one
3      additional change.  The Schedule B reflects a
4      tractor, a lawn tractor that was taken off of an
5      insurance schedule.  There's actually a different
6      tractor and that's been, I think, disclosed to
7      Mr. Radde, and he should be aware of the actual
8      tractor that they have.
9  BY TRUSTEE:
10 Q   All right.  Is that a larger tractor than the one
11     that's in the schedules?
12 A   Yes.
13 Q   And there are a lot of attachments for it, too,
14     right?
15 A   Yes.
16 Q   All right.  The things that Mr. Cutler has told
17     me, Mr. Hecker, is everything else in the
18     schedules true and correct, other than what you
19     just said?
20 A   To the best of my knowledge.
21 Q   Okay.  Are there any other errors or omissions to
22     bring to my or the Court's attention?
23 A   Not that I'm aware of.
24 Q   Did you list all of your assets in the schedules,
25     other than what Mr. Cutler just added?

Page 9

1  A   Yes.
2  Q   Did you list all of your creditors in the
3      schedules?
4  A   To the best of my knowledge.
5  Q   Have you ever filed bankruptcy before?
6  A   No.
7  Q   Do you have a domestic support obligation?
8  A   Yes.
9  Q   You pay spousal support?
10 A   Yes.
11 Q   To whom?
12 A   Sandra Hecker.
13 Q   And that's in the schedules?
14 A   Yes.
15 Q   Are you currently employed, Mr. Hecker?
16 A   No.
17 Q   During the 90 days prior to your bankruptcy
18     filing, did you lose any money by execution on a
19     judgment or through a garnishment or otherwise?
20 A   To the best of my knowledge, I'm not sure.
21 Q   It would be in the schedules or the Statement of
22     Financial Affairs if you did; is that right?
23         MR. CUTLER:  Yes, it would be.
24 BY THE TRUSTEE:
25 Q   Okay.  Is that true, Mr. Hecker?

## Page 10

1  A   Yes.

2  Q   All right.  Did you voluntarily pay over $5,000

3      to any single unsecured creditor in the 90 days

4      prior to filing?

5          MR. CUTLER:  Yes.

6          THE DEBTOR:  Yes.

7  BY THE TRUSTEE:

8  Q   And are all of those transfers disclosed in your

9      Statement of Financial Affairs?

10  A   To the best of my knowledge.

11  Q   Did you transfer any property or interest in

12      property to anyone in the two years before you

13      filed bankruptcy?

14          MR. CUTLER:  Well, as reflected in the

15      Statement of Financial Affairs.

16          THE TRUSTEE:  Let me rephrase.

17          MR. CUTLER:  Anything other than what's

18      reflected in the Statement of Financial Affairs,

19      Mr. Hecker?

20          THE DEBTOR:  Not that I'm aware of.

21  BY THE TRUSTEE:

22  Q   So any transfers that you made in the two years

23      prior to filing are disclosed in the Statement of

24      Financial Affairs?

25  A   To the best of my knowledge, yes.

## Page 11

1  Q   Okay.  Are you self-employed or engaged in any

2      business ventures?

3  A   I started a new venture called New Dimension

4      Consultants.

5  Q   Which is what?

6  A   A consultant for automobile dealers.

7  Q   Did you start that before you filed bankruptcy?

8  A   No, I didn't.

9  Q   Just describe generally for the record what your

10      business was at the time you filed bankruptcy.

11          MR. MOHRMAN:  Which business are you

12      referring to?

13          THE TRUSTEE:  Anything he was engaged

14      in.

15          And who are you, sir?

16          MR. MOHRMAN:  My name is William

17      Mohrman.

18          THE TRUSTEE:  And you're an attorney

19      representing Mr. Hecker?

20          MR. MOHRMAN:  I am.

21  BY THE TRUSTEE:

22  Q   All right.  I just want a general description on

23      the record of what business you personally were

24      engaged in, Mr. Hecker, when you filed

25      bankruptcy.

## Page 12

1  A   I was in the automobile business and

2      automobile-related services and had some other

3      business interests in other kinds of businesses.

4  Q   Fair to say that it was a fairly complex business

5      that you were involved in?

6  A   Yes.

7  Q   Okay.  And in the schedules and Statement of

8      Financial Affairs, there's at least some

9      indication of these businesses, correct?

10  A   Yes.

11  Q   Okay.  Mr. Hecker, you have turned over some

12      jewelry in response to my demand, correct?

13  A   Yes.

14  Q   And I understand that there was some additional

15      items that were turned over.  By additional I

16      mean in addition to what you actually had listed

17      in your schedules.  Is that correct?

18  A   Yes.

19  Q   Let me just give you a copy of this complaint.

20      This is the complaint that I filed earlier this

21      week seeking turn-over of jewelry.  And if you

22      look at the Exhibits A and B here, Mr. Hecker,

23      Exhibit A is what was in your schedules.

24      Exhibit B came from the insurance policies.  And

25      I'd like you to look at Exhibit B and tell me --

## Page 13

1      There are two pages to Exhibit B.  Tell me if

2      there are any items on there that were not turned

3      over yesterday.

4  A   The first item is a Gents nugget ring.  I have no

5      idea where that is.

6  Q   Okay.

7  A   The schedule should reflect that it's maybe three

8      to five years old.

9          MR. CUTLER:  You're referring to the

10      insurance schedule?

11          THE DEBTOR:  Yes.

12          MR. CUTLER:  Exhibit B?

13          THE DEBTOR:  Yes.  And the link

14      bracelet, I have no idea.

15  BY MR. SEAVER:

16  Q   When you say you have no idea, do you think you

17      lost it, do you think it was stolen?  I mean,

18      what do you think about these things?

19  A   The first one might have been my father's ring

20      when he died.  I don't recall.  I don't recall

21      the ring.

22  Q   Okay.

23  A   The bracelet, I don't recall the bracelet.  It

24      may be on there as Gents.  I'm not sure that my

25      wife didn't have it or where it went.  I don't

Page 14

1    know.
2  Q   Okay.  So those two items you don't know their
3    whereabouts?
4  A   Correct.
5  Q   All right.
6        MR. CUTLER:  Mr. Seaver, could I ask a
7    question?
8        THE TRUSTEE:  Sure.
9        THE TRUSTEE:  Mr. Hecker, what efforts
10    have you made to locate jewelry?
11        THE DEBTOR:  I exhausted, to the best
12    of my knowledge, every potential place I think it
13    would be.
14  BY THE TRUSTEE:
15  Q   Which is where?
16  A   Well, I've looked in -- I found items that were
17    missing when I was moving some of my personal
18    things to Cross Lake that were -- I didn't really
19    use a lot of safes, so I had it -- And those
20    items were the most expensive, I didn't wear, so
21    they were in some clothes.
22  Q   Okay.  So continuing on with this Exhibit B to
23    the complaint, are there any other items here, on
24    Exhibit B, that you have not been able to locate?
25  A   I don't believe so.

Page 15

1  Q   Okay.  And did you locate -- when you looked
2    further, did you locate any additional watches or
3    jewelry items by --
4  A   I believe there were some items we turned in
5    yesterday that weren't on the schedule.
6  Q   That weren't on the schedule and weren't on this
7    insurance schedule --
8  A   That's right.
9  Q   -- either?  Okay.
10        Mr. Hecker, at the Cross Lake home
11    there is -- there are a number of boat lifts and
12    docks, dock and sections.  Are those your
13    property?
14  A   Part of the property, yes.
15  Q   What do you mean by that?
16  A   In the records it shows that there's three
17    separate addresses there.
18  Q   Okay.
19  A   And each address has its own dock.
20  Q   Okay.  So what ones are yours?
21  A   When you say yours, mine personally or --
22  Q   I mean Denny Hecker personally, yes.
23  A   The one where my residence is.
24  Q   In front of the large structure there --
25  A   Yes.

Page 16

1  Q   -- there's a dock system and how many boat lifts?
2  A   There was four jetski lifts and two boat spots.
3  Q   Okay.  And those are all property of Dennis
4    Hecker?
5  A   The two boats are -- Are you talking about the
6    docks?
7  Q   I'm not talking about the boats yet.  I'm talking
8    about the docks, boat lifts, canopies.
9  A   I believe they're part of the homestead.
10  Q   Are they property of Dennis Hecker?
11        MR. CUTLER:  Do you own them as opposed
12    to one of your companies?
13        (Discussion held off the record between
14        the debtor and his attorney.)
15        THE DEBTOR:  Yes.
16  BY THE TRUSTEE:
17  Q   You own them?
18  A   Yes.
19  Q   Dennis Hecker owns them?
20  A   Yes.
21  Q   All right.  Then there are two other guest houses
22    there --
23  A   Yes.
24  Q   -- correct?  And those guest houses, each have
25    docks in front of them?

Page 17

1  A   Yes, they do.
2  Q   And they have boat lifts also?
3  A   One of them doesn't.
4  Q   Okay.  The two dock systems for those guest
5    houses, who owns those?
6  A   The LLC that owns the property.
7  Q   Okay.  Did the LLC purchase those docks?
8  A   To the best of my knowledge.
9  Q   And the LLC purchased the boat lift too?
10  A   I believe so.
11  Q   Okay.  Where would those items have been
12    purchased?
13  A   The docks?
14  Q   Yes.
15  A   I have no idea.
16  Q   Would --
17  A   The docks at the main home are five years old or
18    six years old.  I wouldn't recall.  The other
19    ones are wooden docks.  I'm not sure where they
20    came from.
21  Q   All right.  How many watch winders do you have?
22  A   To the best of my ability, one.
23  Q   Okay.  And where is that located, sir?
24  A   It's in 1492 Medina.
25  Q   Okay.  How much did you pay for that when you

## Page 18

1  bought it?
2  A  I have no idea.
3  Q  Over $10,000?
4  A  I have no idea.
5  Q  Okay.  In Medina, at the North Bridge Drive
6  address, who resides there?
7  A  Christi Rowan.
8  Q  And what's your relationship with Ms. Rowan?
9  A  We have a personal relationship.
10 Q  How long have you had that personal relationship?
11 A  On and off approximately a year.
12 Q  About a year, you think?
13 A  Yes.
14 Q  So June of 2008, roughly?
15 A  Approximately.
16 Q  Okay.  Is she employed?
17 A  She has her own photography business.
18 Q  Do you know how much money she makes at that
19 business?
20 A  I have no idea.
21 Q  Okay.  Have you ever deposited any money into any
22 bank accounts held in her name?
23 A  I haven't personally deposited any money into her
24 bank accounts.
25 Q  Have you given any money to anyone to deposit

## Page 19

1  into her account?
2  A  I've given her some money, yes.
3  Q  Okay.  And that's all disclosed in the Statement
4  of Financial Affairs?
5  A  I believe so.
6  Q  All right.  The furniture that's in that home,
7  where did it come from?  In that home, now, I'm
8  still talking about Northridge Drive.
9  A  A good share of it is hers and a good share of it
10 came from Scottsdale.
11 Q  Okay.  So some of it is there is Denny Hecker
12 property?
13 A  Denny Hecker property and some of it is hers.
14 Q  Okay.  Where did the furniture that came from
15 Scottsdale -- I understand it came from
16 Scottsdale, but where was it before it came to
17 Northridge?
18 A  It was a house that we had that we sold a couple
19 of years ago.
20 Q  Okay.  Was it the house sold in 2008 or was it
21 before that?
22 A  I'm not sure.
23 Q  Okay.  And so it's your testimony that some of
24 the furniture in there came from Scottsdale and
25 then some she moved in?

## Page 20

1  A  Yes.
2  Q  Do you have any idea on percentages how much
3  would be Denny Hecker and how much would --
4  A  I don't recall.
5  Q  Okay.  The values -- I'm looking at your
6  schedules now.  And the values for the real
7  property in Cross Lake, how did you come to the
8  conclusion that those were the appropriate
9  values; did someone give you an opinion?
10 A  Yes, they did.
11 Q  And who was that?
12 A  A real estate company in Cross Lake.
13 Q  Is that Bruce Larson's company?
14 A  Yes.
15 Q  And did they give you a written opinion?
16 A  Yes, they did.
17     THE TRUSTEE:  All right.  Mr. Cutler,
18 could you give me send me a copy of that?
19     MR. CUTLER:  I have it.
20     THE TRUSTEE:  Oh, okay, great.
21     MR. CUTLER:  I'll give it to you right
22 now.
23 BY THE TRUSTEE:
24 Q  Say, back on Christi Rowan, what's the name of
25 her photography business?

## Page 21

1     MR. CUTLER:  The record should reflect
2  that I've given the Trustee an original letter
3  from Bruce Larson concerning the value of the
4  Cross Lake property.
5     THE TRUSTEE:  Well, it's actually
6  Robert Berklund.  I think he's an associate of
7  Mr. Larson.  Larson Group Real Estate is the
8  place.
9  BY THE TRUSTEE:
10 Q  But back to Ms. Rowan, what's the name of her
11 photography business?
12 A  I don't know the exact name.  It might be Rowan
13 Photography.  I'm not sure.
14 Q  Okay.  Are there lease payments being made on the
15 Northridge property?
16 A  The lease payments, they spent a great deal of
17 capital improving the property.
18 Q  Who's they?
19 A  Rowan.
20 Q  Okay.
21 A  And the first actual payment starts August 1st.
22 Q  So Ms. Rowan made improvements to the real
23 property?
24 A  Yes, she did.
25 Q  What value, how much in a dollar value?

Page 22

1   A   I believe in the 25,000 range.
2   Q   Okay.
3   A   The house had sat vacant for two years.
4   Q   All right.  So no lease payments are being made
5       at this time; is that right?
6   A   Well, in consideration of the lease payments,
7       they did the improvements.
8   Q   So no lease payments are -- no actual money is
9       changing hands right now; is that right?
10  A   The first cash transaction will be August 1st.
11  Q   Okay.  I'm back on the schedules now and I'm
12      looking at Schedule B for the personal property.
13      And cash on hand says $5,500, correct?
14  A   Yes.
15  Q   Is that all the cash that you had on hand when
16      you filed bankruptcy?
17  A   Yes, it was.
18  Q   There was a search warrant executed on your home
19      on Cross Lake and in Medina, correct?
20  A   Yes, there was.
21  Q   Was any cash seized in connection with the
22      execution of those warrants?
23  A   My wife and I had 17,000 in the safe at Cross
24      Lake.
25  Q   Okay.  17,000?

Page 23

1   A   Yes.  5,500 was my money, the balance was hers.
2   Q   Where would she have gotten her money?
3   A   She would have gotten her money from me over a
4       period of time.
5   Q   Yeah.  When was the last time she was employed?
6   A   In 16 years, never.
7   Q   Okay.  So the whole 17,000 originally came from
8       Denny Hecker?
9   A   Yes.
10  Q   And is the State of Minnesota still holding that
11      money?
12  A   Yes, they are.
13  Q   All right.  Was any money seized in Medina?
14  A   No.
15  Q   Did they look in the safe there?
16  A   They spent hours looking in the safe.
17  Q   Did they take anything out of the safe that you
18      know of?
19  A   There were a couple of Minnesota Viking watches.
20  Q   Okay.
21  A   After seven hours of drilling the safe.
22  Q   Is that all that you think was in the safe, was
23      two Minnesota Viking watches?
24  A   That's all the -- I didn't have any money.  I
25      didn't have anything.  I was surprised they were

Page 24

1       there.
2   Q   Okay.
3           MR. CUTLER:  And, Mr. Hecker, the safe
4       was drilled by the State; is that correct?
5           THE DEBTOR:  Yes.
6           MR. CUTLER:  And that's because you
7       didn't have a key to --
8           THE DEBTOR:  I didn't even know the
9       combination.
10  BY THE TRUSTEE:
11  Q   Okay.  Back to Schedule B, the bank balances,
12      there are a large number of banks here.  And as
13      Mr. Cutler indicated, he disclosed to me before
14      this meeting started and then on the record here
15      that there were I think a couple of accounts that
16      you had overlooked.  How did you determine the
17      balances in each of these bank accounts when you
18      had Schedule B prepared?
19  A   I've had an assistant that handles all my
20      personal affairs for the last 15 years.  They
21      prepared that with the statements they received
22      from the banks.
23  Q   And who was that assistant?
24  A   Susan Miller.
25  Q   What's Susan Miller's address?

Page 25

1   A   I don't know.  She lives in Elk River.
2   Q   Okay.  Is she employed by one of the Hecker
3       companies?
4   A   She just resigned a week ago.
5   Q   I'm sorry.  She resigned --
6   A   Just resigned a week ago.
7   Q   Okay.  So is it accurate to say she provided the
8       information to your attorneys to put in here?
9   A   She provided the information for me and she
10      overlooked a couple of accounts.
11  Q   Okay.  Did you verify any of that information
12      before you signed the schedules?  I mean, by that
13      I mean --
14  A   To the best of my knowledge, the information we
15      gave you when we did the schedules was all there
16      was.
17  Q   Did you personally look at any of the bank
18      account statements to verify the amounts?
19  A   Susan prepared a spreadsheet with all the bank
20      balances from January through the date I filed.
21  Q   All right.
22  A   I was surprised today when Clint had whatever
23      there was.
24          THE TRUSTEE:  Mr. Cutler, would you
25      send me a copy of that spreadsheet, please?

Page 26

1          MR. CUTLER: Yes.
2          THE TRUSTEE: Is that a problem?
3          MR. CUTLER: No, it's not a problem.
4          THE TRUSTEE: Great, okay.
5          THE TRUSTEE: And I received today from
6   Mr. Cutler just before this meeting started, I
7   received copies of bank account statements
8   because, of course, you have to provide me with
9   copies of statements that cover the date of
10  filing. I haven't had the chance to review these
11  to see if all of the statements are here for
12  covering June 4.
13         Did you look at that, Mr. Cutler; are
14  there some missing?
15         MR. CUTLER: Well, I relied on my
16  staff.
17         THE TRUSTEE: Okay.
18         MR. CUTLER: But we believe it covers
19  the period of the date of the filing.
20         THE TRUSTEE: For all of the accounts?
21         MR. CUTLER: Yes.
22  BY THE TRUSTEE:
23  Q    Okay. Mr. Hecker, in looking at the TCF account,
24  I just have a couple questions for you about a
25  few things that I see going out of there.

Page 27

1          MR. MOHRMAN: Is this on the
2   schedules?
3   BY THE TRUSTEE:
4   Q    I don't know if it is or not. Here's the TCF
5   bank statement and it's dated 6/10, you see, up
6   here (indicating). And down here (indicating),
7   on 5/19 and 5/14 I see two checks, seventy-three
8   -- 5173 and 5174, each for $2,500 going out. Do
9   you know what those were?
10  A    I have no idea.
11  Q    Okay. Mr. Hecker, how are you so sure that you
12  had exactly $5,500 in cash on the day of filing?
13  A    At the filing Clint asked me how much money I
14  had, and I shared with you at our first meeting
15  it was 5,500.
16  Q    No. I understand that's what you told Mr. Cutler
17  and you told me that too. I'm asking you, how
18  are you sure that it was 5,500? Did you count it
19  out?
20  A    Yes, I did.
21  Q    Okay. Where were you when you did that?
22  A    To the best of my knowledge, my office.
23  Q    Here in the Cities?
24  A    Yes.
25  Q    All right. And then you took that 5,500, and

Page 28

1   what did you do with the 5,500 after that?
2   A    We went to Cross Lake. And we had met with you
3   and you had asked to -- whether it be turned over
4   with the jewelry and the other things, so I put
5   it in the safe in Cross Lake.
6   Q    Did you spend any cash between the time that your
7   bankruptcy was filed and the time that the search
8   warrant was executed?
9   A    I don't understand the question.
10  Q    Between June 1st and the day the search warrant
11  was executed, did you spend any cash anywhere?
12  A    I believe the search warrant was executed on
13  June 15th and 14th.
14  Q    Okay.
15  A    So I filed on June 4th.
16  Q    Yep. Between those dates, the 4t and whatever
17  day the search warrant was executed, did you
18  spend any cash anywhere?
19  A    I don't believe any significant amount.
20  Q    What does that -- What does significant mean to
21  you?
22  A    Well, one, I don't recall, but I don't believe --
23  If there was any money spent, it was money that I
24  got from my wife or... I'd say it was less than a
25  couple thousand dollars.

Page 29

1   Q    Okay. So between those dates it would have been
2   -- you think you spent less than a couple
3   thousand dollars in cash?
4   A    Yes.
5   Q    And the source of that cash would have been from
6   Tamitha?
7   A    Yes.
8   Q    Okay. Have you received any cash from any
9   sources other than Tamitha since you filed your
10  bankruptcy?
11  A    Are you saying cash or --
12  Q    I'm saying cash right now.
13  A    Would a loan be cash?
14  Q    Well, I was going to ask you about loans too.
15  Let's stick to cash for a minute, though. Have
16  you received currency?
17  A    Since the filing?
18  Q    Yes.
19  A    Not to my knowledge.
20  Q    Have you received loans since the filing?
21  A    Yes, I have.
22  Q    From who?
23  A    Steve McDaniels.
24  Q    Okay. And how much was it, sir?
25  A    A hundred thousand. Actually, it was received by

Page 30

1   the new business.
2   Q   Okay.  So there would be a $100,000 check going
3       into an --
4   A   That's correct.
5   Q   -- account -- going into an account for the new
6       business?
7   A   Yes.
8   Q   Okay.  So since the filing, that's your only
9       source of moneys, is that $100,000 loan?
10  A   I believe so, yes.
11  Q   Okay.  Back to the schedules, Mr. Hecker, at
12      Item 21 it lists GELCO Corporation Sales
13      Agreement.  What is that?  And I'm just looking
14      for a brief description here.
15  A   It's an earn out on a business I sold to GE.
16  Q   Okay.  And is that payable to you personally,
17      Dennis Hecker personally?
18  A   It's payable to one of three different entities.
19  Q   Which would be?
20          MR. CUTLER:  Do you recall?
21          THE DEBTOR:  I don't recall, but I
22      think it's disclosed.
23          MR. CUTLER:  There's a written
24      contract --
25          THE DEBTOR:  Yes.

Page 31

1           MR. CUTLER:  -- that lists the
2       entities?
3           THE DEBTOR:  That's correct.
4   BY THE TRUSTEE:
5   Q   Yeah.  I'm just trying to determine, is one of
6       those three Dennis Hecker personally?
7   A   I don't want to sound like I'm naive.  It could
8       be, but I'm not sure.
9   Q   Okay.  What are the causes -- And I'm still at
10      Item 21 in Schedule B -- the causes of action
11      against the shareholders and directors of
12      HogRider Investments.  Again, I'm just looking
13      for a brief summary here.
14  A   I invested four million with the company and I
15      was to be a director, shareholder.  And over the
16      period of time, I was never invited to a meeting
17      or advised of the shareholder actions or the
18      board actions.
19          And when the businesses started to
20      fail, we borrowed a million dollars from them.
21      I'm not sure which company or how it all lined
22      up, but part of that was we had to give them a
23      get-out-of-jail release for all the things that
24      they didn't do with me as a shareholder,
25      director.  And I don't believe -- we think -- I

Page 32

1       believe that we have a claim.
2   Q   Okay.
3   A   Right now they have the stock secured for a
4       million dollars and I paid four million for it.
5   Q   Is that the JC Bromac --
6   A   Yes.
7   Q   -- Corporation?  That's what that is?
8   A   Yes.
9   Q   Okay.  And I have documents that Mr. Cutler, I
10      believe, has provided to me indicating that there
11      was a loan.  It says that it's loaning it to
12      Dennis E. Hecker in October of 2008, a million
13      dollars.  Is that what you were talking about?
14  A   I believe so, yes.
15  Q   All right.  And what happened to that million
16      dollars; where was it deposited, is what I'm
17      asking?
18  A   That million dollars ended up into the
19      businesses.
20  Q   Okay.  Did it go through one of your personal
21      accounts before it got to the businesses?
22  A   I'm not sure.
23  Q   Okay.  When I looked at these documents, it
24      looked to me like there had been -- at some point
25      a dispute arose between Cornerstone Bank and

Page 33

1       JC Bromac.  Is that right?
2   A   I believe so.
3   Q   Do you remember that?  Tell me what you do
4       remember about it.
5   A   To the best of my knowledge, we borrowed the
6       money from Cornerstone Bank to pay a portion of
7       the HogRider investment.  And I believe that
8       there were some concerns of who had a filing on
9       the stock.
10  Q   Okay.  So the three million from Cornerstone was
11      for the same -- an investment in this -- the
12      HogRider entity?
13  A   There was a company that borrowed the money from
14      Cornerstone.
15  Q   Okay.
16  A   And I'm not certain that the stock was pledged as
17      collateral.
18  Q   Okay.  So a company borrowed the money.  Did
19      Denny Hecker personally guarantee it?
20  A   Yes, he did.
21  Q   Okay.  When was the money borrowed from
22      Cornerstone?  Let me try and narrow the frame a
23      little bit.  Was it in late 2008 that it was
24      borrowed from Cornerstone?
25  A   It was borrowed when I bought the stock from

Page 34

1    HogRider.
2 Q   Can you put a rough time frame on that?  Was it
3    2008, 2007?
4 A   2007 or '8.
5 Q   Okay.  When you originally borrowed -- When the
6    money was originally borrowed from that bank, did
7    they get security documents then?  By that I mean
8    did they get a security interest in various
9    assets then or did they get it later?
10 A   I don't know.  I just signed the guarantee.
11 Q   Okay.  And then did the money from that loan go
12    right to the company?  Well, let me rephrase it.
13    Did it go into your personal account?
14 A   I'm not sure if it went to the personal account
15    or direct to them.
16 Q   Okay.
17 A   The end result was they got it.
18 Q   They being?
19 A   HogRider.
20 Q   Okay.
21 A   Or, actually, the shareholders.  I'm not sure.
22    It could be HogRider.
23 Q   There are written documents that would show me --
24 A   There's a transaction that has, if I can recall,
25    yes.

Page 35

1 Q   Okay.  Let me show you a schedule of items, and
2    this is from the AIG policy.  And this relates to
3    a lawn mower and attachments, and I think you
4    talked about this earlier.  Is this the actual
5    lawn mower and attachments that exist now?
6 A   I have no idea.
7 Q   Okay.
8 A   But I believe that --
9 Q   I'll tell you I took that from your AIG policy.
10    You can see the stamping up there.
11 A   I want to explain that the number of businesses I
12    had, I didn't insure or direct or follow-up or
13    understand the magnitude of what it was.  I just
14    told somebody to handle it.  So if this is the
15    tractor, I'm not sure.
16 Q   Sure.
17 A   There's a newer tractor that exists that cost
18    more money.
19 Q   Okay.  And you've told Fred Radde?
20 A   I e-mailed him yesterday.
21 Q   Okay, great.  Is that in Medina?
22 A   It's in Cross Lake.
23 Q   Okay.  We just talked about any money you
24    received since filing.  I just want to make sure
25    we're clear on this.  The only money, cash,

Page 36

1    checks, wire transfers, any source of funds,
2    loans, that you've received since filing is
3    either money from Tamitha or that $100,000 loan;
4    is that right?
5 A   I believe so.
6 Q   Okay.  Have you -- In the last five years,
7    Mr. Hecker, have you ever transferred money out
8    of this country?
9 A   Never.
10       MR. CUTLER:  Well, wait a minute.
11       THE DEBTOR:  Not that I'm aware of.  I
12    believe never, but not that I'm aware of.
13 BY THE TRUSTEE:
14 Q   Okay.  One of your businesses has a business in
15    Canada, in Ontario, right?
16 A   A fishing lodge, yes.
17 Q   Yeah.  So do you think you might have transferred
18    money into Canada with respect to that?
19 A   I don't want to sound like I don't know, but I
20    had a whole big group of businesses and somebody
21    handled all these investments.
22 Q   Okay.
23 A   Could have.
24       MR. CUTLER:  But I think Mr. Seaver is
25    asking about you personally.

Page 37

1 BY THE TRUSTEE:
2 Q   Yeah, I am, and I was just going to clarify
3    that.
4 A   Mr. Seaver, the check could have came from me,
5    but I'm not sure if it did or not.
6 Q   Okay.  So let's eliminate Canada from the
7    question for a minute.  You have never
8    transferred more than $5,000 to any bank in any
9    country outside of the United States; is that
10    correct?
11 A   The only transfer we might have is when I
12    acquired the Las Ventanas property.
13 Q   And tell me what that is.
14 A   It's a condo in Mexico.
15 Q   All right.  So there may have been or would have
16    been money going to Mexico for that purpose?
17 A   Mr. Seaver, if it was for the closing or for the
18    title, escrow, there's documents to support all
19    that.
20 Q   Have you ever held a bank account outside of the
21    United States?
22 A   I don't believe so.
23 Q   Have you ever had anyone else take money from the
24    United States on your behalf to deposit into any
25    account --

Page 38

1  A  No.
2  Q  -- outside the United States?
3  A  No.
4  Q  Is there a -- Your schedules -- I'm back at
5     Schedule B. It lists a Grand piano, a 1985
6     Kawai. Is there also another Grand piano in one
7     of the homes?
8        MR. MOHRMAN:  What page are you on?
9  BY THE TRUSTEE:
10 Q  I'm on -- It's Item 8 at Schedule B.
11 A  I believe that there is two Grand pianos. One is
12    scheduled in the personal property of Hunter and
13    one is scheduled in the property of Northridge.
14 Q  Okay. So I'm looking right now. I'm looking at
15    Item 8, specifically, of Schedule B and there's
16    one Grand piano there, a 1985 Kawai. Is that one
17    at -- Is that one at Hunter Ridge (sic)?
18 A  That would be at Northridge.
19 Q  Northridge, okay. And the other one?
20 A  Hunter Drive.
21 Q  Hunter Drive. I'm sorry. I misspoke. What sort
22    of Grand piano is at Hunter Drive; do you know
23    the model?
24 A  It's seven to ten years old. I have no idea.
25 Q  How much did you pay for it?

Page 39

1  A  I believe at that time 10,000 or less.
2  Q  Okay. Have you given away sets of golf clubs to
3     anyone in the last year?
4  A  In our business we did a lot of promotions and
5     give-aways. We might have gave away a half a
6     dozen sets --
7  Q  Okay.
8  A  -- maybe more.
9  Q  Still at Schedule B, Item 13, the Smith Barney
10    consolidated account, let me tie this in with
11    some other things. When I went through the
12    transfers that you disclosed in the Statement of
13    Financial Affairs, there are a number of very
14    large transfers to Smith Barney. I'll just pick
15    one as an example. I'm looking at what your
16    document says at the top of it is SOFA 3(c).
17    It's First Federal Riverwood, transfers to
18    affiliates and relatives from June 4, 2008 to
19    June 4, 2009.
20       MR. MOHRMAN:  Is this in the
21    schedules?
22       THE TRUSTEE:  Yeah, it is.
23       MR. MOHRMAN:  Where?
24       THE TRUSTEE:  Here, I can show you my
25    copy. For some reason mine don't have page

Page 40

1     numbers on them.
2  BY THE TRUSTEE:
3  Q  You see there's a million dollar transfer to
4     Smith Barney July of '08, and then on the next
5     page there are other large transfers, 800,000,
6     700,000 and so on. Why were you making those
7     transfers to Smith Barney?
8  A  They were margin calls on stock that I bought.
9  Q  Okay. And what stock was that?
10 A  Dollar Rent-A-Car.
11 Q  All right. What happened to that stock?
12 A  It went from $12 or $13 to 85 cents.
13 Q  Do you still own that stock?
14 A  No, I don't.
15 Q  What happened to it; how did you dispose of it?
16 A  I sold it to Smith Barney.
17 Q  Okay. Was it part of this whole series of
18    transactions that went to Smith Barney?
19 A  The transactions were with Smith Barney in the
20    acquisition and the sale.
21 Q  Okay. And when did you sell it to Smith Barney?
22 A  I didn't sell it to them. They were the
23    stockbroker.
24 Q  Right, I know, but you bought the --
25 A  I believe sometime in -- I bought the week of

Page 41

1     Easter of '08, and I believe sometime in July
2     of '08 I sold it.
3  Q  And you sold it to Smith Barney?
4  A  They were the broker.
5        MR. CUTLER:  They were the broker.
6  BY THE TRUSTEE:
7  Q  Oh, okay. You just sold it in the market?
8  A  Sold it on the market.
9  Q  Okay, okay. All right. Going back to the main
10    part of Schedule B -- And I would see the funds
11    from that coming into one of your bank accounts?
12 A  Yes.
13 Q  Okay. Going back to Schedule B, there's
14    reference to a membership in Spring Hill Club.
15    I'm at Item 35 of Schedule B.
16 A  Yes.
17 Q  What is Spring Hill Club?
18 A  It's a golf club.
19 Q  Okay. And what kind of membership do you have
20    there?
21 A  A golfing membership.
22 Q  Okay. Was there an initiation fee when you
23    joined?
24 A  Originally it was 65,000.
25 Q  Okay.

Page 42

1  A  And today they lowered new members to, I believe,
2     40,000, and there's a waiting list of about three
3     years to sell it back to them.
4  Q  There's an agreement that they'll buy back
5     memberships, but you have to get put on a waiting
6     list; is that the way it goes?
7  A  I'm not positive, but that's what I believe.
8  Q  Okay.  Have you tried to do that, to sell that?
9  A  The guy told me that I wouldn't live long enough
10    to buy it back.
11 Q  Okay.  So you asked about it, but you didn't do
12    it back when you learned you wouldn't live long
13    enough?
14        MR. CUTLER:  You still own it?
15        THE DEBTOR:  Yeah, I still own it.
16 BY THE TRUSTEE:
17 Q  Yeah, okay.  Do you still go out there and use
18    it?
19 A  I haven't used it once this year.
20 Q  You haven't used it at all this year?
21 A  No.
22 Q  Okay.
23 A  One more thing.
24 Q  Sure.
25 A  I believe on the golf club membership, when you

Page 43

1     go on the list you still have to pay the dues
2     until they buy it back.
3  Q  Okay.  How much are the dues?
4  A  Twenty five thousand a year.
5  Q  Where are you on dues payments?  By that I mean
6     are you current on payments?
7  A  I believe at this time -- You make an annual
8     payment, semiannual payment.  I believe that at
9     this point I'm current until the next payment is
10    due.
11 Q  Okay.  There was a payment made in the months
12    before you filed bankruptcy, right?
13 A  I believe so.
14 Q  Okay.  Is there still furniture in a storage
15    facility in Scottsdale?
16 A  That's the furniture now located in Medina.
17 Q  Okay.  So it all got moved up here?
18 A  Yes.
19 Q  So there's no furniture in storage in Scottsdale?
20 A  No.
21 Q  Okay.  At the Statement of Financial Affairs at
22    Item 3B, that's the transfers to creditors from
23    March 6 of '09 to June 4 of '09, and I'm starting
24    at the first page.  And, Mr. Hecker, I've just
25    turned it to a page that says SOFA 3(b) up at the

Page 44

1     top, and that has some transfers to Toyota Motor
2     Credit right up at the top, doesn't it?
3  A  Yes, it does.
4  Q  Okay.  Why were those transfers made?
5  A  I believe they were payments that I made on the
6     buildings or paid on behalf of the dealership for
7     credit lines that they had that they were
8     deficient in.
9  Q  All right.  These are payments coming out of the
10    Denny Hecker personal account, though; am I
11    right?
12 A  I believe so, yes.
13 Q  Okay.  Mr. Hecker, I have seen some documents
14    that would seem to indicate that some shares of
15    stock that you owned were turned over to Toyota
16    in May of 2009.  Does that ring any bells with
17    you?
18 A  Shares of stock?
19 Q  Yeah, business interests.  Here, let me just show
20    you.  We -- My attorneys received your corporate
21    records or business records for various of your
22    entities.  And I'm looking at the stock
23    register.  This is Brainerd Imports, LLC.
24    There's a notation here that says, original
25    certificate delivered to Toyota Motor Credit

Page 45

1     Corporation 5/7/09, and then it refers to
2     99 membership units.  And, in fact, in that
3     corporate file there's a receipt here from Toyota
4     Motor Credit Corporation indicating their receipt
5     of those business membership units and one other
6     membership unit.
7  A  Is there an attachment to -- Was the request from
8     Toyota attached to the -- And you got that from
9     our legal counsel?
10 Q  It came through your attorney.
11        MR. CUTLER:  It came from Mr. Parker?
12 BY THE TRUSTEE:
13 Q  It did, yeah.  That's my understanding.
14 A  To the best of my knowledge, maybe Toyota Credit
15    required that to continue the facility until the
16    dealership now has a purchase agreement on.
17 Q  Okay.  Do you recall, have any personal knowledge
18    of turning those things over to Toyota?
19 A  Mr. Seaver, if somebody put it in front of me, I
20    signed it, I'm sure.
21 Q  Okay.  You had -- Had you guaranteed the debt to
22    Toyota Motor Credit?
23 A  Yes, I did.
24 Q  Okay.  What credit cards have you used for your
25    personal expenses in the last two years?

## Page 46

1  A   I've had American Express, Visa.  I'm not sure
2      about a MasterCard.
3  Q   Would it be accurate to say that the primary card
4      you used was that American Express black card?
5  A   Yes.
6  Q   And then there's a US Bank Visa card listed in
7      here.  Would that be your other, secondary card?
8  A   I believe so.
9  Q   Do you have any additional credit cards that were
10     not listed in the schedules?
11 A   There may be a gas credit card.  I'm not sure.
12 Q   Okay.
13 A   Personally I wouldn't.
14 Q   You aren't using any right now?
15 A   Personal credit cards?
16 Q   Yes.
17 A   I don't have any.
18 Q   Okay.  Who is Pat Terhar, T-E-R-H-A-R?
19 A   He's an associate that's worked for us for
20     15 years.
21 Q   Okay.  Is he a friend of yours also?
22 A   Most of my employees were friends of mine.
23 Q   Okay.  Who's Alex Terhar?
24 A   His 17-year-old son.
25 Q   Okay.  Where have you purchased jewelry in the

## Page 47

1      last two years?
2  A   I believe from -- The schedule reflects, I think,
3      Molina Jewelers in Scottsdale.
4  Q   I'm sorry, who was that?
5  A   Molina.
6  Q   Molina, M-O-L-I-N-A?
7  A   Yes.
8  Q   Okay.
9  A   And Royal Jewelers in Fargo.
10 Q   All right.
11 A   And I'm not sure of anywhere else.
12 Q   How about Las Vegas, any jewelers there?
13 A   Maybe somewhere on the credit card schedule.  I'm
14     not sure.
15 Q   Okay.  How about Aspen?
16 A   There may be something on the credit card
17     schedule for Aspen.
18 Q   Yeah.  I'm not asking you about what's in the
19     schedules, though.  I'm asking where you
20     purchased jewelry in the last --
21 A   I'm answering to the best of my ability.
22 Q   You don't recall any purchases in Aspen?
23 A   I recall Aspen and Las Vegas is probable.
24 Q   Okay.  What would be the jewelers in those two
25     places?

## Page 48

1  A   I would have to get the names for you.
2  Q   Where would you get the names?
3  A   Look it up in the Yellow Pages.
4  Q   Oh, and you'd see it and recognize it?
5  A   Yes.
6  Q   Would you do that and just get that to
7      Mr. Cutler?
8  A   Yes.
9  Q   Thank you.  What's 5H Investments?  I just see a
10     payment here to them for an electronic funds
11     transfer back in August of '08, $3,500.
12        MR. MOHRMAN:  Where are you looking,
13     sir?
14 BY MR. SEAVER:
15 Q   I am looking on one of the pages of the Statement
16     of Financial Affairs, the very last item on that
17     page.  Here, I'll just show you rather than go
18     through there.  See, this page just shows
19     5H Investment, $3,500, 8/12 of '08.
20        MR. MOHRMAN:  Can I see that again?
21        THE TRUSTEE:  Sure.  I'm trying to
22     figure out where we are.  Thank you.
23        THE DEBTOR:  I have no idea.
24 BY THE TRUSTEE:
25 Q   No idea?  Okay.  Since your bankruptcy filing,

## Page 49

1      Mr. Hecker, have you paid your attorneys any
2      money?
3  A   Yes.
4  Q   All right.  How much have you paid?
5  A   I believe --
6         MR. CUTLER:  Can we have a moment?
7      (Discussion held off the record between
8      the Debtor and his attorney.)
9         THE DEBTOR:  Yes.
10 BY THE TRUSTEE:
11 Q   How much have you paid?
12 A   Ten thousand.
13 Q   And that was to who?
14 A   Mr. Mohrman's firm.
15 Q   All right.  And where did that money come from?
16 A   It came from the $100,000.
17 Q   Okay.  Shady Roost Lodge, that's a fishing resort
18     in Ontario, right?
19 A   Yes.
20 Q   Is there a mortgage against that property?
21 A   I'm not sure if there's a mortgage or a credit
22     facility against the property.
23 Q   Do you think somehow it's encumbered by some
24     debt?
25 A   Yes.

Page 50

1    Q    And how much do you think that debt is?
2    A    I would be guessing.  Five or 600,000, I'm not
3         sure.
4    Q    Okay.  Let me show you Schedule F, the front page
5         of Schedule F.  The Alliance Bank entry, in the
6         middle column it says 6/8/09, and then it says,
7         all of the debtor's ownership interest in Jacob
8         Holdings of Nestor Falls.  What does that mean?
9    A    I believe it means that the two shareholders
10        pledged their stock for the loan.
11   Q    Okay.  The date there is June 8 of 2009, and
12        that's --
13   A    Oh, I don't believe the date is correct.
14   Q    Okay.  When do you think that happened?  I'm not
15        looking for an exact date, just a rough time
16        frame.
17   A    A year or two or three before.
18   Q    Okay.  In your Statement of Financial Affairs,
19        you indicate that JP Morgan Chase seized some
20        funds from an investment account in May of '09 --
21   A    Yes.
22   Q    -- but the number isn't in here.  Do you know how
23        much they seized?  Give me a range if you don't
24        know.  Was it more than $5,000?
25   A    Between five and ten, I believe.

Page 51

1    Q    Okay.  What investment account did that come out
2         of?
3              MR. CUTLER:  Mr. Seaver, I think I have
4         records at my office on that, and we'll be happy
5         to supply them.
6              THE TRUSTEE:  Okay, great.
7    BY THE TRUSTEE:
8    Q    Did you give Tamitha Hecker an expensive fur coat
9         last December?
10   A    No, I didn't.
11   Q    Okay.  Did you buy one?
12   A    Yes, I did.
13   Q    What happened to it?
14   A    I gave it to Christi Rowan.
15   Q    Okay.  And how much was that coat; how much did
16        you pay for that coat?
17   A    60,000.
18   Q    6-0?
19   A    Yes.
20   Q    60,000, okay.  Does she still have that coat?
21   A    I'm not sure.
22   Q    And I'm looking now at the transfer section of
23        the Statement of Financial Affairs, the gift
24        section, in particular.  And I see on the first
25        page there the transfers to Tamitha.

Page 52

1              MR. MOHRMAN:  Hold on.
2              THE TRUSTEE:  Sure.
3    BY THE TRUSTEE:
4    Q    It's Item 7 in the Statement of Financial
5         Affairs.
6    A    Yes, okay.
7    Q    All right.  The Rolex watch that you gave to
8         Tamitha that's scheduled there, was that --
9         that's not one of the Rolex watches that was on
10        that list we went through awhile ago?
11   A    No, it wasn't.
12   Q    Okay.  How much did you pay for that Rolex watch
13        that you gifted to her?
14   A    I believe it's $60,450.
15   Q    Okay.  And then on the next page, still at this
16        same section, there are a number of transfers
17        here to family members.  And I'm sure I can get
18        those addresses from Mr. Cutler, correct?
19   A    Oh, sure.  Yes.
20   Q    Okay.  And then Chris McIntire, business
21        associate, a Hublot watch, $20,000.  It just says
22        within one year of petition date.  Can you narrow
23        that for me a little more?
24   A    To the best of my knowledge, it was one year.  He
25        was the partner in HogRider.

Page 53

1    Q    Okay.  And it was just a gift?
2    A    And, Mr. Seaver, it was a Rolex or a Hublot, but
3         I believe it was a Hublot.  I didn't call him up
4         and ask him, but I know I gave him a watch.
5    Q    Okay.  And the CM Rowan that's here at this item,
6         that's Christi Rowan?
7    A    Yes, it is.
8    Q    Okay.  Who is J -- Well, I'm on the next page
9         here now, page 8.  There are actually page
10        numbers on this section.  It says page 8 up at
11        the top.  There's a J. Robb that received $10,000
12        cash.  Who is J. Robb?
13   A    Jessica Robb.
14   Q    What's her relationship to you?
15   A    She was a friend.
16   Q    Okay.  And does Mr. Cutler have her address?
17        Well, would you get it to Mr. Cutler if he
18        doesn't?
19   A    Yes, yes.
20   Q    Why did you give Ms. Robb $10,000?
21   A    They needed money for personal things.
22   Q    Who's they?
23   A    She.
24   Q    Okay.  Is she here in town?
25   A    Yes, she is.

Page 54

1  Q   All right. Item 8 of the Statement of Financial
2      Affairs, right down below this, there are
3      gambling losses here. Do you have documents that
4      would verify those losses?
5  A   Yes.
6  Q   All right.
7  A   We'll get them to you.
8  Q   Okay, great. And I saw in the payments that were
9      made within the specified time period, I saw -- I
10     think it was -- Was it $50,000 to Mirage; do you
11     remember? I know --
12 A   I believe it's on the schedules.
13 Q   Yeah. Whatever the number --
14 A   Yes.
15 Q   -- in fact, was that --
16 A   Yes.
17 Q   -- a payment on old debt to Mirage?
18 A   Yes.
19 Q   Okay. The court reporter is trying to tell us --
20 A   She got our attention.
21        MR. CUTLER: You just did it again.
22 BY THE TRUSTEE:
23 Q   All right. Still in your Statement of Financial
24     Affairs, Item 12, safe deposit boxes, there's
25     reference to Donna Rizner. Who is Donna Rizner?

Page 55

1  A   She had been a long-time associate, left and came
2      back. She was like administrative assistant and
3      came back in HR. And years ago, when she was
4      administrative assistant, we had a safe deposit
5      box at Wells Fargo. It might be ten years old.
6  Q   Is it still there?
7  A   No, she closed it. And the reason she closed it,
8      we didn't even know it existed, is that they
9      debited her Visa card or personal credit card to
10     say, the expense of your safe deposit box. She
11     went over there and she opened it up, and there
12     was nothing in it.
13 Q   Do you, Mr. Hecker, do you have access to a safe
14     deposit box anywhere in this country?
15 A   No, I don't.
16 Q   All right. There's one listed here that is
17     apparently closed now at Lake State Bank, and it
18     says that Chip Lohemiller also had access.
19 A   Yes.
20 Q   Who's Mr. Lohemiller?
21 A   Mr. Lohemiller is the individual who did the
22     construction on our house in Cross Lake and runs
23     a maintenance and repair business in Cross Lake
24     for properties.
25 Q   All right. And he owns a company, right?

Page 56

1  A   Yes, he does.
2  Q   And what's the name of that company?
3  A   Cross Lake something.
4  Q   A property management company?
5  A   Yes, that could be true.
6  Q   Okay. Why were you sharing a safe deposit box
7      with him?
8  A   He's a former Minnesota Viking, and we'd become
9      friends. And from time to time he needed the
10     ability to have cash to pay vendors or work on
11     the house and do a draw-down, whatever the case
12     might be. So I wasn't uncomfortable with him
13     having a safe deposit box for -- it's maybe five
14     years.
15 Q   So would you put cash in there for him to use?
16 A   Originally.
17 Q   Okay. When the construction was going on?
18 A   Before. He did construction for five years. He
19     not only built the house in Cross Lake, he built
20     each of the adjoining properties and did some
21     other work for us.
22 Q   Okay. Have you paid any money to him or his
23     company in the last -- well, let's just say since
24     May 1st?
25 A   It's listed in the schedules. I believe so.

Page 57

1  Q   But I'm asking you -- I'm taking that question
2      further. Your schedules would have only covered
3      up to the date of filing. Have you paid him any
4      money since then --
5  A   Since the --
6  Q   -- or his company?
7  A   I paid -- Since the filing I've paid 25,000 on
8      his bill and Tamitha paid 5,000.
9  Q   All right. The 20,000 you paid, where did that
10     come from?
11 A   Twenty-five.
12 Q   Okay.
13 A   It came from the hundred that I got an advance or
14     or the loan on.
15 Q   Okay. What did you owe that money for; why was
16     the money owed?
17 A   For services on three houses, installing the
18     docks and the landscaping and the maintenance and
19     things like that that come up.
20 Q   He takes care of Cross --
21 A   Yes.
22 Q   -- Lake? You've got to remember, wait until I'm
23     done. Jacob Hecker. I'm still on the Statement
24     of Financial Affairs, paragraph 11, Jacob
25     Hecker. That's your son, right?

Page 58

1  A   That's correct.
2  Q   Okay.  And there's reference there to a transfer
3      to minor account, with an ending balance of a
4      certain amount.  Have you transferred any money
5      into that account in the last year?
6         MR. CUTLER:  Which item is it?
7  BY THE TRUSTEE:
8  Q   Oh, I'm sorry.  It's Item 14 of the Statement of
9      Financial Affairs, on the second page of that.
10     It's page 11 up at the top.
11 A   I believe about seven or eight years ago we
12     opened an account for him with UBS, and it's in
13     his name and the stock broker has managed the
14     account.
15 Q   Have you contributed any funds since that time?
16 A   No.
17 Q   Okay.  All right.  And turn back to the page just
18     before this.  Still at Item 14, there's reference
19     to North State Financial Corp.  what is that
20     company, sir?
21 A   North State Financial is a lending company that
22     during the course of the last 15 years financed
23     vehicles and other things for wholesale car
24     dealers, basically equipment, whatever the case
25     might be.

Page 59

1  Q   Okay.  Now, your Statement of Financial Affairs
2      says that you're holding boats, inventory,
3      et cetera, and it goes on after that.  But what
4      boats are you holding for North State Financial
5      Corp.?
6  A   Two of the boats -- or three of the boats are at
7      Cross Lake.  They're under the UCC filing for
8      Bremer Bank and titled in North State.
9  Q   And those three boats are what?
10 A   I believe there's a Cobalt, a Malibu and some
11     kind of dingy.
12 Q   All right.  Have those boats always been at Cross
13     Lake since they were purchased?
14 A   Yes.
15 Q   All right.  When was the Cobalt purchased?
16 A   Three years ago.
17 Q   All right.  And are you the only one who's used
18     that Cobalt since it was purchased?
19 A   Yes.
20 Q   And it's been at Cross Lake the whole time?
21 A   Yes.
22 Q   Have you made any attempts to sell that Cobalt?
23 A   I visited with Bremer yesterday.  No.
24 Q   Okay.  You've just -- It's just been yours to use
25     personally, right?

Page 60

1  A   It's been in the business, but I've used it.
2  Q   Well, what business use were you making of it in
3      Cross Lake?
4  A   Well, I was in the business of buying and selling
5      things, and I paid way too much when I bought it.
6  Q   How much did you pay?
7  A   I would be guessing today, but 125,000.
8  Q   Okay.  And when you say you, was it Denny Hecker
9      personally who bought it?
10 A   North State.
11 Q   And it's titled in North State, right?
12 A   Yes, it is.
13 Q   And is Bremer Bank on the title?
14 A   Bremer Bank has a UCC filing of all the assets of
15     North State.
16 Q   Is Bremer Bank on the title?
17 A   I'm not sure.
18 Q   Okay.  And this other boat, a Malibu, is that the
19     ski boat?
20 A   Yes, it is.
21 Q   Okay.  And that's a Rib; it's referred to as a
22     Rib, R-I-B, isn't it?  Does that ring any bells
23     for you?
24 A   No.
25 Q   It doesn't --

Page 61

1  A   It's referred to as a Malibu.
2  Q   Okay.  And when was that purchased?
3  A   September of '07, April of '08, somewhere in that
4      time season.
5  Q   I'm sorry, I -- '07 or --
6  A   September of '07 to March of '08, April of '08.
7  Q   Okay.  And it's been there at Cross Lake ever
8      since --
9  A   Yes.
10 Q   -- you purchased it?  Here, let me just show you
11     a page from an insurance policy that I received
12     through my request for documents.  There is --
13     There are a list of boats on here, and there's
14     something called a 2003 Nautica Rib --
15 A   Yes.
16 Q   -- 13-foot.  What's that?
17 A   It's my son's boat.  It's like an inflatable kind
18     of little boat.
19 Q   Okay.  And maybe this will be the boat I'm about
20     to describe to you.  There's a boat there that
21     looks like it's a one- or two-person boat, has a
22     cockpit in it, has a motor in back.
23 A   It's a Mouse boat.  It's a Mouse boat.
24 Q   Okay.  Named after Mickey Mouse or --
25 A   It came from Disney World.

Page 62

1  Q  Okay.  Who owns that?
2  A  My daughter.
3  Q  Who bought it?
4  A  I gave it to her two years ago.
5  Q  Okay.  When did you buy it and how much did you
6     pay for it?
7  A  The summer of '07 or '06 and paid a thousand
8     dollars for it.
9  Q  Okay.  Here, let me show you again, Mr. Hecker, a
10    page from this insurance policy.  And there's a
11    1994 Harley Davidson on here.  Who is that titled
12    in?
13 A  North State.
14 Q  Okay.  2003 Harley Davidson VRCA?
15 A  North State.
16 Q  2006 Polaris Outlaw?
17 A  I believe North State.
18 Q  Is that an ATV; do you know?
19 A  I believe so.
20 Q  2006 Harley Davidson VRSCA?
21 A  I believe that's the motorcycle I gave to Erik
22    Dove.
23 Q  Then down a little farther there's a 2007 Harley
24    Davidson FLHR.  Who is that titled in?
25 A  I'm not sure.  Both of those I'm not sure.

Page 63

1  Q  There's a 2007 Harley Davidson FXST right under
2     that, right?
3  A  Yes, and I'm not sure.
4  Q  All right.  Who has possession of all those
5     motorcycles?  Let's take the Erik Dove one out of
6     the equation for a minute.  The rest of them.
7  A  Three of them are in Cross Lake.
8  Q  Okay.  The others, where are they?
9  A  There's one in Medina.
10 Q  At where?
11 A  Hunter.
12 Q  Okay.
13 A  And I don't know -- The other two we'll have to
14    research.
15 Q  Okay.  And the ones at Cross Lake, how long have
16    they been at Cross Lake?
17 A  On and off for maybe the last year.
18 Q  All right.  When was the '94 Harley purchased?
19 A  In '94.
20 Q  Oh, really.  Was it purchased by North State
21    back --
22 A  Yes.
23 Q  -- in 1994?
24 A  Yes.
25 Q  And you're the only one that's used it since

Page 64

1     then, right?
2  A  I believe so.
3  Q  Was it purchased for resale?
4  A  It was purchased under the North State line of
5     credit but had no covenants.
6  Q  Right.  Was it purchased --
7  A  It was titled in North State.
8  Q  Was it purchased for resale?
9  A  At the time, yes.
10 Q  The 2003 Harley Davidson, when was that
11    purchased?
12 A  I'm not sure.  We'll have to get the details.
13 Q  Okay.  Were all of these Harleys purchased for
14    resale?
15 A  Yes.
16 Q  Has anyone used any of those Harleys other than
17    you and Erik Dove?
18 A  Some of them have been used for two or three
19    years.
20 Q  The question, though, was has anyone other than
21    you or Erik Dove ever used them?
22 A  To the best of my knowledge, no.
23 Q  Okay.  What did Bremer have to say yesterday in
24    your conversation with them?  Do they want this
25    collateral?

Page 65

1  A  I talked to the president, Steve Meads.  And not
2     only do they have it as collateral, they had a
3     real estate development they took about a
4     $6 million loss on.  And his comment to me was --
5     I said, we're embarrassed for the loss.  And he
6     said the economy is pretty self-explanatory, with
7     GM and Chrysler going bankrupt and the world
8     coming to an end in the automobile industry, that
9     they would like to facilitate sometime in August
10    a liquidation of their collateral.  They have a
11    million five outstanding.
12 Q  Who's their attorney; do you know?
13 A  I have no idea.
14 Q  Okay.  Well, just so we're clear here, based on
15    what I'm hearing on the testimony, it doesn't
16    sound to me like those items were held for sale
17    in the trade; it sounds like they were held for
18    personal use, and I believe they're property of
19    the bankruptcy estate.  And you don't need to
20    respond to this.  You're certainly welcome to --
21 A  I'd like to.
22 Q  But I'm going to communicate with Bremer Bank and
23    tell them exactly that.  But go ahead with what
24    you were going to say, sir.
25       MR. CUTLER:  No, you don't need to.

Page 66

1    We'll reserve our rights, if any, with respect to
2    that issue.
3         THE TRUSTEE:  Sure.
4    BY THE TRUSTEE:
5    Q   At Schedule F, and you don't really need to look
6    at this, I see there's Inter Bank as a creditor.
7    It says that your debt to them is personal
8    guarantee, Sidney Holdings of Eden Valley, LLC.
9    I mean, you're welcome to look at it, but what's
10   Sidney Holdings of LLC?
11   A   It's a residence in Eden Valley.
12   Q   Okay.  And who lives there?
13   A   My sister.
14   Q   Okay.  And does she make payments on that home?
15   A   No, she doesn't.
16   Q   Okay.  Who does?
17   A   I've made all the payments since it happened.
18   Q   Denny Hecker personally?
19   A   Yes.
20   Q   All right.  Did Sidney Holdings ever have a bank
21   account?
22   A   I'm not sure.
23   Q   Okay.  Is there an encumbrance against that
24   property?
25   A   The schedule shows.  Yes, there is.

Page 67

1    Q   How much equity do you think there is in that
2    property?
3    A   I don't believe there's any.
4    Q   Okay.  How long has the mortgage been there, sir?
5    A   Since the house was purchased.
6    Q   Okay.  Now -- Oh, and I need to state for the
7    record, I have received a copy of a 2007 tax
8    return from Mr. Hecker.  Is that a true and
9    correct copy of the most recent return you filed,
10   sir?
11   A   You received it from us?
12   Q   It came through your attorney, Mr. Cutler.
13   A   I believe so.
14   Q   And you're on extension for 2008; is that right?
15   A   That's correct.
16   Q   All right.  And I also received a copy of a 2006
17   return.  It's accurate to say that your 2007
18   return, and I can show you this if you want to,
19   for adjusted gross income it was a negative
20   28 million or so, right?
21   A   Yes.
22   Q   Okay.  Mr. Hecker, there was -- shortly before
23   you filed bankruptcy there was what's called a
24   restructuring agreement with TCF Bank, correct?
25   A   Yes.

Page 68

1    Q   All right.  That's the title of the document.
2    I'm just reading it off there.
3    A   I'm not sure what it's called, but...
4    Q   Okay.  Describe for me, as best you can, your
5    understanding of what was accomplished by that
6    agreement.
7    A   What date is that document dated?
8    Q   It says June 3rd, the day before you filed
9    bankruptcy.  It says effective June 3rd.
10   A   Okay.
11   Q   And I'm just looking for you -- from you a
12   general description of what that restructuring
13   accomplished.
14   A   It accomplished returning the Aspen property,
15   which was in default, and returning the Medina
16   property, which was in default.
17   Q   Did you own both of those personally?
18   A   No.
19   Q   Okay.  And what did you get in return for that?
20   A   Well, they forbeared my personal guarantee on
21   both, and they gave me the opportunity to have
22   Cross Lake as the homestead.
23   Q   All right.  Are you making any payments on the
24   Cross Lake homestead?
25   A   I'm paying the taxes and utilities.

Page 69

1    Q   Did this restructuring agreement effectively
2    provide that all you have to pay until the note
3    is payable in full in four years is real estate
4    taxes?
5    A   That's incorrect.
6    Q   Well, tell me what it did, then.
7    A   For a period of twelve months, I believe, it was
8    no interest or principal, but the principal and
9    interest is added onto the end of the note.
10   Q   Yep.  Do you have to pay any interest prior to
11   the note coming due in four years?
12   A   Yes.
13   Q   Okay.  Do you start making interest payments at
14   some point?
15   A   Yes.
16   Q   When is that?
17   A   At the end of twelve months.
18   Q   Okay.  This restructuring agreement also in the
19   whole package, there was -- there were also a
20   couple of leases, correct?
21   A   They leased back the Medina property and the
22   Aspen property --
23   Q   All right.
24   A   -- for a short period of time.
25   Q   All right.  So there was the Medina and the Aspen

Page 70

1    leases, and then there were leases at Cross Lake,
2    also, right?
3  A   There are leases at Cross Lake, yes.
4  Q   All right.  And I'm showing you one here, which
5    is between Jacob Holdings of Cross Lake and
6    Family Holdings of Minnesota.
7  A   Yes.
8  Q   What's Jacob Holdings of Cross Lake, a business
9    entity?
10  A   It's an LLC, yes.
11  Q   Okay.  And who owns the interest in that LLC?
12  A   I believe I do.
13  Q   Okay.  Family Holdings of Minnesota, what's that?
14  A   It's the individual who is renting the property.
15  Q   And who's that?
16  A   His name is William Plumber.
17  Q   Okay.  Is Mr. Plumber a long-time associate of
18    yours?
19  A   Yes, he is.
20  Q   All right.  This residential lease right down at
21    the bottom of the page I'm showing you, which is
22    paragraph 4, calls for an immediate payment of
23    $24,000 in rent.  Did that get paid?
24  A   We amended that.  It did not get paid.
25  Q   All right.  When did you amend it?

Page 71

1  A   I don't know.  I'd have to look.
2  Q   Did you amend it after you filed bankruptcy?
3  A   I don't know.
4  Q   I'm not asking you for a date, I'm asking you --
5  A   I said I don't know.
6  Q   -- before or after?  The security deposit of
7    $2,000 called for by this same lease in
8    paragraph 6, did that ever get paid?
9  A   Can I just see the document?
10  Q   Sure.  It's right here.
11  A   Yes, I believe it did.
12  Q   And where did that money go?
13  A   Either to one of my accounts or it was in cash.
14    I don't recall.
15  Q   All right.  So is it accurate to say that no
16    lease payments have been made on this lease yet?
17  A   I've got to check.  I'm not sure.
18  Q   And there was another lease of the other guest
19    house --
20  A   Yes.
21  Q   -- for the Cross Lake property?
22  A   Yes.
23  Q   And I'm showing you that lease here.  And that's
24    between Jacob Holdings of Cross Lake, Bill
25    Prohovsky and Dan Aldrich, correct?

Page 72

1  A   Yes.
2  Q   All right.  Who is Bill Prohovsky?
3  A   My father-in-law.
4  Q   Okay.  And who is Dan Aldrich?
5  A   My son-in-law.
6  Q   All right.  And this lease has the same
7    provision, close to the same provision in
8    paragraph 4 about an immediate payment of $24,000
9    in rent.
10  A   Yes, it does.
11  Q   Did that get paid?
12  A   I'd have to check.
13  Q   Do you recall anything about getting paid?
14  A   I don't recall at this time.
15  Q   Okay.  It has the same provision for a security
16    deposit, $2,000.  Did that get paid?
17  A   I believe it did.
18  Q   Okay.  And where would that money have gone?
19  A   Deposited in one of the accounts or cash.
20  Q   Okay.  Have any lease payments been made on that
21    lease?
22  A   I'd have to research to find out.
23  Q   What would you research?
24  A   To check and see if any of the deposits came into
25    the bank.

Page 73

1  Q   Where would the deposits have been made?
2  A   Who owns the property?
3  Q   I'm asking you where the deposits --
4  A   I don't have the document in front of me.  I'm
5    not sure who --
6        MR. MOHRMAN:  Do you want to see the
7    document again?
8        THE DEBTOR:  Yeah.
9  BY THE TRUSTEE:
10  Q   Jacob Holdings.
11  A   It would either be Jacob Holdings or my personal
12    accounts.
13  Q   Does Jacob Holdings have a bank account?
14  A   Yes, it does.
15  Q   Where is that?
16  A   I don't know.  We can find that for you.
17  Q   Who's the signatory on the account?
18  A   Mr. Seaver, we had a hundred bank accounts.
19  Q   Yeah.  I'm --
20  A   I'm not sure who is the only signer or who signed
21    and made the deposits.  We can find that
22    information.
23  Q   Okay.  And you'll do that, right?
24  A   Yes.
25  Q   Okay.  Is Mr. Aldrich employed?

Page 74

1  A   He has a company.

2  Q   What's the name of the company?

3  A   I'm at a loss for the name.

4  Q   Okay. Mr. Hecker, I sent a letter to your

5      attorney just recently asking, among other

6      things, that you specify what items of personal

7      property you're claiming as exempt as household

8      goods. And I'm not going to ask you here today

9      what those are, but I just want to make certain

10     that you knew that I'm asking you to tell me

11     exactly what it is that you want to claim as

12     exempt in whatever homes you want to. You'll do

13     that, right?

14 A   Yes.

15 Q   Okay. I received a letter from Mr. Cutler dated

16     July 13. I'm sorry. It's not from Mr. Cutler,

17     it's from Doug Nusbaum at his firm. And he says

18     various things, but there is a list attached to

19     it in which there's a list of items that were

20     gifted to your children, he indicates. Are there

21     any documents to verify those gifts?

22 A   First of all, they were registered in my name

23     because the children are 14 and 8. So I wouldn't

24     have any document between myself and an

25     8-year-old or a 14-year-old.

Page 75

1  Q   Sir, my question is, are there any documents to

2      verify those gifts to them?

3  A   No.

4  Q   Okay. When was the property in Cabos purchased,

5      Mr. Hecker?

6  A   Approximately three to five years ago.

7  Q   Okay. What was the original purchase price?

8  A   I believe a million two.

9  Q   Okay. And where did the funds come from to

10     purchase it?

11 A   I believe Wells Fargo.

12 Q   Okay. Wells Fargo didn't finance the entire

13     million dollar purchase, though, did it?

14 A   No.

15 Q   Okay. Did Denny Hecker also pay some money

16     towards the purchase?

17 A   Yes.

18 Q   Okay. Does Jacob Holdings of Ventanas, LLC, have

19     a bank account?

20 A   I believe they do.

21 Q   Where is that?

22 A   We can provide that for you.

23 Q   Okay. Does Jacob Holdings of Ventanas have any

24     business? Do you understand my question?

25     MR. CUTLER: Other than owning the

Page 76

1      condo?

2  BY THE TRUSTEE:

3  Q   Yeah. Let me rephrase it. Is the only thing

4      that Jacob Holdings of Ventanas, LLC, exists for

5      is to hold that property?

6  A   Yes.

7  Q   Okay. Why did you put it in the name of that LLC

8      rather than in your name personally?

9  A   Can I just ask a question just for a minute?

10     (Discussion held off the record between

11     the Debtor and his attorney.)

12     THE DEBTOR: All of the entities that I

13     own were in LLCs because I had a premarital

14     agreement that over the period of time,

15     everything that I acquired would be in the LLCs

16     and my spouse wouldn't be -- have any of the

17     upside or any of the downside.

18 BY THE TRUSTEE:

19 Q   Okay. So if it had been in your name personally

20     -- And I'll just stick to this one example. So

21     if Cabos had been in your name personally, your

22     understanding is it wouldn't have been protected

23     by the antenuptial agreement?

24 A   I believe so.

25 Q   Okay. Who paid the mortgage on the Cabos

Page 77

1      property, was it you personally? Well, I guess

2      I'm assuming stuff that may not be correct. Is

3      there a mortgage on it?

4  A   There's no mortgage.

5  Q   Okay. Who has paid any related expenses for the

6      Cabos property? Was it you, Denny Hecker?

7  A   It was me probably through Las Ventanas, LLC.

8  Q   What source of revenue did Las Ventanas, LLC

9      have other --

10 A   Zero.

11 Q   Just Denny Hecker?

12 A   Yes.

13 Q   Okay. Here, let me show you something that's in

14     your Schedule C. I'm sorry. It's in the

15     Statement of Financial Affairs. There's a

16     transfer to Jacob Holdings of Las Ventanas on 7/1

17     of 2008 of $174,000. Is that related to the

18     Cabos property or is that something else?

19 A   I believe it would be the Cabos property.

20 Q   Okay. Do you know what that would be for?

21 A   I have no idea. We'd have to research it and

22     give you the documents.

23 Q   Okay. Have you driven a Mazeratti in the last

24     two years?

25 A   No.

Page 78

1  Q   Have you had one in your possession in the last
2      two years?
3  A   No.
4  Q   Has there been one at your Cross Lake home in the
5      last two years?
6  A   No.
7  Q   Have you driven a Bentley in the last two years?
8  A   Yes.
9  Q   When was that, the last time you drove it?
10 A   I believe the last time I drove it might have
11     been 60 days ago.
12 Q   Who owns that Bentley?
13 A   US Bank.
14 Q   Was it a lease?
15 A   It was originally titled to Advantage Rent-A-Car
16     and it's a US Bank financed car.  It's being
17     turned back.
18 Q   Okay.  So when you say US Bank owns it, you mean
19     they have the loan on it?
20 A   Yes.
21 Q   Do you know anything about a motor home being
22     sold to the McCarthy Auto Dealership?
23 A   Yes.
24 Q   Tell me what you know about that.
25 A   It was purchased three or four years ago for

Page 79

1      approximately 800,000, and the company that owned
2      it sold it for 300,000 to McCarthy.
3  Q   Okay.  And that --
4  A   There was 300,000 worth of debt on it.
5  Q   I'm sorry?
6  A   There was 300,000 worth of debt on it.
7  Q   Okay.  So it was sold for the exact amount that
8      was owed?
9  A   About.
10 Q   About.  Okay.  And that was in April, right?
11 A   Yes.
12 Q   What company was it titled in?
13 A   Mr. Seaver, I don't --
14 Q   Just one of your companies?
15 A   Yes.
16 Q   Okay.  And Denny Hecker didn't receive anything
17     from that, right?
18 A   No.
19 Q   What's Fidelity Warranty Services?
20 A   It's a warranty company that provides warranties
21     for people who buy cars.
22 Q   Do you own an interest in that entity?
23 A   No, I don't believe so.
24 Q   Did you at one time?
25 A   I don't believe so.

Page 80

1  Q   Okay.
2  A   We had a commission agreement.
3  Q   Okay.  Tell me about that.  What's the commission
4      agreement?
5  A   We would receive commission based upon sales of
6      products.
7  Q   When you say we, who does that mean?
8  A   We, the company.
9  Q   Not Denny Hecker personally, or is it?
10 A   I don't believe so.
11 Q   Okay.
12 A   There's documents.  There's an agreement that we
13     did for you.
14 Q   Is there some large holdback that's being held by
15     somebody in Florida?
16 A   Well, the reinsurance company is holding back to
17     offset the claims.
18 Q   Okay.  And that's Moran, right?
19 A   Yes.
20 Q   All right.  And you have that listed in the
21     schedules, right, the debt to Moran?
22 A   Yes.
23 Q   Is that a personal debt or is that guaranteed?
24 A   It's guaranteed by myself.
25         THE TRUSTEE:  Okay.  Well, let's just

Page 81

1      take a short break here, and by short I mean ten
2      minutes.  If you guys want more, that's fine, but
3      I'm just thinking a short break.  And then I'm
4      going to open the floor up to others here
5      shortly.  I have more questions, but I want to
6      give other people a chance to ask what they
7      want.
8         (Break taken.)
9            CONTINUED EXAMINATION
10 BY THE TRUSTEE:
11 Q   Before I open it up to others, I do have a few
12     more questions that I'm going to ask here.  The
13     first one is -- And you understand, Mr. Hecker,
14     that you're under oath, still under oath, right?
15 A   Yes.
16 Q   All right.  Here, let me show you an MLS
17     listing.  It's for a property at 34515 Happy
18     Landing Road in Cross Lake.  Are you familiar
19     with that property?
20 A   Yes.
21 Q   All right.  Tell me about that property.
22 A   It's a vacant lot.
23 Q   Okay.  Is there a boat lift there?
24 A   I have no idea.
25 Q   Okay.  Who owned -- Or who owns that lot?  Was it

Page 82

1    titled in one of the business entities?
2  A    I believe so.
3  Q    All right. What's the status of that lot right
4    now; what's happening with it, other than being
5    for sale?
6  A    It's being foreclosed by Riverwood Bank.
7  Q    And does Riverwood Bank have a mortgage on it?
8  A    Yes, they do.
9  Q    When did they get that mortgage?
10  A    I'm not exactly sure.
11  Q    Was it within 90 days of your filing?
12  A    No.
13  Q    Was there some sort of transaction where the LLCs
14    got a lower interest rate from some banks but, in
15    exchange, gave a mortgage on that property before
16    the bankruptcy was filed?
17  A    I have no idea.
18  Q    That doesn't ring any bells with you?
19  A    No.
20  Q    All right. Mr. Hecker, you have been sued in
21    this bankruptcy case by Chrysler Financial
22    Services, correct?
23  A    Yes.
24  Q    And I'm just going to -- I printed a copy of the
25    complaint this morning without all of the

Page 83

1    exhibits, and that's a copy of the complaint. I
2    want to draw your attention specifically to some
3    allegations that are made in that complaint
4    starting at page 5, paragraphs 17 through 19.
5    Would you just take a minute or however long it
6    takes to read through those paragraphs? I don't
7    want you to read them out loud. I just want you
8    to read through them.
9        MR. MOHRMAN: Before Mr. Hecker reviews
10    these paragraphs, is it your intention to ask
11    Mr. Hecker questions regarding the allegations in
12    the adversary complaint?
13        THE TRUSTEE: It is.
14        MR. MOHRMAN: Under the bankruptcy
15    rules, once an adversary proceeding is commenced,
16    any questions related to the adversary complaint
17    and any discovery regarding the adversary
18    complaint must take place pursuant to the Federal
19    Rules of Civil Procedure.
20        THE TRUSTEE: Really. What bankruptcy
21    rule is that, sir?
22        MR. MOHRMAN: It's pursuant to a
23    case --
24        THE TRUSTEE: But decided by the --
25        MR. MOHRMAN: -- out of the United

Page 84

1    States Bankruptcy Court for the District of New
2    Jersey, In Re: 2435 Plainfield Avenue,
3    Incorporated. The citation is 223 Bankruptcy
4    Reporter 440, 1998.
5        THE TRUSTEE: Do you have --
6        MR. MOHRMAN: If I could read to you
7    from the case it says, the majority of courts
8    that have addressed the issue have prohibited a
9    Rule 2004 exam of parties involved in or affected
10    by an adversary proceeding.
11        THE TRUSTEE: Stop right there,
12    Mr. Mohrman. Are you under the impression that
13    this is a Rule 2004 examination?
14        MR. MOHRMAN: I think under other case
15    law --
16        THE TRUSTEE: Are you under the
17    impression that this is a Rule 2004 examination?
18        MR. MOHRMAN: I'm sorry. I was going
19    to answer. It is my understanding that the
20    parameters of the Rule 2004 examination and the
21    examination of Debtor at the first Meeting of
22    Creditors is the same.
23        THE TRUSTEE: Where do you get that?
24        MR. MOHRMAN: That's my understanding
25    of the rules.

Page 85

1        THE TRUSTEE: Understanding based on
2    what rule?
3        MR. MOHRMAN: That's my understanding
4    under the bankruptcy law.
5        THE TRUSTEE: What law?
6        MR. MOHRMAN: Well, you interrupted me
7    earlier, so if I can continue --
8        THE TRUSTEE: Does it mention
9    Section 341 of the bankruptcy code at all in that
10    case?
11        MR. MOHRMAN: There are --
12        THE TRUSTEE: Does it?
13        MR. MOHRMAN: Sir, I'm not being
14    examined here.
15        THE TRUSTEE: Well, you're offering
16    some testimony here.
17        MR. MOHRMAN: I am not offering any
18    testimony, sir. I'm an attorney for the debtor,
19    and I would ask, as a courtesy, that you allow me
20    to complete what I'm going to say. And then if
21    you want to say something, you can do that. As
22    you -- the court reporter told Mr. Hecker
23    earlier, it's difficult for her to take down
24    things when two people are talking at once.
25        THE TRUSTEE: Okay. Finish what you're

Page 86

1  going to say.

2      MR. MOHRMAN:  Thank you.  The case law

3  that's cited in this case, and there's a number

4  of string cites, make it very clear that once an

5  adversary proceeding is commenced, discovery may

6  be had only pursuant to the discovery provisions

7  of the Federal Rules of Civil Procedure.

8      So based on that, I am not going to

9  allow Mr. Hecker to answer questions related to

10  the complaint that's pending.

11      THE TRUSTEE:  Mr. Cutler, you're the

12  bankruptcy attorney here.  Do you think this

13  assessment is accurate?

14      MR. CUTLER:  I haven't made an

15  independent judgment.  I defer to Mr. Mohrman,

16  who's representing Mr. Hecker in connection with

17  the adversary proceeding Mr. Hecker has.

18      THE TRUSTEE:  Right, but you're

19  representing here at the 341, right?

20      MR. CUTLER:  Well, not having heard

21  your questions, it's a little hard to determine

22  if the debtor should respond to them or not.  But

23  the concern, of course, is that neither I nor

24  Mr. Mohrman have had adequate time to review the

25  pleading and the exhibits, which are voluminous.

Page 87

1  The allegations are serious.  There are rules of

2  evidence that will apply and rules of civil

3  procedure that will apply in that proceeding.

4  And the debtor is at a serious disadvantage here

5  depending on the scope and the nature of the

6  questions.  We have a lot of concern about that,

7  that we not jeopardize any defenses that

8  Mr. Hecker could present in connection with

9  that.

10  BY THE TRUSTEE:

11  Q   All right.  Have you read through those

12  paragraphs yet, Mr. Hecker?

13      MR. MOHRMAN:  Again --

14      THE TRUSTEE:  Mr. Mohrman, I'm not

15  talking to you.  I'm talking to Mr. Hecker.

16      MR. MOHRMAN:  -- I'm going to instruct

17  Mr. Hecker not to answer questions related to the

18  adversary complaint that's been filed, because

19  any examination regarding those allegations has

20  to be conducted in the case under the Federal

21  Rules of Civil Procedure.

22      THE TRUSTEE:  Do you think you might

23  want to wait until I actually ask him a question

24  before you do that?

25      MR. MOHRMAN:  Well, you asked him a

Page 88

1  question, to review the complaint.

2      THE TRUSTEE:  No, I'm telling him to

3  review the complaint.  When I get to my

4  questions, you can assert what it is that you're

5  asserting here and we'll let Judge Kressel decide

6  it.

7      MR. MOHRMAN:  Absolutely.

8  BY THE TRUSTEE:

9  Q   Have you read those paragraphs yet, Mr. Hecker?

10      MR. MOHRMAN:  You can answer that.

11      THE DEBTOR:  Yes.

12  BY THE TRUSTEE:

13  Q   All right.  Paragraph 16 says, among other

14  things, that you personally presented to Chrysler

15  Financial a letter dated November 7, 2007, a copy

16  of which is attached as Exhibit E.  Did you do

17  that?

18      MR. MOHRMAN:  Again, I'm going to

19  instruct him not to answer that question.

20  There's an adversary complaint pending.

21      THE TRUSTEE:  All right.  You've done

22  this.  I'm asking him questions.  I understand

23  what you're saying.

24      MR. MOHRMAN:  Okay.

25  BY THE TRUSTEE:

Page 89

1  Q   Mr. Hecker, let me show you Exhibit F from the

2  complaint.  Exhibit F from the complaint is a

3  letter on Hyundai letterhead that talks in the

4  first paragraph about Hyundai agreeing to

5  repurchase 4,855 vehicles from Walden Fleet

6  Services after they were purchased.  There's a

7  signature on a page of this.  Is that your

8  signature?

9      MR. MOHRMAN:  Again, I'm instructing

10  Mr. Hecker not to answer that question.  That

11  question is directed directly at allegations that

12  are contained in the adversary complaint that are

13  currently pending in this bankruptcy court.

14      THE TRUSTEE:  So you're not going to

15  let him tell me whether that's his signature --

16      MR. MOHRMAN:  That's correct --

17      THE TRUSTEE:  -- based on that New

18  Jersey case?

19      MR. MOHRMAN:  -- because I'm concerned

20  that you'll take the position that if I allow him

21  to answer questions regarding anything related to

22  the complaint, that he has waived any rights he

23  has under these cases.

24      THE TRUSTEE:  Any rights he has under

25  that New Jersey bankruptcy case.

**Page 90**

1    BY THE TRUSTEE:
2    Q   Look at this letter, if you would, Mr. Hecker.
3    Did you cause any alteration to be made in the
4    original letter from Hyundai Financial?
5        MR. MOHRMAN:  Again, I instruct
6    Mr. Hecker not to answer that question, because
7    that question is directly related to the
8    allegations that are made in the adversary
9    complaint.
10       THE TRUSTEE:  Also directly related to
11   financial matters in this bankruptcy case,
12   Mr. Mohrman, which I have an obligation to
13   investigate.
14       MR. MOHRMAN:  I understand that.  And
15   if you look at the case law that I researched,
16   the Court specifically discussed the tension
17   between the examination that takes place here and
18   what happens once an adversary complaint is
19   filed.
20       THE TRUSTEE:  All right.
21       MR. MOHRMAN:  And the way the courts
22   have come down on that -- If I may finish, sir,
23   the way the courts have come down on that, is
24   because the courts have stated that this
25   examination is somewhat akin to a fishing

**Page 91**

1    expedition but that once an adversary complaint
2    is filed, that all parties in the case are
3    protected by the discovery rules, that the
4    discovery rules then apply once an adversary
5    proceeding is commenced.  And that is --
6        THE TRUSTEE:  Mr. Mohrman, you can stop
7    the speech, please.  Do you have any Eighth
8    Circuit law that supports this position of
9    yours?
10       MR. MOHRMAN:  From the research --
11       THE TRUSTEE:  Do you have any?
12       MR. MOHRMAN:  Sir, I, again, would
13   request that you please not interrupt me.
14       THE TRUSTEE:  It's a "yes" or "no"
15   answer.
16       MR. MOHRMAN:  And, again, that might be
17   okay to say that to somebody you're examining
18   here, but I'm not under oath and I'm not -- I'm
19   an attorney.
20       THE TRUSTEE:  Okay.  Then I'm going to
21   have you stop testifying.
22       MR. MOHRMAN:  I'm not testifying, sir.
23   And I'm going to put my statement on the record.
24   My research showed yesterday -- I couldn't find
25   any Eighth Circuit authority on the issue, either

**Page 92**

1    at the Eighth Circuit level or at the District
2    Court level.  But I'm sure, as you're well aware,
3    the bankruptcy court here in Minnesota will rely
4    on bankruptcy court decisions from other
5    jurisdictions.  And from what I just read to you
6    from the New Jersey decision, it talked about the
7    majority of other courts.
8    BY THE TRUSTEE:
9    Q   All right.  Coming back to this adversary
10   complaint, Mr. Hecker, did you ever alter a
11   letter from Hyundai Financial before presenting
12   it to Chrysler Financial?
13       MR. MOHRMAN:  I'm going to instruct you
14   not to answer that question, Mr. Hecker.
15       THE TRUSTEE:  All right.  Well, we'll
16   see what the judge in this case has to say about
17   your instructions, Mr. Mohrman.
18       All right.  I'm going to open it up now
19   for questions from other people.  And those of
20   you who have --
21       MR. CUTLER:  Mr. Seaver, are you going
22   to open the floor up to creditors to ask
23   questions --
24       THE TRUSTEE:  Yes.
25       MR. CUTLER:  -- or anybody present?

**Page 93**

1        THE TRUSTEE:  Well, that's a good
2    distinction, Mr. Cutler.
3        THE TRUSTEE:  First of all, people who
4    have questions, just raise your hands.  Give me
5    an idea of how many people we might be talking
6    about here.  One.
7        Okay.  The IRS has some questions here,
8    so let's start with them.
9        Good point, Mr. Cutler.  We'll come
10   back to it if a need to be arises.
11       MR. MOHRMAN:  We would ask, Mr. Seaver,
12   that anybody who is asking questions identify who
13   they are and --
14       THE TRUSTEE:  Sure.
15       MR. MOHRMAN:  -- whether or not they're
16   a creditor in the bankruptcy case.
17       THE TRUSTEE:  And would you identify
18   yourself, sir?
19       MR. CLIFTON:  Sure.  Rich Clifton with
20   the Internal Revenue Service.  The Internal
21   Revenue Service is a creditor in this case with
22   Mr. Hecker, based on tax liens that we have
23   filed.
24       THE TRUSTEE:  Go ahead.
25

Page 94

1           EXAMINATION
2 BY MR. CLIFTON:
3 Q   I want to start with some real property
4     questions.  I think some of these have been
5     answered and maybe clarify some of them.  The
6     property at 1615 Northridge Drive, your value on
7     your schedules was a million one.  How did you
8     arrive at that?
9 A   We arrived at that as a general market condition
10    value.
11 Q   Did you check to see whether it was assessed that
12    by the county?
13 A   I think we looked at more appropriate sales in
14    the neighborhood.
15 Q   Well, the county has it at 1.8 million, so how do
16    you account for a $700,000 difference?
17         MR. CUTLER:  Do you want him to explain
18    why the county has it assessed at 1.8 million?
19 BY MR. CLIFTON:
20 Q   How did you come up with 1.1 compared to that?
21         MR. CUTLER:  He just told you.
22         MR. CLIFTON:  More specifically?
23         MR. CUTLER:  Than what he told you?
24 BY MR. CLIFTON:
25 Q   Yeah.  Who did you talk to to come up with that

Page 95

1     value?
2         THE TRUSTEE:  Just to help you a little
3     bit, these are Mr. Cutler's.  Those are his
4     original copies.  I believe those are the value
5     opinions from a real estate company in Cross
6     Lake.
7         MR. CLIFTON:  Okay.
8 BY MR. CLIFTON:
9 Q   So the 1.1, who did you talk to to get 1.1?
10 A   We looked at comps. in the neighborhood and came
11    up with that value.
12 Q   And did you have access to those comps. yourself?
13 A   They're on MLS.
14 Q   Okay.  So it's MLS you're using.  The condo at
15    53rd Avenue in Plymouth that you jointly own with
16    Kelly Hecker, that's your daughter, correct?
17 A   It's a town house.
18 Q   Okay.  Do you jointly own that with Kelly?
19 A   I cosigned for her, yes.
20 Q   And the two of you have always been the co-owners
21    of that property?
22 A   I believe so.
23 Q   And is there a mortgage on that property?
24 A   Yes, there is.
25 Q   And who pays that?

Page 96

1 A   She does.
2 Q   Okay.  Have you ever?
3 A   No, I don't believe I have.
4 Q   Do you know who the mortgage is with?
5         MR. CUTLER:  It should be on
6     Schedule D.
7 BY MR. CLIFTON:
8 Q   Okay.  The Cross Lake properties, were those ever
9     owned by any company or individual that you're a
10    part of or related to prior to the Jacob Holdings
11    showing as the title holder of those properties?
12 A   I don't believe so.
13 Q   No?
14 A   I don't believe so.
15         MR. CLIFTON:  Okay.  I don't recall.
16    Did we talk about Transcend Communications
17    earlier?  Randy, do you recall?
18         THE TRUSTEE:  I didn't ask him about
19    Transcend Communications.
20 BY MR. CLIFTON:
21 Q   Okay.  You show a two-and-a-half million
22    dollar --
23         MR. CUTLER:  Mr. Clifton, the lender on
24    13905 53rd Avenue North, Apartment 1 is listed in
25    Schedule D as Washington Mutual Bank.

Page 97

1         MR. CLIFTON:  Okay.
2         MR. CUTLER:  Sorry to interrupt.
3         MR. CLIFTON:  That's fine.
4 BY MR. CLIFTON:
5 Q   A question regarding Transcend Communications,
6     Incorporated.  Is that one of your companies?
7 A   I have an interest in the company.
8 Q   What is your interest?
9 A   I'm not sure.
10         MR. CUTLER:  It should be reflected in
11    the schedules in Exhibit B of the attachments.
12    You have a stock ownership interest in it?
13         THE DEBTOR:  Yes.
14 BY MR. CLIFTON:
15 Q   Do you know what percent your stock ownership
16    is?
17 A   Look in the schedule.
18         MR. CUTLER:  Is it less than
19    50 percent, Mr. Hecker?
20         THE DEBTOR:  I'm not sure.
21         MR. CUTLER:  There's an attachment to
22    Exhibit -- to Schedule B, Exhibit B-13 that has a
23    listing of the various ownership interests.
24         MR. CLIFTON:  Right, yeah.
25         MR. CUTLER:  And it should be reflected

Page 98

1    in that schedule.
2        MR. CLIFTON:  Transcend is listed
3    there?
4        MR. CUTLER:  Let me check here for you.
5    if you just give me a second.
6        MR. CLIFTON:  Sure.
7        MR. CUTLER:  Yes, it's listed.
8    BY MR. CLIFTON:
9    Q   Okay.  Is that a privately-held company?
10   A   Yes, it is.
11   Q   Okay.  And what's your interest, ownership?
12       MR. CUTLER:  It's listed in
13   Exhibit B-13 at 54 percent.  There's a separate
14   Transcend Holding Company, LLC, listed in the
15   exhibit as well.
16       MR. CLIFTON:  That's a separate
17   company, though?
18       MR. CUTLER:  It appears to be.
19   BY MR. CLIFTON:
20   Q   You listed your 53-foot Hatteras boat and
21   stated that that had been repossessed or turned
22   back in to the lienholder May of this year?
23   A   Yes.
24   Q   Do you know where that boat is?
25   A   That boat is in Bayport, Minnesota at Bayport

Page 99

1    Marine.
2    Q   Do you have any pets, any animals?
3    A   Yes.
4    Q   What are they?
5    A   German Shepards.
6    Q   Were these the same animals that were talked
7    about in the Forbes magazine article of December
8    of '07?
9    A   I don't recall the article.
10   Q   Are these a special kind of dog?
11       MR. MOHRMAN:  What do you mean by
12   special?
13       THE TRUSTEE:  How much did you pay for
14   those dogs, Mr. Hecker?
15       THE DEBTOR:  There's two dogs.
16       THE TRUSTEE:  Okay.
17       THE DEBTOR:  And they're primarily
18   security dogs for the family.
19       THE TRUSTEE:  How much did you pay for
20   them?
21       THE DEBTOR:  30,000 apiece.
22       THE TRUSTEE:  Okay.  I don't see them
23   in the schedules.  Is there a reason for that?
24       THE DEBTOR:  They're family pets.  My
25   wife claimed that they're hers and the

Page 100

1    children's.
2        THE TRUSTEE:  Who paid for them, you?
3        THE DEBTOR:  I believe it came from one
4    of my accounts.
5        THE TRUSTEE:  Okay.  Go ahead,
6    Mr. Clifton.
7    BY MR. CLIFTON:
8    Q   Came from what?
9    A   Came from my accounts.
10   Q   Okay.  Where are these dogs located now, where do
11   they live?
12   A   Medina.
13   Q   And that address?
14   A   1492 Hunter.
15   Q   Is that where Tamitha lives?
16   A   Yes.
17   Q   And your children?
18   A   Yes.
19   Q   Okay.  Are you separated?
20   A   Yes.
21   Q   Okay.  On Schedule D, sheet four of seven, if you
22   want to look at that, you list Lake Bank of Two
23   Harbors as a secured creditor listing three
24   Silver Lake condominiums.  Are these the Two
25   Harbors properties?

Page 101

1    A   Yes.
2    Q   Can you explain -- Well, first of all, are those
3    Two Harbor properties titled in your name or one
4    of your companies?
5        MR. CUTLER:  Well, if you look at
6    Schedule A, you can determine if they're listed
7    as being owned by Mr. Hecker.  And I don't
8    believe they're reflected on Schedule A, so I
9    believe the real estate records will reflect that
10   they're owned by a company that he directly or
11   indirectly owns.  The best evidence on that would
12   be to check the real estate records.
13       MR. CLIFTON:  Right, I realize that.
14   BY MR. CLIFTON:
15   Q   So the mortgages listed here, do you know if
16   those are mortgages either in your name or your
17   personal guarantee or in one of your companies?
18   A   Well, I personally guaranteed them.
19   Q   I was a little confused by this statement after
20   three Silver Lake condominiums.  Security
21   interest asserted is half interest in household
22   goods.  What do you mean there?  Are we talking
23   about real property and personal property?
24       MR. CUTLER:  Maybe I can address that.
25   If you read the mortgages, the mortgage contains

Page 102

1    a grant of any personal property that's located
2    on the premises in favor of the bank.  We believe
3    that the bank failed to file a UCC-1 financing
4    statement to perfect that.  That's a legal issue.
5              MR. CLIFTON:  So they were trying to
6    secure all personal property located at these
7    condominiums?
8              MR. CUTLER:  The mortgage is a
9    combination mortgage and grant of a security
10   interest in personal property located at the
11   premises.
12             MR. CLIFTON:  Okay.
13             MR. CUTLER:  Kind of a standard form
14   document in Minnesota.
15             MR. CLIFTON:  But you don't think they
16   perfected the UCC filing?
17             MR. CUTLER:  That's correct.  We
18   believe they have not filed a UCC statement.
19             MR. CLIFTON:  Okay.
20             THE TRUSTEE:  Mr. Clifton, when did
21   the -- I understand, and I get this from the
22   papers, I guess, but I understand that the IRS
23   filed a lien.
24             MR. CLIFTON:  Yeah.
25             THE TRUSTEE:  When was that?

Page 103

1              MR. CLIFTON:  Well, we have several
2    liens in different locations.
3              THE TRUSTEE:  Okay.
4              THE TRUSTEE:  And I don't need specific
5    dates now.  If you could just --
6              MR. CLIFTON:  No, I've got them here.
7              THE TRUSTEE:  Okay.
8              MR. CLIFTON:  The first one was filed
9    April 17th of this year in Hennepin County; the
10   next one was on May 8th in Washington County; the
11   same date in Crow Wing County; May 11th in
12   Maricopa County, Arizona; and -- Well, that's
13   it.
14             THE TRUSTEE:  Okay.  You can go ahead.
15   BY MR. CLIFTON:
16   Q   The property at 7175 East Camel Back Road,
17       Scottsdale, Arizona, you listed in your
18       Schedule B, personal property at that location,
19       not itemizing what it was or what its value was.
20       Was that property that earlier was stated had
21       been all transferred back here?
22   A   No, it's not.  I don't believe so.
23   Q   Well, is there property in Arizona that was
24       transferred back here, is my understanding?
25   A   Yes.

Page 104

1    Q   And was that from a different location?
2    A   Yes, from a different location.
3    Q   And what was that location?
4              MR. CUTLER:  Was that a prior home that
5    you sold?
6              THE DEBTOR:  It was a prior home,
7    Gainey Ranch.
8              MR. CUTLER:  The street address was on
9    Gainey Ranch?
10             THE DEBTOR:  Gainey Ranch, yes.
11   BY MR. CLIFTON:
12   Q   And when was that sold?
13   A   Sometime in '08, early '08.
14   Q   So personal property that was brought back to
15       Minnesota was from that location?
16   A   Yes.
17   Q   Gainey Ranch?
18   A   Yes.
19   Q   Okay.  So is there still personal property at
20       this Camel Back address?
21             MR. CUTLER:  Well, the schedules
22   reflect that there is.  I don't understand your
23   question.
24   BY MR. CLIFTON:
25   Q   Well, I'm just clarifying that it is still

Page 105

1    there.  And can you be more specific --
2              MR. CUTLER:  There's no testimony that
3    it's gone anywhere.
4    BY MR. CLIFTON:
5    Q   Can you specify what property is there and what
6        value it may have, or is that information that
7        you have turned over to Mr. Seaver?
8              THE TRUSTEE:  On the Camel Back
9    property, Mr. Hecker, it says interest in an
10   unknown portion of household goods.  What does
11   that mean; why is it unknown?
12             THE DEBTOR:  The ownership is -- half
13   interest is owned by another party.
14             THE TRUSTEE:  Who?
15             THE DEBTOR:  Richard and Brent Olson.
16             THE TRUSTEE:  Are they connected with
17   Royal Jewelers?
18             THE DEBTOR:  Yes, they are.
19             THE TRUSTEE:  Do they own Royal
20   Jewelers?
21             THE DEBTOR:  I believe they have an
22   interest.
23             THE TRUSTEE:  Okay.  So did they
24   purchase some of the furniture in there?
25             THE DEBTOR:  We bought the model

Page 106

1    furnished.
2         THE TRUSTEE:  Okay.  So would it be
3    your view that -- Have you folks equally split
4    payments for this since the purchase?
5         THE DEBTOR:  I'm not sure I own it
6    personally or an LLC.
7         THE TRUSTEE:  And I'm not really asking
8    you that.
9         THE DEBTOR:  Okay.
10        THE TRUSTEE:  Well, since the purchase
11   have payments have been split between the Olsons
12   and you or the business entity?
13        THE DEBTOR:  The original intention was
14   that.  We haven't paid our share for about four
15   months.
16        THE TRUSTEE:  Okay.  Up to that time
17   did the original intention prevail?
18        THE DEBTOR:  Yes.
19        THE TRUSTEE:  Okay.  All right.  What
20   do you think the total value of those household
21   goods is?  I'm not asking about the allocation
22   between the parties now.  I'm just looking for a
23   rough idea of the value.
24        THE DEBTOR:  Well, we paid, I think,
25   two million -- two or four for the unit, and to

Page 107

1    bring in a million eight right now.  So I don't
2    know what the value is.
3         THE TRUSTEE:  Was there an allocation
4    for personal property and real estate when you
5    bought the unit?
6         THE DEBTOR:  No.
7         THE TRUSTEE:  All right.  The personal
8    property, though, that's really what I'm asking
9    about here.
10        THE DEBTOR:  I --
11        THE TRUSTEE:  Just don't know?
12        THE DEBTOR:  -- don't know.
13        THE TRUSTEE:  Okay.  Go ahead,
14   Mr. Clifton.
15   BY MR. CLIFTON:
16   Q   When were you last at that property?
17   A   I believe 60 days ago.
18   Q   So you should have a good idea of what's there
19   for personal property?
20        MR. CUTLER:  Is that a question or a
21   statement?  If you want to ask him, does he have
22   an --
23   BY MR. CLIFTON:
24   Q   Do you have an idea of what's in that property
25   from your visit there 60 days ago?

Page 108

1    A   Yes.
2    Q   So your testimony is that you have a half
3        interest in that property or one of your
4        companies has a half interest in that property,
5        the real property --
6    A   Yes.
7    Q   -- the real property, the real estate?
8         MR. CLIFTON:  I'm switching gears.
9         MR. CUTLER:  Let's just stop a minute.
10   You're asking multiple questions, so he needs a
11   chance to be able to respond before you go into
12   the next one.
13   BY MR. CLIFTON:
14   Q   Okay.  I'm asking about the real property at
15   Camel Back Road.  Who owns the real property?
16   A   Same people in all of the real estate.
17   Q   No.  I'm asking about the real estate.  Who owns
18   the real estate?  You said Royal Jewelers?
19   A   No.  I said Richard and Brent Olson.
20   Q   Okay.  And yourself individually?
21        MR. CUTLER:  Well, Mr. Clifton, I think
22   what we don't know -- what Mr. Hecker doesn't
23   know is whether it's held by him personally or in
24   a corporation that he owns directly or
25   indirectly.

Page 109

1         MR. CLIFTON:  That's my question.
2         MR. CUTLER:  Mr. Hecker, you and/or you
3    and your wife have a 50 percent ownership
4    interest in that condo?
5         THE DEBTOR:  Yes.
6         MR. CUTLER:  And the other 50 percent
7    ownership interest is --
8         THE DEBTOR:  Yes.
9         MR. CUTLER:  -- the Olsons?  And is it
10   held directly by the Olsons or is it held in the
11   corporation?
12        THE DEBTOR:  I'm not sure.
13        MR. CUTLER:  If we researched the real
14   estate records, would it be reflected there?
15        THE DEBTOR:  Yes, it would.
16   BY MR. CLIFTON:
17   Q   Okay.  To clarify what you just asked him, I
18   think your question to him was whether him and
19   his wife owned --
20        MR. CUTLER:  I said and/or his wife, I
21   think.
22        MR. CLIFTON:  Individually.
23        MR. CUTLER:  What we're trying to
24   determine, Mr. Hecker, is whether you own that
25   condominium -- you have a personal interest in

Page 110

1    the condominium or whether it is owned in an
2    LLC.
3            THE DEBTOR: I don't know.
4    BY MR. CLIFTON:
5    Q   Okay. The Los Cabos property, I think we
6        established that was owned by a Jacob Holdings
7        entity?
8            THE TRUSTEE: I think we established
9        it's titled in the name of Jacob Holdings.
10   BY MR. CLIFTON:
11   Q   Right, okay. When were you last at that
12       property?
13   A   February or March.
14   Q   Okay. And was there personal property located
15       there at that time?
16   A   Yes.
17   Q   And you could provide an idea of what that
18       property is?
19   A   Yes.
20           THE TRUSTEE: Mr. Hecker, what do you
21       think that real property in Cabos would sell
22       for?
23           THE DEBTOR: Well, it's ten years old.
24           THE TRUSTEE: Yeah.
25           THE DEBTOR: I think we have on the

Page 111

1    schedule a number. I'm not sure.
2            THE TRUSTEE: I'm just asking you,
3        though, what you think.
4            THE DEBTOR: Five thousand or less.
5            THE TRUSTEE: Oh, I'm asking about the
6        real property, though.
7            THE DEBTOR: Somewhere between a
8        million and a million two.
9            THE TRUSTEE: Okay. Are there any
10       other units similar to that on the market down
11       there?
12           THE DEBTOR: Several.
13           THE TRUSTEE: Okay. And what are they
14       asking for those?
15           THE DEBTOR: Different units bring
16       different prices.
17           THE TRUSTEE: Right. I'm looking for
18       one similar to the one that you have. Are there
19       any of those on the market right now?
20           THE DEBTOR: There's no first floor
21       with the driveway and the parking lot in front of
22       it, no.
23           THE TRUSTEE: Okay. There are some the
24       same size, but not the same level?
25           THE DEBTOR: Yeah, the ocean view.

Page 112

1            THE TRUSTEE: Okay. Go ahead,
2    Mr. Clifton.
3    BY MR. CLIFTON:
4    Q   You listed two IRA accounts with balances as of
5        the end of December, and then there's a statement
6        in your filings that there was a liquidation in
7        April 30th of '09, I think on Schedule E, page 2?
8            MR. CUTLER: Schedule E?
9            MR. CLIFTON: I think that's where I
10       picked it up. Yeah. Well, it was listed -- You
11       listed it on Schedule E, page 2 of 4.
12           MR. CUTLER: There's a withdrawal
13       liability amount listed.
14           MR. CLIFTON: Right.
15           MR. CUTLER: Is that what you're
16       referring to?
17   BY MR. CLIFTON:
18   Q   Right. So there must have been a withdrawal on
19       April 30th of this year?
20   A   The plan was terminated.
21   Q   We're talking about your IRA accounts; is that
22       right?
23           MR. CUTLER: No. Actually, what you're
24       referring to refers to a 401(k) plan.
25           MR. CLIFTON: Not the IRAs?

Page 113

1            MR. CUTLER: On Schedule E.
2            MR. CLIFTON: Not the IRAs?
3            MR. CUTLER: That's a question to you,
4    I guess. Does this schedule -- Review this.
5    Does this refer to the 401(k) plan or to your
6    IRAs that are scheduled on Schedule B; is that --
7            THE WITNESS: I don't know.
8    BY MR. CLIFTON:
9    Q   So your IRA plans, you had two of them listed.
10       Have you liquidated any funds from those accounts
11       in 2009?
12   A   I don't believe so.
13   Q   Okay. You listed investment accounts of some
14       nature with Schmidt Barney, JP Morgan, UBS
15       Financial Services, Stifel Nicolaus and Citi
16       Smith Barney. Do you have any transactions with
17       any of those accounts since January of this year,
18       January 1st?
19           MR. CUTLER: Other than what's
20       reflected in the schedules?
21           MR. CLIFTON: Yeah.
22           THE DEBTOR: No, I don't think so.
23   BY MR. CLIFTON:
24   Q   Okay. On the SOFA, Question 6 --
25           THE TRUSTEE: You're referring to the

Page 114

1   Statement of Financial Affairs, right?
2         MR. CLIFTON:  Yes.
3         THE TRUSTEE:  Okay.
4   BY MR. CLIFTON:
5   Q   And maybe we already talked about this.  What
6       real property, specifically located, what are we
7       talking about with this statement, deeds in lieu
8       and voluntary surrender agreement?
9   A   1492 Hunter Drive in Medina.
10  Q   That's the only property we're talking about
11      there?
12  A   Oh, and Jacob Holdings of Aspen.
13  Q   And that real property is located where, under
14      Jacob Holdings of Aspen?
15  A   Aspen.
16  Q   Is that a condominium or town house?
17  A   Town house.
18  Q   So if I can understand what this statement says,
19      you've surrendered those properties to TCF?
20  A   The Medina property had a TCF first mortgage for
21      five million and a second mortgage with US Bank
22      for 12 million -- or seven million.  And TCF took
23      it back for five million, and US Bank didn't
24      exercise their option.
25  Q   On the Hunter property?

Page 115

1   A   Yes.  On the Aspen property they had a
2       $10 million mortgage, and TCF took it back with
3       an appraisal of eight million.
4   Q   Okay.  I think we established that CM Rowan and
5       Christi M. Rowan are the same person?
6   A   Yes.
7   Q   And in your list of transfers of property, there
8       was two entries to her, one for 65,000 and one
9       for 35,000.
10  A   They weren't all at one time.
11  Q   But they are to one person?
12  A   Yes.
13  Q   Okay.  What is French Lake Stables?
14  A   Are you referring to a check register?
15  Q   Yeah.
16  A   And how much is that for?
17  Q   $360.
18  A   I'm not sure whether the children went riding
19      there.  I have no idea.
20  Q   Do you own a horse?
21  A   No.
22  Q   Any interest in a horse?
23  A   No.
24  Q   Why would you have a payment to Florida Power and
25      Light?

Page 116

1   A   I was personally making the payments of an LLC
2       house that got repossessed that was owned by a
3       partnership.
4   Q   What was the partnership?
5         THE TRUSTEE:  Where was the home,
6   Mr. Hecker?
7         THE DEBTOR:  It was by Naples.
8         THE TRUSTEE:  Do you recall the
9   partnership?
10        THE DEBTOR:  The partner was, I
11  believe, Jeff Holmers.  It was an LLC, and I'm
12  not sure what the name of the company was.
13        THE TRUSTEE:  How do you spell that
14  last name?
15        THE DEBTOR:  H-O-L-M-E-R-S.  We can get
16  that information.
17  BY MR. CLIFTON:
18  Q   Is this one of the entities listed amongst your
19      250 or whatever that you're involved in?
20        MR. CUTLER:  Do you want to review the
21  schedule and see if it's listed there?
22        THE DEBTOR:  Yeah, let's read the
23  schedule.
24        MR. CUTLER:  It's going to take us
25  awhile.

Page 117

1   BY MR. CLIFTON:
2   Q   Could I ask a related question while you're
3       looking?
4         MR. MOHRMAN:  Well, why don't you let
5   them look.
6         MR. CUTLER:  Do you want him to look or
7   do you want him to answer the questions?
8         THE TRUSTEE:  Do you know who it is,
9   Mr. Dove; do you know who it is, what company it
10  is?
11        MR. DOVE:  Most likely it would have
12  been HHR of Copper Oaks, LLC.
13        THE TRUSTEE:  Does that sound right,
14  Mr. Hecker?
15        THE DEBTOR:  Yes.
16        THE TRUSTEE:  That was Erik Dove.
17        THE TRUSTEE:  Mr. Hecker, other than
18  these trips to Mexico, have you traveled outside
19  the country in the last two years?
20        THE DEBTOR:  Canada.
21        THE TRUSTEE:  Okay.  Other than Canada
22  and Mexico, have you traveled outside the country
23  in the last two years?
24        THE WITNESS:  Yes.
25        THE TRUSTEE:  Where?

Page 118

1    THE DEBTOR:  To Germany.
2    THE TRUSTEE:  Okay.  And when was
3  that?
4    THE DEBTOR:  Maybe June and July of
5  '08.
6    THE TRUSTEE:  Okay.  Go ahead,
7  Mr. Clifton.
8    MR. CUTLER:  Can I ask a follow-up
9  question?
10    THE TRUSTEE:  Sure.
11    MR. CUTLER:  Was that for business for
12  Advantage?
13    THE DEBTOR:  Yes, it was.  It was for
14  the sale of Advantage.
15    MR. CUTLER:  And that was to speak to a
16  potential buyer --
17    THE DEBTOR:  Yes --
18    MR. CUTLER:  -- of the Advantage
19  Rent-A-Car --
20    THE DEBTOR:  -- Erich Sixt's
21  Rent-A-Car.
22    MR. CUTLER:  Did you conduct any
23  personal business while you were in Germany?
24    THE DEBTOR:  We flew over -- We left
25  here at five o'clock and got back at ten o'clock

Page 119

1  the next night, there and back two times.
2    MR. CUTLER:  So you didn't conduct any
3  personal business while you were in Germany?
4    THE DEBTOR:  None.
5  BY MR. CLIFTON:
6  Q   Do you belong to the Wayzata Country Club?
7  A   Yes.
8  Q   And what's a membership there cost?
9  A   I have no idea.  I've owned it since 1978.
10    THE TRUSTEE:  Is that --
11    THE DEBTOR:  It costs $1,000 a month.
12    THE TRUSTEE:  Is that a transferable
13  membership?
14    THE DEBTOR:  I believe it has the same
15  kind of limitations that Spring Hill has.
16    THE TRUSTEE:  What's the initiation fee
17  there now; do you know?
18    THE DEBTOR:  I got in in 1978 for
19  20,000.  I believe that's what they'd buy it back
20  for if you got through the waiting list.
21    THE TRUSTEE:  Okay.
22  BY MR. CLIFTON:
23  Q   The question that I was going to ask while you
24  were looking up that Florida Power and Light
25  Partnership, Naples is in Lee County?  You have a

Page 120

1  check to Lee County Treasurer.  Would that be for
2  that property or something else?
3  A   I would be guessing, but I presume it would be
4  that property.
5  Q   Is Naples in Lee County?
6  A   I have no idea.
7  Q   What's the Scottsdale Waterfront Association?
8  A   It's the association that operates the building
9  where the Camel Back property is.
10  Q   Does that property have access to a body of
11  water?
12  A   There's a river next to it, a man-made runoff
13  kind of deal.
14  Q   Okay.  Do you have a boat down there?
15  A   No.  There's no boats available on the --
16  There's -- It's a stream.
17  Q   Okay.  Silver Cliff Properties, are those Two
18  Harbors?
19  A   Yes.
20  Q   What's the Lafayette Club?
21  A   It's a social membership at Lafayette.  It's a --
22  In Minnetonka.
23    THE TRUSTEE:  Is there an initiation
24  fee for that?
25    THE DEBTOR:  I believe, Mr. Seaver,

Page 121

1  when I got in five or six years ago, it was 2,500
2  or something nominal.
3    THE TRUSTEE:  Okay.
4    MR. CLIFTON:  Was your testimony that
5  you provided additional bank account records to
6  Mr. Seaver.
7    MR. CUTLER:  That wasn't my testimony.
8  I'm not here to testify.
9  BY MR. CLIFTON:
10  Q   Mr. Hecker, did you provide additional bank
11  account --
12    MR. CUTLER:  What I said on the record,
13  Mr. Clifton, was that we had provided the Trustee
14  with records that showed what the account
15  balances were on the date of filing.  And in
16  connection with gathering that information, there
17  were some additional accounts that weren't on
18  Schedule B.
19    MR. CUTLER:  And are those being
20  amended?
21    MR. CUTLER:  We've given that
22  information to Mr. Seaver.
23    MR. CLIFTON:  Are the schedules going
24  to be amended to reflect those?
25    MR. CUTLER:  You're asking me?

Page 122

1    MR. CLIFTON: Well, yeah. I guess that
2  would be your duty, wouldn't it, to amend the
3  schedules?
4    MR. CUTLER: Well --
5    MR. CLIFTON: Am I wrong? I mean --
6    THE TRUSTEE: Are you going to -- If
7  there are errors here, you're going to amend --
8    MR. CUTLER: We will amend the
9  schedules to correct any errors or omissions that
10 have been discovered here today.
11   MR. CLIFTON: The point is, how are
12 other creditors to know that there's been changes
13 in what was originally filed if you don't amend
14 them?
15   MR. CUTLER: I don't have a dispute
16 with you, sir, about the substance, but you're
17 putting the burden on me. I'm an attorney here
18 representing Mr. Hecker.
19   MR. CLIFTON: Okay.
20   THE TRUSTEE: Mr. Hecker, let me ask
21 you a question here and interrupt Mr. Clifton a
22 minute. Looking at the Statement of Financial
23 Affairs, I see a payment to something called
24 Ike's for $42,451 in November of '08. What's
25 that?

Page 123

1    THE DEBTOR: It was a loan to Ike's
2  Restaurant.
3    THE TRUSTEE: Did it ever get paid
4  back?
5    THE DEBTOR: No. He's file bankruptcy.
6    THE TRUSTEE: Okay. There's something
7  -- a payment of 19,500 to something called
8  Stardot, Inc., in October of '08. What's that?
9    THE DEBTOR: It was a margin call on a
10 portion of a company owned by ITR.
11   THE TRUSTEE: Okay.
12   THE DEBTOR: They closed the business
13 down and we each had a margin call of 19,5.
14   THE TRUSTEE: Mr. Clifton, back to
15 you.
16   MR. CLIFTON: I think I'm done.
17      FURTHER EXAMINATION
18 BY THE TRUSTEE:
19 Q   All right. I have a few more things,
20 Mr. Hecker. There are a number of transfers here
21 in the Statement of Financial Affairs to Bruce
22 Parker, Trustee. And, in specific, I'm looking
23 at, it looks like, October of '08, June of '08,
24 August of '08. What are those?
25 A   Kids' trusts that have life insurance on me, term

Page 124

1  insurance.
2  Q   Okay. It's an insurance policy on your life or
3      policies on your life?
4  A   Each one of them have a portion of a policy or a
5      policy. It's a term on my life.
6  Q   Okay. And you pay that; is that what these
7      checks are?
8  A   Yes.
9  Q   How much -- What's the amount of the policy?
10   MR. CUTLER: You mean the death
11 benefit?
12   THE TRUSTEE: Yeah, that's what I mean.
13   MR. CUTLER: I think there's several
14 policies.
15   THE DEBTOR: It's on the insurance
16 schedules that I think we provided to you.
17   MR. CUTLER: No. These are owned by
18 the trust.
19   THE DEBTOR: Oh, owned by the trust,
20 okay.
21   MR. CUTLER: Do you know what the face
22 amount of the death benefit of the insurance is
23 inside children's trusts?
24   THE DEBTOR: No, I don't.
25 BY THE TRUSTEE:

Page 125

1  Q   Okay. What other assets are in those trusts?
2  A   That's all.
3  Q   Just the insurance?
4  A   I believe so, yes.
5    THE TRUSTEE: Okay. Mr. Cutler, I
6  realize you're not testifying here, but --
7    MR. CUTLER: Thank you.
8    THE TRUSTEE: -- I sent a letter, and
9  then I'll address this --
10   Are you done, Mr. Clifton, completely?
11   MR. CLIFTON: I think so.
12   THE TRUSTEE: And I'll address this to
13 Mr. Hecker, too, but I had requested bank
14 statements going back to June 1st of 2008. And I
15 know that in your response to me, you indicated
16 that, you know, some records had been seized.
17 But today I have received from you the bank
18 account statements covering the date of filing,
19 which you're obligated and the debtor is
20 obligated to produce. Has any attempt been made
21 to get these other bank records that I've
22 requested?
23   So I'll direct it to you, Mr. Hecker, I
24 guess.
25   MR. CUTLER: I'm actually looking at

Page 126

1    Mr. Castlebomb.  If I can confer with him.
2         THE TRUSTEE:  Sure.  What did you find
3    out?
4         MR. CUTLER:  Mr. Seaver, they are
5    working on gathering information.  We've been
6    getting numerous requests from you almost on a
7    daily basis, so we have to prioritize and triage
8    a little bit, but they are working on gathering
9    that information.
10        THE TRUSTEE:  Okay.  And just so we are
11   clear -- And I have been requesting a lot of
12   information, both me and my attorneys have been,
13   there's no doubt about that, but this was
14   something I sent a letter out back on June 16.
15   But I don't doubt that you're trying to get
16   those.  So as soon as you do, if you would send
17   them out.
18        MR. CUTLER:  Yes.  We've had numerous
19   events that have happened since then, including
20   on that date.
21        THE TRUSTEE:  I'm aware of that.
22        Are you Mr. Prohovsky?
23        MR. PROHOVSKY:  Yes, I am.
24        THE TRUSTEE:  Mr. Prohovsky, you're not
25   under oath here, of course, but have you paid the

Page 127

1    rent on that Cross Lake place?
2         MR. PROHOVSKY:  Have I paid?
3         THE TRUSTEE:  Yeah, the 24,000?
4         MR. PROHOVSKY:  I'm waiting to get a
5    bill.
6         THE TRUSTEE:  So the answer would be
7    no?
8         MR. PROHOVSKY:  They haven't sent it to
9    me.
10        THE TRUSTEE:  Okay.  Well, when you pay
11   it, send it to Mr. Cutler to hold; it
12   that's property of this bankruptcy estate.
13   Okay?
14        MR. PROHOVSKY:  I will check with my
15   attorney and see if he agrees.  If he agrees,
16   yes.  If not, I'll do whatever --
17        THE TRUSTEE:  Sure.  I'm just telling
18   you if it goes elsewhere, I don't think that it
19   should go elsewhere.  But talk to your attorney,
20   of course.
21        MR. CUTLER:  There's another party that
22   I think will have an interest in that, which is
23   TCF.  They have an assignment of rents, I think,
24   on that property.
25   BY THE TRUSTEE:

Page 128

1    Q   Sure.  Mr. Hecker, let me show you -- Well, let
2        me ask you this:  Do you recall in March of 2008
3        purchasing $47,000, roughly, of jewelry from
4        Chanel in Las Vegas?  It was a telephone
5        purchase.  Here, let me show you this.
6    A   Yeah, I guess, if that's what it says.
7    Q   And this was paid for with your American Express
8        black card, right?
9    A   Yes.
10   Q   All right.  Where did all of these items go; who
11       has them?
12   A   There's a gift to -- I'm not sure.
13   Q   A gift to who?
14   A   I bought them as gifts to give away.  I can find
15       out.
16   Q   All right.  Were they all -- And I won't go
17       through each one, but there are seven different
18       things on here.
19   A   If we can get a copy of that, we'll try and give
20       you an answer.
21   Q   You don't recall now who you gifted these things
22       to?
23   A   No.
24   Q   Would it have been one person?
25   A   It might have been several.

Page 129

1    Q   Okay.  Mr. Hecker, we talked a little bit about a
2        property I think that your sister is living in --
3    A   Yes.
4    Q   -- do you recall that?  What's your sister's
5        name?
6    A   Liaini Jansen.
7    Q   How do you spell the first name?
8    A   L-I-A-I-N-I, J-A-N-S-E-N.
9    Q   Thank you.  Are you a signatory on any bank
10       account held in someone else's name?
11   A   No.
12   Q   Do you have access to moneys --
13        MR. CUTLER:  You mean other than the
14       companies?
15   BY THE TRUSTEE:
16   Q   Yeah, other than your companies.
17   A   No.
18   Q   And that's the way you were answering that,
19       right?
20   A   Yes.
21   Q   I mean, we all know you're a signatory on the
22       companies.
23   A   Yes.
24   Q   All right.  Do you have access to moneys in
25       anybody's account through use of ATM or

Page 130

1    otherwise?
2    A   No.
3    Q   Do you use any credit cards that are held in
4        anybody else's name, other than the company --
5        Well, let me just ask the question the way it
6        was. Do you have use of credit cards that are
7        held in anybody else's name?
8    A   I don't believe so.
9            THE TRUSTEE: Okay. Mr. Cutler, I'm
10       going to take a little break to check my notes.
11       I don't think I have a whole lot more, but I
12       think there were some items you wanted to
13       clarify.
14           MR. CUTLER: Do you want me --
15           THE TRUSTEE: Go ahead and do it now,
16       yeah.
17               EXAMINATION
18   BY MR. CUTLER:
19   Q   Mr. Hecker, generally with respect to the
20       preparation of the petition and schedules, you
21       were involved in gathering the information that's
22       reflected in the schedules; is that correct?
23   A   Yes.
24   Q   Your companies have some remaining employees; is
25       that correct?

Page 131

1    A   Three.
2    Q   And were those employees involved in supplying
3        the information that was used in preparation of
4        the schedules?
5    A   Yes.
6    Q   And did they --
7    A   Not all of them. They were part of the team.
8    Q   Okay. Who specifically assisted you in gathering
9        information for the schedules?
10   A   Susan Miller, Rich Hage, Greg Orthun, Danny
11       Storm, Darwin Lund, Erik Dove. I'm not sure
12       anymore.
13   Q   Do you believe the information that they gave you
14       was accurate?
15   A   Yes.
16   Q   Do you have any reason to think that it was not
17       accurate?
18   A   No.
19   Q   Is it possible that there were mistakes in the
20       information they gave you, but you're not aware
21       of those mistakes?
22   A   That's correct.
23   Q   With respect to your personal expenses prior to
24       the filing of the bankruptcy case, did you have
25       staff that took care of paying your personal

Page 132

1    living expenses?
2    A   Everything.
3    Q   And who specifically at your companies performed
4        those duties for you?
5    A   Susan Miller.
6    Q   And were you involved in directing, for example,
7        the payment of utilities at the various homes
8        that you used?
9    A   No.
10   Q   When the utility bills were sent, where were they
11       sent to? Did they come to 500 Ford Road?
12   A   They came to 500 Ford Road.
13   Q   And that's your business address?
14   A   Yes.
15   Q   And as far as you knew, Ms. Miller would process
16       the payment of any of those living expenses?
17   A   That's correct.
18   Q   Is that true also of the payment of your personal
19       credit cards?
20   A   That's correct.
21   Q   Property taxes associated with the properties?
22   A   That's correct.
23   Q   Payment of mortgages or other encumbrances on
24       those assets; is that correct?
25   A   That's correct.

Page 133

1            MR. CUTLER: That's all I have,
2        Mr. Seaver.
3            THE TRUSTEE: All right. I'm going to
4        take a short break here just to check my notes
5        and see if I have anything more. But is there
6        anybody else here who has questions? I know we
7        only had Mr. Clifton. Anybody else? Apparently
8        not.
9               FURTHER EXAMINATION
10   BY THE TRUSTEE:
11   Q   Before we take a break, let me just show you
12       something, Mr. Hecker. This is the insurance
13       policy for personal property, which there were
14       some -- there was some activity shortly before
15       filing, including termination, as I understand
16       it, of the jewelry coverage. But here's my
17       question: You will see that there's a received
18       date here of 6/5/09, $5,000 credit as a payment
19       on that policy. I'll tell you, I spoke with the
20       insurance -- the person at your insurance
21       company. My recollection is that he thought it
22       was a wire transfer. Do you know how that 5,000
23       was paid?
24   A   I have no idea.
25   Q   Okay. You didn't walk in and pay him $5,000; is

Page 134

1   that true?
2          MR. MOHRMAN:  In cash, you mean?
3   BY THE TRUSTEE:
4   Q   Cash, check.
5   A   No.
6          THE TRUSTEE:  Okay.  All right.  Let's
7   just take a ten-minute break here and we'll come
8   back.
9          (Break taken.)
10  BY THE TRUSTEE:
11  Q   All right.  We're back on the record here now.
12      And you understand, Mr. Hecker, that you're still
13      under oath, correct?
14  A   Yes.
15  Q   All right.  Let me show you a printout that I got
16      from the Christi's real estate properties for
17      sale, luxury division.  This is a listing for a
18      residence at 3301 Las Ventanas.  Is that the same
19      complex your unit is in?
20  A   Yeah.  That's a third floor unit.
21  Q   Okay.
22  A   It might be a penthouse.
23  Q   Same building, though, right?
24  A   Same building, but it might be a penthouse.
25  Q   A more expensive unit?

Page 135

1   A   Absolutely.
2   Q   Okay.  And, Mr. Hecker, I've spoken to
3       Mr. Cutler, I've spoken with him both yesterday
4       and today about this and probably Monday, as
5       well, but the lawsuit that I commenced to get
6       turnover of that jewelry because of my concern
7       about that insurance, I understand, based on your
8       testimony here today, that you've turned over to
9       me every piece of jewelry, watch, those sorts of
10      items, that you can locate; is that true?
11  A   That's correct.
12  Q   All right.  And because that action was to force
13      turnover of -- to get possession of those into my
14      custody and it appears to me that you've done
15      that with everything, we've withdrawn the motion
16      that was scheduled for this afternoon and I'm
17      going to have my attorneys withdraw the lawsuit,
18      as well, because it was just for that limited
19      purpose.
20         THE TRUSTEE:  And, Mr. Cutler, excuse
21      me, you and I spoke about, there are various
22      documents here that I have requested, including
23      my initial letter where I'm requesting bank
24      statements.  And we've had a little discussion
25      about that, and other things have come up here

Page 136

1   that I've requested and Mr. Hecker has agreed to
2   produce, through you.  And you're going to
3   produce all those, right?
4          MR. CUTLER:  My client will produce
5   those records, correct.
6          THE TRUSTEE:  And then you'll pass them
7   on to me?
8          MR. CUTLER:  Yes.
9   BY THE TRUSTEE:
10  Q   All right.  Mr. Hecker, you have met with an
11      agent of the estate, an auction agent named Fred
12      Radde, right?
13  A   Yes.
14  Q   And you've shown him various property, right?
15  A   Yes.
16  Q   At one of his visits at Cross Lake, he indicated
17      to me that he saw a car there, I thought he said
18      Mazeratti, a black expensive car, at any rate.
19  A   There was a black Range Rover there, but there
20      was no --
21  Q   But you don't recall there being a black
22      expensive car at your Cross Lake property?
23  A   Never.
24  Q   Okay.  And maybe I misunderstood him.
25         And I asked you about a Bentley and a

Page 137

1   Mazeratti, and you told me about both of those.
2   Have you had in your possession in the last three
3   or four months any other expensive cars, let me
4   just say any cars that would have cost over a
5   hundred thousand new?
6   A   Other than the Bentley we talked about?
7   Q   Yeah.
8   A   No.
9          THE TRUSTEE:  Okay.  All right.  One
10  last chance, folks.  Does anybody have any
11  questions here?  It doesn't appear so.
12         So I am going to, subject to receiving
13  those documents, Mr. Cutler, I'm going to
14  conclude the Meeting of Creditors.  That's all.
15  Thank you.  Thank you everyone for coming.  Thank
16  you, folks.
17         (Whereupon, the proceedings were
18  concluded at 12:55 p.m.)

Page 138

```
 1   STATE OF MINNESOTA  )
 2
 3
 4   COUNTY OF HENNEPIN  )
 5
 6
 7
 8          REPORTER'S CERTIFICATE
 9
10          I, Julie A. Rixe, do hereby certify
11   that the above and foregoing transcript, consisting of
12   the preceding 137 pages, is a correct transcript of
13   my stenographic notes and is a full, true and complete
14   transcript of the proceedings to the best of my
15   ability.
16          Dated July 20, 2009.
17
18
19
20
21          JULIE A. RIXE
            Court Reporter
22
23
24
25
```

# TCF BANK
### *Since 1923*
### Open 7 Days℠

TCF NATIONAL BANK
801 MARQUETTE AVE
MINNEAPOLIS MN  55402

Page 1
STATEMENT DATE
04-10-09
1008
8

## S T A T E M E N T

---

8  R  168 99
DENNIS EARL HECKER
500 FORD RD
MINNEAPOLIS MN  55426-1062

TCF CASHREWARDS - EARN UP TO 30% CASH
BACK BY USING A TCF CHECK CARD AT
HUNDREDS OF LEADING NATIONAL & LOCAL
RETAILERS. SHOP & DINE WITH YOUR TCF
CARD & SEE CASH ADDED TO YOUR ACCOUNT
MONTHLY. SEE ALL THE RETAILERS, OFFERS
& PROGRAM INFORMATION AT
WWW.TCFBANK.COM OR CALL FOR DETAILS.

FOR INFORMATION CALL JEFFREY ARNOLD              612-661-8391

GET MORE CONTROL AND LESS HASSLE WITH DIRECT DEPOSIT AT TCF!  DIRECT DEPOSIT GIVES YOU CONVENIENT
ACCESS TO YOUR FUNDS, A SAVED TRIP TO THE BANK, AND IT'S FREE!  SEE A TCF REPRESENTATIVE
OR VISIT WWW.TCFBANK.COM FOR DETAILS.

---

### PREMIER CHECKING
ACCOUNT NUMBER          1008                          STATEMENT PERIOD 03-11-09 THROUGH 04-10-09

MIN. BAL. TIERS\APYS AS OF 04-01-09
$225,000+\ 2.25% |$100,000+\ 2.00%
$ 50,000+\ 1.00% |$ 10,000+ \ 0.50%

| ACCOUNT SUMMARY | BALANCE 03-10-09 | CHECKS/WITHDRAWALS | DEPOSITS/ADDITIONS | BALANCE 04-10-09 |
|---|---|---|---|---|
| | 111,663.62 | 633,272.30 | 629,090.25 | 107,481.57 |

INTEREST EARNED IN STATEMENT PERIOD          16.80
ANNUAL PERCENTAGE YIELD EARNED    1.06%

INTEREST PAID IN 2008          10,963.56

---

AS OF 03/25/2009, YOUR TCF MILES PLUS REWARDS POINT TOTAL WAS 0.
TO REDEEM OR TO ACCESS YOUR MOST RECENT TCF MILES PLUS REWARDS POINT TOTAL,
PLEASE SIGN IN TO ONLINE BANKING AT WWW.TCFBANK.COM
AND CLICK ON THE REWARDS TAB.

---

### CHECKS PAID

| CHECK NUMBER | AMOUNT PAID | DATE PAID | REF NUMBER | CHECK NUMBER | AMOUNT PAID | DATE PAID | REF NUMBER | CHECK NUMBER | AMOUNT PAID | DATE PAID | REF NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5109 | 52,500.00 | 0313 | 15013268 | * 5116 | 25,376.01 | 0323 | 16011791 | 5120 | 12,200.00 | 0330 | 26136885 |
| 5110 | 42,000.00 | 0316 | 16025641 | 5117 | 44,567.46 | 0323 | 16011789 | 5121 | 3,000.00 | 0402 | 24096899 |
| * 5112 | 10,500.00 | 0318 | 23063591 | 5118 | 25,000.00 | 0327 | 15008262 | 5122 | 8,500.00 | 0407 | 12072789 |
| 5113 | 50,000.00 | 0319 | 24039077 | 5119 | 10,000.00 | 0330 | 26136886 | * 5124 | 2,000.00 | 0408 | 23110623 |

* INDICATES A SKIP IN SEQUENTIAL CHECK NUMBERS

### OTHER WITHDRAWALS AND CHARGES

| DATE | AMOUNT | DESCRIPTION | DATE | AMOUNT | DESCRIPTION |
|---|---|---|---|---|---|
| 0312 | 100,689.95 | RETURNED DEPOSITED ITEM | 0325 | 33,564.68 | RETURNED DEPOSITED ITEM |
| 0312 | 15.00 | RETURN DEPOSITED ITEM FEE | 0325 | 15.00 | RETURN DEPOSITED ITEM FEE |
| 0316 | 40,000.00 | WITHDRAWAL-WIRE TRANSFER | 0327 | 47,811.71 | WITHDRAWAL |
| 0317 | 33,006.68 | WITHDRAWAL-WIRE TRANSFER | 0330 | 35.00 | NSF FEE-ITEM NOT PAID |
| 0317 | 70.00 | UNAVL FDS FEE-ITEM PD | 0331 | 35.00 | UNAVL FDS FEE-ITEM NT PD |
| 0320 | .33,564.68 | WITHDRAWAL-WIRE TRANSFER | 0331 | 35.00 | NSF FEE-ITEM NOT PAID |
| 0320 | 35.00 | UNAVL FDS FEE-ITEM PD | 0408 | 15.00 | WIRE TRANSFER FEE |
| 0324 | 15.00 | WIRE TRANSFER FEE | 0410 | 15.00 | MINIMUM BALANCE FEE |
| 0324 | 58,706.13 | WITHDRAWAL | | | |

## EXHIBIT B


FOR BALANCE, CHECKS PAID INFORMATION, FUNDS TRANSFER, DEPOSIT VERIFICATION, OR OTHER CUSTOMER SERVICE
QUESTIONS, VISIT US ONLINE AT TCFBANK.COM, OR CALL: 612-823-2265).  TOLL FREE AT
1-800-823-2265.  TDD 612-339-3075.  THANK YOU FOR BANKING WITH TCF.  NSF\OVERDRAFT FEE IS $35.

T 000056

# TCF BANK
### Since 1923
*Open 7 Days℠*

TCF NATIONAL BANK
801 MARQUETTE AVE
MINNEAPOLIS MN  55402

Page 2
STATEMENT DATE
04-10-09

1008
8

S T A T E M E N T

8   R   168 99
DENNIS EARL HECKER
500 FORD RD
MINNEAPOLIS MN  55426-1062

TCF CASHREWARDS - EARN UP TO 30% CASH
BACK BY USING A TCF CHECK CARD AT
HUNDREDS OF LEADING NATIONAL & LOCAL
RETAILERS.  SHOP & DINE WITH YOUR TCF
CARD & SEE CASH ADDED TO YOUR ACCOUNT
MONTHLY.  SEE ALL THE RETAILERS, OFFERS
& PROGRAM INFORMATION AT
WWW.TCFBANK.COM OR CALL FOR DETAILS.

## DEPOSITS AND OTHER ADDITIONS

| DATE | AMOUNT | DESCRIPTION | | DATE | AMOUNT | DESCRIPTION | |
|------|--------|-------------|--|------|--------|-------------|--|
| 0311 | 25,000.00 | DEPOSIT | REF # 23099183 | 0323 | 25,000.00 | DEPOSIT | REF # 26174786 |
| 0313 | 52,499.03 | DEPOSIT | REF # 25139401 | 0324 | 25,000.00 | DEPOSIT-WIRE TRANSFER | |
| 0313 | 25,000.00 | DEPOSIT | REF # 25139703 | 0324 | 44,567.46 | DEPOSIT | REF # 22127278 |
| 0313 | 5,000.00 | DEPOSIT | REF # 25074707 | 0324 | 33,564.68 | DEPOSIT | REF # 22127182 |
| 0316 | 42,874.17 | DEPOSIT | REF # 26211056 | 0330 | 25,000.00 | RETURNED CHECK # 5118 | |
| 0316 | 15,000.00 | DEPOSIT | REF # 26213500 | 0331 | 12,200.00 | RETURNED CHECK # 5120 | |
| 0316 | 15,000.00 | DEPOSIT | REF # 26235872 | 0331 | 10,000.00 | RETURNED CHECK # 5119 | |
| 0317 | 28,122.52 | DEPOSIT | REF # 22145154 | 0402 | 2,500.00 | DEPOSIT | REF # 24080363 |
| 0317 | 4,884.16 | DEPOSIT | REF # 22113247 | 0408 | 8,500.00 | RETURNED CHECK # 5122 | |
| 0319 | 25,000.00 | DEPOSIT | REF # 24009986 | 0408 | 5,000.00 | DEPOSIT-WIRE TRANSFER | |
| 0319 | 20,000.00 | DEPOSIT | REF # 24094522 | 0408 | 1,571.25 | DEPOSIT | REF # 23125171 |
| 0320 | 25,000.00 | DEPOSIT | REF # 25079193 | 0410 | 94,225.50 | DEPOSIT | |
| 0320 | 25,000.00 | DEPOSIT | REF # 25114878 | 0410 | 16.80 | INTEREST PAID | |
| 0323 | 33,564.68 | DEPOSIT | REF # 26006001 | | | | |

T000057



**usbank.**
Five Star Service Guaranteed

P.O. Box 1800
Saint Paul, Minnesota 55101-0800

3035     TRC     53                 X     ST01

000000103 1 SP   10648115209157B P
DENNIS E HECKER
500 FORD RD
MINNEAPOLIS  MN 55426-1062

**Uni-Statement**
Account Number:
2088
Statement Period:
Mar. 19, 2009
through
Apr. 17, 2009

Page 1 of 4

☎          To Contact U.S. Bank

By Phone:              1-800-US BANKS
                       (1-800-872-2657)

Minneapolis/St. Paul
Metro Area:            612-US BANKS
                       (612-872-2657)

Telecommunications Device
for the Deaf:          1-800-685-5065

Internet:              usbank.com

## NEWS FOR YOU

Still receiving your federal benefit payments by mail? Sign up for safer, easier direct deposit by calling (800) 333-1795 or online at www.GoDirect.org.

## SUMMARY OF YOUR U.S. BANK RELATIONSHIP

This section reflects the total balances for all accounts on this statement.

| Deposit Accounts | Account Number | Balance | Page |
|---|---|---|---|
| Interest Plus Checking | 2088 | $ 6,684.40 | 1 |
| Money Market | 0537 | 354.30 | 3 |
| Money Market | 0545 | 6,198.66 | 4 |
| Money Market | 0553 | 7,720.48 | 4 |
| **Total Deposit Balances** | | $ 20,957.84 | |

## INTEREST PLUS CHECKING                                          Member FDIC

Account Number 2088
U.S. Bank National Association

**Account Summary**

| | | | | |
|---|---|---|---|---|
| Beginning Balance on Mar. 19 | $ 24,802.73 | Annual Percentage Yield Earned | | 0.00692% |
| Deposits / Credits | 281,976.99 | Interest Earned this Period | $ | 0.12 |
| Other Withdrawals | 114,655.50- | Interest Paid this Year | $ | 1.32 |
| Checks Paid | 185,439.82- | Number of Days in Statement Period | | 30 |
| **Ending Balance on Apr. 17, 2009** | $ 6,684.40 | | | |

U.S. Bank
**Checking**
That **Pays**

**Reward Program Summary**

All Rewards shown are as of Apr. 17, 2009

Cash Bonus Visa CheckCard                    Check Card Number (4748)

| Rewards Paid thru Date | Rewards Earned Program to Date | Rewards Redeemed Program to Date | Current Rewards Balance | Rewards Available to Redeem |
|---|---|---|---|---|
| 1/12/2005 | 0.00 | 0.00 | 0.00 | 0.00 |

EXHIBIT C

H810-148



**DENNIS E HECKER**
500 FORD RD
MINNEAPOLIS  MN 55426-1062

**Private Client Group**



**Uni-Statement**
Account Number:
xxxxxxxxx 2088
Statement Period:
Mar. 19, 2009
through
Apr. 17, 2009

Page 2 of 4

## INTEREST PLUS CHECKING (CONTINUED)
Account Number xxxxxxx-2088

### Deposits / Credits

| Date | Description of Transaction | | Ref Number | Amount |
|------|---------------------------|--|-----------|--------|
| Mar. 19 | Deposit | | 5945013390 | $ 12,500.00 |
| Mar. 19 | Deposit | | 5944961521 | 20,000.00 |
| Mar. 19 | Deposit | | 5945013384 | 20,000.00 |
| Mar. 20 | Deposit | | 6943560193 | 20,000.00 |
| Mar. 23 | Deposit | | 6440865147 | 20,000.00 |
| Mar. 23 | Deposit | | 6943983124 | 20,000.00 |
| Mar. 24 | Deposit | | 6141242349 | 647.89 |
| Mar. 24 | Deposit | | 6141242347 | 20,000.00 |
| Mar. 25 | Deposit | | 5945684786 | 25,376.01 |
| Mar. 25 | Deposit | | 6248271538 | 25,759.22 |
| Mar. 26 | Deposit | | 5945995297 | 20,000.00 |
| Mar. 26 | Deposit | | 6141805955 | 25,000.00 |
| Mar. 31 | RT CH UNCOLLECTED | FUNDS PER FRAUD | | 1,351.00 |
| Mar. 31 | RT CH UNCOLLECTED | FUNDS PER FRAUD | | 3,500.00 |
| Mar. 31 | RT CH UNCOLLECTED | FUNDS PER FRAUD | | 8,000.00 |
| Apr. 1 | Deposit | | 6441218491 | 4,000.00 |
| Apr. 1 | Deposit | | 7530843148 | 11,000.00 |
| Apr. 6 | Deposit | | 6945830493 | 4,842.75 |
| Apr. 8 | Deposit | | 6946204837 | 5,000.00 |
| Apr. 9 | Deposit | | 6946644451 | 5,000.00 |
| Apr. 10 | Deposit | | 6042758801 | 5,000.00 |
| Apr. 13 | Deposit | | 6946847441 | 5,000.00 |
| Apr. 17 | Interest Paid | | 1700000521 | 0.12 |

**Total Deposits / Credits** $ 281,976.99

### Other Withdrawals

| Date | Description of Transaction | | Ref Number | Amount |
|------|---------------------------|--|-----------|--------|
| Mar. 19 | Wire Transfer Fee | | 1900000682 | $ 25.00- |
| Mar. 19 | Wire Debit REF001427     ALLIANCE NEW ULM  090319014763 BNF=A N C INVESTMENTS NO    ADDRESS GIVEN | | | 17,500.00- |
| Mar. 20 | Wire Transfer Fee | | 2000000111 | 18.00- |
| Mar. 20 | Electronic Withdrawal    From CREDIT CARD REF=09079005507251 Y    ELECT PYMT5911111111 | | | 10,000.00- |
| Mar. 20 | Wire Debit INTERNAL    US BANK    090320013216 BNF=MEDICAL INSURANCE    ACCT 500 FORD RD | | | 20,000.00- |
| Mar. 23 | Returned Deposited Item    Fee | | 1000200759 | 19.00- |
| Mar. 23 | Deposited Item Returned | | 1000200759 | 20,000.00- |
| Mar. 25 | Wire Transfer Fee | | 2500000564 | 18.00- |
| Mar. 25 | Wire Debit INTERNAL    US BANK    090325009464 BNF=JACOB PROPERTIES OF    MINNESOTA LLC 500 FORD | | | 15,000.00- |
| Mar. 27 | Internet Banking Payment    To Credit Card ************1291 | | | 5,000.00- |
| Mar. 31 | Returned Deposited Item    Fee | | 1000231708 | 19.00- |
| Mar. 31 | Deposited Item Returned | | 1000231708 | 25,000.00- |
| Apr. 1 | Overdraft Charge | | 1000231708 | 37.50- |
| Apr. 8 | Returned Deposited Item    Fee    H810-149 | | 1000268732 | 19.00- |
| Apr. 8 | Deposited Item Returned | | 1000268732 | 2,000.00- |

**Total Other Withdrawals** $ 114,655.50-

### Checks Presented Conventionally

| Check | Date | Ref Number | Amount | Check | Date | Ref Number | Amount |
|-------|------|-----------|--------|-------|------|-----------|--------|
| 5421 | Mar. 19 | 8997437389 | 947.43 | 5445 | Mar. 19 | 8997551995 | 287.08 |
| 5422 | Apr. 2 | 8896893854 | 947.43 | 5446 | Mar. 19 | 9191675034 | 3,327.17 |
| 5440* | Mar. 23 | 8890341209 | 9,011.90 | 5447 | Mar. 20 | 8998411078 | 576.80 |
| 5442* | Mar. 19 | 8997229198 | 43.25 | 5448 | Mar. 19 | 9396628505 | 350.00 |
| 5443 | Mar. 20 | 6040568821 | 350.00 | 5449 | Mar. 19 | 9396628880 | 593.53 |
| 5444 | Mar. 19 | 8997457035 | 93.00 | 5452* | Mar. 23 | 9397450364 | 1,283.01 |



**Private Client Group**

DENNIS E HECKER
500 FORD RD
MINNEAPOLIS MN 55426-1062

**Uni-Statement**
Account Number:
2088
Statement Period:
Mar. 19, 2009
through
Apr. 17, 2009

Page 3 of 4

## INTEREST PLUS CHECKING (CONTINUED)

Account Number 2088

### Checks Presented Conventionally (continued)

| Check | Date | Ref Number | Amount | Check | Date | Ref Number | Amount |
|---|---|---|---|---|---|---|---|
| 5453 | Mar. 30 | 6041931925 | 260.00 | 5482* | Mar. 30 | 9193103587 | 221.00 |
| 5454 | Mar. 24 | 9397970409 | 2,040.00 | 5484* | Apr. 6 | 8897577209 | 94.07 |
| 5457* | Mar. 23 | 2521783904 | 10,000.00 | 5485 | Apr. 6 | 8898077905 | 364.00 |
| 5459* | Mar. 23 | 7045445632 | 12,500.00 | 5486 | Mar. 24 | 6141242331 | 1,100.00 |
| 5460 | Mar. 20 | 6943560139 | 1,000.00 | 5487 | Mar. 26 | 7045603074 | 2,000.00 |
| 5461 | Mar. 30 | 8894165249 | 850.73 | 5488 | Mar. 26 | 7045603075 | 350.00 |
| 5462 | Mar. 26 | 9497633480 | 1,393.08 | 5489 | Apr. 8 | 8991087051 | 947.43 |
| 5463 | Mar. 27 | 8893235895 | 393.24 | 5492* | Mar. 27 | 9390190180 | 5,000.00 |
| 5464 | Mar. 25 | 9192518954 | 1,260.87 | 5493 | Mar. 30 | 8894234520 | 108.59 |
| 5465 | Mar. 25 | 8892451672 | 2,545.84 | 5494 | Mar. 27 | 8893790460 | 69,000.00 |
| 5466 | Mar. 25 | 7045551937 | 125.17 | 5497* | Apr. 1 | 9391124117 | 1,277.19 |
| 5467 | Mar. 27 | 9390185978 | 1,473.08 | 5498 | Apr. 8 | 9392371225 | 108.40 |
| 5468 | Mar. 30 | 9193145322 | 1,351.00 | 5499 | Apr. 6 | 9194175150 | 15.35 |
| 5468* | Apr. 10 | 0001011540 | 1,351.00 | 5502* | Apr. 1 | 9391098722 | 1,000.00 |
| 5470* | Apr. 8 | 6945977788 | 207.90 | 5503 | Mar. 30 | 9091832652 | 8,000.00 |
| 5472* | Mar. 30 | 8894343379 | 101.63 | 5509* | Apr. 13 | 6042840520 | 2,000.00 |
| 5476* | Mar. 30 | 6041749393 | 350.00 | 5510 | Apr. 15 | 6043152649 | 2,000.00 |
| 5477 | Apr. 6 | 8898161405 | 107.00 | 5513* | Apr. 15 | 6947351807 | 3,500.00 |
| 5478 | Apr. 1 | 9391106216 | 10,980.86 | 5514 | Apr. 15 | 5940033650 | 3,000.00 |
| 5479 | Mar. 27 | 8893455590 | 25.00 | 5515 | Apr. 17 | 7046666954 | 5,000.00 |
| 5480 | Mar. 30 | 2021354387 | 3,500.00 | | | | |

\* Gap in check sequence          Conventional Checks Paid ( 53 )   $   174,653.03

### Checks Presented Electronically

| Check | Date | Ref Number | Amount | Description of Transaction | Payee |
|---|---|---|---|---|---|
| 5441 | Mar. 23 | | 10,000.00 | CHECKPAYMT | RETAIL SERVICES3 |
| 5473* | Mar. 26 | | 158.00 | XCELENERGY | XCEL ENERGY |
| 5474 | Mar. 27 | | 171.37 | CHECK PYMT | DirecTV |
| 5483* | Mar. 27 | | 376.17 | BILL PYMT | FPL PAYMENT CTR |
| 5501* | Apr. 3 | | 81.25 | CPE ACH | CPEnergy MNGCO |

\* Gap in check sequence          Electronic Checks Paid ( 5 )   $   10,786.79

Total Checks Paid   $   185,439.82

### Balance Summary

| Date | Ending Balance | Date | Ending Balance | Date | Ending Balance |
|---|---|---|---|---|---|
| Mar. 19 | 54,135.27 | Mar. 30 | 14,047.91 | Apr. 9 | 13,535.28 |
| Mar. 20 | 42,191.47 | Mar. 31 | 1,879.91 | Apr. 10 | 17,184.28 |
| Mar. 23 | 19,377.56 | Apr. 1 | 3,584.36 | Apr. 13 | 20,184.28 |
| Mar. 24 | 36,885.45 | Apr. 2 | 2,636.93 | Apr. 15 | 14,684.28 |
| Mar. 25 | 69,070.80 | Apr. 3 | 2,555.68 | Apr. 16 | 11,684.28 |
| Mar. 26 | 110,169.72 | Apr. 6 | 8,709.61 | Apr. 17 | 6,684.40 |
| Mar. 27 | 28,730.86 | Apr. 8 | 8,535.28 | | |

Balances only appear for days reflecting change.

H810-150                                    Member FDIC

## MONEY MARKET
Account Number 0537
U.S. Bank National Association

### Account Summary

| | | | |
|---|---|---|---|
| Beginning Balance on Mar. 19 | $ | 364.29 | Annual Percentage Yield Earned     0.03% |
| Deposits / Credits | | 0.01 | Interest Earned this Period     $     0.01 |
| Other Withdrawals | | 10.00- | Interest Paid this Year     $     24.90 |
| | | | Number of Days in Statement Period     30 |
| **Ending Balance on Apr. 17, 2009** | **$** | **354.30** | |

**US bank.** 
*Five Star Service Guaranteed*

**Private Client Group**

DENNIS E HECKER
500 FORD RD
MINNEAPOLIS  MN 55426-1062

**Uni-Statement**
Account Number:
▓▓▓▓ 2088
Statement Period:
Mar. 19, 2009
through
Apr. 17, 2009

Page 4 of 4

---

## MONEY MARKET (CONTINUED)
Account Number ▓▓▓▓-0537
Your average collected balance of $364.29 was below the requirements.

**Deposits / Credits**

| Date | Description of Transaction | Ref Number | | Amount |
|---|---|---|---|---|
| Apr.  17 | Interest Paid | 1700001817 | $ | 0.01 |
| | **Total Deposits / Credits** | | $ | 0.01 |

**Other Withdrawals**

| Date | Description of Transaction | Ref Number | | Amount |
|---|---|---|---|---|
| Apr.  17 | Maintenance Fee | 1700001818 | $ | 10.00- |
| | **Total Other Withdrawals** | | $ | 10.00- |

---

## MONEY MARKET                                                    Member FDIC
Account Number ▓▓▓▓-0545
U.S. Bank National Association

**Account Summary**

| | | | |
|---|---|---|---|
| Beginning Balance on  Mar. 19 | $  6,197.90 | Annual Percentage Yield Earned | 0.14% |
| Deposits / Credits | 0.76 | Interest Earned this Period | $  0.76 |
| | | Interest Paid this Year | $  3.06 |
| **Ending Balance on  Apr. 17, 2009** | $  6,198.66 | Number of Days in Statement Period | 30 |

**Deposits / Credits**

| Date | Description of Transaction | Ref Number | | Amount |
|---|---|---|---|---|
| Apr.  17 | Interest Paid | 1700001819 | $ | 0.76 |
| | **Total Deposits / Credits** | | $ | 0.76 |

---

## MONEY MARKET                                                    Member FDIC
Account Number ▓▓▓▓-0553
U.S. Bank National Association

**Account Summary**

| | | | |
|---|---|---|---|
| Beginning Balance on  Mar. 19 | $  7,719.80 | Annual Percentage Yield Earned | 0.14% |
| Deposits / Credits | 0.95 | Interest Earned this Period | $  0.95 |
| Other Withdrawals | 0.27- | Interest Paid this Year | $  3.81 |
| | | Number of Days in Statement Period | 30 |
| **Ending Balance on  Apr. 17, 2009** | $  7,720.48 | | |

**Deposits / Credits**

| Date | Description of Transaction | Ref Number | | Amount |
|---|---|---|---|---|
| Apr.  17 | Interest Paid | 1700001820 | $ | 0.95 |
| | **Total Deposits / Credits** | | $ | 0.95 |

**Other Withdrawals**

| Date | Description of Transaction | | Ref Number | | Amount |
|---|---|---|---|---|---|
| Apr.  17 | Federal Withholding | On Interest Payment | 1700001821 | $ | 0.27- |
| | **Total Other Withdrawals** | | | $ | 0.27- |

H810-151

Account No.   1008   Page 1



5/23/2008   9999500000.00





5/23/2008   2915250500000.00







UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

---

In re:                                                    BKY No. 09-50779

Dennis E. Hecker,                                                    Chapter 7

               Debtor.

---

**UNSWORN CERTIFICATE OF SERVICE**

---

I hereby certify that on October 16, 2009, I caused the following documents:

***Trustee's Response to Debtor's Motion for Protective Order Relating to 2004
Examinations and Affidavit of Randall L. Seaver***

to be filed electronically with the Clerk of Court through ECF, and that the above documents
will be delivered by automatic e-mail notification pursuant to ECF and this constitutes service or
notice pursuant to Local Rule 9006-1(a).


                                        /e/  Stephanie Wood

Dated:  October 16, 2009           _____

                                        Stephanie Wood
                                        100 South Fifth Street, Suite 2500
                                        Minneapolis, MN  55402
                                        (612) 332-1030

410901