IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

In Re:

DENNIS E. HECKER,

       Debtor.

Case No. 09-50779
Chapter 7
Hon. Robert J. Kressel

---

## NOTICE OF HEARING AND MOTION FOR RELIEF FROM STAY

TO:   Dennis E. Hecker, Debtor

     1.    Alliance Bank ("Alliance") moves the Court for the relief requested below and hereby gives notice of hearing with this Motion.

     2.    The hearing on this Motion will be held on January 7, 2010 at 2:00 p.m., or as soon thereafter as counsel may be heard, in Courtroom 8 West, before the Honorable Robert J. Kressel, Federal Building, 300 South Fourth Street, Minneapolis, MN 55415.

     **3.**    Any response to this Motion must be filed and served by delivery or by mail no later than December 30, 2009, which is five (5) days before the above date (excluding Saturdays, Sundays and holidays) in accordance with Local Rules. **UNLESS A RESPONSE IS TIMELY SERVED AND FILED THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

     4.    This Court has jurisdiction over this motion pursuant to Title 28 U.S.C. §§ 157 and 1334; Federal Rules of Bankruptcy Procedure 5005, and Local Rule 1070-1.

This is a core proceeding. The petition commencing this Chapter 7 case was filed on June 4, 2009 ("the Petition Date"). The case is now pending in this Court.

5.     This motion arises under 11 U.S.C. §362 and Fed. R. Bankr. P. 4001. This motion is filed under Fed. R. Bankr. P. 9014 and Local Rules 9006-1 and 9013-1 to 9013-3. Alliance requests relief from the automatic stay to enforce its rights and pursue such remedies as it may have under state or non-bankruptcy laws.

6.     At the time of Hecker's filing for bankruptcy relief, Hecker was indebted to Alliance pursuant to a series of loan agreements in an amount in excess of $5 million dollars ("the Loans").

7.     Alliance seeks relief from the automatic stay to enforce and foreclose a security interest granted by Dennis E. Hecker ("Hecker") in connection with one of the Loans authorized to Hecker and Jacob Holdings of Stimson LLC ("Stimson"). Hecker pledged his membership interest in Stimson, a non-bankruptcy debtor, as security in connection with a $1,625,000 Promissory Note ("the Stimson Note") (a true and correct copy of which is attached hereto as Exhibit A). As of December 11, 2008, Stimson and Debtor were in default, and they have remained in default, on the payments and performance obligations pursuant to the Stimson Note. Alliance seeks an order from this Court lifting the automatic stay and requests a waiver of the 10-day stay of order under Fed. R. Bankr. P. 4001(a) (3).

8.     As relevant for purposes of this Motion, in March 2007, Alliance entered into a Loan Agreement ("the Stimson Agreement") with Stimson and Hecker, pursuant to which Alliance authorized a $1,625,000 loan ("the Stimson Loan") to Stimson and

Hecker on certain specified conditions spelled out in the Stimson Agreement relating to, among other things, payment terms, guaranty, covenants and conditions of loan proceeds to purchase a 50% Membership Interest in Stimson Partners LLC. (*See* Loan Agreement attached to Exhibit A) Hecker signed the agreement individually and as Chief Manager of Stimson on behalf of Stimson and thereby accepted the terms and conditions described therein.

9.     On March 9, 2007, Stimson and Hecker executed the Stimson Note in favor of Alliance, thereby agreeing and promising to pay the Stimson Loan pursuant to certain specified terms, covenants and conditions. The Stimson Note specified, among other things, that it was secured by two Security Agreements and certain other collateral loan documents and specified events of default. Hecker signed the Stimson Note individually, and as Chief Manager of Stimson on behalf of Stimson, and thereby accepted the terms and conditions described therein.

10.     In March 2007, Alliance and Hecker entered into a Security Agreement ("the Hecker Stimson Security Agreement) through which Hecker secured his obligations to Alliance pursuant to the Stimson Agreement and the Stimson Note by granting to Alliance all of Hecker's membership interest in Stimson. The Hecker Security Agreement also included, among other things, Hecker's representations, warranties and agreements with respect to his "absolute title to each item of Collateral" granted therein.

11.     On March 15, 2007, Alliance filed a UCC Financing Statement with the Office of Secretary of State of the State of Minnesota protecting its security interest in

Debtor's membership interest in Stimson until March 15, 2012, and recorded as Filing No. 200715913537.

12.     On December 11, 2008, Stimson and Hecker defaulted on the Stimson Note when they failed to make the required monthly payment due on December 1, 2008, or within the 10-day grace period as provided in the Stimson Note, despite notice and demand. *See* Exhibit A at p. 2.

### Hecker has not Provided Adequate Protection of Alliance's Interest

13.     Alliance's interest is not being adequately protected.

14.     At the time of the Petition Date, Hecker and Stimson owed a principal balance to Alliance on the Stimson Note of $1,375,000, plus interest and late fees.

15.     The Member Control Agreement of Stimson Partners LLC ("the MCA") (a true and correct copy of which is attached hereto as Exhibit B) provides a formula for valuation of a Membership Interest as the Company Value multiplied by the percentage of interest.

16.     Stimson Partners LLC is a single asset entity, with its sole asset real property located at 700 Hennepin Avenue, Minneapolis, Minnesota ("the Property"). According to a November 20, 2009 appraisal (of which a true and correct copy of an excerpt is attached hereto as Exhibit C), the Property has a value of $3,900,000.

17.     M&I Marshall and Isley Bank has a mortgage on the Property with a current balance of $3,326,407 (see statement attached hereto as Exhibit D). The equity in the Property is $573,593. Therefore, Hecker's 50% Membership Interest has a value of approximately $287,000.

18.    Alliance's interest is not being adequately protected.

19.    Cause exists pursuant to U.S.C. §362 (d) (1) to grant Alliance relief from the automatic stay.

### Hecker has no Equity in the Property and no Reorganization is in Prospect

20.    Hecker's Membership Interest is a 50% ownership in Stimson Partners LLC, a single asset entity with its sole asset the Property valued at $3,900,000.

21.    The Property is encumbered with a mortgage in the amount of $3,326,407.

22.    Hecker and Stimson owe Alliance $1,375,000, plus interest and late fees.

23.    Hecker has no equity in the Property because the amounts of liens and encumbrances on the Property exceed its value.

24.    Alliance is entitled to relief under U.S.C. §362 (d) (2) because Hecker has no equity in the Property, and, this being a liquidation case, no reorganization is in prospect.

WHEREFORE, Alliance respectfully moves the Court for an order as follows:

1.    Terminating the automatic stay for cause under 11 U.S.C. §§362(d)(1) and 362(d)(2) to permit Alliance to enforce its rights and pursue such remedies as it may have under state or non-bankruptcy law; and

2.    Waiving the 10-day stay of order pursuant to Rule 4000 (a) (3).

Dated: December 11, 2009                    GREENE ESPEL, P.L.L.P.


                                            /s/Kathleen K. Statler
                                            Larry D. Espel, Reg. No. 27595
                                            Kathleen K. Statler, Reg. No. 161809
                                            200 S. Sixth Street, Suite 1200
                                            Minneapolis, MN 55402
                                            lespel@greeneespel.com
                                            kstatler@greeneespel.com
                                            (612) 373-0830

                                            Attorneys for Alliance Bank

# EXHIBIT A

# PROMISSORY NOTE

$1,625,000.00

St. Paul, Minnesota<br>
March  9  , 2007

FOR VALUE RECEIVED, the undersigned, **JACOB HOLDINGS OF STIMSON LLC,** a Minnesota limited liability company ("JHS") and **DENNIS E. HECKER** ("DEH") (hereinafter jointly referred to as the **"Borrowers"**), hereby jointly and severally agree and promise to pay to the order of **ALLIANCE BANK,** a Minnesota corporation (**"Holder"**), whose address is 120 Town Square, 444 Cedar Street, St. Paul, Minnesota 55101, or such other place as Holder, or its assigns, may designate, the principal sum of One Million Six Hundred Twenty-five Thousand and No/Dollars ($1,625,000.00), or so much as may be advanced hereunder and under the terms of the Loan Agreement (as hereinafter defined) and to pay interest on the unpaid principal balance outstanding from time to time until this Note is fully paid at the rate of interest hereinafter set forth. Both the principal balance and interest thereon shall be payable in coin or currency which at the time of payment is legal tender for the payment of public or private debts in the United States of America.

The interest rate ("Interest Rate") on this Note shall be a variable rate equal to the sum of (i) one-quarter of one percent (0.25%) and (ii) the Base Rate as defined below, and shall be adjusted from and after the date of this Note each time the Base Rate changes (each such day being referred to as an "Interest Adjustment Date") until the Maturity Date, such adjustments to be effective for the entire day on which they occur, and thereafter through the day prior to the next Interest Adjustment Date. As used herein, the term "Base Rate" refers to the rate of interest announced or published by Alliance Bank as being its base or reference rate. Borrowers acknowledge that the Base Rate is a rate established by the Bank for the pricing of some of its loans and it does not represent the lowest rate charged by the Bank on its loans. **In the event that Borrowers fail to make any payment due hereunder and the same remains due and unpaid after ten (10) days written notice, the Interest Rate shall be increased to a fixed rate of interest equal to fifteen percent (15%) during the remaining term of this Note.**

This Note shall be payable in successive monthly installments of interest commencing on the 1st day of April, 2007, and continuing on the 1st day of each month thereafter until the 1st day of April, 2010, the date of maturity of this Note ("Maturity Date") when the entire unpaid principal balance, accrued interest and all other sums owing Holder under this Note and Loan Documents will be due and payable in full.

In addition to the monthly payment of interest set forth above, Borrowers shall make annual payments of principal as follows:

1. $250,000.00 on or before March 31, 2008; and
2. $250,000.00 on or before March 31, 2009; and
3. $400,000.00 on or before March 31, 2010.

The Borrowers shall have the right to prepay the principal balance outstanding at any time without penalty.

If any installment of principal or interest is not paid within ten (10) days of the due date thereof, Borrowers shall pay to Holder a late charge equal to <u>five percent (5%)</u> of the amount due and unpaid.

Per diem interest shall be computed on the basis of a three hundred sixty (360) day year, but shall be payable on the actual days elapsed during the term of this Note. This Note may be prepaid in part or in full at any time without a prepayment penalty.

This Note is secured by (i) a Loan Agreement dated of even date herewith (the "**Loan Agreement**"); (ii) two Security Agreements of even date herewith executed by JHS and DEH and Holder ("**Security Agreements**"), and (iii) certain other collateral loan documents executed by Borrowers of even date herewith (**"Loan Documents"**). The terms of the Loan Agreement, Security Agreements and all other Loan Documents securing this Note are incorporated herein by reference and made a part hereof and to which reference is hereby made for the statement of the terms and conditions under which advances, repayment and readvances may be made.

To the extent not prohibited by law, Borrowers agree to pay the Holder $30.00 for each check presented for payment and dishonored because of insufficient funds or no account.

Borrowers agree that upon default, the Holder may exercise its right of set-off to pay any or all of the outstanding principal and accrued interest, costs and expenses, attorneys' fees, and advances due and owing on this Note against any obligation Borrowers may have, now or hereafter, to pay money, securities or other property to the Holder. This includes, without limitation:

A. any deposit account balance with Holder, securities account balance or certificate of deposit balance Borrowers may have with the Holder whether general, special, time, savings or checking;

B. any money owing to Borrowers on an item presented to the Holder or in the Holder's possession for collection or exchange; and

C. any repurchase agreement or any other non-deposit obligation or credit in Borrowers' favor.

130256

The Holder's right of set-off may be exercised:

A.      without prior demand or notice in the event that there is an Event of Default that remains uncured;

B.      without regard to the existence or value of any collateral securing this Note; and

C.      without regard to the number or creditworthiness of any other persons who have agreed to pay this Note.

The Holder will not be liable for dishonor of a check or other request for payment where there are insufficient funds in the account (or other obligation) to pay such request because of the Holder's exercise of the Holder's right of set-off. Borrowers agree to indemnify and hold the Holder harmless from any person's claims and the costs and expenses, including without limitation, attorneys' fees and court costs, incurred as a result of such claims or arising as the result of the Holder's exercise of the Holder's right of set-off.

Borrowers shall be in default upon the occurrence of any of the following events, circumstances or conditions ("Events of Default"):

A.      Failure by any party obligated on this Note or any other obligations Borrowers have with Holder to make payment within ten (10) days of the due date; or

B.      A default or breach by Borrowers or any co-signer, endorser, surety, or guarantor under any of the terms of this Note, the Loan Agreement, the Security Agreements or any other Loan Documents, loan agreement, security agreement, mortgage, or any other document or instrument evidencing, guarantying securing or otherwise relating to this Note or any other obligations the Borrowers have with the Holder and the same is not cured within any applicable cure period as set forth in the Loan Agreement and/or Security Agreements; or

C.      The making or furnishing of any verbal or written representation, statement or warranty to the Holder which is or becomes false or incorrect in any material respect by or on behalf of Borrowers or any co-signer, endorser, surety or guarantor of this Note or any other obligations Borrowers have with the Holder; or

D.    The death, dissolution or insolvency of, the appointment of a receiver by or on behalf of, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against Borrowers, or any co-signer, endorser, surety or guarantor of this Note or any other obligations Borrowers have with the Holder; or

E.    Failure to pay or provide proof of payment of any tax, assessment, rent, insurance premium, escrow or escrow deficiency on or before its due date; or

The rights and remedies of Holder, as provided herein or by law or equity or in the Loan Agreement, Security Agreements and other Loan Documents, shall be cumulative and concurrent, and may be pursued singularly, successively, or together at the sole discretion of Holder and may be exercised as often as the occasion therefor shall arise.

It is agreed that time is of the essence in the performance of this Note. Upon the occurrence of an Event of Default in the payment of principal or interest hereon or upon the occurrence of any other Event of Default hereunder, Holder shall have the right and option to declare, without notice, all remaining unpaid principal and accrued interest evidenced by this Note immediately due and payable. Holder may exercise this option to accelerate at any time during the occurrence of any Event of Default regardless of any forbearance by Holder.

No delay or omission on the part of the Holder in exercising any right hereunder shall operate as a waiver of such right or of any other remedy under this Note. A waiver on any one occasion shall not be construed as a bar to or waiver of any such right or remedy on a future occasion. The Holder's course of dealing, or forbearance from, or delay in, the exercise of any of the Holder's rights, remedies, privileges or right to insist upon Borrowers' strict performance of any provisions contained in this Note, or other Loan Documents, shall not be construed as a waiver by the Holder, unless any such waiver is in writing and is signed by the Holder.

All payments made under this Note shall be applied first to interest, second to any late charges due hereunder, and then to principal, except that if any advances made by Holder due to the occurrence of an Event of Default are not repaid on demand, any moneys received, at the option of Holder, may first be applied to repay such advances, plus interest thereon at the interest rate described above, and the balance, if any, shall be applied on account of any principal and/or interest then due.

Upon the occurrence of an Event of Default and if the same is referred to an attorney for collection or any action at law or in equity is brought with respect hereto, Borrowers shall pay Holder all expenses and costs of collection, including but not limited to reasonable

130256

attorneys' fees. Any such cost of collection shall be added to the principal and interest shall accrue thereon.

Borrowers, all guarantors (the **"Guarantors"**), if any, and all other persons liable for all or any part of the indebtedness evidenced by this Note severally waive presentment for payment, protest and notice of non-payment and dishonor. From time to time, without affecting the obligations of Borrowers under this Note, the Loan Agreement, the Security Agreements and any other Loan Document, and without affecting the guaranty of any person, corporation, partnership, or other entity for payment of the indebtedness evidenced by this Note, and without giving notice to or obtaining the consent of the Guarantors, and without liability on the part of Holder, Holder may, at Holder's option, extend the time for payment of sums due under this Note, reduce payments hereon, release anyone liable for the payment of any portion of the indebtedness evidenced by this Note, accept a renewal of the Note, modify the terms and time of payment of the indebtedness evidenced by this Note, join in any extension or subordination agreement, release any security given herefor, take or release other or additional security, and agree in writing with Borrowers to modify the rate of interest or period of amortization of this Note or change the amount of the monthly installments payable hereunder.

All agreements between Holder and Borrowers are hereby expressly limited so that in no contingency or event whatsoever, by reason of acceleration of maturity of the indebtedness evidenced hereby or otherwise, shall the amount paid or agreed to be paid to Holder for the use, forbearance, loaning or detention of the indebtedness evidenced hereby exceed the maximum permissible under applicable law. If from any circumstances whatsoever, fulfillment of any provisions hereof or of the Loan Agreement, the Security Agreements or any other Loan Document shall involve transcending the limit of validity prescribed by law, then the obligation to be fulfilled shall automatically be reduced to the limit of such validity and if from any circumstances Holder should ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be in excess of such highest lawful rate shall be applied to the reduction of the principal balance evidenced hereby and not to the payment of interest or returned to Borrowers, at the option of Holder. This provision shall control every other provision of all agreements between Borrowers and Holder and shall also be binding upon and available to any subsequent holder or endorsee of this Note.

In the event Borrowers sell, convey, transfer or encumber, or dispose of the Collateral (as described in the Security Agreements), or any part thereof, or any interest therein, or agrees so to do (except as provided under the terms of the Loan Agreement and/or Security Agreements) without the written consent of Holder being first obtained, then at the sole option of Holder, Holder may declare the entire amount of unpaid principal and accrued interest due and payable in full and call for payment of the same in full at once.

130256

The provisions contained in this Note may not be amended, except through a written amendment which is signed by Borrowers and the Holder.

This Note and all Loan Documents executed concurrently herewith, represent the entire understanding between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.

Borrowers agree, upon the Holder's request and within the time the Holder specifies, to provide any information, and to execute, acknowledge, deliver and record or file such further instruments or documents as the Holder may require to secure this Note or confirm any lien.

This Note shall be governed by the laws of the State of Minnesota, provided that such laws are not otherwise preempted by federal laws and regulations. In the event of litigation pertaining to this Note, the exclusive forum, venue and place of jurisdiction shall be in the State of Minnesota, unless otherwise designated in writing by the Holder or otherwise required by law.

This Note shall inure to the benefit of and bind the heirs, personal representatives, successors and assigns of the parties; provided however, that Borrowers may not assign, transfer or delegate any of the rights or obligations under this Note without the Holder's express written consent.

Whenever used, the singular shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

The terms used in this Note, if not defined herein, shall have their meanings as defined in the other Loan Documents executed contemporaneously or in conjunction with this Note. If any provision of this Note shall be held unenforceable or void, then such provision to the extent not otherwise limited by law shall be severable form the remaining provisions and shall in no way affect the enforceability of the remaining provisions nor the validity of this Note.

Borrowers will notify the Holder in writing prior to any changes in their names or addresses. All notices under this Note must be in writing. Any notice given by the Holder to Borrowers will be effective upon personal delivery or forty-eight (48) hours after mailing by first class United States mail, postage prepaid, addressed to Borrowers at the address indicated on page one of this Note. Such address may be changed by written notice to the other party.

The Borrowers represent and warrant to the Holder that the loan evidenced by this Note is a business loan transacted solely for the purpose of carrying on the business of the Borrowers and that no part of the Property constitutes the homestead of the Borrowers.

130256

BORROWERS AND HOLDER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS NOTE OR THE INDEBTEDNESS SECURED HEREBY.

IN WITNESS WHEREOF, the undersigned have executed this Note as of the day and year first above written.

BORROWERS:

JACOB HOLDINGS OF
STIMSON LLC

By: _____

Its:    Chief Manager

_____
Dennis E. Hecker

130256

# LOAN AGREEMENT

THIS LOAN AGREEMENT ("**Agreement**") is made and entered into as of the \_\_\_\_\_ day of March, 2007, by and among **JACOB HOLDINGS OF STIMSON LLC ("JHS")**, a Minnesota limited liability company, whose address is 500 Ford Road, St. Louis Park, Minnesota 55426 and **DENNIS E. HECKER ("DEH")** (hereinafter jointly referred to as "**Borrowers**") and **ALLIANCE BANK**, a Minnesota corporation, whose address is 120 Town Square, 444 Cedar Street, St. Paul, Minnesota 55101 ("**Lender**").

## WITNESSETH

WHEREAS, the Borrowers jointly have made a loan request to Lender for a loan ("**Loan**") in the amount of One Million Six Hundred Twenty-five Thousand and No/100 Dollars ($1,625,000.00) to be used to purchase a Membership Interest in Stimson Partners LLC, a Minnesota limited liability company ("**Stimson Partners**").

WHEREAS, Lender agrees to make the Loan to Borrowers for the above purposes according to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, in receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. <u>Loan</u>. Subject to Borrowers complying with the terms and conditions of this Agreement, the Lender will make the Loan to Borrowers upon Borrowers' executing and delivering to Lender a Promissory Note in favor of the Lender in the amount of One Million Six Hundred Twenty-five Thousand and No/100 Dollars ($1,625,000.00) ("**Note**"). The Note will be secured by a Security Agreement of even date executed by JHS ("**JHS Security Agreement**") and a Security Agreement of even date executed by DEH ("**DEH Security Agreement**") (the JHS Security Agreement and DEH Security Agreement are hereinafter jointly referred to as the "**Security Agreements**") and such other documents reasonably required by Lender ("**Loan Documents**"). The Note shall be a single advance note with a Maturity Date of March 31, 2010.

2. <u>Covenants of Borrowers</u>. In order to induce the Lender to make the Loan described in this Agreement, the Borrowers hereby covenant and agree that until the Note is repaid in full:

    (a)    JHS shall furnish Lender with annual financial statements, balance sheets, and income statements, prepared in accordance with generally accepted accounting principals, within one hundred twenty (120) days after the end of each calendar year beginning with the calendar year of 2007, together with copies of the annual financial statements of Stimson Partners;

    (b)    JHS shall furnish Lender with copies of its tax returns, including all schedules, within ten (10) days of filing along with copies of Stimson's tax returns;

(c)     DEH shall annually, within ten (10) days of filing, provide Lender with a copy of his federal and state tax returns, including all schedules, and shall also upon request provide Lender with annual personal financial statements on a form acceptable to Lender.

(d)     Borrowers will provide Lender with evidence satisfactory to Lender that JHS is still a Member of Stinson Partners and holds all of the Class B Membership Interest consisting of 50 Class B Membership Shares.

(e)     DEH will provide Lender with evidence satisfactory to Lender that DEH is the sole member of JHS.

3.      Access to Records.  JHS shall permit Lender and its representatives access to, and the right to make copies of, all books, records, accounts, and properties of JHS at all reasonable times, and upon reasonable notice, and to permit the Lender and its representatives to share said records and to discuss the financial matters of the Borrowers with any independent accountant, attorney, or other advisor who may be acting as an agent, employee, or representatives of the Lender.

4.      Cost and Expenses.  Borrowers agree to pay all cost incurred in making the Loan, including but not limited to appraisal fees, title insurance fees and premiums, attorneys' fees, and recording fees.

5.      Conditions Precedent to Loans.  Without limiting the other conditions of this Agreement, the obligation of the Lender to make any of the loans set forth in this Agreement is further subject to the following conditions precedent:

(a)     The Lender shall have received on or before the date of this Agreement, all of the documents reasonably required by Lender and its counsel.

(b)     Lender shall have received the Security Agreements in a form and substance satisfactory to Lender.

(c)     Lender shall have received an Assignment of Life Insurance on the life of DEH in a form and substance acceptable to Lender.

6.      Default and Remedies.  It shall be an Event of Default under this Agreement if any of the following shall occur:

(a)     The Borrowers fail to make any payments required under this Agreement, the Note, or any present or future supplements or amendments thereto when due or within any applicable grace period, or if payable upon demand, upon demand; or

(b)     A default or Event of Default, other than a default for nonpayment of any amounts due under the Note, occurs under the Note, the Security Agreements, this

Agreement or other Loan Documents; and the same are not cured within thirty (30) days of written notice from the Lender; or

(c)  Borrowers fail to observe or perform any covenants, including, without limitation, the financial covenants of Borrowers contained in Paragraph 3 hereof, or agreement contained in this Agreement and the same are not cured within thirty (30) days of written notice from the Lender; or

(d)  A default or Event of Default shall occur in any other loan outstanding from Lender to Borrowers; and the same are not cured within thirty (30) days of written notice from the Lender; or

(e)  Any statement, representation, or warranty made by the Borrowers to Lender at any time shall prove to have been incorrect or misleading in any material respect when made; or

(f)  DEH fails to maintain the life insurance policy assigned to Lender under the terms of the Assignment of Life Insurance.

Upon the occurrence of any Event of Default, and after any required notice, the Notes shall become immediately due and payable, at the option of the Lender, and in accordance with the terms and provisions set forth therein. Upon the occurrence of an Event of Default, the Lender shall have all rights and remedies of a secured party under the Minnesota Uniform Commercial Code, and shall also have all of the rights and remedies as set forth in this Agreement, the Note, the Security Agreements and the Loan Documents.

7.  Remedies Cumulative.  The rights and remedies of the Lender under this Agreement, and all documents required by this Agreement, are cumulative and not exclusive of any right or remedies which the Lender would otherwise have at law or in equity or by statute.

8.  Waivers.  No waiver by the Lender of any right, remedy, default or Event of Default shall operate as a waiver of any other right, remedy, default, or Event of Default or of the same right, remedy, default or Event of Default on a future occasion. No delay on the part of the Lender in exercising any right or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy preclude another or future exercise thereof or the exercise of any other right or remedy.

9.  Addresses for Notices.  All notices to be given by any party to the others hereunder shall be in writing and deemed to have been given when delivered personally or when deposited in the United States mail, registered or certified mail, postage prepaid, and addressed as set forth in this Agreement.

10.  Recital Paragraphs.  The Recital Paragraphs of this Agreement are fully incorporated into the terms.

11.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota.

12.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts each of which shall be an original but all of which shall constitute one and the same document.

**BORROWERS:**
**JACOB HOLDINGS OF**
**STIMSON LLC**

By:_____

Its:    Chief Manager

_____
Dennis E. Hecker


**LENDER:**
**ALLIANCE BANK**

By:_____
        Dawn M. Karas
Its:    Vice President/Manager




**THIS DOCUMENT WAS DRAFTED BY:**
CAMPBELL KNUTSON, P.A.
1380 Corporate Center Curve, Suite 317
Eagan, MN  55121
Telephone: (651) 452-5000
[JFK]

# EXHIBIT B

MEMBER CONTROL AGREEMENT
OF
STIMSON PARTNERS LLC

THIS MEMBER CONTROL AGREEMENT, dated as of the 4th day of January, 2007, by and among Stimson Partners LLC, a Minnesota limited liability company (the "Company"), Stimson Holdings LLC, a Minnesota limited liability company ("Stimson Holdings"), and Jacob Holdings of Stimson LLC, a Minnesota limited liability company ("Jacob Holdings").

WHEREAS, Section 322B.37 of the Minnesota Limited Liability Company Act (the "Act") authorizes all of the members of a Minnesota limited liability company to enter into a "member control agreement" relating to the control of any phase of the business and affairs of the limited liability company, its liquidation, dissolution and termination or the relations among its members; and

WHEREAS, the Members and the Company desire to enter into such a member control agreement with respect to the Company.

NOW, THEREFORE, in consideration of the foregoing, and of the mutual promises hereinafter contained, the Members and the Company do hereby agree as follows:

ARTICLE I.
DEFINITIONS

1.01    **Definitions.** Unless the context otherwise requires, when used in this Agreement, the terms listed in this Section shall have the following meanings:

    a.    "Act" means the Minnesota Limited Liability Company Act contained in Minnesota Statutes Chapter 322B.

    b.    "Agreement" means this Member Control Agreement as hereinafter amended from time to time, including any schedules and exhibits hereto.

    c.    "Assignment" means to sell, assign, make a gift of, pledge or otherwise transfer or encumber, whether voluntarily or by operation of law.

    d.    "Board" or "Board of Governors" means the board of governors of the Company.

    e.    "Capital Account" means the account of a Member owning Financial Rights which is established and maintained in accordance with Section 2.05 hereof.

    f.    "Cash of The Company Available For Distribution" shall mean the cash received by the Company from all sources, less cash disbursements of every kind, and less such reserves for accrued expenses and working capital requirements as the Board of Governors in its reasonable discretion may from time to time set aside.

g. "Class" means either the Class A Membership Interests or Shares or the Class B Membership Interests or Shares, as the case may be.

h. "Class A Membership Interest or Share" means a Membership Interest or Share designated as such, the rights of which are described in Section 2.08 of this Agreement.

i. "Class B Membership Interest or Share" means a Membership Interest or Share designated as such, the rights of which are described in Section 2.08 of this Agreement.

j. "Code" means the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent laws.

k. "Company" means Stimson Partners LLC, a Minnesota limited liability company.

l. "Company Accountants" means such firm of accountants as may be selected by the Board of Governors to prepare and/or audit the books of account of the Company.

m. "Financial Rights" means a Member's right to share in allocations of income, gain, loss, deduction and credit, liquidating distributions and distributions of the Cash of the Company Available for Distribution pursuant to the provisions of this Agreement.

n. "Governance Rights" means all of a Member's rights as a Member in the Company other than Financial Rights.

o. "Governor" means a natural person serving on the Board of Governors of the Company.

p. "Manager" means a person elected, appointed or otherwise designated as a Manager by the Board of Governors of the Company and any other person considered elected as a Manager pursuant to Section 322B.68 of the Act.

q. "Member" means a person reflected in the required records of the Company as the owner of some Governance Rights of a Membership Interest of the Company.

r. "Member Affiliates" means with respect to any person that is not a natural person, including a corporation, limited liability company or partnership, each natural person having an equity or ownership interest in such entity and any other entity in which such natural person has an equity or ownership interest.

s. "Membership Interest" means a Member's interest in the Company consisting of a Member's Financial Rights and Governance Rights.

Membership Interests in the Company shall be divided into Membership Shares.

t. "Membership Share" means one of the units into which Membership Interests are divided.

u. "Percentage Interest" means all of the Membership Shares owned by a Member, as a percentage of all of the issued and outstanding Membership Shares of the Company.

v. "Tax Matters Partner" means Stimson Holdings.

## ARTICLE II.
## MEMBERSHIP INTERESTS; CAPITAL

2.01 **Membership Interests.** *Exhibit A* lists the number of Membership Shares held by each Member and each Member's Percentage Interest. As of the date hereof, the value of the capital contributions of the Members is as stated on *Exhibit A*.

2.02 **No Interest on Capital Contribution.** No interest shall be paid on the capital contributions of the Members or upon any undrawn profits of any Member which are credited to his, her or its Capital Account.

2.03 **Withdrawal of Capital Contributions.** A Member shall not be entitled to withdraw any part of his, her or its capital contribution, to receive repayment of his, her or its capital contribution, or to receive any distribution from the Company except as specifically provided herein.

2.04 **Additional Capital Contributions.** No Member shall at any time have any obligation to make any additional capital contributions to the Company.

2.05 **Capital Accounts.** A separate Capital Account shall be established and maintained on the books and records of the Company for each Member in accordance with applicable provisions of the Code and regulations issued pursuant to the Code.

2.06 **Loans to the Company.** The Members, including the Governors and Managers who are also Members, may make loans to the Company from time to time, as authorized by the Board of Governors, and no such loan shall be treated as a contribution to the capital of the Company for any purposes hereunder, nor entitle such Member to any increase in his, her or its share of the net income of the Company and/or any cash distributions from the Company. The Company shall be obligated to such Member for the amount of any such loans together with interest at such rate as such Member and the Board shall reasonably agree. Except as otherwise agreed by the Member(s) making such loan(s) to the Company, the principal and interest on any loans to the Company pursuant to this Section shall be repaid before any cash distributions are made to the Members. No Member, including any Governor or Manager, shall have any obligation to make any such loan or to otherwise advance funds to the Company.

2.07 **Additional Members.** Additional Members may be admitted to the Company

upon such terms and conditions as may be established and approved by the Board of Governors. In connection with the admission of a new Member pursuant to this Section 2.07, the Board shall restate the value of all old contributions to the capital of the Company in accordance with the requirements of Section 322B.41 of the Act. Nothing in this Section 2.07 shall be construed to limit the effect of Article V with respect to the Assignment of Membership Interests and/or Financial Rights.

2.08 **Authorized Membership Shares.** The Board is hereby authorized to issue a maximum of 100 Membership Shares. The Company hereby creates Class A Membership Interests consisting of 50 Class A Membership Shares and Class B Membership Interests consisting of 50 Class B Membership Shares. Except as described in Article VIII with respect to the Board of Governors, Class A Membership Interests and Class B Membership Interests shall have identical rights and preferences.

ARTICLE III.
ACCOUNTING, RECORDS, REPORTS AND MANAGEMENT FEE

3.01 **Fiscal Year.** The Company's fiscal year for financial reporting and for federal Income tax purposes shall be the calendar year.

3.02 **Records and Accounting.** At all times during the existence of the Company, the Board of Governors or Managers acting under the direction of the Board shall keep or cause to be kept books and records of accounts utilizing the method of accounting selected by the Board which shall be adequate and appropriate for the Company's business, and in which each transaction of the Company shall be entered fully and accurately. Such books of account shall include such separate and additional accounts for each Member as shall be necessary to reflect accurately the rights and interests of the respective Members and shall specifically reflect the name, address and Percentage Interest held by each Member for the purpose of determining recipients of cash distributions, reports and notices. All such books and records shall be maintained at the principal place of business of the Company.

3.03 **Bank Accounts.** The Board of Governors or Managers acting under the direction of the Board shall maintain one or more bank accounts in the name of the Company and all monies of the Company received by the Company shall be deposited in said bank account(s) and may be withdrawn by check signed by any one of the Managers.

3.04 **Right of Inspection; Lists of Members.** One copy of the books of account described in Section 3.02 hereof, together with a copy of this Agreement and other relevant agreements and any amendments thereto, and one copy of every document relating to the ownership of, and condition of title to, Company properties shall at all times be maintained at the principal place of business of the Company. Each Member or his, her or its duly authorized representatives shall have, during normal business hours, access to and the right to inspect and copy all such documents and all other documents currently maintained relating to the Company's operations.

3.05 **Reports to Members.** The Board of Governors shall send or cause to be sent to each Member, after the close of each fiscal year and each calendar quarter, a report containing an

unaudited cash flow statement, an operating statement reflecting income and disbursements and an unaudited balance sheet.

3.06 **Accounting Decisions.** The Members acknowledge that the Company will be treated as a "partnership" for tax purposes. All decisions as to accounting matters, including but not limited to the determination net profits and net losses of the Company, except as specifically provided to the contrary herein, shall be made by the Board of Governors in its reasonable discretion and all such decisions shall be binding upon all Members. The Board of Governors may rely upon the advice of the Company Accountants in making such decisions.

3.07 **Tax Returns.** The Board of Governors shall prepare or cause to be prepared and shall file on or before the due date (or any extension thereof) any federal, state or local tax returns required to be filed by the Company. The Board of Governors shall cause the Company to pay any taxes payable by the Company. The Board of Governors shall also furnish or cause to be furnished to each Member within ninety (90) days after the end of each fiscal year adequate information concerning such Member's share of the Company's income, gains, losses, deductions and credits for use in the preparation of such Member's tax retains for such fiscal year.

3.08 **Section 754 Election.** Upon receipt of the written request of a Member, the successor in Interest of a Member, or of the executors, administrators or other legal representatives of a Member either deceased or under legal disability, the Board of Governors may, in its reasonable discretion, file on behalf of the Company an election under Section 754 of the Code permitting an adjustment to basis of the Company's property under Sections 734 and 743 of the Code. Nothing herein shall require the Board of Governors to make an election under Section 754 of the Code.

3.09 **Designation of Tax Matters Partner.** Stimson Holdings is hereby designated as the Company's "Tax Matters Partner," as defined in Section 6231 (a)(7) of the Code, and in such capacity is hereby authorized and empowered to act for and represent the Company and each Member before the Internal Revenue Service in any audit or examination of any tax audit of the Company and before any court selected by the Board for judicial review of any adjustment assessed by the Internal Revenue Service. Stimson Holdings hereby accepts such designation. Each of the Members by execution of this Agreement consents and agrees to become bound by all actions reasonably taken by Stimson Holdings as "Tax Matters Partner," including any contest, settlement or other action or position which it deems reasonable and proper under the circumstances; provided that the Board shall approve any settlement of proposed adjustments to the Company's federal or state income tax returns. The legal, accounting and related costs reasonably incurred by Stimson Holdings in its capacity as "Tax Matters Partner" shall be borne by the Company.

3.10 **Management Fee.** The Company shall pay Stimson Holding an annual management fee of $5,000 payable from the cash resources of the Company before determining Cash of The Company Available For Distribution no more frequently than on a monthly basis in a cumulative amount of $416.67 per month.

# ARTICLE IV.
## ALLOCATIONS AND DISTRIBUTIONS

**4.01   Allocation of Income and Loss for Each Fiscal Year.**   The income, gains, losses, deductions and credits of the Company for each fiscal year shall be allocated among all of the Members pro rata in accordance with their respective Percentage Interests as reflected on the Company's books and records.

**4.02   Distributions of Cash.**   The Cash of The Company Available For Distribution shall be distributed at least annually to all of the Members pro rata in accordance with their respective Percentage Interests as reflected on the Company's book and records. Notwithstanding the foregoing: liquidation distributions upon dissolution and termination of the Company shall be made in accordance with Section 6.02 hereof.

**4.03   Allocation Between Assignor and Assignee.** In the case of the Assignment by a Member of part or all of his, her or its Membership Interest during any fiscal year, the taxable income or loss allocable to such Membership Interest in respect to such fiscal year shall be allocated between the assignor and the assignee in proportion to the number of months during such fiscal year that each was the holder of such Membership Interest, determined by reference to the date the Assignment thereof became effective.

**4.04   Alternative Allocations.**   Notwithstanding any of the foregoing provisions of this Article IV to the contrary:

a.   In the event Code Section 704(c) or Code Section 704(c) principles applicable under Treasury Regulation Section 1-704-1(b)(2)(iv)(d)(3) require allocations of income or loss of the Company in a manner different than that set forth above, the provision of Section 704(c) and the regulations hereunder shall control such allocations among the Members and it is the intention of the Members that Sections 2.05 and 4.01 hereof comply with Code Section 704(c) and related Treasury Regulations.

b.   All deductions of the Company which are attributable to any nonrecourse debt of the Company for which any Member bears the economic risk of loss (for example, (i) any loan to the Company which is guaranteed by a Member or (ii) any loan made to the Company by a Member (or which are treated as such by Treasury Regulations, such as Treasury Regulation Section 1.752-3)) shall be allocated solely to such Member if so required by Treasury Regulation Section 1.704-2(i).

c.   The Company's Accountants shall address, in a manner consistent with the Code and the best interests of the Members, (i) the requirements of Treasury Regulation Section 1.704-2(f) regarding minimum gain chargeback, (ii) the partner non-recourse debt provisions as described in Treasury Regulation Section 1-704-2(i), and (iii) the qualified income offset provisions in Treasury Regulation Section 1-704-1 (b)(2)(ii)(d).

95809/3

## ARTICLE V.
## ASSIGNMENT OF MEMBERSHIP INTERESTS

5.01 **Assignments**. No purported Assignment of a Membership Interest or Financial Rights in violation of this Article V shall be valid or effective, and the Company may refuse to recognize any such purported Assignment for any purpose. No purported Assignment of a Member's Governance Rights shall be effective unless it is made in connection with an Assignment of the Member's Financial Rights to the same person and the assignee is either already a Member or is admitted as a substitute Member pursuant to Section 5.02 hereof. An Assignment of all or any part of a Member's Financial Rights and/or Governance rights shall not dissolve the Company. Financial Rights may not be assigned separately from Governance Rights; provided, however, in the event that a creditor of a Member acquires an interest in the Member's Membership Interest, such interest shall only be an interest in Financial Rights and the creditor shall have no Governance Rights.

No Member may pledge or grant a security interest in such Member's Membership Interest without the unanimous consent of the members of the Board of Governors, which consent may be granted or withheld in each Governor's sole discretion. No Member may otherwise make an Assignment of any part of such Member's Membership Interest to someone not a Member of the Company, except to members of the Member's immediate family or trusts or other entities established solely for the benefit of members of the Member's immediate family, unless such Member shall first have offered the Membership Interest to be transferred to the other Members, in proportion to their respective Percentage Interests, on the same terms and conditions as the Member proposes to transfer the Membership Interest. In the event a Member desires to make an Assignment (other than to an existing Member or to immediate family members or entities for their benefit), the Member shall give notice of the proposed Assignment to all Members and the Company, setting forth the terms and conditions of the proposed Assignment. Each Member shall have the right to acquire, on the same terms and conditions, a portion of the Membership Interest equal to the Membership Interest being transferred multiplied by the acquiring Member's Percentage Interest and may exercise such right by giving the transferring Member and the Company notice within fifteen (15) days after notice of the proposed Assignment was given. In the event that some of the Members do not exercise their right in full, the Member proposing to make the Assignment shall give notice to those Members exercising their right in full, and those Members shall have a secondary right, exercisable by giving notice within ten (10) days after notice of the secondary right was given, to acquire the remaining Membership Interest to be transferred in proportion to their respective Percentage Interests. Any portion of the Membership Interest proposed to be transferred which is not acquired by the other Members may be transferred as described in the notice given by the Member proposing to make the Assignment provided that all of the other conditions set forth in this Article V have been satisfied, including the conditions in Section 5.02.

5.02 **Substitution of Members**. An assignee of a Membership Interest shall have the right to be substituted as a Member and to thereby obtain all of the rights of a Member if and only if:

      a.      he, she or it delivers to the Board of Governors a written notice, executed and acknowledged by him, her or it and by his, her or its seller, requesting

that he, she or it be substituted as a Member;

b.   the Board of Governors unanimously consents in writing to such substitution, which consent may be granted or withheld in the Board's reasonable discretion;

c.   the assignee executes, acknowledges and delivers·to the Board of Governors an instrument in form and substance satisfactory to the Board accepting and adopting the terms, provisions, appointments and agreements set forth in this Agreement;

d.   the seller and assignee execute, acknowledge and deliver to the Board of Governors instruments of assignment in form and substance satisfactory to the Board of Governors and·legal counsel for the Company; and

e.   the seller provides the Board of Governors with such assurances as the Board of Governors may deem appropriate, including, at the seller's expense, an opinion of counsel satisfactory in form and substance to the Board and to legal counsel for the Company to the effect that such Assignment complies with any applicable state and federal securities laws and regulations.

## ARTICLE VI.
## DISSOLUTION AND LIQUIDATION

6.01   **Dissolution.**  The Company shall be dissolved upon the occurrence of any of the events specified in Section 322B.80, subdivision 1, clauses (1) - (4) and (6), of the Act unless the dissolution is revoked pursuant to Section 322B.823 of the Act or is discontinued under Section 322B.85 of the Act. The Company shall not be dissolved upon the occurrence of any event that terminates the continued membership of a Member of the Company, including any of the events listed in Section 322B.306, subdivision 1 of the Act. If the Company is dissolved and (a) the dissolution is not revoked or discontinued as provided in the Act and/or this Agreement, and (b) its business is being liquidated in accordance with Section 322B.873, subdivision 1, of the Act, the Company shall cease to carry on its business except to the extent necessary for the winding up of the business of the Company. The Company shall thereafter be wound up and terminated as provided by the Act.

6.02   **Liquidation.**  Upon the dissolution of the Company, if the dissolution is not revoked or discontinued as provided in the Act and/or this Agreement, the Board of Governors or the Managers acting under the direction of the Board shall reduce the assets of the Company to cash. The Members shall continue to share net income or losses during liquidation in accordance with Section 4.01 hereof. Proceeds shall, except as provided in Section 6.03 hereof, be applied in the following order of priority, after taking into account all adjustments to the Capital Accounts for the Company's taxable year during which such liquidation occurs, unless a court of appropriate jurisdiction should rule otherwise:

a.   to the payment of liabilities and obligations of the Company (excluding liabilities and other obligations to the Members) and·the expenses of

liquidation;

b.     to the establishment of such reserves as the Board of Governors or the Managers acting under the direction of the Board may reasonably deem necessary for any contingent liabilities and obligations of the Company for such period as the Board of Governors or the Managers acting under the direction of the Board shall deem advisable for the purpose of disbursing such reserves in payment of such liabilities or obligations and, at the expiration of such period, the balance of such reserves, if any, shall be distributed as hereinafter provided;

c.     to the repayment of any loans or advances that may have been made by any of the Members (including Members who are also Governors and/or Managers of the Company) or any affiliates thereof to the Company;

d.     to the payment to the Members of an amount equal to the value of the capital contributions (as last restated pursuant to Section 322B.41 of the Act) made by such Members to the Company, less any prior cash distributions to such Members pursuant to Section 4.02 hereof;

e.     to the Members in proportion to, and to the extent of, the positive (credit) balances in their Capital Accounts (less any damages and/or offsets due to the Company from such Members); and

f.     the balance of such proceeds, if any, shall be distributed to the Members pro rata in accordance with their respective Percentage Interests (less any damages and/or offsets due the Company from such Members).

6.03   **Distribution in Kind.** A Member shall not be entitled to demand and receive any distribution from the Company in any form other than cash. However, if, in the opinion of the Board of Governors, it does not appear to be in the best interest of the Members that certain Company assets be converted into cash, and if an equitable pro-rata distribution can be made, Company assets may be distributed in kind.

6.04   **Distribution in Event of Dissolution.** No Member shall be entitled to any distribution in dissolution of the Company until all liabilities owed by such Member to the Company have been paid and until any unpaid contributions to the capital of the Company owing by such Member have been made. The Company shall have the right to offset against the amount otherwise payable to a Member under Section 6.02 hereof any amount owed to the Company by that Member and the amount of any damages suffered by the Company as a result of that Member's breach of any provision of this Agreement.

ARTICLE VII.
AMENDMENTS

7.01   **Method of Adoption.** Any amendment to this Agreement shall be adopted and will be valid and binding on all Members if approved by Members owning in the aggregate a sixty-seven percent (67%) Percentage Interest in the Company.

95809/3          9

7.02 **Dissenter's Rights.** In no event shall any Member be entitled to exercise any dissenter's rights which otherwise may exist upon an amendment to this Agreement, and each Member hereby waives any rights they may have to dissent from amendments to this Agreement.

## ARTICLE VIII.
## BOARD OF GOVERNORS

The Board of Governors shall consist of an equal number of individuals but in no event less than four (4) individuals, or such greater number as the Members determine. One-half of the number of the individuals on the Board of Governors shall be designated by the majority vote of the Class A Membership Interests and one-half of the number of the individuals on the Board of Governors shall be designated by a majority vote of the Class B Membership Interests. In the event of a vacancy on the Board of Governors, the Class of Membership Interests that designated such individual as a Governor shall have the right to fill such vacancy by the majority vote of the Membership Interests of such Class. Each Class of Membership Interests shall have the right to replace any individual on the Board of Governors that such Class has designated as a Governor upon written notice to the Company and the other Members by the holders of a majority of the outstanding Membership Interests of such Class.

## ARTICLE IX.
## ADDITIONAL OBLIGATIONS AND AGREEMENTS

9.01 **Business Opportunities.** The Company's sole business is currently the acquisition, ownership and operation of the real property commonly known as the Stimson Building located at 700 Hennepin Avenue, Minneapolis, Minnesota (the "Building"). Except as provided in this Section 9.01, each Member and the Member Affiliate shall be free to pursue other business opportunities, including without limitation, business opportunities that may be in competition with the Company or its tenants; provided, however, that nothing in this Article IX shall impair any contact between the Company and any Member that places restrictions on that Member's right to participate in businesses that compete with tenants of the Company. No Member nor Member Affiliate may acquire any interest in any real property (whether as an owner, optionee, lender, lessee or otherwise) located adjacent to the Building without first offering in writing for ninety (90) days the Members the opportunity to participate in such interest on the same basis as the Percentage Interest of Members in the Company.

9.02 **Shotgun.** One or more Members (the "Triggering Member") may, at any time after September 1, 2008, deliver a written notice (the "Shotgun Notice") to the Company and the other Members setting a dollar value for all of the Membership Interests of the Company (the "Company Value") and requesting that either the other Members purchase all of the Triggering Member's Membership Interests or sell all of the Membership Interests owned by such other Members to the Triggering Member based on the Company Value established by the Triggering Member in the Shotgun Notice. The Shotgun Notice shall be given in accordance with Section 10.5 to the Company and the other Members. If one or more of the other Members desire to purchase the Membership Interests of the Triggering Member based on the Company Value, such Members shall give written notice to the Company, the Triggering Member and the other Members within thirty (30) days after receipt of the Shotgun Notice. If more than one other Member gives such purchase notice, the Membership Interests of the Triggering Member shall be allocated among such

purchasing Members as they may agree or failing an agreement in proportion to the number of Membership Interests owned by each such purchasing Member to the number of Membership Interests owned by all of the purchasing Members. The purchasing Members shall purchase all of the Membership Interests owned by the Triggering Member on the terms set forth in below. If none of the other Members elects to purchase the Triggering Member's Membership Interests, the Triggering Member shall purchase all of the Membership Interests owned by the other Members on the terms set forth below. The Member(s) who are purchasing the Membership Interests (the "Purchasing Members") shall use commercially reasonable efforts to obtain the release of the personal guaranties of obligations of the Company by the Members whose Membership Interests are to be purchased (the "Selling Member(s)") pursuant to the provisions of this Section 9.02 no later than the closing of the sale of such Membership Interest; provided that if the Purchasing Members are not able to obtain the release of such personal guaranties, then the Purchasing Members shall jointly and severally indemnify the Members whose Membership Interests are to be purchased from any and all liabilities and expenses incurred or suffered with respect to such guaranties of the Company's obligations arising from and after the closing of the purchase of such Membership Interests by the Purchasing Members. The purchase price for the Membership Interests purchased pursuant to the provisions of this Section 9.02 shall be the Company Value multiplied by the Percentage Interest of represented by the Membership Interests being purchased. The purchase price shall be paid in immediately available by the Purchasing Member(s) within sixty (60) days after the Shotgun Notice was given. In the event the Purchasing Member(s) fail to purchase all of the Membership Interests of the Selling Member(s) within sixty (60) days after the Shotgun Notice was given, (i) the Selling Member(s) shall have the option, exercisable by giving written notice to the Purchasing Members within thirty (30) days after the end of such 60-day period, of purchasing all (and only all) of the Membership Interests of the Purchasing Members(s) based upon a Company Value equal to 90% of the Company Value stated in the Shotgun Notice, which purchase price shall be paid within sixty (60) days after such option is exercised, and (ii) if the Selling Member(s) do not exercise their option under clause (i), then the Purchasing Member(s) cannot exercise their right to send a Shotgun Notice for a period on one year following the end of the 60 day period that the Purchasing Member(s) had to purchase the Membership Interests of the Selling Members.

9.03    **Tag Along Rights**.  In the event a Member gives notice of Assignment of such Member's Membership Interests pursuant to Section 5.01, the other Members may elect, by giving written notice (the "Tag Along Notice") to such Member within 30 days after receipt of the notice of Assignment to require that, as a condition of such Assignment, the person to whom such assigning Member's Membership Interests are to be assigned also acquires the Membership Interests of the other Member(s) giving the Tag Along Notice on the same terms as the Member giving such notice of Assignment proposes to assign its Membership Interests. In the event that any Member is not a natural person and 50% or more of the equity interests of such Member are to be sold, assigned or transferred then the provisions of this Section 9.03 shall also apply. If a Member is not a natural person 50% or more of the equity interests of such Member are to be sold, assigned or transferred, such Member shall notify the other Member(s) thereof and permit such other Member(s) to exercise the Tag Along Rights contemplated by Section 9.03.

# ARTICLE X.
## MISCELLANEOUS

10.01 **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns.

10.02 **Severability**. In the event of any conflict between a provision of this Agreement and any provision of the Act not subject to variation by this Agreement, the provisions of the Act shall govern. If any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect, such provision shall be fully severable, this Agreement shall be construed and enforced as if such invalid, illegal or unenforceable provision had never comprised a part of this Agreement and the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired. Furthermore, in lieu of such invalid, illegal or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such invalid, illegal or unenforceable provision as may be possible and still be valid, legal and enforceable.

10.03 **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute a single Agreement, or by the execution of a separate agreement under the terms of which the person executing such separate agreement specifically undertakes to be bound by the terms and conditions of this Agreement.

10.04 **Applicable Law**. All questions relating to the validity, performance, enforcement and interpretation of this Agreement and the rights of Members hereunder shall be governed by the laws of the State of Minnesota.

10.05 **Notices**. All notices provided for herein shall be in writing and shall be sent by first class prepaid registered or certified mail to the Company at the Company's principal office and to the Members at their respective addresses set forth in the Company's required records. Any Member or the Company may, at any time by giving five (5) days' prior written notice to the other Members and the Company, designate any other address in substitution of the foregoing address to which such notice will be given. Notice by mail is given when deposited in the United States mail with sufficient postage affixed. Notice is considered received when given.

10.06 **Entire Agreement**. This Agreement represents the only Member Control Agreement with respect to the Company. All other Member Control Agreements with respect to the Company are hereby superseded.

(The executions are on the following page)

95809/3

IN WITNESS WHEREOF, the parties hereto have executed this Member Control Agreement effective as of the day, month and year first above written.

**STIMSON PARTNERS LLC**

By: _D. A. Barranco_
    Dominic A. Barranco, President

**STIMSON HOLDINGS LLC**

By: _____
Its: _Chief Mgr._

**JACOB HOLDINGS OF STIMSON LLC**

By: _____
Its: _____

**SIGNATURE TO STIMSON PARTNERS LLC
MEMBER CONTROL AGREEMENT**

    The undersigned hereby agrees to be bound by the Member Control Agreement dated as of January 4, 2007, by and among Stimson Partners LLC, Stimson Holdings, LLC, Jacob Holdings of Stimson LLC, the undersigned, and the other members listed on *Exhibit A* to this Agreement.

_____
Signature

_____
(Print or Type Name)

DPD\Agt\532.a3-v3-Hecker-Stimson Partners

95809/3

# EXHIBIT A

| Member | Class A Membership Shares | Class B Membership Shares | Percentage Interest | Current Value of Capital Contributions |
|---|---|---|---|---|
| Stimson Holdings LLC | 50 | -0- | 50% | $1,625,000 |
| Jacob Holdings of Stimson LLC | -0- | 50 | 50% | $1,625,000 |

DPD\Agt\532.a3-v3-Hecker-Stimson Partners

# EXHIBIT C

# LENDERS APPRAISAL SERVICES INC.

### 906 Ottawa Avenue
### West St. Paul, Minnesota 55118
### (612) 720-3886 Fax: (651) 698-9663

November 20, 2009

Ms. Carmen M. Kjome
Officer, Private and Commercial Banking
Alliance Bank
55 East 5th Street, Suite 115
St. Paul, MN 55101

RE:   Appraisal of the Seven Bar and Restaurant Complex
      at 700 Hennepin Avenue, Minneapolis, Minnesota

Dear Ms. Kjome:

Pursuant to your request, we have prepared a **Restricted** appraisal of the above referenced property for the purpose of providing you with an opinion of the current market value.

The opinion of value as stated in this report is predicated upon the definition of market value contained herein. Implicit in the definition of market value is that payment is made in cash or its equivalency.

The property rights appraised consist of title in fee simple.

By virtue of our investigation we have formed the opinion that the value of the subject property "as is" as of November 20, 2009 and based on a marketing period of one year, is:

### THREE MILLION NINE HUNDRED THOUSAND DOLLARS
### $3,900,000

The undersigned certifies that he has personally inspected the subject property and that this appraisal is made subject to certain limiting conditions and assumptions as hereinafter expressed. Facts and information contained herein were obtained from sources that we considered reliable and are true to the best of our knowledge and belief. This appraisal also complies with USPAP and FIRREA standards.

The following report describes our methods of approach, contains data gathered in our investigation, and demonstrates our analysis in arriving at the estimation of market value for the subject property.

Respectfully submitted,
LENDERS APPRAISAL SERVICES, INC.

F. W. Gergen, MAI
Certified General Real Property Appraiser
License #4001499

# EXHIBIT D

**M&I MARSHALL AND ILSLEY BANK**
**COMMERCIAL LOAN LINE 1-800-588-2823**
**P O BOX 3114**
**MILWAUKEE WI 53201-3114**

Page 1 of 1

# LOAN STATEMENT

| Account/Note Number | 00040609877-47998 |
|---|---|
| Statement Date | 11/16/09 |
| Officer | WEITZ,STEVEN J |
| Branch Number | 101200 |
| Current Balance | $3,326,406.85 |
| Payment Due Date | 12/01/09 |
| | |
| Amount Due | $28,064.48 |

հԱհԱհԱհ||ImmԱԱհԱԱԱԱ|հԱհ||Ա|
STIMSON PARTNERS LLC
750 2ND ST S # 602
MINNEAPOLIS MN 55401-2378

*Your Account Number 00031186209 Will Be Charged*

## SUMMARY

| Note/Category | Current Balance | Interest Rate | Maturity Date | Description | Amount Due |
|---|---|---|---|---|---|
| 47998/0 | 3,326,406.85 | 7.080000 | 12/15/12 | Principal Payment | 8,438.68 |
| | | | | Interest To 12/01/09 | 19,625.80 |
| | | | | Total Due On 12/01/09 | $28,064.48 |

### YEAR-TO-DATE SUMMARY

| Interest Paid | 222,264.38 | Escrow Interest Paid | 0.00 |
|---|---|---|---|
| Unapplied Funds | 0.00 | Escrow Balance | 0.00 |
| Taxes Disbursed | 0.00 | | |

Please return the bottom portion if you are making an additional loan payment.

098 00040609877 47998 610 00000 0002806448 4

STIMSON PARTNERS LLO
750 2ND ST S # 602
MINNEAPOLIS MN 55401-2378

098

Please remit and make check payable to:

| Account/Note Number | 00040609877-47998 |
|---|---|
| Payment Due Date | 12/01/09 |
| | |
| Amount Due | $28,064.48 |
| Additional Prin, Int, Escrow, Fees: | |

Amount Enclosed

M&I MARSHALL & ILSLEY BANK
P O BOX 3114
MILWAUKEE WI 53201-3114

☐  Check here for change of address or phone number and indicate changes.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

In Re:

DENNIS E. HECKER,

Debtor.

Case No. 09-50779
Chapter 7
Hon. Robert J. Kressel

---

## MEMORANDUM IN SUPPORT OF MOTION FOR RELIEF FROM THE STAY

---

Alliance Bank ("Alliance" submits this memorandum in support of its Motion for Relief from the Automatic Stay ("Alliance's Motion").

### Facts

The allegations and the defined terms in Alliance's Motion are expressly incorporated herein. Unless otherwise noted, all capitalized terms have the same meanings as ascribed to them in Alliance's Motion.

### Argument

Section 362(d) of the Bankruptcy Code provides, in relevant part, as follows:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; [or]
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) The debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

11 U.S.C. §362. Alliance relies upon both §362(d)(1), cause, and, in the alternative, §362(d)(2), the absence of equity held by Hecker coupled with the fact that this is a liquidation case with no reorganization in prospect. As dictated by § 362(g), Alliance has the burden of proof on the issue of Hecker's equity in the Property and Hecker has the burden of proof on all other issues.

## I.  ALLIANCE IS ENTITLED TO RELIEF FROM THE STAY FOR CAUSE

Cause exists for relief from the automatic stay under 11 U.S.C. § 362 (d) (1). Alliance's interests are not adequately protected. The standards for adequate protection in the Eighth Circuit are set forth in *In re Martin*, 761 F.2d 472 (8th Cir. 1985). To be adequately protected, Alliance is entitled to "indubitable equivalence" whereby Hecker 'should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights.' *Id. at* 476 (citing *In Re American Mariner Industries, Inc.*, 734 F.2d 426, 435(9th Cir. 1984). It is incumbent upon the Court to: 1) establish the value of the secured creditor's interest, 2) identify the risks to that value and 3) determine if Debtors have provided adequate protection to protect the interest against the risks. *Id.* at 476-477.

At the time of the Petition Date there was an outstanding principal balance to Alliance on the Stimson Note of $1,375,000, plus interest and late fees. The Stimson Note is secured by Hecker's 50% Membership Interest in Stimson Partners LLC, which

has as its sole asset property valued at $3,900,000 and subject to a mortgage of $3,398,292, insufficient to provide adequate protection of Alliance's interest.

Hecker has made no offers of adequate protection to Alliance. Pursuant to 11 U.S.C. §362 (g), the burden is on the debtor to prove the absence of cause or the existence of adequate protection. Hecker has failed to provide adequate protection for Alliance's interest and cause exists for relief from the stay to allow Alliance to exercise its right and remedies.

## II. ALLIANCE IS ENTITLED TO RELIEF FROM STAY BECAUSE HECKER HAS NO EQUITY IN THE PROPERTY AND THERE IS NO PROSPECT OF REORGANIZATION IN A LIQUIDATION CASE

Alliance is entitled to relief under 363 (d) (2) because Hecker has no equity in the Property and as this is a liquidation case, there is no prospect of reorganization. "Equity" is defined as "the difference between the property value and the total amount of liens against it." *Stewart v. Gurley*, 745 F.2d 1194, 1195 (9th Cir. 1984).

As indicated above, the Stimson Note is secured by Hecker's 50% Membership Interest in Stimson Partners LLC, a single asset entity, with its sole asset the Property valued at $3,900,000. Hecker and Stimson owe Alliance $1,375,000, plus interest and late fees on the Stimson Note. The Property is also encumbered by a mortgage in the amount of $3,398,292. Hecker has no equity in the Property because the amounts of the liens and other encumbrances on the Property exceed its value.

## CONCLUSION

For the above stated reasons, Alliance's motion for relief from the automatic stay should be granted.

Dated: December 11, 2009            GREENE ESPEL, P.L.L.P.


/s/Kathleen K. Statler
Larry D. Espel, Reg. No. 27595
Kathleen K. Statler, Reg. No. 161809
200 S. Sixth Street, Suite 1200
Minneapolis, MN 55402
lespel@greeneespel.com
kstatler@greeneespel.com
(612) 373-0830

Attorneys for Alliance Bank

| In Re: | Case No. 09-50779 |
| | |
| DENNIS E. HECKER, | Chapter 7 |
| | |
| Debtor. | Hon. Robert J. Kressel |

---

### CERTIFICATE OF SERVICE

---

I, Kathleen K. Statler, declare, under penalty of perjury, that on December __, 2009, I filed the following:

1. Alliance Bank's Notice of Hearing and Motion for Relief from Stay;
2. Exhibits A through D;
3. Alliance Bank's Memorandum in Support of Motion for Relief from the Stay; and
4. Proposed Order

with the Clerk of Bankruptcy Court through ECF, and that ECF will send an e-notice of electronic filing to the following:

Kendall L. Bader on behalf of Debtor Dennis Hecker
kbader@fredlaw.com, klbader@yahoo.com

Patti H Bass on behalf of Interested Party HSBC Bank Nevada, N.A.
ecf@bass-associates.com

Matthew R. Burton on behalf of Interested Party RANDALL SEAVER
mburton@losgs.com

Tyler D. Candee on behalf of Plaintiff Randall Seaver - Trustee
tcandee@lapplibra.com, dwegler@lapplibra.com

Bruce H. Carlson on behalf of Interested Party VISIONBank
bruce.carlson@mlcfargolaw.com, tricia.fossen@mlcfargolaw.com

Monica L. Clark on behalf of Interested Party Toyota Motor Sales, U.S.A., Inc.
clark.monica@dorseylaw.com

Gordon B. Conn on behalf of Trustee Randall Seaver
conn@kwgc-law.com

Clinton E. Cutler on behalf of Debtor Dennis Hecker
ccutler@fredlaw.com, mdavis@fredlaw.com
David B Galle on behalf of Defendant WELLS FARGO BANK
dgalle@oppenheimer.com

Stephen F Grinnell on behalf of Attorney Craig Reimer
stephen.grinnell@gpmlaw.com

Aaron R. Hartman on behalf of Interested Party Beal Bank Nevada
ahartman@aoblaw.com, lwilhelm@aoblaw.com

Joshua A. Hasko on behalf of Plaintiff CARLTON FINANCIAL CORPORATION
jhasko@messerlikramer.com, nkuhnly@messerlikramer.com

Andrea M. Hauser on behalf of Plaintiff Randall Seaver, Trustee
ahauser@losgs.com

David L. Johnson on behalf of Plaintiff Vision Bank
david.johnson@mlcfargolaw.com

Douglas W. Kassebaum on behalf of Debtor Dennis Hecker
dkassebaum@fredlaw.com, scharter@fredlaw.com;bankruptcy@fredlaw.com

Jeffrey D. Klobucar on behalf of Interested Party Crown Bank
jklobucar@foleymansfield.com

Jordan S Kushner on behalf of Interested Party Cindy Bowser
kushn002@umn.edu

Connie Lahn on behalf of Interested Party Hyundai Capital America
connie.lahn@fmjlaw.com, Aong.Moua@fmjlaw.com

Thomas Lallier on behalf of Interested Party Crown Bank
tlallier@foleymansfield.com

Joseph W. Lawver on behalf of Interested Party Associated bank
jlawver@messerlikramer.com, mnygaard@messerlikramer.com

Seth Leventhal on behalf of Plaintiff Hyundai Capital America
seth.leventhal@fmjlaw.com, sherri.debettignies@fmjlaw.com

Nauni J Manty on behalf of Interested Party Tamitha Hecker
ecf@mantylaw.com

Michael L Meyer on behalf of Interested Party Toyota Financial Savings Bank
mlmeyer@ravichmeyer.com

Ralph Mitchell on behalf of Plaintiff Randall Seaver - Trustee
rmitchell@lapplibra.com, jpipp@lapplibra.com

William F Mohrman on behalf of Debtor Dennis Hecker
mohrman@mklaw.com, gynild@mklaw.com

Andrew Paul Moratzka on behalf of Defendant LKMCD PROPERTIES, LLC
apm@mcmlaw.com, jef@mcmlaw.com;ldj@mcmlaw.com

Cynthia A. Moyer on behalf of Debtor Dennis Hecker
cmoyer@fredlaw.com, cthomas@fredlaw.com

Nicholas N Nierengarten on behalf of Interested Party Chrysler Financial Services
Americas LLC, f/k/a DaimlerChrysler Financial Services Americas LLC
nicholas.nierengarten@gpmlaw.com

Robert G. Parish on behalf of Interested Party TCF NATIONAL BANK
rparish@faegre.com

Timothy J Peters on behalf of Interested Party TOYOTA MOTOR CREDIT
CORPORATION
tpeters@peterslawplc.com, peters.timothy.james@gmail.com

Jamie R. Pierce on behalf of Interested Party United States Rent A Car, Inc.
jpierce@hinshawlaw.com,
akulbeik@hinshawlaw.com;mpocock@hinshawlaw.com;kmoore@hinshawlaw.com

Steven R Qualley on behalf of Defendant RiverWood Bank
steveq@gqlaw.net, squalley@gqlaw.net

Recovery Management Systems Corp
claims@recoverycorp.com

Craig E. Reimer on behalf of Interested Party Chrysler Financial Services Americas LLC, f/k/a DaimlerChrysler Financial Services Americas LLC
creimer@mayerbrown.com,
samahdi@mayerbrown.com;srozen@mayerbrown.com;hroin@mayerbrown.com

David E. Runck on behalf of Interested Party Hyundai Capital America
david.runck@fmjlaw.com, Aong.Moua@fmjlaw.com

Randall L. Seaver
rlseaver@fullerseaverramette.com, rseaver@ecf.epiqsystems.com

Eric J Sherburne on behalf of Interested Party U.S. Bank National Association
esherburne@steinmoore.com, notices@steinmoore.com

Brad A Sinclair on behalf of Creditor Cornerstone Bank
bsinclair@serklandlaw.com, crohr@serklandlaw.com

William R. Skolnick on behalf of Debtor Dennis Hecker
wskolnick@skolnick-shiff.com, zpuchtel@skolnick-shiff.com;petricka@visi.com;rcargill@skolnick-shiff.com;dlarson@skolnick-shiff.com

Rebecca G. Sluss on behalf of Interested Party Grant Thornton LLP
rsluss@oppenheimer.com

Matthew A. Swanson on behalf of Interested Party JPMorgan Chase Bank, N.A.
matthew.swanson@leonard.com, callie.sanford@leonard.com

Gregory L. Taddonio on behalf of Interested Party TOYOTA MOTOR CREDIT CORPORATION
gtaddonio@reedsmith.com, kpalmer@reedsmith.com

US Trustee
ustpregion12.mn.ecf@usdoj.gov

Nicholas J. Vivian on behalf of Interested Party AnchorBank, fsb
nvivian@eckberglammers.com, dneumann@eckberglammers.com

4

and by U.S. mail to the following parties:


Michael B. Lubic
Sonnenschein Nath & Rosenthal, LLC
601 South Figueroa Street, Suite 2500
Los Angeles, CA 90017

Michael M. Malter
Binder & Malter LLP
2775 Park Avenue
Santa Clara, CA 95050


Dated:  December 11, 2009

GREENE ESPEL, P.L.L.P.


_____/s/Kathleen K. Statler_____
Larry D. Espel, Reg. No. 27595
Kathleen K. Statler, Reg. No. 161809
200 S. Sixth Street, Suite 1200
Minneapolis, MN  55402
lespel@greeneespel.com
kstatler@greeneespel.com
(612) 373-0830

Attorneys for Alliance Bank

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

In Re: | Case No. 09-50779
| Chapter 7
DENNIS E. HECKER, | Hon. Robert J. Kressel

Debtor.

---

## ORDER FOR RELIEF FROM THE AUTOMATIC STAY

This case came before the court on a motion by Alliance Bank for an order for relief from the automatic stay. Based on the motion and file,

IT IS ORDERED:

1.    Alliance Bank is granted relief from the automatic stay of 11 U.S.C. §362 with respect to Debtor's membership interest in Jacob Holdings of Stimson LLC; and

2.    Notwithstanding Fed. R. Bankr. P. 4001 (a) (3), this order is effective immediately.

Dated: _____

Robert J. Kressel
United States Bankruptcy Judge