## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

In re:                                                    BKY No. 09-50779
                                                                Chapter 7
Dennis E. Hecker,

        Debtor.

---

## TRUSTEE'S RESPONSE IN OPPOSITION TO MOTION FOR LEAVE TO APPEAL AND MOTION TO DISMISS APPEAL AS MOOT

---

## INTRODUCTION

Cornerstone Bank, Cornerstone Holding Company, and Blackstone Financial, LLC (collectively referred to as "**Cornerstone**") moved for leave to appeal the Bankruptcy Court's order entered on November 25, 2009 approving a Settlement Agreement and abandonment of estate assets by Randall L. Seaver, the Trustee (the "**Order**").[1]  The Order allowed for the sale of a franchised auto dealership, Denny Hecker's Toyota Scion of Baxter/Brainerd, which had a dealership agreement with Toyota Motor Sales, Inc., and the sale of the underlying real estate. The Trustee files this Response under Bankruptcy Rule 8003(a), opposing Cornerstone's Motion for Leave to Appeal on the basis that any appeal of the Order is moot as <u>Cornerstone did not obtain a stay of the sale</u>, and the sale of assets to a third party has closed.  Alternatively, the Trustee moves for the dismissal of the appeal as an interlocutory appeal.

## FACTUAL BACKGROUND

The Trustee negotiated an Asset Purchase Agreement for a sale of the assets of Brainerd Imports LLC ("**Brainerd**"), a limited liability corporation controlled by the Debtor, Dennis E. Hecker, to Brainerd T, LLC.  The Asset Purchase Agreement also included the sale of the assets

---

[1] A copy of the Order is attached hereto as Exhibit 1.

of Jacob Holdings of Baxter LLC ("**JHB**"), which was wholly owned by Jacob Properties of Minnesota, LLC ("**JP-Minnesota**"), a real estate holding company controlled by the Debtor, to Walser Real Estate IV, LLC. The purchasers Brainerd T, LLC and Walser Real Estate IV, LLC shall be referred to collectively, as "**Walser**." The Asset Purchase Agreement is attached as Exhibit 2 and the Settlement Agreement is attached as Exhibit 3.

Earlier, the Trustee sought court approval for a previous settlement with the Debtor and Walser in October 2009, but approval was denied. Throughout the fall of 2009, Toyota Motor Sales, U.S.A., Inc. ("**TMS**") threatened to terminate Brainerd's ability to operate as a dealership for Toyota vehicles. TMS obtained an order granting it relief from the automatic stay to terminate the dealership agreement on November 12, 2009.

The Trustee identified monetary preference claims of at least $206,000 the bankruptcy estate had against Toyota Motor Credit Corporation ("**TMCC**"), which claimed liens against Dealership assets. In addition, it also appeared to the Trustee that he could avoid a transfer of Brainerd stock which was made to TMCC in May 2009. The Trustee negotiated a new sale agreement with Walser and TMCC, exclusive of any involvement of the Debtor. Walser agreed to purchase Brainerd for a price exceeding $3.1 million dollars and to assume Brainerd's debt to TMCC, an amount in excess of $5 million dollars. TMCC agreed to release its liens against all assets of the Dealership and to pay the Trustee $425,000.00 from the sale proceeds as a settlement of preference claims against TMCC up to $425,000.00.

The Trustee's goal in negotiating the sale of the auto dealership and abandonment of JHB and JP-Minnesota was to: (a) realize value from Brainerd through a preference recovery; (b) ensure that the creditors of Brainerd were paid; and, (c) to protect the bankruptcy estate from adverse tax consequences.

On November 20, 2009, the Trustee sought bankruptcy court approval of the Settlement Agreement and sales on an expedited basis by filing and serving a notice of hearing and motion for approval of the Settlement Agreement and for authorization to abandon property, which hearing was set for November 25, 2009. All interested parties including Cornerstone received electronic notice on November 20, 2009.

On November 24, 2009, Cornerstone filed its Objection to the Trustee's Motion of Approval of Settlement Agreement and Abandonment Regarding Brainerd Imports LLC and Jacob Holdings of Baxter, LLC.

On November 25, 2009, after a hearing on the Trustee's Motion, the Bankruptcy Court overruled Cornerstone's objection and entered an order approving the Settlement Agreement and authorizing the sale to Walser. The Order was immediately effective upon entry. *See*, Exhibit 1. Cornerstone did not request a stay of the Order or the sale pending appeal.

On the evening of November 25, 2009 and during the next day, the sale transaction closed. A copy of the Settlement Statement is attached as Exhibit 4. On November 27, 2009, Walser reopened Toyota Scion of Baxter/Brainerd for business. Notably, as a result of the closing, the Trustee has now waived his ability to pursue preference claims against TMCC, unless they exceed $425,000. All parties to the transaction have materially altered their economic circumstances based on the Order.

On December 7, 2009, Cornerstone filed its Motion for Leave to Appeal and Notice of Appeal under 28 U.S.C. §158, and its Election that Appeal Be Heard by the United States District Court under 28 U.S.C. §158(c)(1)(A).

# ARGUMENT

## I.     CORNERSTONE'S APPEAL IS MOOT

Cornerstone could have sought a stay of the Order pending an appeal but elected not to do so.  Accordingly, the parties closed on the sale of the auto dealership and the Trustee abandoned estate assets.  Non-adverse third parties, like Walser, made substantial economic commitments in reliance on the Order.  TMCC consented to the closing only because the Settlement Agreement eliminated TMCC's preference exposure.  Now that the sale has closed, a reviewing court cannot provide Cornerstone a remedy, and therefore, this appeal is moot.

### A.     Mootness in Bankruptcy Proceedings

The question of whether a case is moot reflects the constitutional premise that "only live cases or controversies be decided by our courts."  *Manges v. Seattle-First National Bank (In re Manges*, 29 F. 3d 1034, 1038 (5th Cir. 1994) *citing Powell v. McCormack,* 89 S.Ct. 1944, 1951 n. 7, (1969) (recognizing that the Court's inability to consider the merits of a moot case "is a branch of the [U.S. CONST. art. III] constitutional command that the judicial power extends only to cases or controversies")  In bankruptcy proceedings, appellate courts will deem an issue moot when the proceedings have progressed to "a point beyond which they cannot order fundamental changes in reorganization actions."  *Manges* at 1039.

> The test for mootness reflects a court's concern for striking the proper balance between the equitable considerations of finality and good faith reliance on a judgment and the competing interests that underlie the right of a party to seek review of a bankruptcy order adversely affecting him.  The concept of "mootness" from a prudential standpoint protects the interests of non-adverse third parties who are not before the reviewing court but who have acted in reliance upon the plan as implemented.

*Manges* at 1039 (citations omitted).   Bankruptcy courts generally examine three factors in determining whether a case is moot: (i) whether a stay has been obtained, (ii) whether the plan

has been "substantially consummated," and (iii) whether the relief requested would affect either the rights of parties not before the court or the success of the plan. *Ronit, Inc. v. Stemson Corp. (In re Block Shim Dev. Co.),* 939 F.2d 289, 291 (5th Cir.1991).

"If a party appeals an order approving a sale of bankruptcy estate property but does not obtain a stay of the order pending the appeal, the intervening sale of the property eliminates the reviewing court's ability to provide relief, and the appeal must be dismissed as moot." *Nieters v. Sevcik (In re Rodriquez),* 258 F.3d 757, 759 (8th Cir. 2001) *(per curiam) (citing In re Security Life Ins. Co.,* 228 F.3d 865, 870 (8th Cir. 2000)) (emphasis added). Although the franchised auto dealership was not bankruptcy estate property, TMCC required the Trustee's approval of the sale, and the transaction affected significant economic rights of third parties. Once a bankruptcy court authorizes a sale to a bonafide purchaser under 11 U.S.C. §363, the Bankruptcy Code specifically prohibits the reversal of the order:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. §363(m); *see also,* Bankruptcy Rule 8005:

> Unless an order approving a sale of property ... is stayed pending appeal, the sale to a good faith purchaser ... shall not be affected by the reversal or modification of such order on appeal, whether or not the purchaser knows of the pendency of the appeal.

After the closing of a sale, a reviewing court can provide no remedy and any appeal of the order authorizing the sale is moot. *See Reagan v. Wetzel, et al. ( In re Reagan)*, 403 B. R. 614, 620 (8th Cir. BAP 2009) *citing Wintz v. American Freightways, Inc. (In re Wintzs Cos.),* 219 F.3d 807, 811 (8th Cir.2000); *United States v. Fitzgerald,* 109 F.3d 1339, 1342 (8th Cir.1997); *Van Iperen*

*v. Prod. Credit Assoc. of Worthington-Slayton Branch (In re Van Iperen),* 819 F.2d 189, 191 (8th Cir. 1987) (per curiam) ("Once collateral is taken and converted into cash, no court is able to formulate adequate relief to the debtor."). *See also, In re Hilal,* 226 F. App'x 381, 383 n. 1 (5th Cir. Apr.2, 2007).

**B.     As Cornerstone failed to Obtain a Stay, the Sale Closed and Cornerstone's Appeal of the November 25, 2009 Order is Moot.**

Here, Cornerstone had proper notice of the proposed settlement and sale, Cornerstone filed its objection, and attended the hearing on the Trustee's motion for approval of the Settlement Agreement and sale. When the Court overruled Cornerstone's objection and approved the sale, Cornerstone did not seek a stay of the Order. "Equity aids the vigilant, not those who slumber on their rights." *Gen. Electric Co. v. Sciaky Bros., Inc*., 304 F. 2d 724 (6th Cir. 1962).

Virtually the same circumstances arose in the case of *In re Supplement Spot, LLC*, 2009 WL 1684577 (S.D. Tex. 2009) (copy attached as Exhibit 5). A Chapter 11 trustee sold assets of debtor entity over an objection. The transactions were funded and consummated. *Id.*, at *2. The objecting party did not obtain a stay of the bankruptcy court's order. The court then ruled as follows:

> In the bankruptcy context, the mootness concept is a "recognition by the appellate courts that there is a point beyond which they cannot order fundamental changes in reorganization actions." "Consequently, a reviewing court may decline to consider the merits of a [compromise and settlement] order when there has been substantial consummation ... such that effective judicial relief is no longer available--even though there may still be a viable dispute between the parties on appeal." The Court must consider whether it is "prudent" to upset the settlement. *Id.* To determine whether a bankruptcy appeal is moot, the Court examines three primary factors: "(i) whether a stay has been obtained, (ii) whether the [settlement] has been 'substantially consummated,' and (iii) whether the relief requested would affect ... rights of parties not before the court ...." *Id.*
>
> In this case, Appellants neither requested nor obtained a stay of the Bankruptcy Court's orders. Appellants did not request a stay in their Objections or during the evidentiary

hearing. The settlement has been fully consummated--the property has been sold, the proceeds have been distributed . . .

*Id.,* at *2.

The factors set forth in *Supplement Spot* are easy to apply to this case. It is without question that Cornerstone failed to request a stay of the Order. It is also without question that the transactions contemplated by the settlement and the abandonment have been "substantially consummated" and numerous third parties have acted in reliance on the Order There has been a closing and the estate has abandoned its interest in property based on the Order.

Finally, reversing the Order would significantly affect the rights of parties not before the Court. Toyota, the Walser entities, creditors of the Hecker entities, the Trustee and many others have altered their economic stakes because of the Order. Walser obtained financing for the purchase and reopened a new Toyota dealership under a new Toyota franchise. Walser reopened the Toyota dealership the day after Thanksgiving and re-employed former employees of the Dealership who had been unemployed. The estate abandoned its interest in JHB and JP-Minnesota, LLC, two of Debtor's real estate entities, one of which was his real estate holding company, and settled its claims against TMCC. To unwind the transactions is impossible. Cornerstone requests relief which the Court cannot provide even if it were so inclined, and accordingly, Cornerstone's appeal is moot.

## II. THE DISTRICT COURT SHOULD NOT ENTERTAIN THIS APPEAL AS AN INTERLOCUTORY APPEAL

Cornerstone's Motion for Leave to Appeal suggests that Cornerstone believes that this appeal is interlocutory, although Trustee is not convinced that this is the case. An order is "final" when a decision has been entered that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Coopers & Lybrand v. Livesay,* 437 U.S.

463, 467 (1978) *quoting Catlin v. United States,* 324 U.S. 229, 233 (1945)).  Moreover, an order approving a compromise is final as it determines the right of the parties.  *See H&C Development Group, Inc. v. First Vermont Bank and Trust. Co.( In re Miner),* 22 B.R. 199, 203 (2nd Cir. BAP 1998).  Nonetheless, if the appeal in this matter is interlocutory, the same facts that would necessitate dismissal for mootness would also require a dismissal of this appeal as an interlocutory appeal.

An interlocutory appeal is appropriate only in exceptional circumstances.  *In re Frascella Enterprises, Inc.*, 388 B.R. 619, (Bankr. E.D. Pa. 2008), citing *Milbert v. Bison Laboratories, Inc.*, 206 F.2d 431, 433 (3rd Cir. 1958) and *Matter of Magic Restaurants, Inc.*, 202 B.R. 24 (D. Del. 1996).  The District Court's jurisdiction over bankruptcy appeals is governed by 28 U.S.C. §158(a)(1) and (3),  which extends to "final decisions, judgments, orders, and decrees"  as well as to interlocutory orders and decrees "with leave of court."  The District Court has discretion to hear interlocutory appeals from the bankruptcy Court. 28 U.S.C. §158(a)(3); *see also, Contractors, Laborers Teamsters, et al. v. Killips (In re M & S Grading, Inc.)* 526 F. 3d 363 ( 8th Cir. 2008).  "A district court will look to the standards which govern interlocutory appeals from the district court to the court of appeals pursuant to 28 U.S.C. §1292(b)." *Celotex Corp. v. AIU Ins. Co. (In re Celotex Corp.),* 187 B.R. 746, 749 (M.D. Fla. 1995). A court will permit an interlocutory appeal "if there are controlling questions of law as to which there are substantial grounds for difference of opinion and if an immediate appeal from the order may materially advance the ultimate termination of the litigation." *See* 28 U.S.C. §1292(b); *In re Johns-Manville Corp.,* 45 B.R. 833, 835 (S.D.N.Y. 1984).

First, Cornerstone cannot show that the Order presents a controlling question of law over which there is a split of authority or other "substantial ground for difference of opinion" among

the courts. The Order approved a complex agreement and sale transaction whose component parts did not reflect any controversial or novel legal issues. Cornerstone's question to be determined on appeal presupposes that (a) there would be "equity" available to lien claimants and (b) that its lien would have been in a first position to capture such equity. The issues involved are lien priority, preference law and the standards for the approval of a settlement. None of these present an issue of law over which create a "substantial grounds for a difference of opinion."

Moreover, as Cornerstone did not seek a stay of the sale transaction, the sale transaction closed and Brainerd Toyota has reopened for business, and an appeal of the Order would not resolve any issue that would advance the administration of the bankruptcy estate or termination of any outstanding litigation.

Cornerstone seeks to recharacterize the funds that the bankruptcy estate received as preference recoveries from TMCC to the receipt of equity derived from the Debtor's assets. The bankruptcy court recognized that Cornerstone's characterization of the preference recovery has no legal basis, as those funds resulted from the Trustee's ability to assert claims against TMCC under 11 U.S.C. §547 and to obtain a recovery for the estate under 11 U.S.C. §§550 and 551.

Aside from being untrue, Cornerstone's characterization would lead to the unwinding of the entire sale transaction, not just a recharacterization of the bankruptcy estate's recovery. But for the settlement of the preference claims, TMCC would not have allowed the transfer of the franchise to Walser. Instead TMCC would have continued to assert its secured claims to all dealership assets until preference claims were resolved. Furthermore, in the absence of funds coming into the estate from the settlement, the Trustee would not have consented to the transactions which allowed the Debtor's corporate entities to transfer their assets to Walser.

Further, the Trustee would not have waived claims against TMCC. In the end, each part of the transaction was integral and Cornerstone's attempt to recharacterize the settlement and sale is a misguided effort. Cornerstone could have sought a stay of the Order prior to the closing on the sale. Cornerstone elected not to seek a stay.

Cornerstone has also failed to demonstrate that relief would lead to a termination of litigation. To the contrary, if Cornerstone was successful on appeal, a whole "can of worms" would be opened relating to all parties to the settlement, the abandonment and the related transactions. In this case, a dealership sale with a value in excess of $8 million closed based on the Order. The genie cannot be put back in the bottle. Therefore, the District Court should not grant Cornerstone leave to file its appeal. See *In re Hill*, 2008 WL at 2331028 (W.D. N.C.) (no grounds for appeal of order approving settlement agreement) (copy of case attached as Exhibit 6).

## MOTION TO DISMISS APPEAL

Based on the foregoing, the Trustee requests that this submission be considered both an opposition to Cornerstone's motion to allow an appeal and an independent motion to dismiss the appeal.[2]

## CONCLUSION

Cornerstone has not met its burden to demonstrate that an interlocutory appeal is appropriate in this matter. Further, the underlying transactions having closed, Cornerstone's appeal is moot. Based on the foregoing, the Trustee requests that Cornerstone's motion for leave to appeal be denied.

---

[2] The Trustee would add that Cornerstone's request for leave to appeal does not comply with Bankruptcy Rule 8003(a) as it did not attach a copy of the Order, as required.

**LEONARD, O'BRIEN,
SPENCER, GALE & SAYRE LTD.**

Dated: December 14, 2009

/e/ Matthew R. Burton

By: _____
   Matthew R. Burton #210018
   Attorneys for Trustee
   100 South Fifth Street, Suite 2500
   Minneapolis, MN 55402
   (612) 332-1030

413543

11

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

Dennis E. Hecker,

       Debtor.

BKY No. 09-50779

Chapter 7

## ORDER

This case is before the court on the motion of the trustee for approval of a settlement agreement.

Based on the motion and the file,

IT IS ORDERED:

1.      The trustee's motion for expedited relief is granted.

2.      The trustee's settlement with Brainerd Imports LLC, Jacob Holdings of Baxter LLC, and Toyota Motor Credit Corporation is approved.

3.      The trustee is authorized to execute and deliver, on behalf of the sellers, the Asset Purchase Agreement and Real Estate Purchase Agreement, and all documents and instruments contemplated by the Asset Purchase Agreement and Real Estate Purchase Agreement contemplated by the Settlement Agreement (and attached as part of Exhibit A to the verified notice of hearing and motion), or otherwise necessary to effectuate the transactions contemplated under the Settlement Agreement. Execution of the instruments by the trustee in his capacity as trustee shall be sufficient to convey title to the interest so conveyed.

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on 11/25/2009
Lori Vosejpka, Clerk, by LMH



EXHIBIT

tabbies

_____/_____

4.     The trustee's settlement with TMCC as to the estate's preference claims is approved.

5.     The trustee's requested abandonment of the bankruptcy estate's interest in JHB and Jacob Properties of Minnesota LLC is approved effective after the closing of the transactions contemplated by the settlement agreement approved by this order with the abandonment retroactive to the commencement of the case, it being understood, however, that nothing contained in this paragraph 5, including the abandonment authorized hereunder, shall effect the validity of any instrument of conveyance to be executed by the trustee in connection with the proposed sale and consent to termination authorized under this order.

6.     This order is binding upon the debtor, all creditors of the debtor and parties in interest in the case, and inures to the benefit of the trustee and the buyer and all applicable successors and assigns, and Toyota Motor Sales, U.S.A., Inc.

7.     The trustee's consent to Toyota Motor Sales, U.S.A., Inc. terminating the Toyota Dealer Agreement with Brainerd Imports LLC, if the transactions contemplated herein are not closed by November 30, 2009, approved.

8.     Notwithstanding Fed. R. Bankr. P. 6004(h), this order is effective immediately.


Dated:  November 25, 2009                     /e/ Robert J. Kressel
                                              Robert J. Kressel
                                              United States Bankruptcy Judge

2

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is entered into as of the 20th day of November, 2009, by and among **BRAINERD T, LLC**, a Minnesota limited liability company or its assigns ("Buyer"), and **BRAINERD IMPORTS LLC**, a Minnesota limited liability company d/b/a Denny Hecker's Toyota Scion of Baxter/Brainerd ("Seller").

## RECITALS

A.    Seller owns and operated a motor vehicle sales and services dealership (the "Dealership") which conducted business at 7036 Lake Forest Road, Baxter, Minnesota 56425 (the "Dealership Premises"). Seller operated the Dealership pursuant to a dealer sales and services agreement for Toyota and Scion motor vehicles granted by Toyota Motor Sales, U.S.A., Inc. (the "Manufacturer") for the Toyota and Scion lines of motor vehicles.

B.    Seller desires to sell and Buyer desires to buy certain of the assets of Seller used in connection with Seller's ownership and operation of the Dealership on the terms and conditions set forth herein.

C.    On June 4, 2009 (the "Petition Date"), Dennis E. Hecker ("Hecker" or the "Debtor"), the holder of 99% of the membership interests in Seller, filed a voluntary petition for relief under chapter 7 of the United States Bankruptcy Code with the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"). Randall L. Seaver is the duly-appointed chapter 7 trustee for Hecker's bankruptcy case (the "Trustee").

D.    On or about October 14, 2009, the Trustee, acting on behalf of all of the members of Seller, took action to remove Hecker from the office of sole governor of Seller. The Trustee hereby represents that he is duly authorized to execute this Agreement on behalf of Seller.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein and of the purchase price set forth below, the parties, intending to be legally bound by the terms hereof, agree as follows:

1.    <u>Incorporation of Recitals</u>. The Recitals set forth above are incorporated herein by reference and are made a part of this Agreement and shall constitute an expression of the intent of the parties and as an aid in the construction of this Agreement.

2.    <u>Sale and Purchase of Assets</u>. Subject to the conditions, covenants, and agreements below, Seller shall, at Closing (as herein defined), transfer to Buyer by appropriate bills of sale, assignments, and such other instruments as may be reasonably required by Buyer, all in a form reasonably satisfactory to Buyer, all ownership interest in the assets set forth below (collectively, the "Dealership Assets"), free and clear of all liens, security interests, encumbrances and restrictions.

2431308v3



EXHIBIT

2

2.1     New Vehicles.  All of Seller's new, unused, and undamaged 2009 and 2010 Toyota and Scion motor vehicles acquired by Seller directly from the Manufacturer or from other Toyota or Scion dealers and owned and held by Seller for sale as of the Escrowed Closing Date (as defined herein) or owned and in transit to Seller as of the Escrowed Closing Date (collectively, "New Vehicles").  The New Vehicles and their corresponding purchase prices shall be listed on Schedule 2.1 attached hereto.

2.2     Used Vehicles.  All used vehicles, new Toyota or Scion 2008 model year or older vehicles owned by Seller and held for resale as of the Escrowed Closing Date and listed on Schedule 2.2 ("Used Vehicles") will be sold at the price designated on Schedule 2.2, representing the mutual agreement of Seller and Buyer as to each of the Used Vehicles.  Seller will retain each used vehicle not listed on Schedule 2.2 and as to which the Seller and Buyer cannot agree on price and any such used vehicles not purchased pursuant to this Agreement will be removed from the Dealership Premises by Seller, at Seller's sole expense, within thirty (30) days after the Closing.

2.3     Parts and Accessories.  Seller's entire inventory of new, unused, and undamaged Toyota, Scion and after-market parts and accessories contained in their original, unbroken packages which are returnable to the Manufacturer or vendor and which are listed in the Manufacturer's or vendor's most recent parts books or reflected in Manufacturer's electronic database for current parts as of the Escrowed Closing Date ("Parts and Accessories").  The purchase price for the Parts and Accessories shall be $60,361.  Seller shall assign to Buyer at Closing any and all parts return rights that Seller is entitled to exercise with the Manufacturer or other vendors for the Parts and Accessories, and Buyer shall be responsible for handling all such parts returns.

2.4     Fixed Assets.  All of Seller's special tools, equipment, furniture, fixtures, and other fixed assets and personal property (the "Dealership Fixed Assets").  The purchase price for the Dealership Fixed Assets shall be Two Hundred Fifty Thousand Dollars ($250,000.00).

2.5     Intangible Assets and Goodwill.  All of Seller's rights to goodwill and other intangible assets used in the operation of the Dealership, including without limitation, the following (collectively, the "Intangible Assets"): (i) all telephone and facsimile numbers and e-mail addresses assigned to Seller at the Dealership Premises or owned and/or used by Seller in the day-to-day operation of the Dealership subject to, and conditioned upon, Buyer's assumption of all white page and yellow page advertising contracts with respect thereto for all periods following the Closing Date; (ii) all websites, URLs, and domain names relating to Seller's Dealership operations; (iii) to the extent transferable, all licenses necessary for the continued conduct of the Dealership by Buyer; (iv) hard copies and computer copies of all of Seller's business records relating in whole or in part to the Dealership, including new car registration lists, customer lists, customer records and sales files, service records including warranty repair and claim records, new and used car sales records; (v) all right to any names used by Seller in conducting the operation of the Dealership; (vi) to the extent transferable, all Toyota and Scion franchise rights; (vii) all Toyota and Scion service policy and procedure manuals, service bulletins, distribution manuals, shop reference manuals, color and trim boards, literature, new

product materials and parts reference catalogs, (viii) Seller's trademarks (both registered and unregistered), trade names, service marks, brand names, service names, logos, copyrights, applications for any and all of the foregoing and registrations thereof; (ix) Seller's software and other proprietary rights, including, without limitation, know how, processes, methods and trade secrets; and (x) Seller's goodwill. The purchase price for the Intangible Assets shall be One Million Six Hundred Seventy-Five Thousand Dollars ($1,675,000.00).

3.    Excluded Assets.    Seller shall specifically retain the following assets (the "Excluded Assets"):

3.1    Cash.    All cash on hand, including undeposited receipts, or on deposit in Seller's accounts on the Closing Date.

3.2    Accounts Receivable.    All accounts receivable of Seller as of the Closing Date, including customer receivables, employee receivables, factory receivables and finance receivables.

3.3    Contracts.    All of Seller's rights in contracts other than the Assumed Contracts and Leases.

4.    Purchase Price.

4.1    Amount of Purchase Price.    The total purchase price ("Purchase Price") to be paid by Buyer to Seller for the Dealership Assets shall be the sum of the amounts payable for (i) New Vehicles pursuant to Section 2.1 hereof; (ii) Used Vehicles pursuant to Section 2.2 hereof; (iii) $60,361 for the Dealership Parts and Accessories, (iv) $250,000 for the Dealership Fixed Assets; and (v) $1,675,000.00 for the Intangible Assets.

4.2    Manner of Payment.    On or before the Closing Date, the Purchase Price shall be payable by wire transfer or other readily available funds as follows:  (i) $50,000 to Kaplan, Strangis and Kaplan, P.A. for legal services (payable from the Deposit described in Section 25 herein), (ii) $425,000 to Randall L. Seaver, in his capacity as Chapter 7 trustee for Hecker, representing the Settlement Payment as defined by a settlement agreement by and between the Trustee, Sellers, and TMCC dated November 20, 2009 (the "Settlement Agreement"); (iii) $100,000 to be held in the trust account of Peters Law Firm, P.C., as escrow agent pursuant to an escrow agreement between Buyer, Seller, and Toyota Motor Sales, U.S.A., Inc. ("TMS") for unpaid parts and accessories statements in the form attached hereto as Exhibit A (the "TMS Escrow Agreement"), subject to the liens and security interests of Toyota Motor Credit Corporation ("TMCC"); (iv) $2,508,029 to TMCC as partial payment for the amounts owed on account of Seller's secured loan obligations; and (iv) the balance of the funds shall be placed in escrow ("Escrowed Funds") in accordance with an escrow agreement in the form agreed to by the Parties (the "Unsecured Escrow Agreement").

4.3    Allocation of Purchase Price.    The allocation of the Purchase Price among the subcomponents of the Dealership Assets shall be as set forth in Section 2. The parties

2431308v3                                          3

agree that such allocation of the Purchase Price represents the fair market value allocable to each of the assets purchased hereunder, and was arrived at by arm's length negotiations, and shall be used by each party in reporting the transactions contemplated by this Agreement for federal and state income tax purposes.

5. Assumption of Contracts, No Assumption of Other Liabilities, Indemnification.

5.1  Seller's Liabilities.  Except for the Assumed Contracts and Leases (as defined below), Buyer does not assume any debts, liabilities, contracts or other obligations of Seller of any kind or nature whatsoever, whether accrued, absolute, fixed, contingent, known or unknown, due or to become due, unliquidated or otherwise. Seller shall be responsible for all of Seller's obligations and liabilities.  Any contracts and/or leases that Buyer agrees to assume are listed on Schedule 5.1 attached hereto (such contracts and leases, the "Assumed Contracts and Leases"). Those contracts and leases of Seller that Buyer does not agree to assume shall remain the sole responsibility and obligation of Seller.  At the Closing, Seller shall assign and transfer all of its right, title and interest in and to the Assumed Contracts and Leases to Buyer and Buyer shall assume Seller's obligations under the Assumed Contracts and Leases accruing after the Closing Date.  Seller shall retain all obligations and liabilities accruing under the Assumed Contracts and Leases on or prior to the Closing Date.

5.2  Indemnification of Buyer.  From the Escrowed Funds, Seller shall, and does hereby agree to indemnify and hold Buyer and its officers, managers, members, governors, shareholders, directors, agents, employees, representatives, successors and assigns harmless from and against any known liabilities, losses, claims, damages, costs and expenses resulting from:   (a) any misrepresentation or breach of any misrepresentation, warranty, covenant, or agreement on the part of Seller made herein or pursuant to any document delivered pursuant hereto by Seller; and (b) the existence or operation of the Dealership on or prior to the Closing Date or any claim asserted by any creditor of Seller against the Dealership Assets.  Seller may use the Escrowed Funds to resolve and compromise any such claims.

5.3  Indemnification of Seller.  Buyer shall, and does hereby agree to, indemnify and hold Seller harmless from and against any and all liabilities, losses, claims, damages, costs and expenses resulting from: (a) any misrepresentation or breach of any representation, warranty, covenant, or agreement on the part of Buyer made herein or pursuant to any other document, certificate or agreement delivered pursuant hereto by Buyer; and (b) the existence or operation of the Dealership after the Closing Date.

5.4  Cooperation.  In the event a party hereto (the "Indemnifying Party") is indemnifying the other party hereto (the "Indemnified Party"), the Indemnified Party agrees to provide the Indemnifying Party such cooperation, information, or assistance as the Indemnifying Party may reasonably request.

5.5  Defense of Claims; Settlement.  The Indemnifying Party shall have the right to assume defense of and to settle any claim asserted by a third party against the Indemnified Party with counsel reasonably acceptable to the Indemnified Party so long as

the Indemnifying Party is diligently defending such claim; provided, however, that the Indemnified Party may retain its own counsel if there is an actual or potential material conflict of interest (which is not waived by the parties) of the counsel for the Indemnifying Party representing both the Indemnifying Party and the Indemnified Party in which event the Indemnifying Party shall also pay the legal expenses of the Indemnified Party. The Indemnifying Party shall not settle any claim without the consent of the Indemnified Party (which consent shall not be unreasonably withheld, conditioned or delayed), unless such settlement requires no admission of liability on the part of the Indemnified Party and no assumption of any obligation or monetary payment for which the Indemnified Party has not been fully indemnified.

6.    Representations and Warranties by the Trustee on behalf of Seller. Trustee, on behalf of Seller, represents and warrants as follows:

6.1    Authority.    Subject to entry of orders from the Bankruptcy Court approving both the Settlement Agreement (the "Bankruptcy Court Order") and the Trustee's abandonment of corporate assets, the execution and delivery by the Trustee of this Agreement, and all actions performed or required to be performed by him under this Agreement have been duly authorized, approved, and ratified. This Agreement is a legal, valid, and binding agreement of Seller enforceable against it in accordance with its terms.

7.    Representations and Warranties by Buyer.    Buyer represents, warrants, and covenants as follows:

7.1    Organization and Good Standing.    Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the State of Minnesota and has the power to own its properties and to carry on its business as now being conducted.

7.2    Authority. The execution and delivery by Buyer of this Agreement, and all actions by Buyer, its shareholders, directors, officers, and employees, performed or required to be performed under this Agreement have been duly authorized, approved, and ratified by the Board of Governors of Buyer. This Agreement is a legal, valid, and binding agreement of Buyer enforceable against it in accordance with its terms.

8.    Additional Covenants.

8.1    Negative Covenants of Seller. Between the date hereof and the Closing, Seller will not do any of the following without Buyer's prior written consent:

(a)    Make any change in the compensation, bonuses, or benefits payable to any employee of Seller;

(b)    Enter into any agreement other than in the ordinary course of business.

9.    Closing. Provided the conditions of closing set forth in Sections 10 and 11 of this Agreement have been fully satisfied, or in the event not satisfied, have been waived by the appropriate party, the closing of this Agreement (the "Closing") shall occur in two stages. The

2431308v3                              5

escrowed closing shall occur on November 23, 2009 (the "Escrowed Closing Date"), at which time Seller and Buyer shall submit all non-cash deliveries required under this Agreement to Commercial Partners Title, LLC (the "Title Company") to hold in escrow pending the Closing Date. The closing (the "Closing" or "Closing Date") shall occur within 24 hours of the entry of the Bankruptcy Court Order, but no later than 3 p.m. on November 25, 2009. On the Closing Date, Buyer shall deliver the Purchase Price required by this Agreement and upon confirmation of receipt of all deliveries required herein (including the Buyer's Closing Documents and Seller's Closing Documents (as defined herein), the Title Company may break the escrow and deliver the conveyance documents and sale proceeds as described herein. The Closing shall be held at such time and place as the parties may mutually agree upon in writing.

10.    Seller's Conditions of Closing.    Seller's performance at the Closing of the obligations imposed upon Seller pursuant to this Agreement shall be subject to the following conditions:

10.1    Representations and Warranties. The representations and warranties made by Buyer in Section 7 of this Agreement shall be true and correct as of the Closing and shall be in full force and effect as of the Closing; Buyer shall have fully performed all agreements and obligations required to be performed by Buyer on or before the Closing pursuant to this Agreement; and Buyer shall deliver to Seller a certificate of an officer of Buyer certifying that the foregoing conditions have been met.

10.2    Adverse Proceedings. No action or proceeding shall have been instituted before any court or other governmental body, or issued or threatened by any governmental authority or other third party (other than the Trustee) pertaining to the acquisition by Buyer pursuant to this Agreement.

10.3    Payment of Purchase Price. Buyer shall have delivered to Seller the Purchase Price on or before the Closing Date according to the terms and conditions of this Agreement.

10.4    Unsecured Escrow Agreement. Buyer and Seller shall have entered into an Unsecured Escrow Agreement which provides a mutually satisfactory mechanism, approved by both Buyer and Seller, in each party's absolute discretion, for the funding, resolution, and payment of known unsecured creditors of Seller.

10.5    Deliveries. On or before the First Closing Date, Buyer shall have delivered to the Title Company for the benefit of Seller (collectively, the "Buyer's Closing Documents"):

(a)    the certificate required by Section 10.1;

(b)    a certificate of an officer of Buyer certifying that resolutions have been duly adopted by Buyer's Board of Directors authorizing the transactions set forth in this Agreement, and attaching a copy of such resolutions;

(c)    a copy of the TMS Escrow Agreement executed by Buyer;

(d)    a copy of the Unsecured Escrow Agreement executed by Buyer; and

(e)    a copy of the assignment and assumption agreement with respect to the Assumed Contracts and Leases in a form reasonably acceptable to Buyer and Seller ("Assignment and Assumption Agreement") executed by Buyer.

10.6    Dealership Premises. A closing for the sale of the Dealership Premises between Jacob Holdings of Baxter LLC ("Real Estate Seller") and Walser Real Estate IV, LLC ("Real Estate Buyer") pursuant to a Real Estate Purchase Agreement shall have been consummated contemporaneously with the closing dates specified in this Agreement.

10.7    Bankruptcy Court Approval. The Bankruptcy Court shall have entered the Bankruptcy Court Order.

10.8    TMCC Liens. TMCC shall, at the Closing, release its security interest in the Dealership Assets.

10.9    TMCC Approval. TMCC shall have approved the form of any documents executed in connection with this transaction.

10.10    Manufacturer Approval.    Buyer shall have been approved by the Manufacturer for the ownership and operation of a Toyota and Scion motor vehicle sales and service dealership at the Dealership Premises.

11.    Buyer's Conditions of Closing. Buyer's performance at the Closing of the obligations imposed upon Buyer pursuant to this Agreement and Buyer's obligation to pay the Purchase Price for the assets and interests to be purchased by Buyer pursuant to this Agreement shall be subject to the following conditions:

11.1    Representations and Warranties. The representations and warranties made by Seller in Section 6 of this Agreement shall be true and correct as of the Closing and shall be in full force and effect as of the Closing; Seller shall have fully performed all agreements and obligations required to be performed by Seller on or before the Closing pursuant to this Agreement; and Seller shall deliver to Buyer a certificate certifying that the foregoing conditions have been met.

11.2    Adverse Proceedings. No action or proceeding shall have been instituted before any court or other governmental body, or issued or threatened by any governmental authority or other third party (other than Buyer) pertaining to the acquisition by Buyer pursuant to this Agreement.

11.3    Unsecured Escrow Agreement. Buyer and Seller shall have entered into an Unsecured Escrow Agreement which provides a mutually satisfactory mechanism, approved by both Buyer and Seller, in each party's absolute discretion, for the funding, resolution, and payment of known unsecured creditors of Seller, and Buyer shall be reasonably satisfied with the funding of the Escrowed Funds.

11.4   _Deliveries._   On or before the First Closing Date, Seller shall have delivered to the Title Company for the benefit of Buyer (collectively, the "Buyer's Closing Documents"):

(a)   a bill of sale, deeds, assignments, and other instruments of transfer and conveyance reasonably requested by Buyer as shall be effective to vest in Buyer good and marketable title to the Dealership Assets free and clear of all liens, claims, and encumbrances;

(b)   certificates of origin or other evidences of title to the New Vehicles and Used Vehicles with appropriate assignments;

(c)   evidence of the release of all liens against the Dealership Assets;

(d)   an Assignment of Seller's Right to Return Parts to the Manufacturer;

(e)   a certificate required by Section 11.1;

(f)   a copy of the TMS Escrow Agreement executed by Seller;

(g)   a copy of the Unsecured Escrow Agreement executed by Seller; and

(h)   a copy of the Assignment and Assumption Agreement executed by Seller.

11.5   _Dealership Premises._   A closing for the sale of the Dealership Premises between Real Estate Seller and Real Estate Buyer pursuant to a Real Estate Purchase Agreement shall have been consummated contemporaneously with the closing dates specified in this Agreement.

11.6   _Manufacturer Approval._   Buyer shall have been approved by the Manufacturer for the ownership and operation of a Toyota and Scion motor vehicle sales and service dealership at the Dealership Premises (the "Manufacturer Approval"). This approval must not contain any special or unusual conditions or contingencies other than the agreements set forth in the respective standard dealership sales and service agreements.

11.7   _Bankruptcy Court Approval._   The Bankruptcy Court shall have entered the Bankruptcy Court Order. In preparation thereof, Buyer shall have a reasonable opportunity to review and comment on the form of the Bankruptcy Court Order prior to filing of the motion contemplated under this Agreement. The Bankruptcy Court Order shall, among other things, include a waiver of all stay provision applicable to the order, including the stay of Rule 6004 of the Bankruptcy Rules and shall specifically authorize the Trustee execute and deliver, on behalf of the Seller, all documents and instruments contemplated under this Agreement or otherwise necessary to effectuate the transactions contemplated under this Agreement. The Bankruptcy Court Order shall be binding upon

entry upon all creditors of the Debtor and shall inure to the benefit of the Trustee and the Buyer and all applicable successors and assigns. Trustee shall promptly file, and thereafter diligently pursue, a motion for entry of the Bankruptcy Court Order. The Trustee shall provide notice of the motion to all of Debtor's known creditors and all equity holders of the Sellers.

11.8   Financing Approval.   Buyer has obtained all necessary approvals from TMCC in connection with its financing of the transaction contemplated by this Agreement and the Real Estate Purchase Agreement, and the form of any documents executed herein.

12.   Termination.   The parties may terminate this Agreement and the transactions contemplated herein as follows:

12.1   Consent of Buyer and Seller.   Buyer and Seller may terminate this Agreement by mutual written consent at any time prior to the Closing.

12.2   Buyer's Right to Terminate.   Buyer may terminate this Agreement by giving written notice to Seller at any time prior to the Closing if: (1) Seller has breached any representation, warranty, or covenant contained in this Agreement in any material respect, and the breach has continued without cure for a period of five (5) business days after the notice of breach to Seller, or (2) the Closing shall not have occurred on or before November 25, 2009 by reason of the failure of any condition precedent under Section 11 of this Agreement (unless Buyer is in breach of this Agreement).

12.3   Seller's Right to Terminate.   Seller may terminate this Agreement by giving written notice to Buyer at any time prior to the Closing if: (1) Buyer has breached any representation, warranty, or covenant contained in this Agreement in any material respect, and the breach has continued without cure for a period of five (5) business days after the notice of breach to Buyer; or (2) the Closing shall not have occurred on or before November 25, 2009 by reason of the failure of any condition precedent under Section 10 of this Agreement (unless Seller is in breach of this Agreement).

12.4   Effect of Termination.   If this Agreement is terminated pursuant to Section 12 of this Agreement, all rights and obligations of the parties hereunder shall terminate without any liability of any party to any other party, except for any liability of any party then in breach.

13.   Assignability.   Buyer shall not assign any of its rights or obligations under this Agreement without the prior written consent of Seller, except that Buyer may transfer its rights to any corporation or other business entity controlled by Buyer or any of its owners ("Permitted Assigns"), provided such Permitted Assigns take subject to the terms, conditions, and covenants of this Agreement. Seller may not assign or transfer any of their rights or obligations under this Agreement without the prior written consent of Buyer.

14.   Brokers.   Neither party has retained the services of a broker for this transaction, and each party shall be solely responsible for and shall hold the other party completely harmless from any fees or obligations, if any, incurred by such party for the services of any broker.

15.   <u>Paragraph Headings</u>.  The Section headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

16.   <u>Modifications and Amendments</u>.  This Agreement may be modified or amended only by written agreement executed by the parties.

17.   <u>Terms Binding</u>.  The terms, covenants, and conditions of this Agreement shall bind and inure to the benefit of the parties and their respective representatives, successors and permitted assigns.  The parties, and each of their respective representatives, successors and assigns, shall take any action necessary or proper to carry out the purpose and intent of this Agreement.

18.   <u>Minnesota Law Governing</u>.  This Agreement has been entered into by the parties in the State of Minnesota and shall be construed according to and governed by the laws of the State of Minnesota, without regard to any conflict of laws principles.

19.   <u>Notices</u>.  All notices or other communications permitted or required to be given by one of the parties to the other party shall be in writing and shall be delivered to the other party by hand delivery, by nationally recognized overnight courier or by depositing it in a depository of the United States Post Office, postage prepaid, certified or registered mail, return receipt requested, addressed to the other party at its address set forth below or at such other place as may be designated by written notice of one party to the other party:

| | |
|---|---|
| If to Seller: | Randall L. Seaver, in his capacity<br>as Chapter 7 Trustee for Dennis E. Hecker<br>12400 Portland Avenue South, Suite 132<br>Burnsville, MN 55337 |
| With a copy to (which shall not<br>constitute notice to such parties): | Matthew R. Burton, Esq.<br>Leonard, O'Brien, Spencer, Gale & Sayre, Ltd.<br>100 South Fifth Street, Suite 2500<br>Minneapolis, MN 55402-1234 |
| If to Buyer: | Brainerd T LLC<br>c/o Paul M. Walser<br>4401 American Blvd. W.<br>Bloomington, MN 55437<br>Attn:  Paul Walser |
| With a copy to (which shall not<br>constitute notice to Buyer): | Joseph P. Noack, Esq.<br>Briggs and Morgan, P.A.<br>2200 IDS Center<br>80 South 8th Street<br>Minneapolis, MN  55402 |

2431308v3

10

Such notice shall be deemed to be given or served at the time that it is hand delivered by one party to the other party, one (1) business day after delivery to an overnight courier for delivery the next business day, or three (3) days after it is postmarked by the United States Post Office with postage prepaid and properly addressed to the other party.

20.   <u>Severability</u>.   The invalidity or unenforceability of any provision of this Agreement shall not affect or impair the validity of any other provision.

21.   <u>Entire Agreement</u>.   The terms contained in this Agreement, including the exhibits and schedules hereto, constitute the entire agreement of the parties, supersedes all prior agreements, and there are no other agreements between the parties regarding the subject matter of this Agreement or other covenants, promises, terms, conditions, or undertakings, either written or oral, except as expressly set forth herein and in the exhibits hereto.   In particular, this Agreement supersedes that that certain set of agreements, including, without limitation, an asset purchase agreement, consulting agreement, and real estate purchasing agreement, that were entered into on or about September 14, 2009, by and among Seller, Jacob Holdings of Baxter, LLC, Paul Walser, and Dennis E. Hecker ("Hecker") (collectively the "Prior Agreements").   As a condition to and in consideration of this Agreement, the parties agree and provide notice that all of the Prior Agreements are hereby terminated in their entirety in accordance with their terms because of conditions set forth therein not having been timely satisfied, including the termination of any other agreements that were conditioned upon the transactions contemplated under the Prior Agreements having been completed.

22.   <u>Counterparts</u>.   This Agreement may be executed in multiple original or facsimile counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one of such counterparts.

23.   <u>Absence of Third-Party Beneficiary Rights</u>.   No provision of this Agreement is intended, nor is any provision to be interpreted to provide or create any third party beneficiary rights or any other rights of any kind in any client, customer, affiliate, shareholder, employee or partner of any party to this Agreement or any other person or entity.

24.   <u>Publicity</u>.   The parties shall consult with each other before making any public statements with respect to the transactions contemplated by this Agreement.   Except as may be reasonably necessary to effect the transactions contemplated hereby, including obtaining the Manufacturer Approval, no public statements shall be made relating to this Agreement without the prior consent of all parties.

25.   <u>Earnest Money Deposit</u>.   As of the date of this Agreement, Buyer has delivered to Kaplan, Strangis and Kaplan, P.A. for deposit to its trust account an earnest money deposit in the amount of $50,000 (the "Deposit"), which deposit shall be (a) applied in partial payment of the Purchase Price at the Closing if the Closing occurs, (b) refunded to Buyer in the event Buyer terminates this Agreement pursuant to Section 12.2 or the Manufacturer exercises its right of first refusal to purchase the Dealership Assets, or (c) paid to Seller in the event Seller terminates this Agreement pursuant to Section 12.3(1).

26. <u>Cooperation</u>. Each party hereto shall execute and deliver such instruments and take such other actions as the other party may reasonably request in order to carry out the intent of this Agreement, including actions required or requested after the closing; provided, however, that in the event the Trustee is unable to cooperate in undertaking such actions on behalf the Seller that are necessary to carry out the parties' intentions with regard to this Agreement, the Seller hereby grants to Buyer an irrevocable power of attorney coupled with an interest and binding upon successors in interest to undertake such actions to correct or complete documentation necessary to carry out the intention of this Agreement, including, without limitation, preparing and filing necessary corrective or additional instruments of transfer or conveyance for the assets and properties being acquired by Buyer pursuant to this Agreement.

27. <u>Miscellaneous</u>. The Trustee's consent to the terms of this Agreement is conditioned upon each of the following: (a) Bankruptcy Court approval of the Settlement Agreement; (b) Bankruptcy Court approval of the Trustee's proposed abandonment of corporate entities and their assets; and (c) final consent of the bankruptcy estate's accounting professional, (which shall not be unreasonably withheld). If all of the conditions are not met, this Agreement shall be null and void.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first-above written.

SELLER:
**BRAINERD IMPORTS, LLC,**
a Minnesota limited liability company

By: _____
    Randall L. Seaver, in his capacity as
    Chapter 7 Trustee for Dennis E. Hecker

BUYER:
**BRAINERD T, LLC,**
a Minnesota limited liability company

By _____
   Paul M. Walser
   Title:_____

2431308v3                    12

26.     Cooperation.  Each party hereto shall execute and deliver such instruments and take such other actions as the other party may reasonably request in order to carry out the intent of this Agreement, including actions required or requested after the closing; provided, however, that in the event the Trustee is unable to cooperate in undertaking such actions on behalf the Seller that are necessary to carry out the parties' intentions with regard to this Agreement, the Seller hereby grants to Buyer an irrevocable power of attorney coupled with an interest and binding upon successors in interest to undertake such actions to correct or complete documentation necessary to carry out the intention of this Agreement, including, without limitation, preparing and filing necessary corrective or additional instruments of transfer or conveyance for the assets and properties being acquired by Buyer pursuant to this Agreement.

27.     Miscellaneous.   The Trustee's consent to the terms of this Agreement is conditioned upon each of the following:  (a) Bankruptcy Court approval of the Settlement Agreement; (b) Bankruptcy Court approval of the Trustee's proposed abandonment of corporate entities and their assets; and (c) final consent of the bankruptcy estate's accounting professional, (which shall not be unreasonably withheld).  If all of the conditions are not met, this Agreement shall be null and void.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first-above written.

**SELLER:**
**BRAINERD IMPORTS, LLC,**
a Minnesota limited liability company


By:_____
     Randall L. Seaver, in his capacity as
     Chapter 7 Trustee for Dennis E. Hecker


**BUYER:**
**BRAINERD T, LLC,**
a Minnesota limited liability company

By_____
     Paul M. Walser
     Title:_____

**Schedule 2.1**

**NEW VEHICLES**
[REDACTED]

## APA SCHEDULE 2.1 - NEW VEHICLES

**2009 and 2010 New Vehicles**

| DLR_NBR | Collateral | Year | Make | Model | VIN Number | Brainerd T Bids |
|---|---|---|---|---|---|---|
| 22052 | NEW | 2009 | TOYT | AVALON XL/XL | 4T1BK36B29U334500 | $25,226.00 |
| 22052 | NEW | 2009 | TOYT | AVALON XL/XL | 4T1BK36B29U336960 | $28,214.00 |
| 22052 | NEW | 2010 | TOYOT | CAMRY | 4T48F3EX3AR000239 | $19,322.00 |
| 22052 | NEW | 2009 | TOYT | CAMRY HYBRID | 4T1BB46K59U090492 | $24,163.00 |
| 22052 | NEW | 2009 | TOYT | CAMRY HYBRID | 4T1BB46K29U096220 | $27,261.00 |
| 22052 | NEW | 2009 | TOYT | CAMRY HYBRID | 4T1BB46K69U110197 | $27,282.00 |
| 22052 | NEW | 2009 | TOYT | CAMRY LE/XLE | 4T1BK46K39U062483 | $25,548.00 |
| 22052 | NEW | 2009 | TOYT | CAMRY/SE/LE/ | 4T4BE48K29R104376 | $24,046.00 |
| 22052 | NEW | 2009 | TOYT | CAMRY/SE/LE/ | 4T1BE48K99U374909 | $21,606.00 |
| 22052 | NEW | 2009 | TOYT | CAMRY/SE/LE/ | 4T1BE48K99U892826 | $21,606.00 |
| 22052 | NEW | 2009 | TOYT | COROLLA | JTDBL40E499076008 | $16,657.00 |
| 22052 | NEW | 2009 | TOYT | COROLLA/LE/X | JTDBL40E09J049273 | $16,338.00 |
| 22052 | NEW | 2009 | TOYT | COROLLA/LE/X | JTDBL40E099068570 | $16,000.00 |
| 22052 | NEW | 2009 | TOYT | COROLLA/S/LE | 1NXBU40E99Z087989 | $16,402.00 |
| 22052 | NEW | 2009 | TOYT | COROLLA/S/LE | 1NXBU40E59Z104212 | $17,847.00 |
| 22052 | NEW | 2009 | TOYT | COROLLA/S/LE | 1NXBU40E09Z104375 | $18,559.00 |
| 22052 | NEW | 2009 | TOYT | COROLLA/S/LE | 1NXBU40E88Z112983 | $17,847.00 |
| 22052 | NEW | 2009 | TOYT | COROLLA/S/LE | 1NXBU40E38Z113491 | $17,847.00 |
| 22052 | NEW | 2009 | TOYT | COROLLA/S/LE | 1NXBU40E19Z113778 | $16,000.00 |
| 22052 | NEW | 2009 | TOYT | COROLLA/S/LE | 1NXBU40EX9Z124407 | $18,434.00 |
| 22052 | NEW | 2009 | TOYT | COROLLA/S/LE | 1NXBU40E99Z127198 | $17,891.00 |
| 22052 | NEW | 2009 | TOYT | COROLLA/S/LE | 1NXBU40E28Z129469 | $16,044.00 |
| 22052 | NEW | 2009 | TOYT | COROLLA/S/LE | 1NXBU40E78Z142122 | $16,000.00 |
| 22052 | NEW | 2009 | TOYT | HIGHLANDER | JTEEW44A092029493 | $37,751.00 |
| 22052 | NEW | 2009 | TOYT | HIGHLANDER | JTEEW44A592033734 | $39,313.00 |
| 22052 | NEW | 2009 | TOYT | HIGHLANDER | JTEEW44A492035300 | $39,489.00 |
| 22052 | NEW | 2009 | TOYT | MATRIX XRS | 2T1GE40E49C003897 | $19,564.00 |
| 22052 | NEW | 2009 | TOYT | PRIUS | JTDKB20U593515220 | $24,022.00 |
| 22052 | NEW | 2009 | TOYT | PRIUS | JTDKB20UX93526245 | $21,345.00 |
| 22052 | NEW | 2009 | TOYT | PRIUS | JTDKB20UX93527993 | $22,462.00 |
| 22052 | NEW | 2009 | TOYT | PRIUS | JTDKB20U293533867 | $22,519.00 |
| 22052 | NEW | 2009 | TOYT | PRIUS | JTDKB20U297859497 | $22,406.00 |
| 22052 | NEW | 2009 | TOYT | SCION XB | JTLKE50E191071836 | $16,118.00 |
| 22052 | NEW | 2009 | TOYT | SCION XD | JTKKU10419J038326 | $15,501.00 |
| 22052 | NEW | 2009 | TOYT | SCION XD | JTKKU10429J040179 | $15,501.50 |
| 22052 | NEW | 2009 | TOYT | SCION XD | JTKKU10409J044196 | $14,942.50 |
| 22052 | NEW | 2009 | TOYT | TACOMA ACCES | 5TEUU42N39Z813457 | $25,282.00 |
| 22052 | NEW | 2009 | TOYOT | VENZA | 4T3BK11A79U001932 | $32,091.00 |
| | | | | **TOTAL BRAINERD T LLC BIDS - 2009 AND 2010 NEW VEHICLES** | | **$834,457.00** |

**2008 New Vehicles**

| DLR_NBR | Collateral | Year | Make | Model | VIN Number | Brainerd T Bids |
|---|---|---|---|---|---|---|
| 22052 | NEW | 2008 | TOYT | CAMRY SOLARA | 4T1FA38P98U146830 | $24,500.00 |
| 22052 | NEW | 2008 | TOYT | CAMRY SOLARA | 4T1CE30P08U763228 | $15,500.00 |
| 22052 | NEW | 2008 | TOYT | CAMRY SOLARA | 4T1CE30P48U765407 | $15,500.00 |
| 22052 | NEW | 2008 | TOYT | SCION TC | JTKDE167480231761 | $13,500.00 |
| 22052 | NEW | 2008 | TOYT | SCION XB | JTLKE50E781056174 | $15,500.00 |
| 22052 | NEW | 2008 | TOYT | SCION XD | JTKKU10418J032489 | $14,000.00 |
| 22052 | NEW | 2008 | TOYT | TUNDRA DOUBL | 5TBRV54158S480109 | $20,500.00 |
| 22052 | NEW | 2008 | TOYT | YARIS | JTDBT923184032879 | $12,000.00 |
| 22052 | NDEMO | 2008 | TOYT | SEQUOIA | 5TDBY68A585011733 | $38,000.00 |
| | | | | **TOTAL BRAINERD T LLC BIDS - 2008 NEW VEHICLES** | | **$169,000.00** |

| | | |
|---|---|---|
| **TOTAL BRAINERD T LLC BID - ALL NEW VEHICLES** | | **$1,003,457.00** |

**<u>Schedule 2.2</u>**

**USED VEHICLES**
[REDACTED]

## APA SCHEDULE 2.2 - USED VEHICLES

**Used Vehicles**

| DLR_NBR | Collateral | Year | Make | Model | VIN Number | Brainerd T Bids |
|---------|-----------|------|------|-------|-----------|-----------------|
| 22052 | USED | 2008 | HOND | ACCORD EX | 1HGCP26728A015664 | $16,850.00 |
| 22052 | USED | 2000 | BUIC | LESABRE CUST | 1G4HP54K4YU116437 | $2,540.00 |
| 22052 | USED | 2005 | BUIC | LESABRE CUST | 1G4HP52K65U133383 | $5,990.00 |
| 22052 | USED | 2003 | CHEV | IMPALA | 2G1WF52E439274951 | $3,260.00 |
| 22052 | USED | 2008 | CHEV | MALIBU LS | 1G1ZG57B78F167536 | $10,840.00 |
| 22052 | USED | 2006 | CHEV | UPLANDER LS | 1GNDV23L56D107216 | $5,840.00 |
| 22052 | USED | 2006 | CHRY | SEBRING GTC | 1C3EL75R46N203938 | $4,870.00 |
| 22052 | USED | 2005 | CHRY | SEBRING TOUR | 1C3EL56TX5N522547 | $2,175.00 |
| 22052 | USED | 2005 | CHRY | SEBRING TOUR | 1C3EL55R25N567357 | $4,550.00 |
| 22052 | USED | 2002 | FORD | RANGER | 1FTZR45E72PA07949 | $5,030.00 |
| 22052 | USED | 2005 | LEXS | ES 330 | JTHBA30GX55139288 | $13,400.00 |
| 22052 | USED | 2005 | MERC | MONTEGO LUXU | 1MEFM401X5G815358 | $6,910.00 |
| 22052 | USED | 1999 | MERC | MOUNTAINEER | 4M22U54E1XUJ06968 | $425.00 |
| 22052 | USED | 2008 | NISS | ALTIMA 2.5 S | 1N4AL24E98C242279 | $16,740.00 |
| 22052 | USED | 2007 | TOYT | CAMRY HYBRID | JTNBB46K573012135 | $11,540.00 |
| 22052 | USED | 2009 | TOYT | CAMRY HYBRID | 4T1BB46KX9U063434 | $19,060.00 |
| 22052 | USED | 2004 | TOYT | CAMRY LE XLE | 4T1BE32K94U802373 | $7,040.00 |
| 22052 | USED | 2005 | TOYT | CAMRY LE/XLE | 4T1BE32K15U018256 | $8,960.00 |
| 22052 | BLINE | 2007 | TOYT | CAMRY/LE/XLE | 4T1BE46K27U519723 | $10,150.00 |
| 22052 | BLINE | 2007 | TOYT | COROLLA CE/L | 1NX8R32EX7Z931242 | $9,650.00 |
| 22052 | USED | 2008 | TOYT | COROLLA CE/L | 1NXBR30E18Z951139 | $11,100.00 |
| 22052 | BLINE | 2008 | TOYT | COROLLA CE/L | 1NXBR32EX8Z956238 | $11,050.00 |
| 22052 | USED | 2008 | TOYT | PRIUS | JTDKB20U283308857 | $14,650.00 |
| 22052 | BLINE | 2008 | TOYT | PRIUS | JTDKB20UX83321653 | $15,990.00 |
| 22052 | USED | 2007 | TOYT | PRIUS | JTDKB20U563334746 | $15,850.00 |
| 22052 | USED | 2007 | TOYT | PRIUS | JTDKB20U277684066 | $12,225.00 |
| 22052 | USED | 2004 | VOLK | JETTA GLS | 3VWSA69M34M083888 | $5,025.00 |
| 22052 | USED | 2006 | VOLK | JETTA TDI | 3VWRT71K66M783450 | $11,050.00 |
| 22052 | USED | 2000 | VOLK | NEW BEETLE G | 3VWCA21C6YM461032 | $2,150.00 |
| | | | | **TOTAL BRAINERD T LLC BIDS - USED VEHICLES** | | **$264,300.00** |

## Schedule 5.1

### ASSUMED CONTRACTS AND LEASES

1.    TRAC Vehicle Agreements

2.    Assignment of Sellers' telephone numbers.

## REAL ESTATE PURCHASE AGREEMENT

**THIS AGREEMENT** ("Agreement") is made and entered into as of the "Effective Date" (as defined on the signature page), by and between **JACOB HOLDINGS OF BAXTER LLC**, a Minnesota limited liability company ("Seller") and **WALSER REAL ESTATE IV, LLC**, a Minnesota limited liability company, ("Buyer").

## RECITALS

(i)   Seller is the owner of the property located at 7036 Lake Forest Road, Baxter MN, which property is legally described on Exhibit A attached to this Agreement (the "Land"), together with: (a) all buildings and improvements constructed or located on the Land ("Buildings") and (b) all easements and rights benefiting or appurtenant to the Land (collectively the Land and Buildings are the "Real Property").

(ii)   Seller and Buyer agree to sell and purchase the Real Property pursuant to the terms and conditions of the Agreement.

(iii)   Seller is a wholly owned subsidiary of Jacob Properties of Minnesota LLC ("JP-Minnesota"). As of the Petition Date, Dennis E. Hecker ("Hecker" or the "Debtor") held 91% of the membership interests in JP-Minnesota. On June 4, 2009 (the "Petition Date"), Hecker filed a voluntary petition for relief under chapter 7 of the United States Bankruptcy Code with the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"). An additional 4% of JP-Minnesota was held by certain trusts for Hecker's children and the remaining 5% is owned by Rosedale Dodge, Inc., a company that is wholly owned by Hecker.

(iv)   Randall L. Seaver is the duly-appointed chapter 7 trustee for Hecker's bankruptcy case (the "Trustee"). On or about October 14, 2009, the Trustee, acting on behalf of the majority of members of Seller, took action to remove Hecker from the office of sole governor of Seller. The Trustee hereby represents that he is duly authorized to execute this Agreement on behalf of Seller.

**NOW, THEREFORE**, in consideration of the covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree, for themselves, their successors and assigns as follows:

1.   **PURCHASE PRICE AND MANNER OF PAYMENT**. The total purchase price ("Purchase Price") to be paid by Buyer for the Real Property shall be Five Million Two Hundred Ninety Four Thousand Fifty Eight Dollars and 16/100ths ($5,294,058.16) Dollars, payable as follows:

A.   Five Million Two Hundred Ninety Four Thousand Fifty Eight Dollars and 16/100ths ($5,294,058.16) in immediately available funds by cashier's check or wire transfer to Seller on the "Date of Closing" as defined in this Agreement.



EXHIBIT

_B_

2.  **REPRESENTATIONS AND WARRANTIES BY SELLER.** Seller represents and warrants to Buyer as follows, which warranties and representations shall survive the Closing for a period of one year and shall not merge in any document signed or delivered at Closing:

    A.    [RESERVED].

3.  **REPRESENTATIONS AND WARRANTIES OF BUYER.**

    A.    **Authority to Execute.** The parties signing this Agreement on behalf of Buyer hereby represent and warrant to Seller that such persons have all due authority to sign this Agreement on behalf of Buyer.

    B.    **Condition of Building and Personal Property.** Buyer acknowledges that the Building, fixtures, and other improvements being purchased by Buyer are not new, and, except for those representations and warranties expressly set forth in this Agreement, are being purchased "AS IS." Buyer has the right and duty to inspect the Building, fixtures, and other improvements or have it inspected by a person of Buyer's choice, at Buyer's expense. It is understood by the Buyer that the Buyer accepts the Real Property "AS IS," except for those representations and warranties expressly set forth in this Agreement. Except as expressly provided in the Agreement, the Seller shall have no further responsibility or liability with respect to the condition of the Real Property, Building, fixtures and other improvements. This provision shall survive the delivery of the Deed (as defined herein).

    C.    **Affirmative Duty.** In the event Seller had actual knowledge as to a breach of any of the above representations and warranties of Buyer, Seller shall disclose its knowledge in writing to Buyer no later than the time of Closing. If Seller shall fail to disclose such known breach to Buyer prior to Closing, the breach shall be deemed waived by Seller and Buyer shall be released from any such claimed breach.

4.  **CONTINGENCIES.**

The obligations of Buyer under this Agreement are expressly contingent upon each of the following:

    (i)    **Representations and Warranties by Seller.** Buyer and Seller shall have agreed to amend this Agreement to include certain representations and warranties of Seller with respect to, *inter alia*, the authority of the Trustee to execute documents on behalf of the Seller. The representations and warranties of Seller contained in this Agreement must be true now and as of the Closing as if made on the Escrow Date or the Closing Date.

    (ii)    **Lease Termination.** The lease to Brainerd Imports, LLC, d/b/a Denney Hecker's Toyota Scion of Baxter, Brainerd which currently encumbers the Real Property shall be terminated on the Date of Closing.

(iii)   **Title**. Buyer must be able to obtain the Title Policy in accordance with the requirements and terms of Section 5 below.

(iv)   **Performance of Seller's Obligations**. Seller shall have performed all of the material obligations required to be performed by Seller under this Agreement, as and when required by this Agreement.

(v)   **Access**. Seller shall allow Buyer, and Buyer's agents, access to the Real Property without charge and at all reasonable times for the purpose of Buyer's inspection of the Real Property. Buyer shall pay all costs and expenses of such investigation and testing and shall hold Seller and the Real Property harmless from all costs and liabilities relating to Buyer's activities. Buyer shall further repair and restore any damage to the Real Property caused by or occurring during the Buyer's testing and return the Real Property to substantially the same condition as existed prior the Buyer's entry. Buyer shall obtain Seller's prior consent to each such entry. Seller shall not unreasonably withhold such consent. Seller shall have the right to be present to accompany Buyer or Buyer's consultant on each such entry. All such inspections shall have been completed on or before the Escrow Date. If Buyer is not satisfied with such inspection, Buyer may, at its option elect to terminate the Agreement.

(vi)   **Requisite Approvals**. Seller shall have obtained the written approval of Toyota Motor Credit Corporation ("TMCC") to this transaction and the Trustee shall have obtained an order from the Bankruptcy Court approving his Settlement Agreement with TMCC (the "Bankruptcy Court Order") in connection with this transaction. Buyer and the Title Company shall have a reasonable opportunity to review and comment on the form of the Bankruptcy Court Order prior to filing of the motion contemplated under this Agreement. The Bankruptcy Court Order shall, among other things, include a waiver of all stay provision applicable to the order, including the stay of Rule 6004 of the Bankruptcy Rules and shall specifically authorize the Trustee execute and deliver, on behalf of the Seller, all documents and instruments contemplated under this Agreement or otherwise necessary to effectuate the transactions contemplated under this Agreement. The Bankruptcy Court Order shall be binding upon entry upon all creditors of the Debtor and shall inure to the benefit of the Trustee and the Buyer and all applicable successors and assigns. Trustee shall promptly file, and thereafter diligently pursue, a motion for entry of the Bankruptcy Court Order. The Trustee shall provide notice of the motion to all of Debtor's known creditors and all equity holders of the Sellers.

(vii)   **Closing on Dealership Assets**. A closing for the sale of the Dealership Assets (as defined by an Asset Purchase Agreement between Brainerd Imports LLC and Brainerd T, LLC) shall have occurred contemporaneously with the closing contemplated herein.

-3-

The obligations of Seller under this agreement are contingent upon each of the following:

    (i)    **Compliance**. Buyer's compliance with all terms and conditions of this Agreement.

    (ii)    **Representation and Warranties by Buyer**. The representations and warranties of Buyer contained in this Agreement must be true now and as of the Closing as if made on the Escrow Date or Closing Date.

    (iii)    **Requisite Approvals**. Seller shall have obtained the written approval of TMCC to this transaction and the Bankruptcy Court Order shall have been entered. The Trustee's consent to the terms of this Agreement is conditioned upon each of the following: (a) Bankruptcy Court approval of the Settlement Agreement; (b) Bankruptcy Court approval of the Trustee's proposed abandonment of corporate entities and their assets, and (c) final consent of the bankruptcy estate's accounting professional. If all of the conditions are not met, this Agreement shall be null and void.

    (iv)    **Closing on Dealership Assets**. A closing for the sale of the Dealership Assets (as defined by an Asset Purchase Agreement between Brainerd Imports LLC and Brainerd T, LLC) shall have occurred contemporaneously with the closing contemplated herein.

5.    **TITLE AND SURVEY**. Buyer has received an ALTA 2006 Owner's Policy of Title Insurance commitment issued by Commercial Partners Title, LLC (the "Title Company") as agent for Stewart Title Guaranty Company, Commitment No. 32385 (the "Title Commitment") containing legible copies of any instruments referred to in such Title Commitment as constituting exceptions or restrictions upon the title of Seller, except that copies of any liens which are to be released at Closing may be omitted, for an Owner's Policy of Title Insurance in form and content reasonably acceptable to Buyer insuring title to the Real Property, deleting standard exceptions including affirmative insurance regarding zoning, contiguity, appurtenant easements and such other matters as may be identified by Buyer in the amount of the Purchase Price issued by Title. The Title Commitment will commit to insure title to the Real Property subject only to the following permitted encumbrances and such other matters reflected in the Commitment. For the purpose of this Agreement, the "Permitted Encumbrances" include the following:

    (i)    Building, zoning and platting laws, ordinances and state and federal regulations, which do not restrict the use of the Real Property as a New and Used Motor Vehicle Sales and Service Facility.

    (ii)    Utility easements.

    (iii)    The lien of current real estate taxes and assessments not yet due and payable.

    (iv)    A lease agreement between Seller and its affiliate, Brainerd Imports, LLC ("Lease"). The Lease will be terminated at the Closing and shall not be

considered a Permitted Encumbrance for purposes of the Closing and the Title Policy.

    (v)    Easements of record, which do not interfere with existing improvements or restrict the use of Real Property as a New and Used Motor Vehicle Sales and Service Facility.

    (vi)    Those items listed on Schedule B of the Title Commitment with the exception of (a) any liens or encumbrances held by TMCC; and (b) any real property taxes that accrued through the date of Closing.

Buyer has reviewed the title commitment and acknowledges that it has no objections thereto (subject to release of the mortgage and assignment of rents described therein with respect to the Real Property) and understands and acknowledges that the conveyance will be subject to all Permitted Encumbrances.

At closing, Buyer shall, at its expense, obtain the title policy ("Title Policy") issued by the Title Company pursuant to the Title Commitment, in substantially the form of Exhibit B.

6.    **CLOSING**.  The closing of this Agreement (the "Closing") shall occur in two stages. The documents to be delivered as described herein shall be delivered into escrow with the Title Company on or before November 23, 2009 (the "Escrow Date") together with mutual instructions to the Title Company as to the procedure for closing, substantially in form attached hereto as Exhibit C (the "Escrow Instructions"). The Closing shall occur in accordance with the Escrow Instructions within 24 hours of the entry of the Bankruptcy Court Order, but no later than 3 p.m. on November 25, 2009 (the "Closing Date"). The Closing shall take place at the office of the Title Company or at such other location as the parties may mutually agree upon in writing.

    A.    **Seller's Closing Documents**.  On or before the Escrow Date, Seller shall sign and/or deliver to the Title Company the following (collectively, "Seller's Closing Documents") to be held in escrow for the benefit of Buyer pending the Closing Date:

        (i)    **Quit Claim Deed**.  A quit claim deed (the "Deed") in recordable form conveying the Real Property to Buyer as required under this Agreement.

        (ii)    **Lien Releases**.  Releases of the mortgage and assignment of leases shown on the title commitment with respect to the Real Property or a payoff letter from the lender in form satisfactory to the Title Company to enable the Title Company to issue the Title Policy without exceptions for those liens.

        (iii)    **Preliminary Settlement Statement**.  A settlement statement showing all pro rations, adjustments and proposed disbursement of proceeds based on the assumption of a November 25, 2009 Closing Date (the "Preliminary Settlement Statement").

(iv)   **Assignment of Contracts.**  To the extent assignable, a conditional Assignment of Contracts, in form reasonably satisfactory to Buyer, assigning Seller's interest in the Contracts related to the Real Property to Buyer, subject to Buyer assuming Seller's obligations and obtaining the consent of all parties having a right to consent to such assignment.

(v)   **Assignment of Permits.**  To the extent assignable, a conditional Assignment of Permits, in form reasonably satisfactory to Buyer conveying the Permits to Buyer together with the consent of all parties having a right to consent to such assignment.

(vi)   **Lease Termination.** A Termination of the Lease.

(vii)   **FIRPTA.** A non-foreign affidavit, properly executed, containing such information as is required by Internal Revenue Code Section 1445(b)(2) and its regulations.

(viii)   **Seller's Affidavit.**  Standard form of Seller's affidavit as required by the Title Company in order for Title to issue is title insurance policy free and clear of the "standard" or preprinted exceptions and in a form acceptable to the Trustee.

(ix)   **Keys.** Any and all keys and security codes for access to the Real Property.

(x)   **Escrow Instructions.** The Escrow Instructions described herein.

(xi)   **Power of Attorney.**  A power of attorney in form attached hereto as Exhibit D, in confirmation of the power granted in Section 28 of this Agreement.

(xiii)   **Additional Documents.** Such other documents as Buyer may reasonably request to carry out the transaction contemplated under this Agreement.

B.   **Buyer's Closing Documents.** On the Escrow Date, Buyer shall sign and/or deliver to the Title Company the following (collectively, "Buyer's Closing Documents") to be held in escrow for the benefit of Seller pending the Closing Date:

(i)   **Preliminary Settlement Statement.** The Preliminary Settlement Statement.

(ii)   **Escrow Instructions.** The Escrow Instructions described herein.

(iii)   **Additional Documents.** Such other documents as Seller may reasonably request to carry out the transactions contemplated under this Agreement.

C.   **Closing.** On the Closing Date, Buyer shall deliver to the Title Company the Purchase Price due at Closing in the approximate amount of Five Million Two Hundred Ninety Four Thousand Fifty Eight Dollars and 16/100ths

-6-

($5,294,058.16). Upon receipt of the Purchase Price (together with any prorations or allocations owed by Buyer herein and less any pro rations or allocations owed by Seller herein) and the Bankruptcy Court Order, the Title Company shall close the transaction in accordance with the Escrow Instructions. If the Closing date is other than November 25, 2009, then the Title Company shall prepare and submit to Seller and Buyer for signature a revised settlement statement (the "Final Settlement Statement") reflecting adjustments of pro rations to the actual Closing Date. If the Closing Date is November 25, 2009, then the Preliminary Settlement Statement shall also be considered the Final Settlement Statement.

7. **PRORATIONS**. Seller and Buyer agree to the following prorations and allocations of costs regarding this Agreement:

   A. **Real Estate Taxes and Special Assessments**. The real estate taxes due and payable in all years prior to the year of Closing shall be paid in full by the Seller. The Seller shall be responsible for paying any interest and penalties due thereon. The real estate taxes and installments of special assessments due and payable in the year of Closing shall be prorated as of the Escrow Date, based on the calendar year. Real estate taxes and installments of special assessments due and payable in the year after the year of Closing shall be the responsibility of the Buyer. Buyer shall assume responsibility for payment of all assessments levied after the Escrow Date. Seller represents that the Real Property shall be non-homestead classification.

   B. **Recording Costs**. Seller will pay the costs of recording all documents necessary to place record title in the condition warranted by Seller in this Agreement, and the deed tax payable in connection with this transaction. Buyer will pay the cost of recording the deed and the mortgage registration tax applicable to this transaction.

   C. **Other Costs**. All other operating costs of the Real Property, will be allocated between Seller and Buyer as of the Escrow Date, so that Seller pays that part of such operating costs payable on or before the Escrow Date, and the Buyer pays that part of the operating costs payable after the Escrow Date.

   D. **Attorney's Fees**. Each of the parties will pay its own attorney's fees.

   E. **Closing Costs**. Seller and Buyer shall equally divide any fee to be charged by Title Company for the Closing. Seller shall pay the cost of providing the Title Commitment and Buyer shall pay the cost of the Title Policy.

8. **OPERATION PRIOR TO CLOSING**. During the period from the date of Seller's acceptance of this Agreement through the Closing Date (the "Executory Period"), Seller shall operate and maintain the Real Property in the ordinary course of business in accordance with prudent, reasonable business standards, including the maintenance of adequate liability insurance and insurance against loss by fire, windstorm and other hazards, casualties and contingencies, including vandalism and malicious mischief.

- 7 -

However, Seller shall execute no contracts, leases, or other agreements regarding the Real Property during the Executory Period that are not terminable on or before the Closing, without the prior written consent of Buyer, which consent may be withheld by Buyer in its sole discretion.

9.    **DAMAGE.** If, prior to the Closing, all or any part of the Real Property is substantially damaged by fire or other casualty, the elements or any other cause, the Seller shall immediately give notice to Buyer of such fact and at Buyer's option (to be exercised within twenty (20) days after the Seller's notice), this Agreement shall terminate, in which event neither party will have any further obligations under this Agreement. If Buyer fails to elect to terminate despite such damage, or if Real Property is damaged but not substantially, Seller shall promptly commence to repair such damage or destruction and return the Real Property to its condition prior to such damage. If such damage shall be completely repaired prior to the Closing, then there shall be no reduction in the Purchase Price and Seller shall retain the proceeds of all insurance related to such damage. If such damage shall not be completely repaired prior to the Closing, but Seller is diligently proceeding to repair, then Seller shall complete the repair after the Closing and shall be entitled to receive the proceeds off all insurance related to such damage after repair is completed; provided, however, Buyer shall have the right to delay the Closing until the repair is completed. If Seller shall fail to diligently proceed to repair such damage, then Buyer shall have the right to require a closing to occur and the Purchase Price (and specifically the cash portion payable at the Closing) shall be reduced by the costs of such repair as estimated by an unaffiliated licensed, bonded and insured contractor selected by Buyer, or at Buyer's option the Seller shall assign to Buyer all right to receive the proceeds of all insurance related to such damage and the Purchase Price shall be reduced only by the amount of any deductible. For purposes of the section, the words "substantially damaged" mean damage that would cost Three Hundred Thousand and No/100 ($300,000.00) Dollars or more to repair.

10.    **BROKER'S COMMISSION.** Seller and Buyer represent and warrant to each other that they have dealt with no brokers, finders, or the like in connection with this transaction. Further, Seller and Buyer agree to indemnify each other and to hold each other harmless against all claims, damage, costs, or expenses of or for any other such fees or commissions resulting from their actions or agreements regarding the execution or performance of this Agreement, and will pay all costs of defending any action or lawsuit brought to recover any such fees or commissions incurred by the other party, including reasonable attorney's fees.

11.    **NOTICES.** All notices provided for in this agreement shall be in writing. The notice shall be effective three (3) business days after the date the Party sending such notice deposits the notice with the United States Postal Service with all necessary postage paid, for delivery to the other Party via certified mail, return receipt requested, at the address set forth below, or on the date of faxing provided a copy of the same is deposited in the mail in the date of faxing as required hereby, or on the date of personal delivery, or on the next business day after depositing with a nationally recognized overnight courier which guarantees next-day delivery and provides for a return receipt.

- 8 -

|                                                                 |                                                                                                                                                                                 |
| --------------------------------------------------------------- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| If to Seller:                                                   | Randall L. Seaver, in his capacity<br>as Chapter 7 Trustee for Dennis E. Hecker<br>12400 Portland Avenue South, Suite 132<br>Burnsville, MN 55337<br>Fax No. _____ |
| With a copy to (which shall not<br>constitute notice to such parties): | Matthew R. Burton, Esq.<br>Leonard, O'Brien, Spencer, Gale & Sayre, Ltd.<br>100 South Fifth Street, Suite 2500<br>Minneapolis, MN 55402-1234<br>Fax No. (612) 332-2740 |
| If to Buyer:                                                    | Walser Real Estate IV, LLC<br>c/o Paul M. Walser<br>4401 American Blvd. W.<br>Bloomington, MN 55437<br>Attn:  Paul Walser<br>Fax No. (952) 351-7367 |
| With a copy to (which shall not<br>constitute notice to Buyer): | Joseph P. Noack, Esq.<br>Briggs and Morgan, P.A.<br>2200 IDS Center<br>80 South 8th Street<br>Minneapolis, MN  55402<br>Fax No. (952) 977-8650 |

12. **POSSESSION**.  Possession of the Real Property shall be delivered by the Seller to the Buyer on the Closing Date.

13. **TERMINATION OF THE PURCHASE AGREEMENT**.  Pursuant to Minn. Stat. §559.21, subd. 4(a), the Buyer hereby agrees that this Agreement may be terminated thirty (30) days after service of the Notice of Cancellation pursuant to Minn. Stat.§ 559.21.

14. **REMEDIES**.  In the event of any default hereunder by Buyer, Seller may elect at its option to cancel this Agreement.  Either party may pursue any and all remedies available at law or in equity.  This provision does not preclude the injured party from seeking and recovering from the defaulting party specific performance of this Agreement and/or damages, including attorneys' fees.

15. **POST CLOSING OBLIGATIONS**.  At any time from time to time after the Closing, each party shall upon request of another party, execute, acknowledge, and deliver all such further and other assurances and documents, and will take such actions consistent with all terms of this Agreement, as may be reasonably requested to carry out the transactions contemplated herein and to permit each party to enjoy its rights and benefits hereunder. If requested by Buyer, Seller further agrees to prosecute or otherwise enforce its own

- 9 -

name for the benefit of Buyer, any claim, right or benefit transferred by this Agreement that may require prosecution or enforcement in Seller's name. Any prosecution or enforcement of claims, rights, or benefits under this provision shall be solely at Buyer's expense, unless the prosecution or enforcement is made necessary by a breach of this Agreement on the part of the Seller.

16. **EXHIBITS**. Exhibits to this Agreement are an integral part of the Agreement. All of the Exhibits to be attached shall be so attached on or before the Date of Closing and at such time shall become a part of this Agreement.

### List of Exhibits

Exhibit A - Real Property Legal Description

Exhibit B – Pro forma title policy

Exhibit C – Escrow Instructions

Exhibit D – Power of Attorney

17. **ENTIRE AGREEMENT, MODIFICATION AND WAIVER**. This Agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and undertakings of the parties, and there are no warranties, representations, or other agreements between the parties in the connection with the subject matter hereof, except as specifically set forth in this Agreement. Without limiting the generality of the foregoing, this Agreement supersedes in its entirety the Real Estate Purchase Agreement between the parties dated September 18, 2009. No supplement or modification of this Agreement shall be binding unless it is executed in writing by both parties. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions whether or not similar, nor shall such waiver constitute a continuing waiver.

18. **SUCCESSORS AND ASSIGNS**. This Agreement shall be binding upon and inure to the benefit of the parties, their successors, and assigns. Either party may assign its rights hereunder, but no such assignment shall relieve either party of its obligations hereunder.

19. **GOVERNING LAW**. This Agreement was executed in Minnesota, and shall be governed by the laws of the State of Minnesota.

20. **MUTUAL DRAFTING**. This Agreement in the mutual product of the parties and each provision hereof has been subject to the mutual consultation, negotiation and agreement of each of the parties, and shall not be constructed for or against any party to this Agreement.

21. **COUNTERPARTS**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

- 10 -

22. **HEADINGS.** Headings contained herein are for reference only and are not a part of this Agreement.

23. **RIGHT TO INDEPENDENT COUNSEL.** Each of the parties has been represented by independent counsel in connection with this Agreement and Exhibits or has knowingly and voluntarily decided not to be represented by independent counsel. Each of the parties represents that this Agreement and Exhibits have been read and understood and that each have received a copy.

24. **ABSENCE OF THIRD PARTY BENEFICIARY RIGHTS.** No provision of this agreement is intended, nor is any provision to be interpreted to provide or create any third party beneficiary rights or any other rights of any kind in any client, customer, affiliate, shareholder, employee or partner of any party to this Agreement or any other person or entity.

25. **CONTEMPORANEOUS CLOSING – ASSET PURCHASE AGREEMENT.** Brainerd Imports LLC an affiliate of Seller, and Brainerd T, LLC or its assigns have entered into an Asset Purchase Agreement for the purchase and sale of certain assets owned by Brainerd Imports LLC ("Asset Purchase Agreement"). The obligations of Seller and Buyer to perform under this Agreement are specifically contingent upon the occurrence of simultaneous closing of the Asset Purchase Agreement. If the Asset Purchase Agreement is terminated or deemed void according to its terms and conditions, then this Agreement shall also be terminated or deemed void. The parties agree that this Agreement shall be closed on the same date and contemporaneous with the closing of the Asset Purchase Agreement.

26. **1031 EXCHANGE.** In the event, prior to closing, Buyer or Seller or both shall desire to structure this transaction as a part of tax deferred exchange, pursuant to Section 1031 of the Internal Revenue Code, Buyer and/or Seller may assign its rights, but not its obligations to a Qualified Intermediary or Accommodation Title Holder under Treasury regulations Section 1031 et. sm. and Seller and/or Buyer as an accommodation to Buyer and/or Seller, shall enter into and execute any such amendatory documentation as Buyer and/or Seller may reasonably request; provided, however that the other party shall not incur any additional costs, expense, risk or potential liability whatsoever on the account thereof. Neither party shall have any liability to the other whatsoever in the event the subject transaction of Buyer or Seller is found, held or adjudicated not to qualify as or as a part of a tax deferred exchange pursuant to Section 1031 of the Internal Revenue Code.

27. **INCORPORATION OF RECITALS.** The parties acknowledge and agree that the recitals as contained in this Agreement are true and correct and incorporate all of such recitals into this Agreement.

28. **COOPERATION.** Each party hereto shall execute and deliver such instruments and take such other actions as the other party may reasonably request in order to carry out the intent of this Agreement, including actions required or requested after the closing; provided, however, that in the event the Trustee is unable to cooperate in undertaking such actions on behalf the Seller that are necessary to carry out the parties' intentions

- 11 -

with regard to this Agreement (and it is anticipated that the Trustee will abandon his interest in Seller on or after Closing), the Seller hereby grants to Buyer an irrevocable power of attorney coupled with an interest and binding upon successors in interest to undertake such actions to correct or complete documentation necessary to carry out the intention of this Agreement, including, without limitation, preparing and filing necessary corrective or additional instruments of transfer or conveyance for the assets and properties being acquired by Buyer pursuant to this Agreement.  To confirm this grant, Seller will execute and deposit with the Title Company, as one of the Seller Closing Documents, a Power of Attorney in recordable form and substantially in form attached as Exhibit D.

**IN WITNESS WHEREOF,** the parties have executed this Real Estate Purchase Agreement as of the later of the dates set forth below:

[REST OF PAGE INTENTIONALLY LEFT BLANK. SIGNATURE PAGES TO FOLLOW.]

SIGNATURE PAGE TO REAL ESTATE PURCHASE AGREEMENT BETWEEN JACOB HOLDINGS OF BAXTER, LLC AND WALSER REAL ESTATE IV, LLC

**SELLER:**

**JACOB HOLDINGS OF BAXTER LLC**

Dated: November 20, 2009

By: _____

Randall L. Seaver, in his capacity as
Chapter 7 Trustee for Dennis E. Hecker

- 13 -

SIGNATURE PAGE TO REAL ESTATE PURCHASE AGREEMENT BETWEEN JACOB
HOLDINGS OF BAXTER, LLC AND WALSER REAL ESTATE IV, LLC

**BUYER:**

**WALSER REAL ESTATE IV, LLC**

**Dated: November 20, 2009**

By:

    **Paul Walser**
**Its: Chief Manager**

## EXHIBIT A

## REAL PROPERTY LEGAL DESCRIPTION

**Lot 1, Block 1, Jacob First Addition, Crow Wing County, Minnesota**

**EXHIBIT B**

**PRO FORMA TITLE POLICY**

[TO BE ATTACHED.]

**EXHIBIT C**

**ESCROW INSTRUCTIONS**

[TO BE ATTACHED]

**EXHIBIT D**

**POWER OF ATTORNEY**

# Power Of Attorney
# To Convey
# Real Property

STATE OF MINNESOTA          )
                                           ) *ss.*
COUNTY OF HENNEPIN     )

    KNOW ALL BY THESE PRESENTS, that JACOB HOLDINGS OF BAXTER LLC, a Minnesota limited liability company,  Grantor and principal (whether one or more), hereby appoints PAUL M. WALSER, a resident of Hennepin County, Minnesota, as Grantor's Attorney-in-Fact to sell and convey real property in Crow Wing County, Minnesota, legally described as follows:

     Lot 1, Block 1, Jacob First Addition, Crow Wing County, Minnesota

Grantor hereby gives the Attorney-in-Fact full authority to perform any other acts necessary or incident to the execution of the powers granted herein including, but not limited to, authority to execute, deliver or accept delivery of deeds, contracts for deed, mortgages, bills of sale, and closing statements, if any, incident to such sale, and to perform all acts authorized hereby, as fully as the Grantor could do if personally present, with full power of substitution.  This Power of Attorney shall not be affected by disability of the principal.  This Power of Attorney is granted pursuant to the common law of the State of Minnesota.  **THIS POWER OF ATTORNEY IS EXECUTED PURSUANT TO A PURCHASE AGREEMENT DATED NOVEMBER ___, 2009, RELATING TO THE DESCRIBED REAL PROPERTY, IS COUPLED WITH AN INTEREST AND IS IRREVOCABLE.**

    JACOB HOLDINGS OF BAXTER, LLC

    By: _____
    Randall L. Seaver, in his capacity as
    Chapter 7 Trustee for Dennis E. Hecker

- 18 -

Dated: November ___, 2009

STATE OF MINNESOTA    )
    ) *ss.*

COUNTY OF HENNEPIN

The foregoing instrument was acknowledged before me this ___ day of November, 2009, by Randall L. Seaver, in his capacity as Chapter 7 Trustee for Dennis E. Hecker, on behalf of Jacob Holdings of Baxter, LLC..

_____
SIGNATURE OF NOTARY PUBLIC OR OTHER OFFICIAL

Drafted by:

BRIGGS AND MORGAN, P.A. (JEN)
2200 IDS Center, 80 S. 8th Street
Minneapolis, MN 55402

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is made and entered into as of this day the 20th day of November, 2009 by and between **RANDALL L. SEAVER**, in his capacity as the Chapter 7 Trustee of the Bankruptcy Estate of Dennis E. Hecker (the "Trustee"), **BRAINERD IMPORTS, LLC**, a Minnesota limited liability company ("Brainerd"), **JACOB HOLDINGS OF BAXTER LLC**, a Minnesota limited liability company ("JHB"), and **TOYOTA MOTOR CREDIT CORPORATION**, a California corporation ("TMCC").

### RECITALS

A.     Dennis E. Hecker (the "Debtor") filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code on June 4, 2009 (the "Petition Date") with the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"). The Debtor's case is pending before the Bankruptcy Court at Case No. 09-50779 (the "Bankruptcy Case"). The Trustee was appointed to serve as the chapter 7 trustee for the Debtor's bankruptcy estate.

B.     As of the Petition Date, the Debtor held 99% of the membership interests in Brainerd, a limited liability company which owned and operated a motor vehicle sales and service dealership under the name of Denny Hecker's Toyota Scion of Baxter/Brainerd. Brainerd was an authorized Toyota dealer pursuant to a Toyota Dealer Agreement dated July 30, 2007 (the "Dealer Agreement") with Toyota Motor Sales, U.S.A., Inc. ("TMS"). The remaining 1% of the Dealership is held by Inver Grove Investments, Inc., which is wholly owned by the Debtor.

C.     Prior to September 5, 2009, Brainerd conducted its business upon certain real property located at 7036 Lake Forest Road, Baxter, Minnesota 56425 (the "Premises"). The Premises is owned by JHB, a wholly owned subsidiary of Jacob Properties of Minnesota LLC ("JP-Minnesota"). As of the Petition Date, the Debtor held 91% of the membership interests in JP-Minnesota. An additional 4% of JP-Minnesota was held by certain trusts for the Debtor's children and the remaining 5% is owned by Rosedale Dodge, Inc., a company that is wholly owned by the Debtor.

D.     On or about September 14, 2009, Brainerd and JHB (together, the "Sellers") and the Debtor entered into certain agreements (the "Prior Agreements") to sell substantially all of the Sellers' assets to Paul M. Walser ("Walser") or his designee, subject to Bankruptcy Court approval.

E.     On or about October 28, 2009, the Bankruptcy Court denied approval of the Prior Agreements.

F.     Following the Bankruptcy Court's decision, TMS took further action to terminate the Dealership Agreement due to certain alleged defaults. On or about November 12, 2009, the Bankruptcy Court issued an order lifting the automatic stay in the Debtor's case so that TMS could terminate the Dealership Agreement. In the event the Dealership Agreement is



**EXHIBIT**

3

terminated, it is unlikely that funds will be available from the sale of the Assets to pay the Sellers' creditors or to trigger a payment to the Trustee.

G.     The Trustee and Walser subsequently negotiated the terms of a new purchase agreement whereby Brainerd T, LLC and Walser Real Estate IV, LLC (together, the "Buyers") would acquire certain assets from Sellers. As a result of these discussions, Brainerd T, LLC agreed to acquire from Brainerd certain personal property identified as the "Dealership Assets" under an Asset Purchase Agreement attached and incorporated herein as **Exhibit A** (the "APA"). Walser Real Estate IV, LLC likewise agreed to acquire from JHB certain real and personal property identified as the "Real Property" under a Real Estate Purchase Agreement attached and incorporated herein as **Exhibit B** (the "RPA"). The Debtor was not involved in these negotiations.

H.     The Dealership Assets and Real Property (together, the "Acquired Assets") are encumbered by perfected, first-priority liens and security interests held by TMCC. The liens and security interests secure, *inter alia*, Sellers' obligations under a Loan and Security Agreement dated March 20, 2007 (in the original principal amount of $5,445,000), an Inventory Loan and Security Agreement dated July 11, 2007, and certain other loan agreements, security agreements, guaranty agreements, mortgages, and related documents executed by the Sellers and their affiliates (collectively, the "TMCC Obligations").

I.     The Trustee has alleged, or may allege certain claims against TMCC related to certain transfers made by the Debtor in the 90-day period prior to the Petition Date (collectively, the "Transfers") on the basis that such Transfers are allegedly avoidable, including but not limited to: (i) loan payments on the TMCC Obligations of at least $206,000; and (ii) the delivery of the original membership certificates for Brainerd.

J.     TMCC has denied that the Transfers are avoidable. Furthermore, TMCC asserts that if the Transfers were avoided, the TMCC Obligations would increase by a corresponding amount and would remain fully secured by the Dealership Assets and Real Property.

K.     Under the transaction proposed by the Trustee and Buyers, TMCC would not receive full payment at closing for the TMCC Obligations. TMCC is unwilling to consent to the proposed transaction and release its liens against the Acquired Assets unless the Trustee releases any claims he may have with respect to the Transfers.

L.     To resolve the Trustee's claims related to the Transfers and to facilitate the sale of the Acquired Assets, the Trustee, Sellers, and TMCC (together, the "Parties") agree to a settlement pursuant to the terms of this Agreement.

**NOW THEREFORE**, in consideration of the foregoing Recitals, the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     Recitals. The recitals set forth above are true and correct, are incorporated herein by reference, are being relied upon by the Parties.

-2-

2.    Settlement with TMCC. The Trustee agrees to settle and resolve any claims it may have against TMCC with respect to the Transfers to the extent of $425,000 in exchange for a payment of $425,000 (the "Settlement Payment"). The Settlement Payment shall be distributed from the proceeds available at closing of the sale of the Acquired Assets after the payments provided to TMCC herein as follows: (a) $400,000 paid to the Trustee at closing; and (b) $25,000 to be paid pursuant to the terms of an Unsecured Escrow Agreement negotiated by and between Brainerd, the Trustee, and Buyers. This settlement would be limited to the sum of $425,000 and the Trustee would retain claims, if any, against TMCC beyond that amount.

3.    Transaction Documents. The Trustee consents to the sale of the Acquired Assets pursuant to the terms set forth in the APA and RPA (together, the "Transaction Documents"). The Trustee agrees to execute the Transaction Documents and any related escrow agreements, conveyance documents, or other documents on behalf of Sellers as reasonably requested to effectuate this Agreement and the sale of the Acquired Assets contemplated herein.

4.    Release of Liens on Acquired Assets. TMCC agrees to release its liens upon the Acquired Assets at Closing provided that: (a) it receives payments at closing of no less than $5,055,153 from the proceeds of the Real Property and no less than $2,508,029 from the proceeds of the Dealership Assets; (b) it shall retain its liens and security interests upon all property of the Sellers not included in the Acquired Assets, and upon all proceeds from the sale of the Acquired Assets (excluding the Settlement Payment), including but not limited to, the proceeds of any escrow account required by TMS; and (c) nothing herein shall be deemed a release or waiver of any amounts due from Sellers to TMCC on account of the TMCC Obligations or pursuant to certain corporate guaranty agreements, marshaling claims, or otherwise.

5.    Release of TMCC. In exchange for the Settlement Payment and the other consideration provided herein, the Trustee on behalf of himself, the Debtor, and the Debtor's bankruptcy estate, hereby releases, acquits, and forever discharges TMCC and its officers, directors, shareholders, employees, attorneys, assigns, affiliates, predecessors, successors in interest, insurers, and representatives, from the first $425,000 of any and all claims, counterclaims, rights, demands, costs, damages, losses, liabilities, attorneys' fees, actions and causes of action whatsoever, whether known or unknown, liquidated or unliquidated, fixed or contingent, material or immaterial, disputed or undisputed, legal or equitable, matured or unmatured, or foreseen or unforeseen, which the Trustee, the Debtor, and/or Debtor's estate now have or hereafter may have under chapter 5 of the United States Bankruptcy Code, including the Transfers.

6.    Bankruptcy Court Approval. The Trustee shall seek approval from the Bankruptcy Court regarding the terms of this Agreement.

7.    Closing Date. This Agreement shall terminate in the event that any of the following occurs (each, a "Termination Event"): (a) fully executed copies of the Agreement and Transaction Documents are not provided on or before 5 p.m. on November 20, 2009; (b) fully executed copies of any required conveyance documents or other documents required for closing of the asset sales are not delivered to the Title Company (as defined in the APA) on or before 5 p.m. on November 23, 2009; (b) the purchase price and other cash consideration required under

the respective Transaction Documents is not wired or transferred to the Title Company in immediately available funds on or before 5 p.m. on November 25, 2009; and (c) the Bankruptcy Court does not issue an Order approving this Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure. Upon the occurrence of a Termination Event, this Agreement shall be deemed null and void *ab initio*, and the Trustee and TMCC shall each retain all rights, claims, and defenses in existence prior to the execution of this Agreement.

8.     Abandonment by Trustee. Upon receipt of the Settlement Payment, the Trustee is deemed to have abandoned any further interest he may have in each of Jacob Properties of Minnesota LLC and Jacob Holdings of Baxter LLC, or their respective assets.

9.     Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.

10.     Amendment and Waiver. No amendment of this Agreement, and no waiver, discharge, or termination of any one or more of the provisions hereof, shall be effective unless set forth in writing and signed by the Trustee and TMCC.

11.     No Waiver. Neither this Agreement nor any actions taken by TMCC herein shall constitute a waiver, termination, discharge, or abandonment of any term or provision of any loan agreement, note, mortgage, security agreement, guaranty agreement, or any other documents or agreements executed by Sellers or their affiliates in favor of TMCC, or any rights or privileges arising therefrom. Furthermore, with the exception of any payments received by TMCC after the date of this Agreement, no payments provided herein, including but not limited to, the Settlement Payment, shall be deemed to offset, setoff, or otherwise reduce the amounts due and payable to TMCC as part of the TMCC Obligations, and all such rights held by TMCC are expressly reserved.

12.     Miscellaneous. The Trustee's consent to the terms of this Agreement is conditioned upon each of the following: (a) Bankruptcy Court approval of the settlement; (b) Bankruptcy Court approval of the Trustee's proposed abandonment of corporate entities and their assets; and (c) final consent of the bankruptcy estate's accounting professional. If all of the conditions are not met, this Agreement shall be null and void.

[THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK.]

-4-

IN WITNESS WHEREOF, the Trustee, Brained, JHB, and TMCC have caused this Agreement to be duly executed and delivered so as to be effective as of the date shown above.

**RANDALL L. SEAVER**, in his capacity as Chapter 7 Trustee for the bankruptcy estate of Dennis E. Hecker

By: _____

Name: _____

Title: _____

Date: _____


**BRAINERD IMPORTS LLC,**
a Minnesota limited liability company

By: _____

Name: _____

Title: _____

Date: _____


**JACOB HOLDINGS OF BAXTER LLC,**
a Minnesota limited liability company

By: _____

Name: _____

Title: _____

Date: _____

**TOYOTA MOTOR
CREDIT CORPORATION,**
a California corporation

By: _____

Name: **Michael R. Groff**

Title: **Group Vice President**

Date: **November 20, 2009**

-6-

CLOSING STATEMENT
ASSET PURCHASE AGREEMENT DATED NOVEMBER 20, 2009

CLOSING DATE: November 25, 2009
DISBURSEMENT DATE: November 25, 2009
BUYER: Brainerd T, LLC, a Minnesota limited liability company
SELLER: Brainerd Imports LLC, a Minnesota limited liability company
CLOSING AGENT: Commercial Partners Title, LLC, 200 South Sixth St., Suite 1300, Minneapolis, MN 55402
CLOSING AGENT FILE: 32385
PROPERTY ADDRESS: 7036 Lake Forest Road, Baxter, MN

| | BUYER | | SELLER | |
|---|---|---|---|---|
| | Due From (Debit) | Due To (Credit) | Due From (Debit) | Due To (Credit) |
| **Purchase Price:** | | | | |
| 2.1 Purchase Price - New Vehicles 08, 09, 10 | 1,003,457.00 | | | 1,003,457.00 |
| 2.2 Purchase Price - Used Vehicles | 264,300.00 | | | 264,300.00 |
| 2.3 Purchase Price - Parts | 60,361.00 | | | 60,361.00 |
| 2.4 Fixed Assets | 250,000.00 | | | 250,000.00 |
| 2.5 Blue Sky | 1,675,000.00 | | | 1,675,000.00 |
| | | | | |
| **Funding Sources:** | | | | |
| 25 Deposit - at Kaplan, Strangis | | 44,833.75 | | |
| 25 Deposit - at Commercial Partners | | 5,166.25 | | |
| Working Capital Loan | | 700,000.00 | | |
| Floorplan Loan | | 1,267,757.00 | | |
| Funds from Buyer | | 1,235,361.00 | | |
| | | | | |
| **APA Disbursements:** | | | | |
| Kaplan, Strangis & Kaplan Legal Fees | | | 44,833.75 | |
| TMCC Partial Loan Payment | | | 2,408,284.25 | |
| Toyota Motor Sales Escrow - Peters Law Firm | | | 100,000.00 | |
| Randall L. Seaver - Chapter 7 Trustee | | | 400,000.00 | |
| Gleason & Assoc. Escrow (Trustee Deferred) | | | 25,000.00 | |
| Gleason & Assoc. Escrow (Primary Escrow) | | | 275,000.00 | |
| | 3,253,118.00 | 3,253,118.00 | 3,253,118.00 | 3,253,118.00 |

The above closing statement is hereby approved, and the closing agent is hereby authorized and directed to disburse the money as indicated herein and deliver instruments, documents, and other property, if any, to the designated parties and otherwise close this transaction in accordance with the closing instructions.

BRAINERD T, LLC,
a Minnesota limited liability company

By: _Paul Liaglan_
Name: PAUL LIAGLAN
Title: CEO

BRAINERD IMPORTS LLC,
a Minnesota limited liability company

By: _____
Name: _____
Title: _____

COMMERCIAL PARTNERS TITLE, LLC

By: _Gail Larson_
Name: Gail Larson
Title: Commercial Closer



EXHIBIT
4
tabbies

**CLOSING STATEMENT**
**ASSET PURCHASE AGREEMENT DATED NOVEMBER 20, 2009**

CLOSING DATE: November 25, 2009
DISBURSEMENT DATE: November 25, 2009
BUYER: Brainerd T, LLC, a Minnesota limited liability company
SELLER: Brainerd Imports LLC, a Minnesota limited liability company
CLOSING AGENT: Commercial Partners Title, LLC, 200 South Sixth St., Suite 1300, Minneapolis, MN 55402
CLOSING AGENT FILE: 32385
PROPERTY ADDRESS: 7036 Lake Forest Road, Baxter, MN

| | BUYER | | SELLER | |
| --- | --- | --- | --- | --- |
| Purchase Price: | Due From (Debit) | Due To (Credit) | Due From (Debit) | Due To (Credit) |
| 2.1 Purchase Price - New Vehicles 08, 09, 10 | 1,003,457.00 | | | 1,003,457.00 |
| 2.2 Purchase Price - Used Vehicles | 264,300.00 | | | 264,300.00 |
| 2.3 Purchase Price - Parts | 60,361.00 | | | 60,361.00 |
| 2.4 Fixed Assets | 250,000.00 | | | 250,000.00 |
| 2.5 Blue Sky | 1,675,000.00 | | | 1,675,000.00 |
| | | | | |
| Funding Sources: | | | | |
| 25 Deposit - at Kaplan, Strangis | | 44,833.75 | | |
| 25 Deposit - at Commercial Partners | | 5,166.25 | | |
| Working Capital Loan | | 700,000.00 | | |
| Floorplan Loan | | 1,267,757.00 | | |
| Funds from Buyer | | 1,235,361.00 | | |
| | | | | |
| APA Disbursements: | | | | |
| Kaplan, Strangis & Kaplan Legal Fees | | | | 44,833.75 |
| TMCC Partial Loan Payment | | | | 2,408,284.25 |
| Toyota Motor Sales Escrow - Peters Law Firm | | | | 100,000.00 |
| Randall L. Seaver - Chapter 7 Trustee | | | | 400,000.00 |
| Gleason & Assoc. Escrow (Trustee Deferred) | | | | 25,000.00 |
| Gleason & Assoc. Escrow (Primary Escrow) | | | | 275,000.00 |
| | 3,253,118.00 | 3,253,118.00 | 3,253,118.00 | 3,253,118.00 |

The above closing statement is hereby approved, and the closing agent is hereby authorized and directed to disburse the money as indicated herein and deliver instruments, documents, and other property, if any, to the designated parties and otherwise close this transaction in accordance with the closing instructions.

BRAINERD T, LLC,
a Minnesota limited liability company

By: _____
Name: ISAAC GIAUBER
Title: CEO

COMMERCIAL PARTNERS TITLE, LLC

By: _____
Name: Paul Larson
Title: Commercial Closer

BRAINERD IMPORTS, LLC
a Minnesota limited liability company

By: _____
Randall L. Seaver, in his capacity as Chapter 7 Trustee for
Dennis E. Hecker, an authorized representative of Brainerd
Imports, LLC pursuant to an order by the U.S. Bankruptcy
Court, District of Minnesota, in Case No. 09-50779



**COMMERCIAL PARTNERS**
T I T L E , L L C

200 South Sixth Street, Suite 1300
Minneapolis, MN 55402
PHONE (612) 337-2470
FAX (612) 337-2471

## BUYER'S CLOSING STATEMENT

| | |
|---|---|
| Closing Date: | November 25, 2009 |
| Disbursement Date: | November 25, 2009 |
| BUYER: | Walser Real Estate IV, LLC, a Minnesota limited liability company |
| SELLER: | Jacob Holdings of Baxter LLC, a Minnesota limited liability company |
| Closing Agent: | Commercial Partners Title, LLC, 200 South Sixth St., Suite 1300, Minneapolis, MN 55402 |
| Closing Agent File No.: | 32385 |
| PROPERTY ADDRESS: | 7036 Lake Forest Road, Baxter, MN          Crow Wing County, MN |

| | | DEBIT | CREDIT |
|---|---|---|---|
| Sales Price | | 5,294,058.16 | |
| Mortgage | Toyota Motor Credit Corporation | | 5,294,058.00 |
| Pro-rated Taxes | 2009 Taxes=$157,845.56 | | |
| $157,845.56 / 365 X 37 | | 16,000.78 | |
| Balance of Assessments | Assumed | | |
| Closing Fee (1/2) | to: Commercial Partners | 750.00 | |
| Title Insurance Premium-Owners | to: Commercial Partners | 5,300.00 | |
| Title Insurance Premium-Loan | to: Commercial Partners | 50.00 | |
| Endorsements | to: Commercial Partners | 700.00 | |
| Reimbursement for Zoning Letter | to: Commercial Partners | 65.00 | |
| Mortgage Registration Tax | to: Crow Wing County | 12,705.74 | |
| Recording Fees | Deed / Mtg / Subordination | 230.00 | |
| | | | |
| | | | |
| SUBTOTAL | | 5,329,859.68 | 5,294,058.00 |
| CASH FROM BUYER | | | 35,801.68 |
| CASH TO BUYER | | | |
| TOTAL | | 5,329,859.68 | 5,329,859.68 |

The above closing statement is hereby approved, and the closing agent is hereby authorized and directed to disburse the money as indicated herein and deliver instruments, documents and other property, if any, to the designated parties and otherwise close this transaction in accordance with the closing instructions.

Walser Real Estate IV, LLC, a Minnesota limited liability company

By: _____
          Its: CEO

COMMERCIAL PARTNERS TITLE, LLC

By: _____
Gale Larson

CLOSING DATE: November 25, 2009
DISBURSEMENT DATE: November 25, 2009
BUYER: Brainerd T, LLC, a Minnesota limited liability company
SELLER: Brainerd Imports LLC, a Minnesota limited liability company
CLOSING AGENT: Commercial Partners Title, LLC, 200 South Sixth St., Suite 1300, Minneapolis, MN 55402
CLOSING AGENT FILE: 32385
PROPERTY ADDRESS: 7036 Lake Forest Road, Baxter, MN

| | BUYER | | SELLER | |
|---|---|---|---|---|
| | Due From (Debit) | Due To (Credit) | Due From (Debit) | Due To (Credit) |
| **Purchase Price:** | | | | |
| Real Estate | 5,294,058.16 | | | 5,294,058.16 |
| New Vehicles | 1,003,457.00 | | | 1,003,457.00 |
| Used Vehicles | 264,300.00 | | | 264,300.00 |
| Parts | 60,361.00 | | | 60,361.00 |
| Fixed Assets | 250,000.00 | | | 250,000.00 |
| Blue Sky | 1,675,000.00 | | | 1,675,000.00 |
| | | | | |
| **Funding Sources:** | | | | |
| Deposit - at Kaplan, Strangis | | 44,833.75 | | |
| Deposit - at Commercial Partners | | 5,166.25 | | |
| Real Estate Loan | | 5,294,058.00 | | |
| Working Capital Loan | | 700,000.00 | | |
| Floorplan Loan | | 1,267,757.00 | | |
| Funds from Buyer - APA | | 1,235,361.00 | *35,801.68* | |
| Funds from Buyer - RPA | | ~~35,464.52~~ | | |
| **RPA Allocations/Disbursements:** *SEE ATTACHED CPT CLOSING STATEMENT* | | | *See seller statement attached.* | |
| Property Taxes | 16,000.78 ✓ | | 157,629.33 | |
| Closing Fee | ~~450.00~~ *150.00* ~~400.00~~ ✓ | | 400.00 | |
| Title Insurance Premiums - Owner | 5,300.00 ✓ | | | |
| Title Insurance Premium - Loan | 50.00 ✓ | | | |
| Endorsements | 700.00 ✓ | | | |
| Zoning Letter | 65.00 ✓ | | | |
| Mortgage Registration Tax | 12,705.74 ✓ | | | |
| Recording Fees | 230.00 ✓ | | 159.00 | |
| Utility Payment - City of Baxter | | | 364.02 | |
| Commitment Fee | | | 803.00 | |
| State Deed Tax | | | 17,470.33 | |
| TMCC Partial Mortgage Payment | | | 5,057,236.42 | |
| Gleason & Assoc. Escrow (Novum Structures) | | | 60,000.00 | |
| | | | | |
| **APA Disbursements:** | | | | |
| Kaplan, Strangis & Kaplan Legal Fees | | | 44,833.75 | |
| TMCC Partial Loan Payment | | | 2,408,284.25 | |
| Toyota Motor Sales Escrow - Peters Law Firm | | | 100,000.00 | |
| Randall L. Seaver - Chapter 7 Trustee | | | 400,000.00 | |
| Gleason & Assoc. Escrow (Trustee Deferred) | | | 25,000.00 | |
| Gleason & Assoc. Escrow (Primary Escrow) | | | 275,000.00 | |
| | ~~8,582,627.68~~ *8,582,977.68* | ~~8,582,627.52~~ *8,582,977.68* | 8,547,176.16 | 8,547,176.16 |

The above closing statement is hereby approved, and the closing agent is hereby authorized and directed to disburse the money as indicated herein and deliver instruments, documents, and other property, if any, to the designated parties and otherwise close this transaction in accordance with the closing instructions.

WALSER REAL ESTATE IV, LLC,
a Minnesota limited liability company

By: _____
Name: _DAVE WALSER_
Title: _CEO_

JACOB HOLDINGS OF BAXTER LLC,
a Minnesota limited liability company

By: _____
Name: _____
Title: _____

**BRAINERD T, LLC,**
a Minnesota limited liability company

By: _____
Name: _____
Title: _____

**COMMERCIAL PARTNERS TITLE, LLC**

By: _____
Name: _____
Title: _____

**BRAINERD IMPORTS LLC,**
a Minnesota limited liability company

By: _____
Name: _____
Title: _____



**COMMERCIAL PARTNERS**
T I T L E , L L C
200 South Sixth Street, Suite 1300
Minneapolis, MN 55402
PHONE (612) 337-2470
FAX (612) 337-2471

## SELLER'S CLOSING STATEMENT

| | |
|---|---|
| Closing Date: | November 25, 2009 |
| Disbursement Date: | November 25, 2009 |
| BUYER: | Walser Real Estate IV, LLC, a Minnesota limited liability company |
| SELLER: | Jacob Holdings of Baxter LLC, a Minnesota limited liability company |
| Closing Agent: | Commercial Partners Title, LLC, 200 South Sixth St., Suite 1300, Minneapolis, MN 55402 |
| Closing Agent File No.: | 32365 |
| PROPERTY ADDRESS: | 7036 Lake Forest Road, Baxter, MN    Crow Wing County, MN |

| | | DEBIT | CREDIT |
|---|---|---|---|
| Purchase Price | | | 5,294,058.16 |
| Mortgage Payoff | Toyota Motor Credit Corporation | 5,053,629.51 | |
| 2009 Tax/Penalty/Interest | to: Crow Wing County (Good through 11/30/09) | 179,530.11 | |
| Interest on 2009 Taxes through 12/31/09 | | 3,156.91 | |
| Pro-rated Taxes | 2009 Taxes=$157,845.55 | | |
| $157,845.55 / 365 X 37 | | | 16,000.76 |
| Balance of Assessments | Assumed by Buyer | | |
| Payoff Utility Billing | to: City of Baxter (Due 12/10/09) | 364.02 | |
| Closing Fee (1/2) | to: Commercial Partners | 750.00 | |
| Commitment Fee | to: Commercial Partners | 803.00 | |
| State Deed Tax | | 17,470.39 | |
| Recording Fees | Satisfaction/CC BK Order | 155.00 | |
| UCC Filing | MN SOS 2 Amendments | 100.00 | |
| Novum Structures Escrow | to: Gleason & Associates | 60,000.00 | |
| | | | |
| SUBTOTAL | | 5,310,058.94 | 5,310,058.94 |
| CASH FROM SELLER | | | |
| CASH TO SELLER | | | |
| TOTAL | | 5,310,058.94 | 5,310,058.94 |

The above closing statement is hereby approved, and the closing agent is hereby authorized and directed to disburse the money as indicated herein and deliver instruments, documents and other property, if any, to the designated parties and otherwise close this transaction in accordance with the closing instructions.

Jacob Holdings of Baxter LLC, a Minnesota limited liability company

11-25-09

By: Randall L. Seaver, in his capacity as Chapter 7 Trustee for Dennis E. Hecker, an authorized representative of Jacob Holdings of Baxter LLC pursuant to an order by the U. S. Bankruptcy Court, District of Minnesota in Case No. 09-50779.

COMMERCIAL PARTNERS TITLE, LLC

By: Gale Larson

CLOSING STATEMENT
SALE OF ASSETS BY BRAINERD IMPORTS LLC AND JACOB HOLDINGS OF BAXTER LLC

CLOSING DATE: November 25, 2009
DISBURSEMENT DATE: November 25, 2009
BUYER: Brainerd T, LLC, a Minnesota limited liability company
SELLER: Brainerd Imports LLC, a Minnesota limited liability company
CLOSING AGENT: Commercial Partners Title, LLC, 200 South Sixth St., Suite 1300, Minneapolis, MN 55402
CLOSING AGENT FILE: 32385
PROPERTY ADDRESS: 7036 Lake Forest Road, Baxter, MN

| | BUYER | | SELLER | |
|---|---|---|---|---|
| | Due From (Debit) | Due To (Credit) | Due From (Debit) | Due To (Credit) |
| Purchase Price: | | | | |
| Real Estate | 5,294,058.16 | | | 5,294,058.16 |
| New Vehicles | 1,003,457.00 | | | 1,003,457.00 |
| Used Vehicles | 264,300.00 | | | 264,300.00 |
| Parts | 60,361.00 | | | 60,361.00 |
| Fixed Assets | 250,000.00 | | | 250,000.00 |
| Blue Sky | 1,675,000.00 | | | 1,675,000.00 |
| 2009 Tax credit | | | | 16,000.78 |
| Funding Sources: | | | | |
| Deposit - at Kaplan, Strangis | | 44,833.75 ✓ | | |
| Deposit - at Commercial Partners | | 5,166.25 ✓ | | |
| Real Estate Loan | | 5,294,058.00 ✓ | | |
| Floorplan Loan | | 700,000.00 ✓ | | |
| Working Capital Loan | | 1,207,757.00 ✓ | | |
| Funds from Buyer - APA | | 1,285,361.00 ✓ | | |
| Funds from Buyer - RPA | | 35,801.68 ✓ | | |
| RPA Allocations/Disbursements: | | | 257,609.33 | 173,180.11 ✱ |
| Property Taxes | 16,000.78 | | 31,156.91 | |
| Property Taxes (10/1) | 0.00 | | 750.00 ✓ | |
| Closing Fee | 750.00 | | | |
| Title Insurance Premium - Owner | 5,300.00 | | | |
| Title Insurance Premium - Loan | 50.00 | | | |
| Endorsements | 700.00 | | | |
| Zoning Letter | 65.00 | | | |
| Mortgage Registration Tax | 12,709.74 | | | |
| Recording Fees | 230.00 | | 155.00 ✓ | |
| Utility Payment - City of Baxter | | | 364.02 ✓ | |
| Commitment Fee | | | 803.00 ✓ | |
| State Deed Tax | | | 17,470.39 ✓ | |
| TMCC Partial Mortgage Payment | | | 5,053,129.51 | 2,053,629.51 ✱ |
| Gleason & Assoc. Escrow (Novum Structures) | | | 60,000.00 | |
| LLC filings | | | | ← 1000.00 ✓ |
| APA Disbursements: | | | | ✱ see attached |
| Kaplan, Strangis & Kaplan Legal Fees | | | 44,833.75 | Seller closing |
| TMCC Partial Loan Payment | | | 2,408,284.25 | statement |
| Toyota Motor Sales Escrow - Peters Law Firm | | | 100,000.00 | |
| Randal L. Seaver, Chapter 7 Trustee | | | 400,000.00 | |
| Gleason & Assoc. Escrow (Trustee Deferred) | | | 25,000.00 | |
| Gleason & Assoc. Escrow (Primary Escrow) | | | 275,000.00 | |
| | 8,582,077.68 | 8,582,077.68 | 8,847,176.16 | 8,847,176.16 |
| | | | 8,563,176.94 | 8,563,176.94 |

The above closing statement is hereby approved and the closing agent is hereby authorized and directed to disburse the monies as indicated herein and deliver instruments, documents, and other property, if any, to the designated parties and otherwise close this transaction in accordance with the closing instructions.

WALSER REAL ESTATE IV, LLC,
a Minnesota limited liability company

By: _____
Name: _____
Title: _____

JACOB HOLDINGS OF BAXTER LLC,
a Minnesota limited liability company

By: _____
Name: _____
Title: _____



Slip Copy, 2009 WL 1684577 (S.D.Tex.)
**(Cite as: 2009 WL 1684577 (S.D.Tex.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas,
Houston Division.
In re SUPPLEMENT SPOT, LLC, Debtor.
John Acord and Marcella Ortega, Appellants,
v.
Ben Floyd, Trustee, Appellee.
**Bankruptcy Case No. 06-35903.**
**Civil Action No. H-09-0856.**

June 16, 2009.

Randall A. Rios, Lynn Chuang Kramer, Munsch Hardt et al, Houston, TX, for Trustee/Appellee.

Joe Alfred Izen, Jr., State Bar Information, Bellaire, TX, for Appellants.

Barbara Mincey Rogers, Waldron Schneider et al, David W. Anderson, Rogers Anderson et al, Houston, TX, for Debtor.

### *MEMORANDUM AND ORDER*

NANCY F. ATLAS, District Judge.

**\*1** Appellants John Acord and Marcella Ortega filed a Notice of Appeal from the United States Bankruptcy Court's Orders relating to the approval of a settlement and the sale of property owned by Debtor. The case is now before the Court on United States Bankruptcy Trustee Ben Floyd's Motion to Dismiss [Doc. # 2], in which the Trustee argues that the appeal is moot. Appellants filed a Response [Doc. # 8] to the Motion to Dismiss, and the Trustee filed a Reply [Doc. # 9].[FN1] Having reviewed the record and the governing legal authorities, the Court concludes that the appeal is moot and **grants** the Trustee's Motion to Dismiss.

> FN1. Appellants filed a "Motion for Leave to File Sur-Response" [Doc. # 10]. Although there is no provision in the Bankruptcy Rules for a "Sur-Response," the Court **grants** the Motion for Leave to File Sur-Response.

### I. BACKGROUND

Debtor Supplement Spot, LLC, whose primary business is the sale of nutritional supplements, filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code in November 2006. At the time the petition was filed, the name of Debtor was "Young Again Nutrition, LLC" but the name was later changed to Supplement Spot, LLC. Marcella Ortega is Debtor's sole shareholder, and John Acord is her son. Young Again Products, Inc. ("YAP") was a principal creditor, was the plaintiff in trademark litigation pending against Debtor in Utah and Maryland, and was the plaintiff in Adversary Proceeding No. 07-3019, which involved allegations of improper post-petition trademark infringement. On February 27, 2007, the Bankruptcy Court entered an Agreed Order Directing the Appointment of Chapter 11 Trustee [Doc. # 98 in Bankruptcy Case 06-35903], and on March 1, 2007, the Bankruptcy Court approved the appointment of Ben Floyd as the Chapter 11 Trustee [Doc. # 100 in Bankruptcy Case 06-35903].

Negotiations between YAP and the Trustee resulted in a compromise and settlement. On November 11, 2008, the Trustee filed a motion ("Motion") seeking approval of the settlement and authorization to sell Debtor's property to Casey Borgers Investments, LLC ("CBI"), a third party purchaser. The Trustee represented that the proposed settlement, including the sale of Debtor's property, was the result of arms-length negotiations that were conducted in good faith. *See* Motion [Doc. # 187 in Bankruptcy Case 06-35903], ¶ 28. Appellants jointly filed Objections [Doc. # 194 in Bankruptcy Case 06-35903] to the proposed settlement. In response to the Trustee's Motion to Strike Appellants' Objections, the Bankruptcy Court held that Acord did not have standing to object because he was not a creditor and had no financial interest in Debtor. The Bankruptcy Court allowed Ortega, as the sole shareholder of Debtor, to pursue the objections and to participate fully in the evidentiary hearing regarding approval of the proposed settlement.

Following the hearing on the Trustee's motion for approval of the settlement, the Bankruptcy Court on

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



EXHIBIT
5

December 17, 2008, entered his "Order Approving Trustee's Motion (I) To Approve Compromise and Settlement Agreement with Young Again Products, Inc. Pursuant to Bankruptcy Rule 9019; and (II) To Sell Debtor's Property to Casey Borgers Investments, L.L.C. Free and Clear of Liens, Claims, Charges, Encumbrances, and Interests Pursuant to 11 U.S.C. § 363(f)" [Doc. # 201 in Bankruptcy Case 06-35903], thus allowing the sale of the Debtor's property to CBI to proceed.

**\*2** On December 19, 2008, the sale of the subject property to CBI was funded and closed. Later that day, the Trustee funded payments of the settlement proceeds to YAP in the amount of $112,000.00 and to real estate broker Golden Gate Business Group, Inc. ("Golden Gate") <u>FN2</u> in the amount of $45,000.00. In accordance with the settlement agreement, stipulations of dismissal were filed in the courts in Utah and Maryland, and in Adversary No. 07-3019.

> FN2. Golden Gate served as the Trustee's court-appointed financial advisor and consultant.

On December 29, 2008, Appellants filed a Motion for Rehearing, which was denied on March 11, 2009 following a hearing. On March 23, 2009, Appellants filed their Notice of Appeal from the Order ruling on the Trustee's Motion to Strike, the Order approving the settlement, the Order denying the Motion for Rehearing, and the related Findings of Fact and Conclusions of Law. The Trustee filed his Motion to Dismiss the appeal as moot. The Motion has been fully briefed and is now ripe for decision.

## II. *ANALYSIS*

The Trustee argues that the appeal should be dismissed as moot because the property has been sold, the proceeds of the sale have been distributed, and all related litigation has been dismissed in accordance with the terms of the settlement. In the bankruptcy context, the mootness concept is a "recognition by the appellate courts that there is a point beyond which they cannot order fundamental changes in reorganization actions." *Matter of Manges*, 29 F.3d 1034, 1039 (5th Cir.1994).<u>FN3</u> "Consequently, a reviewing court may decline to consider the merits of a [compromise and settlement] order when there has been substantial

consummation ... such that effective judicial relief is no longer available-even though there may still be a viable dispute between the parties on appeal." *Id.* The Court must consider whether it is "prudent" to upset the settlement. *Id.* (quoting *In re UNR Indus., Inc.,* 20 F.3d 766, 769 (7th Cir.1994)). To determine whether a bankruptcy appeal is moot, the Court examines three primary factors: "(i) whether a stay has been obtained, (ii) whether the [settlement] has been 'substantially consummated,' and (iii) whether the relief requested would affect ... rights of parties not before the court ...." *Id.*

> FN3. The *Manges* case dealt with a plan of reorganization, but the legal principles apply equally to appeals involving a compromise and settlement. *See In re Hilal,* 226 F. App'x 381, 383 n. 1 (5th Cir. Apr.2, 2007).

In this case, Appellants neither requested nor obtained a stay of the Bankruptcy Court's orders. Appellants did not request a stay in their Objections or during the evidentiary hearing. The settlement has been fully consummated-the property has been sold, the proceeds have been distributed, and the related litigation has been dismissed as settled. Indeed, because the lawsuits in Utah and Maryland have been dismissed, it is questionable whether the settlement could be undone completely. Nonetheless, reversing the settlement at this point, even if feasible, would adversely affect the rights of third parties, including CBI and Golden Gate. All of the relevant factors in the mootness evaluation in the bankruptcy context support the conclusion that this appeal is moot and should be dismissed.

**\*3** Appellants argue that the appeal should not be dismissed as moot because Acord was not allowed to participate as an interested party and because "bad faith defeats application of the mootness doctrine ." *See* Response, pp. 3-8. These arguments are not supported by the record. Acord had no ownership interest in the Debtor and had no claim against the Debtor. As a result, the Bankruptcy Court correctly held that he was not a party in interest as defined by 11 U.S.C. § 1109(b) and lacked standing to object to the proposed settlement. The Bankruptcy Court found, however, that Appellant Ortega had standing because she was the sole shareholder in the Debtor. Ortega was given notice and participated in the hearing on the proposed

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1684577 (S.D.Tex.)
**(Cite as: 2009 WL 1684577 (S.D.Tex.))**

settlement. Indeed, she presented evidence in support of her objections to the settlement, including testimony from Acord.[FN4] As a result, the Bankruptcy Court's alleged failure to provide Acord with adequate notice and to allow him to object to the proposed settlement does not legally or equitably prevent dismissal of this appeal as moot.

> FN4. To the extent Acord had any interest in the Debtor, as Ortega's son, his interests were aligned with hers.

Appellants' argument regarding bad faith also is refuted by the record. The Bankruptcy Court specifically found after an evidentiary hearing that the Trustee and YAP negotiated the settlement in good faith and that the transactions contemplated by the settlement, including the sale of the property to CBI, were undertaken "in good faith." *See* Compromise and Settlement Order, ¶ ¶ 1, 16. Appellants have presented no evidence to support their bald assertion of bad faith. The Court rejects Appellants' argument that bad faith prevents application of the mootness doctrine in this case.

### III. *CONCLUSION AND ORDER*

The property at issue has been sold, the proceeds have been distributed, and the related lawsuits have been dismissed pursuant to the settlement agreement. As a result, the case is "past the point where equitable judicial relief is available" and the appeal is moot. It is, therefore,

**ORDERED** that the Motion to Dismiss [Doc. # 2] is **GRANTED.** It is further

**ORDERED** that Appellants' Motion for Leave to File Sur-Response [Doc. # 10] is **GRANTED.**

The Court will issue a separate Final Dismissal Order.

S.D.Tex.,2009.
In re Supplement Spot, LLC
Slip Copy, 2009 WL 1684577 (S.D.Tex.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

BKY No. 09-50779

In re:

Chapter 7

Dennis E. Hecker,

Debtor.

## UNSWORN CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2009, I caused the following documents:

**_Trustee's Response in Opposition to Motion for Leave to Appeal and Motion to Dismiss Appeal as Moot_**

to be filed electronically with the Clerk of Court through ECF, and that the above documents will be delivered by automatic e-mail notification pursuant to ECF and this constitutes service or notice pursuant to Local Rule 9006-1(a).

/e/  Stephanie Wood

Dated:  December 14, 2009

_____

Stephanie Wood
100 South Fifth Street, Suite 2500
Minneapolis, MN  55402
(612) 332-1030

413772