# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

-------------------------------------------

In re:

Dennis E. Hecker,

        Debtor.

-------------------------------------------

Randall L. Seaver, Trustee

        Plaintiff,

vs.

Dennis E. Hecker,

        Defendant.

-------------------------------------------

BKY No. 09-50779
ADV No. 10-_____

**COMPLAINT**

Plaintiff Randall L. Seaver, Trustee ("Plaintiff"), for his Complaint against Defendant Dennis

E. Hecker ("Hecker"), states and alleges as follows:

    1.     Plaintiff is the duly qualified and acting Trustee in this case.

    2.     This is an action seeking a denial of discharge of Hecker pursuant to 11 U.S.C. §727.

    3.     This Court has jurisdiction over this proceeding pursuant to 11 U.S.C. §727, 28

U.S.C. §157 and 28 U.S.C. §1334.

    4.     This case was commenced by the filing of a voluntary petition under Chapter 7 on

June 4, 2009. The §341 meeting was set for July 15, 2009. The time for the Trustee to file a

complaint under 11 U.S.C. §727 was extended to January 15, 2010 by this Court's Order.

5.     By January 2009, Hecker had been sued by Chrysler Financial and knew that Chrysler Financial would be obtaining a judgment against him for hundreds of millions of dollars and he also knew that other lenders would be pursuing him for millions of dollars.

**NORTHSTATE FRAUDULENT TRANSFER ASSET CONCEALMENT SCHEME**

6.     Hecker desired to continue his lavish lifestyle and devised a scheme whereby, through use of Northstate Financial Corporation and through the assistance of others, Hecker could retain possession, use, and control of substantial assets, and could shield those assets from Chrysler Financial, other creditors, and, ultimately, the Trustee in his bankruptcy case.

7.     At all relevant times Hecker owned 100% of the stock of Northstate Financial Corporation ("Northstate").

8.     On November 24, 2009, the first day of his Rule 2004 examination, Hecker testified that:

> Q (Seaver) So Northstate Financial wasn't in the business of
>     buying a boat for itself to sit there and hold it
>     and then resell it?
> A (Hecker)  I am Northstate Finance, for all [intents and]
>     purposes.  Northstate Finance is a separate
>     company, LLC, but at the direction of whatever I
>     chose to do is what they did.
> Q (Seaver)  Were they in that business?
> A (Hecker) Were they a boat dealer?
> Q (Seaver)  Yes.
> A  (Hecker) No.
> Q  (Seaver)  Were they a motorcycle dealer?
> A    (Hecker) No.  They weren't a car dealer either.

A copy of page 133 of the transcript of the November 24, 2009 examination is attached hereto as Exhibit 1.

9.     In the years prior to filing, Hecker acquired for his own benefit, use and pleasure, many assets which were subject to title requirements.  Those items were in the possession of Hecker since their purchase, even though some may have been nominally titled in the name of Northstate at the time of filing.  In some cases, even though the purchase contracts named Northstate, the items were still covered under the Manufacturers Statement of Origin ("MSO").  By leaving those items in MSO status,  Hecker was able to avoid paying sales tax, and the items were not easily traceable to Hecker, even though they were, for all intents and purposes, his property.  The items in Hecker's possession and control included the following when he filed bankruptcy:

| Item | Purchase Price | Sales Tax Paid on Purchase |
| --- | --- | --- |
| 1994 Harley Davidson | unknown | unknown |
| 2005 Cobalt 343 Boat | $225,000 (less $100,000 on trade) | No |
| 2008 Harley Davidson FXDSE 2/colbalt | 23,590 | No |
| 2004 Haul Trailer | unknown | unknown |
| 2004 Eagle Trailer | unknown | unknown |
| 2004 Cadillac Escalade VIN 1GYEK63N14R268187 | unknown | unknown |
| 2007 Edgewater Boat | 18,000 | No |
| 2006 Harley Davidson Screaming Eagle | $2,3206 | No |
| 2006 Harley Davidson Screaming Eagle VRSCSE2/Yellow Plat w/pinstripe 1HD1PPG116K977621 | $23,706 | No |
| 2007 Harley Davidson | $23,000 | No |

| | | |
|---|---|---|
| Screaming Eagle FXTSSE/blue w/blue 1HD1PT9147Y951535 | | |
| 2006 Harley Davidson CC Roadster VRSCSE2/S. Red/ Charloal 1HD1PPG316K95806 | $23,206 | No |
| Tom Car KF2277TLGA6PTVL313 | Unknown | Unknown |
| Cadillac Escalade Golf Cart | Unknown | Unknown |
| Mitsubishi Eclipse Convertible | Unknown | Unknown |

10.     The items described at paragraph 9 were held personally by Hecker for his own personal use, benefit and enjoyment.  They were not "held for resale."

11.     The Trustee believes and therefore alleges that all items identified at paragraph 9 were property of Hecker and therefore are property of this estate.

12.     Another scheme devised by Hecker was to transfer additional assets into Northstate Financial Corporation.  Hecker could then retain possession, control and use of those assets, while at the same time, asserting to others that they were not personal assets of Dennis Hecker.  Through this scheme, Hecker believed he could retain all personal ownership benefits while shielding those assets from creditors and the bankruptcy trustee.

13.     In January of 2009, Hecker was one of the titled owners of an unencumbered 2007 Colbalt 222 boat ("Colbalt 222").  The Cobalt 222 and trailer had been purchased in 2007 for over $62,000.

14.     In January of 2009, Hecker was one of the titled owners of an unencumbered 2008 Malibu Wake Setter.

4

15.     In December, 2008, Hecker, through use of personal check number 5208, in the amount of $23,590, purchased a 2008 Harley Davidson FXD SE2 motorcycle from Wild Prairie Harley Davidson.  A redacted copy of the check is attached hereto as Exhibit 1A.

16.     The 2008 Harley Davidson was purchased for the sole use, possession and enjoyment of Hecker, however, he had the bill of sale printed in the name of Northstate.  A copy of the bill of sale is attached hereto as Exhibit 1B.  No sales tax was paid on the transaction.

17.     On February 17, 2009, Hecker's interests in the 2008 Malibu Wake Setter and the Colbalt 222 were transferred to Northstate.

18.     In addition, Hecker had in his possession those items identified at paragraph 9 hereof which had been purchased for the sole use and enjoyment of Hecker, but which were never titled or were titled in the name of Northstate.  As a part of his scheme to retain and conceal assets, Hecker asserted that those assets were property of Northstate Financial Corporation, even though those assets were, and had always been, under the sole control, use and possession of Hecker.

## Christi Rowan Transfers

19.     By June, 2008, even though he was married to Tamitha Hecker, Hecker had begun a relationship with a woman named Christi Rowan.

20.     Christi Rowan had been married to Brent Rowan until their marriage was dissolved in October, 2008.

21.     Christi Rowan had been employed by Multi Media Holdings Company, I Gannett ("Gannett") but that employment ended in July, 2008.  After the end of her employment with Gannett, Rowan's only source of income was as a self-employed photographer.

22.     In March of 2008, Rowan moved into an apartment at the former Whitney Hotel, located at 150 Portland Avenue, Minneapolis, MN ("Whitney Residence"). She signed a 1 year lease which called for $4,000 per month lease payments, and a $4,000 security deposit. The deposit and monthly rental payments were funded almost solely by Hecker.

23.     After expiration of the lease, Rowan continued her occupancy at the Whitney Residence, through a month-to-month lease extension through July, 2009. Hecker almost solely funded the continued occupancy.

24.     In addition to funding her occupancy at the Whitney Residence, Hecker, in the year prior to filing, funded an expensive and extravagant lifestyle for Rowan.

25.     Hecker provided Rowan, in the year prior to filing, with vacations, large amounts of cash, air travel, jewelry and clothing and also funded Rowan's daughter's tuition at Breck School, and Rowan's lease of a 2008 Land Rover.

26.     The Debtor made transfers to or for the benefit of Rowan in the year prior to filing, through the charging of items for her benefit on his American Express and Visa cards in an amount exceeding $125,000. Those charges included $60,000 for a fur coat, $15,000 for a watch, over $30,000 for a Harrison Dog, over $11,000 for lodging at the St. Regis Hotel in Aspen, CO, and other charges for lodging in Cabo San Lucas, airfare to Cabo, airfare to Hawaii, and lodging in Cabo San Lucas. A copy of the Bill of Sale for the Harrison dog is attached hereto as Exhibit 1C.

27.     Additionally, in the year prior to filing, Hecker made transfers to or for the benefit of Rowan through use of his Nieman Marcus card in an amount in excess of $34,000.

28.     Hecker also provided Rowan with cash which was never deposited into any accounts. Hecker did not maintain any log or record of cash given to Rowan in the year prior to filing.

Included among the additional cash given to Rowan which was not deposited into her accounts was $7,000 for cosmetic surgery. In the year prior to filing, Hecker caused over $235,000 in cash and checks to be transferred to Rowan. Some of those monies were deposited into her account at Trustone Credit Union. The funds came from Hecker, monies owed to Hecker or his companies, accounts funded by Hecker, and from Hecker controlled entities. A list of some apparent cash and check transfers to Rowan which were deposited into her Trustone Credit Union account are attached hereto as Exhibit 2 and 3. Copies of redacted items representing some of the deposits are attached hereto as Exhibit 4.

29.     Rowan also deposited monies from Hecker into an account held by her at Associated Bank. An itemization and copies of some apparent Hecker funded deposits into that account is attached hereto as Exhibit 5.

30.     The transfers to Rowan included the transfer by Hecker of checks payable to Hecker which were deposited into Rowan's account. Redacted copies of some such checks are attached hereto s Exhibit 6.

31.     Rowan also deposited monies from Hecker into an account held at Wells Fargo Bank to which she had access.

### Hecker Land Rover Scheme

32.     In April, 2009 Rowan was unemployed, except as a self-employed photographer.

33.     In April, 2009, Hecker wanted to obtain a new Land Rover.

34.     Rowan went to Land Rover/Jaguar of Minneapolis in April, 2009 for the purpose of buying or leasing a Land Rover for Hecker.

35.     A black 2008 Supercharged Land Rover with a purchase price of $86,026 was selected for Hecker ("Hecker Land Rover").

36.     Rowan knew that she would not qualify for the credit necessary for the purchase if she honestly disclosed that she was unemployed, except for her photography business.

37.     A credit application was signed by Rowan and submitted to the dealer. That application stated that she was an attorney employed by Gannett making over $189,000 annually. The application was false. She is not and has never been an attorney and was not earning over $189,000 annually. A redacted copy of the application is attached hereto as Exhibit 6A.

38.     Rowan also altered her 2008 W-2 to state that she had earned $189,500 in 2008. She presented that falsified W-2 with the intention of obtaining credit for the purchase of the Hecker Land Rover. A redacted copy of the falsified W-2 presented by Rowan is attached as Exhibit 7. Copies of the cover page and pages 37-40 of Rule 2004 testimony by Rowan regarding the falsified W-2 are attached hereto as Exhibit 8.

39.     As a result of her actions, Rowan was approved for the purchase of the Hecker Land Rover with a monthly payment of $2,178.16.

40.     The amount due at closing on the Hecker Land Rover was about $13,000.

41.     Hecker provided the funds to Rowan for the closing on the purchase of the Hecker Land Rover. A copy of the Hecker Land Rover sale agreement is attached hereto as Exhibit 8A.

42.     Since its purchase, Hecker has had possession and use of the Hecker Land Rover.

43.     The monthly payments on the Hecker Land Rover have been funded primarily by Hecker.

44.     In reality, Hecker is the owner of the Hecker Land Rover.

45.     The above-described scheme was effected in order to conceal the Hecker Land Rover from Hecker's creditors and, subsequently, the Trustee.

46.     Hecker did not disclose his ownership or possession of the Hecker Land Rover in his original schedules or statement of financial affairs.

### Northridge Scheme

47.     At all relevant times, Hecker owned a home at 1615 Northridge Drive, Medina, MN ("Northridge").

48.     Northridge had been the homestead of Hecker and his spouse, Tamitha, until they moved to another nearby home located at Hunter Drive in Medina, MN.

49.     By 2009, Hecker decided that he wanted to install Rowan as the occupant of the Northridge home, which is just several blocks from the home that Hecker was then sharing with his spouse, Tamitha Hecker.

50.     In early 2009, Hecker was already funding $4,000 per month for Rowan to reside at the Whitney Residence.

51.     Hecker discussed with Rowan improvements which she desired to have made to Northridge before she moved from the Whitney Residence into Northridge.  At the time such improvements were contemplated, Rowan was unemployed, except for her sole proprietorship photography business.

52.     During early 2009, Hecker funded improvements at Northridge.  Some of those improvements were made to Northridge by Rowan's former husband, Brent Rowan.

53.     Hecker and Rowan wanted to protect the Northridge home from administration by the Chapter 7 Trustee when Hecker filed his contemplated bankruptcy.  Hecker and Rowan perfected

that intent by entering into a purported lease ("Lease"). The date that Hecker and Rowan actually signed the Lease is unknown. A copy of the Lease is attached hereto as Exhibit 9.

54. According to the Lease, Rowan received credit because of improvements made to Northridge, even though Hecker was the one who funded the payment for those improvements.

55. The purported Lease provided that Rowan would pay $5,000 per month in rent.

56. Hecker knew that Rowan was unemployed, except for her sole proprietorship photography business. Hecker also knew that Rowan had a $2,200 per month obligation on a white Land Rover that Hecker had advised Rowan to lease in November, 2008. A copy of cover page of the November Rowan Land Rover lease is attached hereto as Exhibit 10. Hecker also knew that Rowan was obligated to make monthly payments of $2,178.16 on the Hecker Land Rover. Hecker also knew that Rowan had other substantial monthly obligations. See e-mail regarding Rowan "budget" attached hereto as Exhibit 11. Hecker knew that Rowan did not have income sufficient to pay the $5,000 monthly Northridge Lease obligation. See pages 15-16 of the transcript of the Hecker Rule 2004 examination attached hereto as Exhibit 12.

57. By means of the transfer made by entry into the purposed Lease, Hecker was able to encumber Northridge thus preventing the Trustee from administering the Northridge property. Additionally, by entering into the purported Lease, Hecker was assured of a home located in the metropolitan Minneapolis area in which he and Rowan could live.

### ROLEX SCHEME

58. Prior to filing bankruptcy, Hecker had an extensive watch collection which included the following Rolex watches:

    a.    Platinum Rolex Oyster Perpetual Day/Date Model #18946.

b.     18 carat gold Rolex Oyster Perpetual Cosmograph Dayton/Crocodile strap Model #16518.

c.     18 carat gold Rolex Oyster Perpetual Date with 18 carat gold bracelet Model #16808.

d.     18 carat gold Rolex Oyster Perpetual Date and submariner with after market alterations and 18 carat gold Oyster link bracelet Model #16618.

e.     18 carat yellow gold Rolex Oyster Quartz Day/Date with 18 carat gold bracelet and after market alterations Model #19018.

f.     18 carat yellow gold Rolex Oyster Perpetual Date Yacht Master with 18 carat gold bracelet Model #16628b.

g.     18 carat gold Rolex Daytona with 18 carat gold bracelet Model #16528

h.     18 carat gold Rolex Oyster Perpetual Date Yacht Master with 18 carat gold bracelet Model #16628.

i.     18 carat gold Rolex Oyster Perpetual Date Submariner with blue dial and stainless steel and 18 carat gold bracelet Model #16613.

j.     18 carat gold Rolex Cellini with black leather strap Model #6623.

k.     Stainless steel Tiger Woods series made by Tudor for Rolex with black leather band.

59.     In April, 2009, in preparation for his bankruptcy, Hecker had certain selected watches and his wedding ring delivered to Embellir Gallery of Gems in Mendota Heights, MN to obtain a value opinion.  Copies of pages 45-51 and 256 of the transcript of the Rule 2004 examination of Hecker are attached hereto as Exhibit 13.

60.     Hecker withheld, from the watches sent to Embellir five Rolex watches believed to be the Rolex watches identified as items 49 (a)(b)(f)(h) and (i) in paragraph 50 hereof.  Certificates obtained by the Plaintiff from Wixon Jewelers regarding those watches are attached hereto as Exhibit 14.

61.     When Hecker received a "Liquidation Appraisal" from Embellir for the Rolex watches, he then caused that information to be put into his bankruptcy schedules, thereby intentionally excluding from the schedules the five Rolex watches which he had not provided to Embellir for appraisal.  A copy of the Embellir liquidation appraisal for the disclosed Rolex watches is attached hereto as Exhibit 15.

62.     The Trustee reviewed insurance documents and discovered that Hecker had concealed certain Rolex watches.  On July 13, 2009, the Trustee commenced ADV No. 09-5020 against Hecker seeking, among other things, to compel him to turn over the concealed Rolex watches to the Trustee.  After Hecker was sued by the Trustee in ADV No. 09-5020, he turned over to the Trustee the five concealed Rolex watches.

63.     The Trustee believes that the five concealed Rolex watches have a combined value of over $40,000.

## CONCEALED ASSETS

64.     Hecker had many assets of substantial value which he intentionally concealed and omitted from his bankruptcy schedules.  Those assets include the assets identified at paragraph 9 of this complaint and the following:

   a.     2008 Harley Davidson FXD motorcycle purchased for $23,590, the bill of sale for which was prepared in the name of Northstate.  Exhibit 1A and 1B.

   b.     Five Rolex watches having a value of in excess of $40,000.

   c.     John Deere Gator S/N MO54CBC0846547 and "Bad Boy" golf cart VIN BBE514B3975004484 having a combined value of at least $10,000.

   d.     At least $500 in American Express traveler's checks.  Copies of those checks are attached hereto as Exhibit 18.

   e.     2004 Police Interceptor vehicle, sold at auction by the Trustee for $4,000.

f.      Handgun.

g.      Boat docks and lifts having a value of at least $25,000.

h.      Cash, in addition to the $5,500 disclosed in his Schedule B.

i.      Six round trip first class airline tickets from Minneapolis to Hawaii which were purchased by Hecker in March, 2009 for an amount in excess of $13,000. Hecker converted those tickets to his use in August, 2009, having never disclosed the existence of those assets to the Trustee.

j.      A golf membership at Roaring Fork Club in Colorado purchased by Hecker for the sum of $200,000. The last $50,000 installment on that purchase was made in late 2008. The membership, less accrued fees, is fully, but not immediately, refundable.

k.      A membership at Roaring Fork Mountain Club in Colorado purchased for $10,000. The membership is 90% refundable, but is not immediately refundable.

l.      Hecker had pre-paid to Steve Mathiesen, the sum of $7,500 to lease a home in Sturgis, SD for the 2009 Sturgis Motorcycle Rally. Hecker concealed this asset, and converted the value of this concealed asset to the use of his associates post-petition. A copy of the lease is attached hereto as Exhibit 19.

m.      A golf cart, which was sold by the Trustee at auction for the total price of $1,950.

n.      2008 Land Rover purchased in April, 2009 for over $86,000, which purchase was funded by Hecker, and which vehicle was titled in the name of Christi Rowan. Exhibit 8A.

o.      Right to expense reimbursement from Host Acquisitions, LLC d/b/a Payless in an amount in excess of $5,000. A redacted copy of a $7,500 expense reimbursement check for the period January, 2009 - July, 2009 is attached hereto as Exhibit 20.

p.      An amended note and mortgage from Karen Peterson in the amount of $23,468.69. A copy of the amended note and mortgage is attached hereto as Exhibit 21.

q.      Real and other property located in Pitkin County, CO and legally described as Timbers Club at Snowmass Unit S6 Desc. Parking Space. (Hecker paid

13

$55,000 for this property, which includes a social membership in November, 2004). The property has a current property tax valuation of $130,000 and is titled in the names of Dennis and Tamitha Hecker. In October, 2009, Hecker paid dues to the Timbers Club. Copies of documents from Pitkin County regarding this asset are attached hereto as Exhibit 21A.

r.   Hundreds of dollars in $2 bills held in the safe at 500 Ford Road.

s.   Harley Davidson motorcycle, Jeep Wranger, trailer, skis and artwork located in Aspen, CO.

t.   Membership at Golf Club Scottsdale.

### CROSSLAKE SCHEME

65.   Hecker intended to assert claimed homestead rights at 11700 Cross Avenue, using a reverse piercing theory, even though that property, and the two adjacent Crosslake properties were titled in the name of Jacob Holdings of Cross Lake, LLC

66.   On June 3, 2009, the day before his filing, Hecker entered into various transactions with TCF Bank whereby Hecker business entities and Hecker deeded properties and personal property to TCF Bank and took other actions, in exchange for TCF Bank entering into an agreement or agreements whereby Hecker could retain control and possession of three expensive structures located on Crosslake, MN with addresses of 11614 Echo Bay Drive, 11707 Cross Avenue and 11700 Cross Avenue, (collectively "Crosslake Properties"). Hecker desired to retain and claim the property at 11700 Cross Avenue as his homestead. He also desired to retain control, possession or ownership of the other two Crosslake Properties and to render those properties valueless to the bankruptcy estate.

67.   If Hecker was successful in asserting, through his reverse pierce theory, that he was personally the owner of 11700 Cross Avenue, he knew that the other two Crosslake properties, immediately adjacent to the 11700 property, would under the same theory, be found to also be the

property of Dennis Hecker individually, and consequently, property of the bankruptcy estate. In order to protect those two properties against the Trustee's administration of them, in the event Hecker was successful in his reverse piercing theory Hecker engaged in a scheme and transfers in order to create the false illusion that properties were encumbered for the next two years, to prevent the Trustee from administering them.

68.     In order to further the scheme, shortly before filing bankruptcy, Hecker caused to be created falsified leases with insiders for the 11614 Echo Bay Drive and 11707 Cross Avenue Properties. Although the leases state that they are effective as of May, 2009, they were not signed until early June, 2009.

Each of those leases stated that:

> **Term.**  Tenant shall lease the Premises for the twenty four (24) month period beginning May 1, 2009, and ending on April 30, 2011 (the "Term"). Tenant acknowledges that Tenant must vacate the premises at the end of the Term, but agrees to give Landlord written notice no later than sixty (60) days before the end of the Term if Tenant does no wish to remain in the Premises during the Term. If Tenant does not give this notice and vacates the Premises, Landlord may, but shall not be required, to consider the Term to be extended for up to an additional sixty (60) days.

**Rent.** Rent will consist of the payment by Tenant of Two Thousand and 00/100 Dollars ($2,000.00) each month during the Term of this Lease; provided, however, that Rent for the first year of the Term of the Lease in the amount of Twenty-Four Thousand and 00/100 Dollars ($24,000.00) shall be paid by Tenant upon execution of this Lease. Rent for subsequent months shall be payable in advance no later than the first day of each subsequent calendar month. Tenant will pay a Twenty Five Dollar ($25.00) service charge if Tenant does not pay the full monthly rent by the first day of the month. Tenant also will be assessed a Twenty-five Dollar ($25.00) charge for any check not honored by Tenant's bank.

69. Each of those leases was provided to the Trustee by Hecker's attorney. Each lease contains an "effective date" of May 1, 2009. At no time prior to the §341 meeting was it disclosed to the Trustee that, in fact, the stated pre payment of rent in the amount of $24,000 on each lease had never been made. Nor was it disclosed to the Trustee prior to the §341 meeting that neither of the security deposits, which the leases state "shall" be made upon execution of the document, had ever been made. The effect and the intent of Hecker signing the lease documents the day before his bankruptcy filing and presenting them to the Trustee without explanation of the false statements contained in the leases was to defraud and mislead the Trustee into believing that both 11614 Echo Bay Drive and 11700 Cross Avenue Properties were subject to prepaid 12 month leases for which the total amount of $48,000 had been paid immediately before filing.

70. The falsified leases and false prepayments were a scheme designed to benefit Hecker and certain relatives and insiders. The effect of this scheme was to allow Hecker and others, at no cost, to occupy and control the Crosslake Properties. An additional goal of the scheme was to "tie

up" the property subject to the purported leases for a period of two years so that the Trustee could not administer the property.

71. At the meeting of creditors, Hecker testified regarding the lease prepayments as follows:

Q Okay. Family Holdings of Minnesota, what's that?
A It's the individual who is renting the property.
Q And who's that?
A His name is William Plumber.
Q Okay. Is Mr. Plumber a long-time associate of
    yours?
A Yes, he is.
Q All right. This residential lease right down at
    the bottom of the page I'm showing you, which is
    paragraph 4, calls for an immediate payment of
    $24,000 in rent. Did that get paid?
A We amended that. It did not get paid.
Q All right. When did you amend it?
A I don't know. I'd have to look.
Q Did you amend it after you filed bankruptcy?
A I don't know.
Q I'm not asking you for a date, I'm asking you --
A I said I don't know.
Q -- before or after? The security deposit of
    $2,000 called for by this same lease in
    paragraph 6, did that ever get paid?
A Can I just see the document?
Q Sure. It's right here.
A Yes, I believe it did.
Q And where did that money go?
A Either to one of my accounts or it was in cash.
    I don't recall.
Q All right. So is it accurate to say that no
    lease payments have been made on this lease yet?
A I've got to check. I'm not sure.
Q And there was another lease of the other guest
    house --
A Yes.
Q -- for the Cross Lake property?
A Yes.

17

Q   And I'm showing you that lease here.  And that's
    between Jacob Holdings of Cross Lake, Bill
    Prohofsky and Dan Aldrich, correct?
A   Yes.
Q   All right.  Who is Bill Prohofsky?
A   My father-in-law.
Q   Okay.  And who is Dan Aldrich?
A   My son-in-law.
Q   All right.  And this lease has the same
    provision, close to the same provision in
    paragraph 4 about an immediate payment of $24,000
    in rent.
A   Yes, it does.
Q   Did that get paid?
A   I'd have to check.
Q   Do you recall anything about getting paid?
A   I don't recall at this time.
Q   Okay.  It has the same provision for a security
    deposit, $2,000.  Did that get paid?
A   I believe it did.
Q   Okay.  And where would that money have gone?
A   Deposited in one of the accounts or cash.
Q   Okay.  Have any lease payments been made on that
    lease?
A   I'd have to research to find out.

72.     The underlined portions of the above testimony were false as Hecker knew that Bill

Prohofsky had not made the $24,000 payment, and Hecker knew that neither of the $2,000 security deposits

had been made.

## COUNT 1
## CONCEALMENT OR FAILURE TO KEEP OR FALSIFICATION OF RECORDS §727(a)(3)

73.     Plaintiff realleges and reaffirms paragraph 1 through 72 above.

74.     Hecker has failed to prepare and file his 2008 tax returns.  Those tax returns are

documents from which Hecker's business and financial affairs could be ascertained.

75.     In the year prior to filing, Hecker gave in excess of one hundred of thousand dollars in cash to Christi Rowan.  Some of the cash was deposited into accounts under the control of Christi Rowan. Hecker failed to keep recorded information from which the amount and date of cash transfers to Christi Rowan could be ascertained.

76.     In the year prior to filing, Hecker, according to the statement of financial affairs, transferred cash, gifts and incentives totaling "approximately $50,000" to employees.  Hecker did not keep records necessary to identify the recipients of those transfers and the amounts received by them.

77.      The Northridge Lease and the Crosslake leases contained falsified information as described in this Complaint.

### COUNT 2
### FALSE OATHS IN ORIGINAL SCHEDULES §727(a)(4)

78.     Plaintiff realleges and reaffirms paragraph 1 through 77 above.

79.     The Defendant knowingly and fraudulently, and in connection with this bankruptcy case made material omissions, false oaths and accounts in his original schedules and statement of financial affairs and concealed assets including, but not limited to, the following:

    a.     The original statement of financial affairs did not disclose the transfer of Hecker's interest in the Cobalt 222 boat to an insider within one year prior to filing.

    b.     The original statement of financial affairs did not disclose the transfer of Hecker's interest in the 2008 Malibu Wake Setter boat to an insider within one year prior to filing.

    c.     The original statement of financial affairs did not disclose the transfer of Hecker's interest in the 2008 Harley Davidson to an insider within one year prior to filing.

      d.        The transfers of Hecker's interest in the Colbalt 222, Malibu Wavesetter and the transfer of the Harley Davidson were all transfers bearing the following "badges of fraud" as established by Minn. Stat. §513.44:

              i.      The transfers were to insiders;
              ii.     Hecker retained possession of the property;
              iii.    The transfers were concealed;
              iv.    The transfers were made after Hecker had been sued;
              v.     Hecker received no consideration for the transfers; and
              vi.    Hecker was insolvent at the time of the transfers.

      e.        The original statement of financial affairs, at items 3 and 7, disclosed transfers to Christi Rowan as follows:

At item 3:
Rowan 5112   3/18/09      $10,500.00
Rowan 5503   3/30/09      $8,000

At item 7:
CM Rowan     within one year of petition date - misc. & cash - $35,000
CM Rowan     within one year of petition date - misc. & cash - $65,000

Those statements were false. In fact, Hecker made at least the following transfers, including transfers from Hecker business entities, to or for the benefit of Christi Rowan in the year prior to filing:

Cash & checks - in excess of ...................................................................$235,000

The Debtor made transfers to or for the benefit of Rowan in the year prior to filing, through the charging of items for her benefit on his American Express and Visa cards in an amount exceeding $125,000. Those charges included $60,000 for a fur coat, $15,000 for a watch, over $30,000 for a Harrison Dog, over $11,000 for lodging at the St. Regis Hotel in Aspen, CO, and other charges for lodging in Cabo San Lucas, airfare to Cabo, airfare to Hawaii, and lodging in Cabo San Lucas. He also made transfers to Rowan in the year prior to filing, through use of his Nieman Marcus card in an amount in excess of $34,000. He also paid $7,000 cash for cosmetic surgery for Rowan.

      f.        Hecker did not disclose that he owned or that he had in his possession on the day of filing the Hecker Land Rover which had been purchased just two months before filing for over $86,000. The fact that Hecker paid for the Hecker Land Rover overcomes any presumption that the title holder, Christi Rowan, owned it. *In re Johnson,* 210 B.R. 153 (Bankr. D. Minn. 1997).

g.      Hecker's Schedule B stated that he had a total of $5,500 in cash. That statement was false.

h.      Hecker did not disclose his ownership of a John Deere Gator and a "Bad Boy" cart worth at least $10,000.

i.      Hecker did not disclose his ownership of boat docks and lifts having a value of at least $25,000.

j.      At item 14 of the statement of financial affairs, which requires disclosure of "property held for another person," Hecker answered as follows:

| NAME AND ADDRESS OF PROPERTY | DESCRIPTION AND VALUE OF PROPERTY | LOCATION OF PROPERTY |
|---|---|---|
| Northstate Financial Corp.<br>500 Ford Road<br>Minneapolis, MN 55426 | Boats, inventory, etc. with $150,000.00 value held for resale and securing $1.5 million debt to Bremer Bank | Crosslake, MN; Minneapolis, MN; and Brainerd, MN |

That statement was false. Those items were not being held for resale, and the Plaintiff believes they were, in reality, property of Hecker. Additionally, Hecker did not disclose additional property, purportedly belonging to others, that Hecker was holding, including an unencumbered 2007 Mini Cooper at Hecker's Los Cabos property (titled in the name of Rosedale Leasing).

k.      In the two years prior to filing bankruptcy, $40,000 in payments to Becky Toevs Rooney, a marriage dissolution attorney, who represented Tamitha Hecker were funded by Hecker. There is no disclosure of those transfers.

l.      Amended Note and mortgage from Karen Peterson in the amount of $23,468.69.

m.      In the two years prior to commencement of this bankruptcy case, Hecker transferred jewelry having a value, in total, in the hundreds of thousands of dollars to various women including, but not limited to, the following:

      i.      Jessica Robb - $154,000 ring;
      ii.      Unknown recipients of Chanel watches.

These transfers were not disclosed at item 10 of the statement of financial affairs.

n.      Hecker's original Schedule B listed various watches, including 5 Rolex watches. That schedule did not disclose, and thereby concealed watches,

including an additional 5 Rolex watches having a value in excess of $40,000. The Trustee commenced ADV No. 09-5020 against Hecker and, only then, did Hecker disclose the existence of and turn over to the Trustee the additional watches, including the 5 Rolex watches. A copy of Supplemental B7, filed by Hecker on September 1, 2009, admitting ownership of the previously concealed watches is attached as Exhibit 22.

o.    In December, 2008 - January, 2009, Hecker paid over $120,000 to fund life insurance policies which policies were held for irrevocable trusts established for his children and grandchildren. According to documents later provided to the Trustee by Hecker, the 6 policies upon which he paid over $120,000 had combined cash surrender values, as of 7/28/09, of over $140,000. A copy of document bearing control number H814-259, with minor names and policy numbers redacted, is attached as Exhibit 23 hereto. All of those payments made in December, 2008 were payments to or for the benefit of insiders and at most, less than $30,000 of those transfers were disclosed in his SOFA.

p.    At the time of filing, Hecker had in his possession at least 5 traveler's checks in the amount of $100 each. Those checks had been purchased pre-petition. He did not disclose his possession of those traveler's cheques in his original Schedule B. Those American Express Cheques were seized from Hecker's safe at Crosslake.

q.    Hecker's Schedule B stated that one of his life insurance policies "may have cash value." He scheduled the value of the policy at $12,000. In fact, as of March 31, 2009, the cash value was in excess of $17,500 for the Prudential Life Insurance Policy ending in the numbers 2304.

r.    Hecker did not disclose any transfers to William Prohofsky in his statement of financial affairs. On June 1, 2009, a cashier's check was issued from Hecker's account at Premier Bank in the amount of $5,500 payable to William Prohofsky. A copy of that check is attached hereto as Exhibit 24. Mr. Prohofsky was or is married to Tamitha Hecker's mother, and was one of the purported tenants on one of the Crosslake leases.

s.    In March, 2009, Hecker had purchased six round trip first class airline tickets from Minneapolis to Hawaii. Those tickets were in the names of Hecker, Christi Rowan, Hecker's two children, and Christi Rowan's two children. The total purchase cost of those tickets was in excess of $13,000. The tickets had not been used at the time Hecker filed his

22

Chapter 7 petition. In August, 2009, Hecker, having never disclosed the existence of the tickets to the Trustee, converted them to his own use.

t.      Hecker had purchased pre-petition, for the sum of $200,000, a golf membership and in the Roaring Fork Club in Colorado. Hecker had made the last $50,000 installment payment for the purchase of that membership in late 2008. The membership, less accrued fees, is fully, but not immediately, refundable. Hecker did not disclose the existence of this asset.

u.      Hecker owed Roaring Fork Club money at the time of filing. Hecker did not disclose this obligation in any of his schedules.

v.      Hecker had also paid the sum of $10,000 to purchase a membership in the Roaring Fork Mountain Club. That membership is 90% refundable, but the refund is not immediately available. Hecker did not disclose the existence of this asset.

w.      Hecker did not disclose, at item 18 of the statement of financial affairs, that, within the six years prior to filing, he had been a director of Bremer Bank.

x.      Hecker did not disclose his ownership of real property located in Pitkin County, CO and legally described as Timbers Club at Snowmass Unit S6 Desc. Parking Space. (Hecker paid $55,000 for this property, which includes a social membership in the Timbers Club, in November, 2004). The property has a current property tax valuation of $130,000. Hecker paid dues to the Timbers Club in October, 2009.

y.      Hecker did not disclose that he owned and had in his possession a Harley Davidson VRod motorcycle located in Aspen, CO.

z.      Hecker did not disclose that he had in his possession in the garage of the Cabo San Lucas, Mexico property an unencumbered 2007 Mini Cooper.

aa.     Hecker did not disclose that he had in his possession, in Aspen, CO, a Toyota pickup.

bb.     Hecker did not disclose his ownership of a golf membership at the Golf Club Scottsdale in Scottsdale, AZ.

cc.  Hecker did not disclose that he had pre-paid to Steve Mathiesen, the sum of $7,500 to lease a home in Sturgis, SD for the 2009 Sturgis Motorcycle Rally.  Hecker converted the value of this concealed asset to the use of his associates post-petition.

dd.  Hecker did not disclose his right to expense reimbursement from Host Acquisitions, LLC d/b/a Payless in an amount in excess of $5,000.

ee.  Hecker did not disclose hundreds of dollars in $2 bills held in the safe at 500 Ford Road.

ff.  Hecker did not disclose ownership and possession of a trailer, skis and artwork located in Aspen, CO.

gg.  Hecker answered item 20 of the statement of financial affairs as follows:

20.  Inventories

None  a.  List the dates of the last two inventories taken of your property, the name of the person who
■       supervised the taking of each inventory, and the dollar amount and basis for each inventory.

| DATE OF INVENTORY | INVENTORY SUPERVISOR | DOLLAR AMOUNT OF INVENTORY |
|---|---|---|
| | | (Specify cost, market or other basis) |

None  b.  List the name and address of the person having possession of the records of each of the two
■       inventories reported in a., above.

That answer was false.  In fact, inventories of Hecker's property had been compiled including inventories compiled by Chip Lohmiller, Sue Miller and Hecker.  A copy of pages 64-66 and 80-84 of Hecker's November 24, 2009f Rule 2004 testimony confirming the existence of inventories is attached hereto as Exhibit 25.  Copies of inventories are attached as Exhibit 25A.

hh.  Hecker did not disclose at item 3 or item 10 of the statement of financial affairs grants of security interests and transfers to Cornerstone Bank which were made within the year prior to filing.

ii.  Hecker did not disclose, either at item 3 or item 10 of the statement of financial affairs that he had transferred to Toyota Motor Credit Corporation, in May of 2009, an original stock certificate for Brainerd Imports, LLC.  A copy of the stock register for that entity is attached hereto as Exhibit 26.

jj.  Hecker did not disclose pre-petition transfers to Pat Terhaar including the transfer of a $1,500 tool box, bronze ornamental bears which had been purchased by Hecker and ATVs.

kk.  Hecker did not disclose ownership and possession of a Jeep Wrangler located in Aspen, CO.

## COUNT 3
## FALSE OATHS IN AMENDED SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS §727(a)(4)

80.  Plaintiff reaffirms and realleges paragraphs 1 through 79 above.

81.  On or about September 1, 2009, Hecker filed Amended Schedules A, B and C and an amended statement of financial affairs. The Defendant knowingly and fraudulently, and in connection with this bankruptcy case, made material omissions, false oaths and accounts in those amended schedules and statement of financial affairs and concealed assets, including, but not limited to, the following:

a.  Hecker did not disclose his ownership of boat docks and lifts having a value of at least $25,000.

b.  Hecker stated that he had $5,500 in cash on the day of filing. That statement was false.

c.  The amended statement of financial affairs, at item 7, disclosed transfers to Christi Rowan as follows:

At item 7:
CM Rowan    Travel, Lodging, Gifts and Cash - $110,426.31
            Dog - $30,900
            Fur Coat - $60,000

That statement was false. In fact, Hecker made at least the following transfers to Christi Rowan in the year prior to filing:

Cash & checks - in excess of ...................................................................$235,000

The Debtor made transfers to or for the benefit of Rowan in the year prior to filing, through the charging of items for her benefit on his American Express and Visa cards in an amount exceeding $125,000. Those charges included $60,000 for a fur coat, $15,000 for a watch, over $30,000 for a Harrison Dog, over $11,000 for lodging at the St. Regis Hotel in Aspen, CO, and other charges for lodging in Cabo San Lucas, airfare to Cabo, airfare to Hawaii, and lodging in Cabo San Lucas. He also made transfers to Rowan in the year prior to filing, through use of his Nieman Marcus card in an amount in excess of $34,000. He also paid $7,000 cash for cosmetic surgery for Rowan.

d.  Hecker did not disclose that he owned or that he had in his possession on the day of filing the Hecker Land Rover which had been purchased just two months before filing for over $86,000. The fact that Hecker paid for the Hecker Land Rover overcomes any presumption that the title holder, Christi Rowan, owned it. *In re Johnson,* 210 B.R. 153 (Bankr. D. Minn. 1997).

e.  Hecker did not disclose his ownership of a John Deere Gator and a "Bad Boy" cart worth at least $10,000.

f.  At item 14 of the amended statement of financial affairs, which requires disclosure of "property held for another person," Hecker answered as follows:

| NAME AND ADDRESS OF PROPERTY | DESCRIPTION AND VALUE OF PROPERTY | LOCATION OF PROPERTY |
|---|---|---|
| Northstate Financial Corp. 500 Ford Road Minneapolis, MN 55426 | Boats, inventory, etc. with $150,000.00 value held for resale and securing $1.5 million debt to Bremer Bank | Crosslake, MN; Minneapolis, MN; and Brainerd, MN |

That statement was false. Those items were not being held for resale, and the Plaintiff believes they were, in reality, property of Hecker. Additionally, Hecker did not disclose additional property, purportedly belonging to others, that Hecker was holding, including an unencumbered 2007 Mini Cooper at Hecker's Los Cabos property which was titled in the name of Rosedale Leasing.

g.  In the two years prior to filing bankruptcy, $40,000 in payments to Becky Toevs Rooney, a marriage dissolution attorney, who represented Tamitha Hecker were funded by Hecker. There is no disclosure of those transfers.

h.  Amended Note and mortgage from Karen Peterson in the amount of $23,468.69.

i.  In the two years prior to commencement of this bankruptcy case, Hecker transferred jewelry having a value, in total, in the hundreds of thousands of dollars to various women including, but not limited to, the following:

    i.  Jessica Robb - $154,000 ring;
    ii.  Unknown recipients of Chanel watches.

These transfers were not disclosed at item 10 of the statement of financial affairs.

j.  Hecker's original Schedule B listed various watches, including 5 Rolex watches. That schedule did not disclose, and thereby concealed watches, including an additional 5 Rolex watches having a value in excess of $40,000. The Trustee commenced ADV No. 09-5020 against Hecker and, only then, did Hecker disclose the existence of and turn over to the Trustee the additional watches, including the 5 Rolex watches. A copy of Supplemental B7, filed by Hecker on September 1, 2009, admitting ownership of the previously concealed watches is attached as Exhibit 22.

k.  In December, 2008 - January, 2009, Hecker paid over $120,000 to fund life insurance policies which policies were held for irrevocable trusts established for his children and grandchildren. According to documents later provided to the Trustee by Hecker, the 6 policies upon which he paid over $120,000 had combined cash surrender values, as of 7/28/09, of over $140,000. A copy of document bearing control number H814-259, with minor names and policy numbers redacted, is attached as Exhibit 23 hereto. All of those payments made in December, 2008 were payments to or for the benefit of insiders and at most, less than $30,000 of those transfers were disclosed in his SOFA.

l.  At the time of filing, Hecker had in his possession at least 5 traveler's checks in the amount of $100 each. Those checks had been purchased pre-petition. He did not disclose his possession of those traveler's cheques in his original Schedule B. Those American Express Cheques were seized from Hecker's safe at Crosslake.

m.  Hecker's Schedule B stated that one of his life insurance policies "may have cash value." He scheduled the value of the policy at $12,000. In fact, as of March 31, 2009, the cash value was in excess of $17,500 for the Prudential Life Insurance Policy ending in the numbers 2304.

n.    Hecker did not disclose any transfers to William Prohofsky in his amended statement of financial affairs. On June 1, 2009, a cashier's check was issued from Hecker's account at Premier Bank in the amount of $5,500 payable to William Prohofsky. A copy of that check is attached hereto as Exhibit 24. Mr. Prohofsky was or is married to Tamitha Hecker's mother, and was one of the purported tenants on one of the Crosslake leases.

o.    In March, 2009, Hecker had purchased six round trip first class airline tickets from Minneapolis to Hawaii. Those tickets were in the names of Hecker, Christi Rowan, Hecker's two children, and Christi Rowan's two children. The total purchase cost of those tickets was in excess of $13,000. The tickets had not been used at the time Hecker filed his Chapter 7 petition. In August, 2009, Hecker, having never disclosed the existence of the tickets to the Trustee, converted them to his own use.

p.    Hecker had purchased pre-petition, for the sum of $200,000, a golf membership in the Roaring Fork Club in Colorado. Hecker had made the last $50,000 installment payment for the purchase of that membership in late 2008. The membership, less accrued fees, is fully, but not immediately, refundable. Hecker did not disclose the existence of this asset.

q.    Hecker owed Roaring Fork Club money at the time of filing. Hecker did not disclose this obligation in any of his schedules.

r.    Hecker had also paid the sum of $10,000 to purchase a membership in the Roaring Fork Mountain Club. That membership is 90% refundable, but the refund is not immediately available. Hecker did not disclose the existence of this asset.

s.    Hecker did not disclose, at item 18 of the statement of financial affairs, that, within the six years prior to filing, he had been a director of Bremer Bank.

t.    Hecker did not disclose his ownership of real property located in Pitkin County, CO and legally described as Timbers Club at Snowmass Unit S6 Desc. Parking Space. (Hecker paid $55,000 for this property, which includes a social membership in the Timbers Club, in November, 2004). The property has a current property tax valuation of $130,000. Hecker paid dues to the Timbers Club in October, 2009.

u.   Hecker did not disclose that he owned and had in his possession a Harley Davidson V Rod motorcycle located in Aspen, CO.

v.   Hecker did not disclose that he had in his possession in the garage of the Cabo San Lucas, Mexico property an unencumbered 2007 Mini Cooper.

w.   Hecker did not disclose that he had in his possession, in Aspen, CO, a Toyota pickup.

x.   Hecker did not disclose his ownership of a golf membership at the Golf Club Scottsdale in Scottsdale, AZ.

y.   Hecker did not disclose that he had pre-paid to Steve Mathiesen, the sum of $7,500 to lease a home in Sturgis, SD for the 2009 Sturgis Motorcycle Rally. Hecker converted the value of this concealed asset to the use of his associates post-petition.

z.   Hecker did not disclose his right to expense reimbursement from Host Acquisitions, LLC d/b/a Payless in an amount in excess of $5,000

aa.  Hecker did not disclose hundreds of dollars in $2 bills held in the safe at 500 Ford Road.

bb.  Hecker did not disclose ownership and possession of a trailer, skis and artwork located in Aspen, CO.

cc.  Hecker answered item 20 of the amended statement of financial affairs as follows:

20.  Inventories

None   a.  List the dates of the last two inventories taken of your property, the name of the person who
 ■       supervised the taking of each inventory, and the dollar amount and basis for each inventory.

| DATE OF INVENTORY | INVENTORY SUPERVISOR | DOLLAR AMOUNT OF INVENTORY |
| --- | --- | --- |
| | | (Specify cost, market or other basis) |

None   b.  List the name and address of the person having possession of the records of each of the two
 ■       inventories reported in a., above.

That answer was false. In fact, inventories of Hecker's property had been compiled by Hecker, Chip Lohmiller, Sue Miller and Hecker. A copy of pages 78-81 of Hecker's Rule 2004 testimony confirming the existence of inventories is attached hereto as Exhibit 25. Copies of two pre-petition inventories are attached hereto as Exhibit 25A.

dd.    Hecker did not disclose at item 3 or item 10 of the statement of financial affairs grants of security interests and transfers to Cornerstone Bank which were made within the year prior to filing.

ee.    Hecker did not disclose, either at item 3 or time 10 of the statement of financial affairs that he had transferred to Toyota Motor Credit Corporation, in May of 2009, an original stock certificate for Brainerd Imports, LLC. A copy of the stock register for that entity is attached hereto as Exhibit 26.

ff.    Hecker did not disclose pre-petition transfers to Pat Terhaar including the transfer of a $1,500 tool box, bronze ornamental bears which had been purchased by Hecker and ATVs.

gg.    Hecker did not disclose ownership and possession of a Jeep Wrangler located in Aspen, CO.

## COUNT 4
## FRAUDULENT TRANSFERS 11 U.S.C. §727(a)(2)(A)

82.    Plaintiff realleges and reaffirms paragraph 1 through 81 above.

83.    Within the year prior to filing, Hecker transferred or permitted to be transferred various items and transfers with the intent to hinder, delay or defraud creditors, or permitted such transfers including, but not limited to, the following:

a.    Transfer of his interest in an unencumbered Cobalt 222 boat to Northstate

b.    Transfer of his interest in an unencumbered 2008 Malibu Wavesetter boat to Northstate.

c.    Transfer of his interest in an unencumbered 2008 Harley Davidson motorcycle to Northstate.

d.    Transfer of Northridge Lease Interest to Christi Rowan, which occurred either pre or post-petition.

e.    Transfers of cash and checks to Christi Rowan and Tamitha Hecker in the 60 days before filing.

f.   Transfer of $5,500 to William Prohofsky.

g.   The transfers of funds to purchase the Hecker Land Rover which was titled in the name of Christi Rowan, and the monthly payments financed by Hecker on that vehicle were all transfers made with the intent to hinder, delay or defraud creditors or the Trustee.

h.   The transfers of leasehold interests in 11614 Echo Bay Drive and 11707 Cross Avenue were transfers of interest in property which Hecker believed would be found to be property of Hecker because of his "reverse pierce" theory. Those transfers were made by Hecker with the intent to hinder, delay or defraud creditors and the bankruptcy estate.

## COUNT 5
## POST-PETITION CONCEALMENT AND CONVERSION 727(a)(2)(B)

84.   Plaintiff reaffirms and realleges paragraph 1 through 83 above.

85.   After the filing of his petition, Hecker, with the intent to hinder, delay or defraud an officer of the estate, concealed and/or converted or transferred property or permitted to be concealed property of the estate including, but not limited to:

a.   Concealment of certain of the items identified at paragraph 64 of this complaint.

b.   Concealment and conversion of value of pre-payment of rental of Sturgis home, in the amount of $7,500.

c.   Concealment of John Deere Gator and "Bad Boy" cart.

d.   Concealment and conversion of 6 pre-paid round trip first class airline tickets from Minneapolis to Hawaii.

e.   Concealment and conversion of expense reimbursement from Host Acquisitions.

## COUNT 6

## FALSE OATHS AT §341 MEETING §727(a)(4)

86. Plaintiff realleges and reaffirms paragraph 1 through 85 above.

87. At the Chapter 7 §341 meeting the Defendant knowingly and fraudulently made various false statements while under oath, including, but not limited to the following underlined portions of the testimony contained in the attached pages 7-10, 18-19 and 22-23. Exhibit 26A.

Q Did you sign the petitions, schedules, statements and related documents that you filed with the Court and is the signature on those yours?

A Yes.

Q Did you read those documents before you signed them?

A Yes.

Q Are you personally familiar with the information contained in those documents?

A Yes.

Q To the best of your knowledge, is that information true and correct?

A Yes.

  MR. CUTLER: Mr. Trustee, there are some corrections and additions. And we'll probably file amendments on this, but we have -- as I disclosed to you this morning, we have discovered some additional bank accounts and have given you the bank account forms, the most recent statements for those.

  In connection with the turnover of the jewelry and the watches yesterday, there was some additional watches that were discovered by Mr. Hecker and have been turned over.

  And then there's an error on Schedule C with respect to the homestead exemption, and we'll amend that. It has a zero dollar amount listed and it should be listed up to $300,000.

  THE TRUSTEE: Okay.

  MR. CUTLER: Those are the only transfers or the only -- Oh, there was one additional change. The Schedule B reflects a tractor, a lawn tractor that was taken off of an insurance schedule. There's actually a different tractor and that's been, I think, disclosed to

Mr. Radde, and he should be aware of the actual
tractor that they have.

BY TRUSTEE:

Q   All right.  Is that a larger tractor than the one
that's in the schedules?

A   Yes.

Q   And there are a lot of attachments for it, too,
right?

A   Yes.

Q   All right.  The things that Mr. Cutler has told
me, Mr. Hecker, is everything else in the
schedules true and correct, other than what you
just said?

A   To the best of my knowledge.

Q   Okay.  Are there any other errors or omissions to
bring to my or the Court's attention?

A   Not that I'm aware of.

Q   Did you list all of your assets in the schedules,
other than what Mr. Cutler just added?

A   Yes.

Q   Did you list all of your creditors in the
schedules?

A   To the best of my knowledge.

                                            . . .


Q   All right.  Did you voluntarily pay over $5,000
to any single unsecured creditor in the 90 days
prior to filing?

        MR. CUTLER:  Yes.

        Hecker:  Yes.

BY THE TRUSTEE:

Q   And are all of those transfers disclosed in your
Statement of Financial Affairs?

A   To the best of my knowledge.

Q   Did you transfer any property or interest in
property to anyone in the two years before you
filed bankruptcy?

        MR. CUTLER:  Well, as reflected in the
Statement of Financial Affairs?

        THE TRUSTEE:  Let me rephrase.

        MR. CUTLER:  Anything other than what's
reflected in the Statement of Financial Affairs,

Mr. Hecker?

Hecker: <u>Not that I'm aware of</u>.

BY THE TRUSTEE:

Q  So any transfers that you made in the two years prior to filing are disclosed in the Statement of Financial Affairs?

A  <u>To the best of my knowledge, yes</u>.

. . .

Q  Have you given any money to anyone to deposit into her account?

A  I've given her some money, yes.

Q  Okay.  And that's all disclosed in the Statement of Financial Affairs?

A  <u>I believe so</u>.

. . .

A  My wife and I had 17,000 in the safe at Cross Lake.

Q  Okay.  17,000?

A  <u>Yes.  5,500 was my money, the balance was hers</u>.

. . .

Q  -- before or after?  The security deposit of $2,000 called for by this same lease in paragraph 6, did that ever get paid?

A  Can I just see the document?

Q  Sure.  It's right here.

A  <u>Yes, I believe it did</u>.

Q  And where did that money go?

A  Either to one of my accounts or it was in cash.

. . .

Q  And I'm showing you that lease here.  And that's between Jacob Holdings of Cross Lake, Bill Prohofsky and Dan Aldrich, correct?

A  Yes.

Q  All right.  Who is Bill Prohofsky?

A  My father-in-law.

Q  Okay.  And who is Dan Aldrich?

A  My son-in-law.

Q  All right.  And this lease has the same

provision, close to the same provision in
paragraph 4 about an immediate payment of $24,000
in rent.

A   Yes, it does.

Q   Did that get paid?

A   <u>I'd have to check</u>.

Q   Do you recall anything about getting paid?

A   <u>I don't recall at this time</u>.

Q   Okay.  It has the same provision for a security
deposit, $2,000.  Did that get paid?

A   <u>I believe it did</u>.


### COUNT 7
### WITHHOLDING OF INFORMATION AND FAILURE TO OBEY A LAWFUL COURT ORDER (727)(a)(4)(D) and (6)(A)

88.     Plaintiff reaffirms and realleges paragraph 1 through 87 above.

89.     The Trustee brought a motion to compel turnover of information and on October 21,

2009, an order was entered requiring Hecker to turnover that information ("Order").  A copy of the

order is attached hereto as Exhibit 27.

90.     Hecker did not comply with the order and on November 19, 2009 an order was

entered and ordering compliance with the court's October 21, 2009 order.  A copy of that order is

attached hereto as Exhibit 28.

91.     Hecker has not complied with paragraphs 3, 8, 9, 16 and 17 of the October 21, 2009

order and so has not complied with paragraph 2 of the November 19, 2009 order.


### COUNT 8
### FALSE RULE 2004 TESTIMONY 727(a)(4)(A)

92.     Plaintiff realleges and reaffirms paragraph 1 through 91 above.

93.     Commencing on November 24, 2009, Hecker knowingly and fraudulently provided

false testimony while, under oath, pursuant to Bankruptcy Rule 2004 including at least, the

following underlined testimony at pages 32-33, 50, 61, 95-96 and 98 of the transcript of his examination.

Q   Okay.  For all of these bank accounts that we're looking at on the first -- We're still at Exhibit 8, the first page of Schedule B.  All of those bank accounts that are on that page, did you personally confirm that those account balances were correct for any of those?

A   I believe I worked off the statements from the banks.

Q   I'm asking if you personally looked at those statements and confirmed that these amounts were correct?

A   I believe I did.

Q   Okay.  So for each of the banks we see listed there on this page 6 of Exhibit 8, you checked the bank statement and confirmed that the balance indicated in the schedule was accurate?

A   Can you ask me that again?

Q   For each of these bank accounts on page 6 of Exhibit 8, you checked the bank account statements to confirm that the amounts set forth in the schedules were accurate?

A   To the best of my knowledge, I believe I did.

Q   And if they wouldn't have been accurate, you would have changed them, right?

A   Knowing that, yes.

. . .

BY MR. SEAVER:

Q   Yes.  I'm asking if you reviewed the documents that were filed with the Court on July 1 of 2009 before they were filed?

A   Yes.

Q   And you didn't notice any inaccuracies in any of those?

A   I mean, I think we filed 135 pages of schedules. And, as I said, a number of people helped put them together in the middle of a government

36

raid.  I'm not sure that -- I did my best to be honest and forthwith as I could.

Q    You didn't notice any inaccuracies in the schedules when they were filed?

MR. SKOLNICK:  I'm sorry, Madam Court Reporter, could you read the question back?

(Whereupon, the question was read back by the court reporter.)

THE WITNESS:  <u>At the time I don't believe so</u>.

. . .

Q    I'm still on this Exhibit 8 at page 88, Item 10, which is the other transfers section.  Did you review this section before you filed this -- before you signed the signature declaration, which is Exhibit 7?

A    Again, this was a product of the work paper of all the people working on the stuff together, but I believe I read it before I signed it, yes.

Q    All right.  And you didn't notice any inaccuracies there?

A    <u>Not that I recall</u>.

. . .

To the best of your knowledge, is the information in here, in the schedules, true and correct, the amended schedules?

A    <u>To the best of my knowledge</u>.

Q    Okay.  Did you list all of your assets in the amended schedules?

A    <u>To the best of my knowledge at the time</u>.

Q    Are there any errors or omissions in here, in the amended schedules, to bring to my or the Court's attention?

A    Yes, there are.

Q    There are.  What are they?

A    Well, we believe that Roaring Fork is an error.

Q    The Roaring Fork Club membership was not listed?

A    Yes.

Q   Okay.  Anything else?

A   Can I have a minute just to look here?

Q   Sure.

        MR. CUTLER:  Can we have just a second,
    Randy?  I think we can get through this.

        MR. SEAVER:  Sure.

    (Break taken.)

BY MR. SEAVER:

Q   Back on the record.  Was that it for the mistakes
or errors?

A   I believe that we may have a 401(k)/IRA
difference.


                        . . .


Q   Okay.  Any other errors or mistakes?

A   I believe we talked about a couple of them, the
Hawaiian airline tickets.

Q   The six round-trip tickets that aren't in here,
in the schedules?

A   <u>Whether they -- Yes.  We discussed the tickets
earlier.  I'm not sure that should be or not be,
but... And at this time I can't think of anything
else, but I'm not absolutely sure.</u>

Copies of those pages are attached hereto as Exhibit 29.

WHEREFORE, the Trustee seeks an order of this Court granting the following relief:

1.              Denying the discharge of Dennis E. Hecker pursuant to the provisions of 11 U.S.C. §727

including §§727(a)(2), (a)(3), (a)(4) and (a)(6).

2.              Such other and further relief as may be just and equitable.

**LEONARD, O'BRIEN, SPENCER, GALE & SAYRE, LTD.**

Dated: January 13, 2010

/e/ Matthew R. Burton

By:_____
    Matthew R. Burton #210018
    100 South Fifth Street, Suite 2500
    Minneapolis, MN 55402
    (612) 332-1030

Attorneys for Randall L. Seaver, Trustee