April 9, 2009:

**DEH Items and Associated Registration:**

**Northstate Financial:**

Heritage Classic Harley
Polaris RZR
(3) Boat Trailers
Nautica Boat
Edgewater Boat (?)
05 Cobalt Boat (possibly changed 2/09)
Malibu Boat (possibly changed 2/09)

**Rosedale Leasing LLC:**

Harley 07 RS Motorcycle
07 Yatch Trailer
EXTR TRailer (Rosedale Leasing)
07 Cobalt Boat  (DEH/RDLLC)

**Dennis E. Hecker:**

Yamaha TTR50
Yamaha TTR50
Yamaha TTR 90
Yamaha TTR 125
Polaris Predator 50
Polaris Predator 90
Polaris Outlaw 90
Polaris Outlaw 250
Vespa (5 units)
Sea Doo GTX (2 units)
Sea Doo LRV (2 units)
Sea Doo Jet Ski (2units)
Mouse Boat
Harris Pontoon
Creastliner Pontoon
Snow Mobile Trailer
Snow Mobile Trailer

**MSO/Non Registered or ?:**

08 Screaming Eagle Harley # 977621
08 Screaming Eagle Harley # 977610
08 Screaming Eagle Harley # 977133
06 Harley CC Roadster  ( Inver Grove Toyota)
Mini 4 Wheelers (4) units
Segway
Mongoose Scooters (2)
Freedom Scooters (2)
Tom Car
Rietta Mini Bike
John Deere Tractor (think previously Monticellos'
Go Carts (2)
04 Cadillac Escalade (DH Stillwater Cadillac)
Bad Boy Buggy
07 Yamaha Jet Ski
Yellow Mini Go Cart
Escalade Golf Cart
Bikes (5)
Mitsubishi Eclipse Convertible
Hatteras Boat ( Denstar ?)
Boat Lift ( Master Craft)
Additional Boat Lift

EXHIBIT 25A    US923 000183

*4/8/05*

**Susan A. Miller**

From:        Susan A. Miller
Sent:        Wednesday, April 08, 2009 3:43 PM
To:          Denny Hecker; Erik P. Dove
Subject:    DEH Related Items and Associated Registration

*17*
*11-24-09*

Harley 07 RS ( Rosedale Leasing)
Heritage Classic ( N state) 1994 ?
Screaming Eagle 2006 (vin# 977621) on MSO
100 Anniversary Eagle 2006 (Vin# 977610) on MSO
2006 CC Roadster ( Inver Grove Toyota) nothing
2008 Eagle (vin # 977133) on MSO
Yamaha TTR50 (2) (DEH)
Yamaha TTR 90 (DEH)
Yamaha TTR125 (DEH)
Mini 4 Wheelers (4) ( MSO's)
Polaris Predator 50 ( DEH)
Polaris Predator 90 (DEH)
Polaris Outlaw 90 (DEH)
Polaris Outlaw 250 (DEH)
Segway ?
Mongoose Scooters (2) no MSO
Fre edom Scooters (2) no MSO
Vespa (5) (DEH)
Tom Car (MSO)
Rietta Mini Bike no MSO
Polaris RZR (Nstate)
John Deere Tractor (?) no Title or MSO
Go Carts (2) nothing
Edgewater Boat , ( was RDLLC) Believe changed 2/09 to Nstate
Cobalt Boat ( was Nstate) Believed changed 2/09
Malibu Boat (was Nstate) believed changed 2/09
Associated Trailers (3) all Nstate
Nautica Boat ( Nstate Financial)
04 Cadillac Escalade ( DHCad/Pont/GMC)
Trailer EXTR (Rosedale Leasing)** think goes with Prevost
Bad Boy (MSO)
Yamaha Jet Ski 07 ( not Reg-MSO)
07 Yatch Trailer ( RDLL)
Yellow Mini Go Cart
Sea Doo GTX (2)_( no reg info) think DEH
Sea Doo LRV (2) (no reg info) think DEH
Sea Doo (2) no reg info) think DEH
Mouse Boat
Odyssey Boat (?) reg to RDLLC ** I believe sold prior........ Think Deck Boat
Harris Pontoon (DEH)
Crest liner Pontoon ( DEH)
Escalade Golf Cart
(5) Regular Bikes
Mitsubishi Eclipse Convertible (?) unknown
Hatteras Boat 52 Ft. ( Denstar) registration (?)
Master Craft Boat Lift ( no registration)
1 Additional Boat Lif ( no registration)
Cobalt 07 ( RDLLC) Will/DEH Boat

1

US923 000181

# CROSSLAKE INVENTORY 4/1/08

## SHOP-TOYBOX

YELLOW TOM CAR - VIN: KF2277TLGA6PTVL313

07 BAD BOY GOLF CART - VIN: BBE514B3975004484

06 YAMAHA SUPER JET SJ 700 B/F FIN# 508203

YELLOW MINI HUMMER GO CART NO 026

07 RED POLARIS RZR - VIN: 4XAVH76A1D8326019

07 WHITE VW CONVERTIBLE – VIN: 3VWFF31Y77M413410 DEALER PLATE: D80008

05 COBALT 34' BOAT – VIN: 4JEBE343X51255695 LIC#: MN6561KB / TRAILER VIN: E34/124TRB

99 BLUE KART WHEELS GO KART S/N: 199987 MODEL #: 2506-3417

PURPLE PROWLER GO KART S/N: 33009

04 BLACK VESPA VIN #: ZAPC16C1445008224 LIC #: 44-182ME EXP 09

03 YELLOW MINI CHOPPER VIN #: 5LYRR11584C003222

BLACK MINI CHOPPER VIN #: 5C052850

03 BLACK YAMAHA VINO VIN #:JYASA17A34A019289 LIC #: 87-010ME EXP 09

## COMPOUND/ECHO

93 POLARIS INDY STORM S/N: 2218974 LIC #: AW6272 EXP 10

97 POLARIS SUPERSPORT S/N: 3301835 LIC #: BT8676 EXP 10

97 POLARIS 700 XCR S/N: 3376580 LIC #:CK8179 EXP 10

JOHN DEERE LEAF BAGGER S/N: MOO519X080832

## COMPOUND/BEACH

97 POLARIS 700 XC S/N: 3379484 LIC #: CK8180 EXPIRED

97 POLARIS SUPER SPORT S/N: 3306133 LIC #: BT8675 EXP 10

01 POLARIS INDY 340 S/N: 4XALD3AS92B209447 LIC #:HG2138 EXP 10

97 POLARIS INDY XCF S/N: 3303851 LIC #:BT8677 EXP 10

99 POLARIS SUPER SPORT S/N: 4XASBSBS75C020679 LIC #: CN9371 EXP 10

98 POLARIS XC 700 S/N: 4XASB7AS6XB010016 LIC #: CN9370 EXP 10

01 ARCTIC CAT 120 S/N: 4UF02SNW12T302331

97 SKI DOO MINI Z S/N: 121300183

07 YAMAHA TTR50 S/N: JBPCA01Y770030030

07 YAMAHA TTR90 S/N: JYACB06Y0SA020279

07 YAMAHA 50 S/N: JYA3PT0351A017744

NORTHSTAR PRESSURE WASHER

EXCELL PRESSURE WASHER S/N 1100115454

RIETTA MINI BIKE

MONGOOSE ELECTRIC DRIVE SCOOTER S/N MRB1201272BCK001302

FREEDOM SCOOTER S/N: 0305301

FREEDOM SCOOTER S/N: 0280319

JOHN DEERE MOWER DECK S/N M054CBC084647

TRITON TRAILER XTV S/N: 4TCSU10437HB03946

06 JOHN DEERE GATOR S/N: W04X2SD012778

07 AGRIMETAL BLOWER S/N 27559

<u>COMPOUND MAIN</u>

04 CADILLAC ESCALADE VIN: 1GYEK63N14R268187

06 POLARIS OUTLAW S/N:

STORAGE
NORTHSTATE

40 FT ENCLOSED TRAILER
YELLOW TOM CAR: VIN: KF2277TLGA6PTVL313
POLARIS RAZOR: VIN: 4XAVH76A1D8326019
CADILLAC ESCALADE GOLF CART:
4 WHEELER 250 OUTLAW
4 WHEELER 90 OUTLAW
HARLEY DAVIDSON HERITAGE CLASSIC
YAMAHA 50
YAMAHA 125
MITSUBISHI SPYDER

**BRAINERD IMPORTS LLC (f/k/a Brainerd Toyota LLC)**
**A RECORD OF UNIT CERTIFICATES AS ISSUED**

| NO. | DATE | NO. MEMBERSHIP UNITS | ISSUED TO | FROM WHOM TRANSFERRED | NO. ORIG. CERT. | NO. ORIG. MEMBERSHIP UNITS | NO. MEMBERSHIP UNITS TRANSF. |
|---|---|---|---|---|---|---|---|
| 1 | 9/13/2006 | 99 | Dennis E. Hecker Cancelled and reissued to reflect name change. | NAME: Original Issue | | | |
| 2 | 9/13/2006 | 1 | Inver Grove Investments, Inc. Cancelled and reissued to reflect name change. | NAME: | | | |
| 3 | 9/26/2006 | 99 | Dennis E. Hecker Original Certificate delivered to Toyota Motor Credit Corporation 5/7/09 | NAME: Dennis E. Hecker | 1 | 99 | 99 |
| 4 | 9/26/2006 | 1 | Inver Grove Investments, Inc. Original Certificate delivered to Toyota Motor Credit Corporation 5/7/09 | NAME: Inver Grove Investments, Inc. | 2 | 1 | 1 |
| | | | | NAME: | | | |
| | | | | NAME: | | | |
| | | | | NAME: | | | |

**EXHIBIT 26**

Page 5

1 A   Dennis Hecker.
2 Q   And where do you live, Mr. Hecker?
3 A   17600 Cross Avenue, Cross Lake, Minnesota.
4          THE TRUSTEE:  Here, I'm going to
5     circulate a signature sheet, too, and I'd
6     appreciate it if folks would sign in and give me
7     a phone number.
8          And, also, before I start this
9     questioning, you'll see my contact information on
10    that sheet that's going around.  If anybody has
11    any information they believe would be of
12    assistance to me in administering this case,
13    please feel free to contact me using any of that
14    contact information.
15 BY THE TRUSTEE:
16 Q   Mr. Hecker, how long have you lived at the Cross
17    Lake address that you just gave?
18 A   Approximately 45 days.
19 Q   Which would be what day; what day did you move in
20    there?
21 A   I've owned it for three years.  I don't recall
22    exactly which day.
23 Q   Well, you filed on June 4, just to give you some
24    perspective.  Did you move in before that or
25    after that?

Page 6

1 A   I believe, to the best of my knowledge, before,
2     shortly after.
3 Q   A couple of days before?
4 A   I don't really remember.
5          THE TRUSTEE:  Okay.  Say, let me also
6     state this.  Since this case has been filed, my
7     attorneys, who are representing me in this case,
8     and I have had almost daily conversations or
9     communications through e-mail or telephone with
10    Mr. Hecker's attorney, Mr. Cutler's office.  I've
11    requested various information and we have
12    received substantial information through
13    Mr. Cutler's office.  So a lot of the information
14    has been exchanged prior to this meeting today.
15         And I have reviewed the driver's
16    license, Social Security proof from Mr. Hecker
17    and they're appropriate.
18 BY THE TRUSTEE:
19 Q   Mr. Hecker, have you read the bankruptcy
20    information sheet provided by the U.S. Trustee?
21 A   Yes, I have.
22 Q   Did you sign the petitions, schedules, statements
23    and related documents that you filed with the
24    Court and is the signature on those yours?
25 A   Yes.

Page 7

1 Q   Did you read those documents before you signed
2     them?
3 A   Yes.
4 Q   Are you personally familiar with the information
5     contained in those documents?
6 A   Yes.
7 Q   To the best of your knowledge, is that
8     information true and correct?
9 A   Yes.
10         MR. CUTLER:  Mr. Trustee, there are
11    some corrections and additions.  And we'll
12    probably file amendments on this, but we have --
13    as I disclosed to you this morning, we have
14    discovered some additional bank accounts and have
15    given you the bank account forms, the most recent
16    statements for those.
17         In connection with the turnover of the
18    jewelry and the watches yesterday, there was some
19    additional watches that were discovered by
20    Mr. Hecker and have been turned over.
21         And then there's an error on Schedule C
22    with respect to the homestead exemption, and
23    we'll amend that.  It has a zero dollar amount
24    listed and it should be listed up to $300,000.
25         THE TRUSTEE:  Okay.

Page 8

1          MR. CUTLER:  Those are the only
2     transfers or the only -- Oh, there was one
3     additional change.  The Schedule B reflects a
4     tractor, a lawn tractor that was taken off of an
5     insurance schedule.  There's actually a different
6     tractor and that's been, I think, disclosed to
7     Mr. Radde, and he should be aware of the actual
8     tractor that they have.
9 BY TRUSTEE:
10 Q   All right.  Is that a larger tractor than the one
11    that's in the schedules?
12 A   Yes.
13 Q   And there are a lot of attachments for it, too,
14    right?
15 A   Yes.
16 Q   All right.  The things that Mr. Cutler has told
17    me, Mr. Hecker, is everything else in the
18    schedules true and correct, other than what you
19    just said?
20 A   To the best of my knowledge.
21 Q   Okay.  Are there any other errors or omissions to
22    bring to my or the Court's attention?
23 A   Not that I'm aware of.
24 Q   Did you list all of your assets in the schedules,
25    other than what Mr. Cutler just added?

EXHIBIT 26A

Page 9

1 A  Yes.
2 Q  Did you list all of your creditors in the
3     schedules?
4 A  To the best of my knowledge.
5 Q  Have you ever filed bankruptcy before?
6 A  No.
7 Q  Do you have a domestic support obligation?
8 A  Yes.
9 Q  You pay spousal support?
10 A  Yes.
11 Q  To whom?
12 A  Sandra Hecker.
13 Q  And that's in the schedules?
14 A  Yes.
15 Q  Are you currently employed, Mr. Hecker?
16 A  No.
17 Q  During the 90 days prior to your bankruptcy
18     filing, did you lose any money by execution on a
19     judgment or through a garnishment or otherwise?
20 A  To the best of my knowledge, I'm not sure.
21 Q  It would be in the schedules or the Statement of
22     Financial Affairs if you did; is that right?
23        MR. CUTLER:  Yes, it would be.
24 BY THE TRUSTEE:
25 Q  Okay.  Is that true, Mr. Hecker?

Page 10

1 A  Yes.
2 Q  All right.  Did you voluntarily pay over $5,000
3     to any single unsecured creditor in the 90 days
4     prior to filing?
5        MR. CUTLER:  Yes.
6        THE DEBTOR:  Yes.
7 BY THE TRUSTEE:
8 Q  And are all of those transfers disclosed in your
9     Statement of Financial Affairs?
10 A  To the best of my knowledge.
11 Q  Did you transfer any property or interest in
12     property to anyone in the two years before you
13     filed bankruptcy?
14        MR. CUTLER:  Well, as reflected in the
15     Statement of Financial Affairs?
16        THE TRUSTEE:  Let me rephrase.
17        MR. CUTLER:  Anything other than what's
18     reflected in the Statement of Financial Affairs,
19     Mr. Hecker?
20        THE DEBTOR:  Not that I'm aware of.
21 BY THE TRUSTEE:
22 Q  So any transfers that you made in the two years
23     prior to filing are disclosed in the Statement of
24     Financial Affairs?
25 A  To the best of my knowledge, yes.

Page 11

1 Q  Okay.  Are you self-employed or engaged in any
2     business ventures?
3 A  I started a new venture called New Dimension
4     Consultants.
5 Q  Which is what?
6 A  A consultant for automobile dealers.
7 Q  Did you start that before you filed bankruptcy?
8 A  No, I didn't.
9 Q  Just describe generally for the record what your
10     business was at the time you filed bankruptcy.
11        MR. MOHRMAN:  Which business are you
12     referring to?
13        THE TRUSTEE:  Anything he was engaged
14     in.
15        And who are you, sir?
16        MR. MOHRMAN:  My name is William
17     Mohrman.
18        THE TRUSTEE:  And you're an attorney
19     representing Mr. Hecker?
20        MR. MOHRMAN:  I am.
21 BY THE TRUSTEE:
22 Q  All right.  I just want a general description on
23     the record of what business you personally were
24     engaged in, Mr. Hecker, when you filed
25     bankruptcy.

Page 12

1 A  I was in the automobile business and
2     automobile-related services and had some other
3     business interests in other kinds of businesses.
4 Q  Fair to say that it was a fairly complex business
5     that you were involved in?
6 A  Yes.
7 Q  Okay.  And in the schedules and Statement of
8     Financial Affairs, there's at least some
9     indication of these businesses, correct?
10 A  Yes.
11 Q  Okay.  Mr. Hecker, you have turned over some
12     jewelry in response to my demand, correct?
13 A  Yes.
14 Q  And I understand that there was some additional
15     items that were turned over.  By additional I
16     mean in addition to what you actually had listed
17     in your schedules.  Is that correct?
18 A  Yes.
19 Q  Let me just give you a copy of this complaint.
20     This is the complaint that I filed earlier this
21     week seeking turn-over of jewelry.  And if you
22     look at the Exhibits A and B here, Mr. Hecker,
23     Exhibit A is what was in your schedules.
24     Exhibit B came from the insurance policies.  And
25     I'd like you to look at Exhibit B and tell me --

**Page 17**

1 A Yes, they do.
2 Q And they have boat lifts also?
3 A One of them doesn't.
4 Q Okay. The two dock systems for those guest
5 houses, who owns those?
6 A The LLC that owns the property.
7 Q Okay. Did the LLC purchase those docks?
8 A To the best of my knowledge.
9 Q And the LLC purchased the boat lift too?
10 A I believe so.
11 Q Okay. Where would those items have been
12 purchased?
13 A The docks?
14 Q Yes.
15 A I have no idea.
16 Q Would --
17 A The docks at the main home are five years old or
18 six years old. I wouldn't recall. The other
19 ones are wooden docks. I'm not sure where they
20 came from.
21 Q All right. How many watch winders do you have?
22 A To the best of my ability, one.
23 Q Okay. And where is that located, sir?
24 A It's in 1492 Medina.
25 Q Okay. How much did you pay for that when you

**Page 18**

1 bought it?
2 A I have no idea.
3 Q Over $10,000?
4 A I have no idea.
5 Q Okay. In Medina, at the North Bridge Drive
6 address, who resides there?
7 A Christi Rowan.
8 Q And what's your relationship with Ms. Rowan?
9 A We have a personal relationship.
10 Q How long have you had that personal relationship?
11 A On and off approximately a year.
12 Q About a year, you think?
13 A Yes.
14 Q So June of 2008, roughly?
15 A Approximately.
16 Q Okay. Is she employed?
17 A She has her own photography business.
18 Q Do you know how much money she makes at that
19 business?
20 A I have no idea.
21 Q Okay. Have you ever deposited any money into any
22 bank accounts held in her name?
23 A I haven't personally deposited any money into her
24 bank accounts.
25 Q Have you given any money to anyone to deposit

**Page 19**

1 into her account?
2 A I've given her some money, yes.
3 Q Okay. And that's all disclosed in the Statement
4 of Financial Affairs?
5 A I believe so.
6 Q All right. The furniture that's in that home,
7 where did it come from? In that home, now, I'm
8 still talking about Northridge Drive.
9 A A good share of it is hers and a good share of it
10 came from Scottsdale.
11 Q Okay. So some of it there is Denny Hecker
12 property?
13 A Denny Hecker property and some of it is hers.
14 Q Okay. Where did the furniture that came from
15 Scottsdale -- I understand it came from
16 Scottsdale, but where was it before it came to
17 Northridge?
18 A It was a house that we had that we sold a couple
19 of years ago.
20 Q Okay. Was it the house sold in 2008 or was it
21 before that?
22 A I'm not sure.
23 Q Okay. And so it's your testimony that some of
24 the furniture in there came from Scottsdale and
25 then some she moved in?

**Page 20**

1 A Yes.
2 Q Do you have any idea on percentages how much
3 would be Denny Hecker and how much would --
4 A I don't recall.
5 Q Okay. The values -- I'm looking at your
6 schedules now. And the values for the real
7 property in Cross Lake, how did you come to the
8 conclusion that those were the appropriate
9 values; did someone give you an opinion?
10 A Yes, they did.
11 Q And who was that?
12 A A real estate company in Cross Lake.
13 Q Is that Bruce Larson's company?
14 A Yes.
15 Q And did they give you a written opinion?
16 A Yes, they did.
17      THE TRUSTEE: All right. Mr. Cutler,
18 could you give me send me a copy of that?
19      MR. CUTLER: I have it.
20      THE TRUSTEE: Oh, okay, great.
21      MR. CUTLER: I'll give it to you right
22 now.
23 BY THE TRUSTEE:
24 Q Say, back on Christi Rowan, what's the name of
25 her photography business?

Page 21

1  MR. CUTLER: The record should reflect
2  that I've given the Trustee an original letter
3  from Bruce Larson concerning the value of the
4  Cross Lake property.
5  THE TRUSTEE: Well, it's actually
6  Robert Berklund. I think he's an associate of
7  Mr. Larson. Larson Group Real Estate is the
8  place.
9  BY THE TRUSTEE:
10 Q  But back to Ms. Rowan, what's the name of her
11    photography business?
12 A  I don't know the exact name. It might be Rowan
13    Photography. I'm not sure.
14 Q  Okay. Are there lease payments being made on the
15    Northridge property?
16 A  The lease payments, they spent a great deal of
17    capital improving the property.
18 Q  Who's they?
19 A  Rowan.
20 Q  Okay.
21 A  And the first actual payment starts August 1st.
22 Q  So Ms. Rowan made improvements to the real
23    property?
24 A  Yes, she did.
25 Q  What value, how much in a dollar value?

Page 22

1  A  I believe in the 25,000 range.
2  Q  Okay.
3  A  The house had sat vacant for two years.
4  Q  All right. So no lease payments are being made
5     at this time; is that right?
6  A  Well, in consideration of the lease payments,
7     they did the improvements.
8  Q  So no lease payments are -- no actual money is
9     changing hands right now; is that right?
10 A  The first cash transaction will be August 1st.
11 Q  Okay. I'm back on the schedules now and I'm
12    looking at Schedule B for the personal property.
13    And cash on hand says $5,500, correct?
14 A  Yes.
15 Q  Is that all the cash that you had on hand when
16    you filed bankruptcy?
17 A  Yes, it was.
18 Q  There was a search warrant executed on your home
19    on Cross Lake and in Medina, correct?
20 A  Yes, there was.
21 Q  Was any cash seized in connection with the
22    execution of those warrants?
23 A  My wife and I had 17,000 in the safe at Cross
24    Lake.
25 Q  Okay. 17,000?

Page 23

1  A  Yes. 5,500 was my money, the balance was hers.
2  Q  Where would she have gotten her money?
3  A  She would have gotten her money from me over a
4     period of time.
5  Q  Yeah. When was the last time she was employed?
6  A  In 16 years, never.
7  Q  Okay. So the whole 17,000 originally came from
8     Denny Hecker?
9  A  Yes.
10 Q  And is the State of Minnesota still holding that
11    money?
12 A  Yes, they are.
13 Q  All right. Was any money seized in Medina?
14 A  No.
15 Q  Did they look in the safe there?
16 A  They spent hours looking in the safe.
17 Q  Did they take anything out of the safe that you
18    know of?
19 A  There were a couple of Minnesota Viking watches.
20 Q  Okay.
21 A  After seven hours of drilling the safe.
22 Q  Is that all that you think was in the safe, was
23    two Minnesota Viking watches?
24 A  That's all the -- I didn't have any money. I
25    didn't have anything. I was surprised they were

Page 24

1  there.
2  Q  Okay.
3  MR. CUTLER: And, Mr. Hecker, the safe
4  was drilled by the State; is that correct?
5  THE DEBTOR: Yes.
6  MR. CUTLER: And that's because you
7  didn't have a key to --
8  THE DEBTOR: I didn't even know the
9  combination.
10 BY THE TRUSTEE:
11 Q  Okay. Back to Schedule B, the bank balances,
12    there are a large number of banks here. And as
13    Mr. Cutler indicated, he disclosed to me before
14    this meeting started and then on the record here
15    that there were I think a couple of accounts that
16    you had overlooked. How did you determine the
17    balances in each of these bank accounts when you
18    had Schedule B prepared?
19 A  I've had an assistant that handles all my
20    personal affairs for the last 15 years. They
21    prepared that with the statements they received
22    from the banks.
23 Q  And who was that assistant?
24 A  Susan Miller.
25 Q  What's Susan Miller's address?

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

BKY No. 09-50779

In re:

Dennis E. Hecker,                                                    **ORDER**

        Debtor.

This case is before the court on the motion of Randall L. Seaver, chapter 7 trustee, for turnover of property of the estate.

Upon the motion and the file,

IT IS ORDERED: Within seven days from the entry of this order Dennis E. Hecker shall turnover to the trustee the following:

1.    Copies of all bank statements, check images and registers for all Hecker business entities listed on Exhibit B-13 of the debtor's bankruptcy schedules as well as those of New Dimension Advisors LLC from June 1, 2009 to October 1, 2009.

2.    Copies of all utility bills for the properties at Crosslake and 1615 North Ridge Drive from June 1, 2009 to October 1, 2009.

3.    Copies of all credit card statements for any credit cards that Dennis Hecker has used or upon which he is a signatory from May 1, 2009 to October 1, 2009.

4.    Copies of all documents relating to or evidencing expenses incurred or paid in conjunction with any travel and lodging of Dennis Hecker outside the State of Minnesota from June 1, 2009 to October 1, 2009.

5.    Copies of all checks, wire transfers and all other documents relating to or evidencing any payments to any attorney or law firm by Dennis Hecker, New Dimension Advisors LLC or any of the business entities listed at Exhibit B-13 of the Dennis Hecker bankruptcy schedules from January 1, 2009 to October 1, 2009.

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on 10/21/2009
Lori Vosejpka, Clerk, by LMH



EXHIBIT 27

6.      Copies of all documents relating to or evidencing the transfer of any monies or property to or for the benefit of Christi Rowan made by Dennis Hecker, New Dimension Advisors LLC, or any of the business entities listed on Exhibit B-13 of the Dennis Hecker bankruptcy schedules, from January 1, 2008 to October 1, 2009.

7.      Copies of all account statements for any bank account held by any person or entity from June 1, 2009 - October 1, 2009 into which any monies paid to any of the business entities listed on Exhibit B13 of the bankruptcy schedules have been deposited.

8.      Any and all bank account statements, check registers, check images, account receivable ledgers, balance sheets, depreciation schedules and income statements for Northstate Financial Corporation from January 1, 2008 to date.

9.      Copies of all loan agreements between Northstate Financial Corporation and Bremer Bank.

10.     Copies of all insurance policies maintained by Northstate Financial Corporation for any of its property on January 1, 2008 to date.

11.     Tax returns for Northstate Financial Corporation from 2006 - 2008.

12.     Copies of the following for Inver Grove Investments LLC:

    a.      Tax returns from 2006 - 2008;

    b.      Bank account statements and check images, together with check register, from January 1, 2008 to date;

    c.      Copies of all insurance policies maintained by Inver Grove Investments for any of its property.

    d.      Copies of all documents evidencing the purchase by Inver Grove Investments LLC of a 2006 Prevost.

    e.      Copies of any and all documents evidencing the receipt of funds from the sale of the Prevost, including, without limitation, documents evidencing the disposition or transfer of any funds received which were in excess of the amount of the TCF lien on the vehicle.

13.     Any and all documents reflecting or relating to the lease or purchase by the debtor or any of his business entities of any aircraft from and after May 1, 2009,

including copies of any leases and purchase agreements and checks making payments on any leases or purchase agreements.

14. Copies of all checks or other instruments by which any payments were made by the debtor or any related entity to Simcon Training Center, or any other entities, from May 1, 2009 to date, for the training of any pilots, including, without limitation, Jayson Gallus.

15. Copies of all checks and other items by which any payments were made by the debtor or any related entity to Jayson Gallus from April 1, 2009 to date.

16. All documents evidencing maintenance of, improvements made to and services provided by anyone to the property located at 1615 North Ridge Drive, Medina, MN from June 1, 2008 to date. Also, for the same time frame, copies of checks or other financial instruments which paid for services, improvement or items provided, for or to the property located at 1615 North Ridge Drive, Medina, MN, from June 1, 2008 to date.

17. Copies of all e-mails between Dennis E. Hecker and anyone, except for e-mails between Hecker and his attorneys, and e-mails between Hecker and his spouse, for the time period of June 1, 2008 to date.

18. Copies of all records evidencing the transfer of funds to the debtor, personally, from any source, either as income, loan or repayment, since June 4, 2009.


Dated: October 21, 1009

/e/ Robert J. Kressel
Robert J. Kressel
UnitedStates Bankruptcy Judge

410086

3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                                           BKY No. 09-50779

Dennis E. Hecker,                                                          Chapter 7

        Debtor.

## ORDER

This case is before the court on the motion of Randall L. Seaver, the trustee seeking an order holding the debtor in civil contempt of court.

Based on the motion and the file,

**IT IS ORDERED**:

1.    The trustee's request for expedited relief is approved.

2.    The debtor must comply with the turnover order by 12:00 p.m. on November 23, 2009.

3.    The trustee is awarded his costs and fees incurred in bringing this motion. The debtor shall pay $660.00 to the trustee, by check made payable to "Randall L. Seaver, Trustee," on or before November 20, 2009.

Dated: _ November 19, 2009 __       /e/ Robert J. Kressel
                                      Robert J. Kressel
                                      United States Bankruptcy Judge

412337

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on 11/19/2009
Lori Vosejpka, Clerk, by LMH

EXHIBIT 28

1       Hecker helped me prepare the schedules.

2 Q    Okay.  For all of these bank accounts that we're

3       looking at on the first -- We're still at

4       Exhibit 8, the first page of Schedule B.  All of

5       those bank accounts that are on that page, did

6       you personally confirm that those account

7       balances were correct for any of those?

8 A    I believe I worked off the statements from the

9       banks.

10 Q   I'm asking if you personally looked at those

11      statements and confirmed that these amounts were

12      correct?

13 A   I believe I did.

14 Q   Okay.  So for each of the banks we see listed

15      there on this page 6 of Exhibit 8, you checked

16      the bank statement and confirmed that the balance

17      indicated in the schedule was accurate?

18 A   Can you ask me that again?

19 Q   For each of these bank accounts on page 6 of

20      Exhibit 8, you checked the bank account

21      statements to confirm that the amounts set forth

22      in the schedules were accurate?

23 A   To the best of my knowledge, I believe I did.

24 Q   And if they wouldn't have been accurate, you

25      would have changed them, right?


EXHIBIT 29

1 A    Knowing that, yes.

2 Q    When was Mr. Dove last licensed as an attorney,

3      do you know?

4 A    I don't honestly know.

5 Q    Okay.  You know he hasn't been licensed for

6      several years?

7            MR. SKOLNICK:  I'm going to object.  I

8      don't think that's true.

9 BY MR. SEAVER:

10 Q    Okay.  Is he licensed now; do you know that,

11      Mr. Hecker?

12 A    I don't know.

13 Q    Okay.  Did there come a time in the last couple

14      of years that you found out that his license had

15      lapsed?

16 A    I don't honestly know.

17            MR. SKOLNICK:  For the record, I think

18      you're wrong.

19            MR. SEAVER:  Okay.  If I'm wrong, I'm

20      wrong.  We can go off the record.

21            (Discussion held off the record.)

22            MR. SEAVER:  We just had a brief

23      discussion off the record, Mr. Skolnick and I.

24      Mr. Skolnick indicates that he believes that

25      Mr. Eric Dove had a restricted license at all

1     review, before they were filed, these schedules

2     and Statement of Financial Affairs that were

3     filed with the Court on July 1 of 2009?

4           MR. CUTLER:  And, again, you're asking

5     if he reviewed the papers, right?

6 BY MR. SEAVER:

7 Q   Yes.  I'm asking if you reviewed the documents

8     that were filed with the Court on July 1 of 2009

9     before they were filed?

10 A   Yes.

11 Q   And you didn't notice any inaccuracies in any of

12    those?

13 A   I mean, I think we filed 135 pages of schedules.

14    And, as I said, a number of people helped put

15    them together in the middle of a government

16    raid.  I'm not sure that -- I did my best to be

17    honest and forthwith as I could.

18 Q   You didn't notice any inaccuracies in the

19    schedules when they were filed?

20          MR. SKOLNICK:  I'm sorry, Madam Court

21    Reporter, could you read the question back?

22          (Whereupon, the question was read back

23          by the court reporter.)

24          THE WITNESS:  At the time I don't

25   believe so.

1 Q    I'm still on this Exhibit 8 at page 88, Item 10,

2      which is the other transfers section. Did you

3      review this section before you filed this --

4      before you signed the signature declaration,

5      which is Exhibit 7?

6 A    Again, this was a product of the work paper of

7      all the people working on the stuff together, but

8      I believe I read it before I signed it, yes.

9 Q    All right. And you didn't notice any

10     inaccuracies there?

11 A   Not that I recall.

12 Q   Okay. The second item there talks about stock in

13     Venture Bank exchanged for reduction in debt.

14     Tell me about that transaction.

15 A   This is tied to Mike Givens too.

16 Q   Okay.

17 A   The bank called up and put pressure on to give

18     them back their stock to reduce the debt. And

19     for the purposes of doing that, they would reduce

20     the debt. I believe they gave a small amount of

21     money back. I don't remember the exact details.

22 Q   Okay.

23 A   They wanted the stock back.

24 Q   How many shares of stock did you have; do you

25     recall?

1 Q    Yep.

2 A    I'd like to sit and go through them.

3 Q    Pardon?

4 A    I'd like to sit and review them.

5 Q    Oh, sure.

6             MR. CUTLER:  Could you read the

7       question back, please?

8             (Whereupon, the question was read back

9             by the court reporter.)

10            THE WITNESS:  Do you want to take a

11      ten-minute break and I'll take the time to go

12      through and read this?

13            MR. SEAVER:  Off the record.

14            (Discussion held off the record.)

15 BY MR. SEAVER:

16 Q    Back on the record.  We'll come back to that

17      personally familiar information -- with the

18      information question the next time around.

19            To the best of your knowledge, is the

20      information in here, in the schedules, true and

21      correct, the amended schedules?

22 A    To the best of my knowledge.

23 Q    Okay.  Did you list all of your assets in the

24      amended schedules?

25 A    To the best of my knowledge at the time.

1 Q    Are there any errors or omissions in here, in the

2      amended schedules, to bring to my or the Court's

3      attention?

4 A    Yes, there are.

5 Q    There are. What are they?

6 A    Well, we believe that Roaring Fork is an error.

7 Q    The Roaring Fork Club membership was not listed?

8 A    Yes.

9 Q    Okay. Anything else?

10 A    Can I have a minute just to look here?

11 Q    Sure.

12           MR. CUTLER: Can we have just a second,

13      Randy? I think we can get through this.

14           MR. SEAVER: Sure.

15           (Break taken.)

16 BY MR. SEAVER:

17 Q    Back on the record. Was that it for the mistakes

18      or errors?

19 A    I believe that we may have a 401(k)/IRA

20      difference.

21 Q    Do you mean there's a 401(k) that's not listed?

22 A    I'm not --

23           MR. CUTLER: Hold on just a second.

24      Let's get to the -- Let's get the reference in

25      front of you in the schedules. Where is that?

1          MR. SEAVER:  The one that got rolled

2      over, is that the one that got liquidated that's

3      in dispute over there?

4          MR. CUTLER:  Yes.

5 BY MR. SEAVER:

6 Q   Okay.  Any other errors or mistakes?

7 A   I believe we talked about a couple of them, the

8      Hawaiian airline tickets.

9 Q   The six round-trip tickets that aren't in here,

10     in the schedules?

11 A  Whether they -- Yes.  We discussed the tickets

12     earlier.  I'm not sure that should be or not be,

13     but... And at this time I can't think of anything

14     else, but I'm not absolutely sure.

15 Q  Okay.  All right.  In the amended schedules, the

16     gifts to Christi Rowan, that's at page 24 of 40,

17     now it's saying travel, lodging, gifts and cash,

18     $110,426.31.  What documents did you rely upon to

19     come up with that number?  Do you see where I

20     am?

21 A  Yes.  I believe that computation came from

22     reviewing credit card receipts, tracking deposits

23     given to Ms. Rowan, and doing as much due

24     diligence as I can with all the records that have

25     been seized and taken by the two raids.