# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

Dennis E. Hecker

Bky No. 09-50779

Debtor,

Chapter 7

Randall L. Seaver, Trustee,

Plaintiff,

vs.

Dennis E. Hecker, et. al.,

Defendants.

**DEFENDANT AND DEBTOR DENNIS HECKER'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO CONFIRM SETTLEMENT AGREEMENT**

Adv. No. 09-5045

## INTRODUCTION

Defendant/Debtor Dennis E. Hecker ("Hecker") is entitled to ongoing compensation from Defendant Midwest Motors, LLC ("Midwest Motors") pursuant to a Personal Services Agreement ("PSA") between Hecker and Midwest Motors. The Trustee brought this adversary proceeding on the meritless assertion that the PSA is really a disguised part of the purchase price for an auto dealership. Several creditors have crossclaims with the same baseless allegation. The undisputed record indicates that the PSA is a legitimate contract for services, not a disguised purchase price. Nevertheless, Plaintiff/Trustee Randall Seaver ("Trustee"), Defendant/Creditor Toyota Financial Savings Bank ("TFSB"), Defendant/Creditor Chrysler Financial Services Americas, LLC ("Chrysler"), Defendant/Creditor Toyota Motor Credit Corporation ("TMCC") and Defendant Midwest Motors, LLC ("Midwest Motors") seek to force Hecker to accept a

"settlement agreement" for much less than Hecker is entitled to under the PSA. The Motion to Confirm this "settlement agreement" should be denied.

**STATEMENT OF FACTS**

**A.     Background**

On April 16, 2009, Hecker executed a PSA with Twin Cities Automotive, LLC ("TCA"). (Parker Aff. ¶ 2-5.) During the negotiation of the PSA, representatives of TCA stated that TCA wanted the services of Hecker in connection with TCA's expanding ownership of automobile dealerships in the metropolitan Minneapolis/St. Paul area. (Parker Aff. ¶ 4.) Under the PSA, Hecker agreed to provide services and consultation to TCA in the management and operation of TCA's auto dealerships. (Parke Aff. Ex. A at ¶ 1.) In exchange for Hecker's services, TCA agreed to pay Hecker the sum of $1,000,000.00 in 48 equal monthly installments. (*Id.* at ¶ 3.)

At the same time that TCA and Hecker executed the PSA, TCA also executed a Purchase Agreement with Inver Grove Motors, LLC d/b/a Denny's Hecker's Inver Grove Toyota ("IGM"). (*Id.*) Under the Purchase Agreement, TCA purchased a Toyota dealership (the "Dealership") in Inver Grove, Minnesota from IGM. At the time of the Purchase Agreement, Hecker was the owner of IGM and the operator of the Dealership. (*Id.*) Peter Hasselquist, President of TCA who executed the PSA on behalf of TCA, has testified via affidavit that TCA paid fair market value for the Dealership. (Hasselquist Aff. at ¶ 3-4.) Hasselquist has also testified that the PSA was a legitimate contract for services and not a disguised purchase price. (*Id.*)

In order to protect itself against potential third party claims, TCA included Section 12(b) of the PSA. (Parker Aff. ¶ 6-8.) Section 12(b) provides as follows:

> The Company and its affiliates will use commercially reasonable efforts to defend against any Claims so long as Hecker is not in default under the terms of the Agreement. For the avoidance of doubt the term commercially reasonable efforts in this context shall include that the Company will not settle any Claims for a period of at least six (6) months from the date a Claim is first asserted, in litigation or otherwise, and notice thereof has been provided to Hecker. Buyer or Company, as applicable, shall present to Hecker any settlements it intends to enter into in advance for his approval, which settlements shall be deemed to be approved by Hecker unless the Company or Buyer has breached its obligations to use commercially reasonable efforts to defend.

(Parker Aff. Ex. A.) The operative term "Claims" as used in Section 12(b) is defined in Section 11 of the PSA as follows:

> a third party asserts (a) any claim, whether in a bankruptcy action, foreclosure action or otherwise, that all or any portion of the Fees are or should have been characterized as consideration for the transactions contemplated by the terms of the Asset Purchase Agreement, or any claims of a similar nature, or (b) any claim that the consideration paid by Buyer under the terms of the Asset Purchase Agreement was insufficient or inadequate or (c) any bankruptcy, preference, fraudulent conveyance or claims of a similar nature related to the transactions contemplated by the Asset Purchase Agreement (collectively, "Claims").

(*Id.*)

Section 12(b) was intended to enable TCA to settle ***third party*** claims that might be made against Hecker with respect to the payments after TCA used commercially reasonable efforts to defend the payments. (Parker Aff. ¶ 8.) Section 12(b) was not intended to permit TCA to settle disputes between TCA and Hecker regarding the PCA. (*Id.*) Section 12(b) was not intended to permit TCA to unilaterally and arbitrarily reduce the amount that TCA owes to Hecker under the PSA. (*Id.*)

Toyota Motor Sales, USA ("TMS") had a right of first refusal with regard to the Purchase Agreement. TMS exercised that right and assigned its interest under the Purchase Agreement to Stephen J. McDaniels, who in turn assigned his rights to Midwest Motors, a company owned and operated by McDaniels. Midwest Motors assumed all obligations to Hecker under the PSA.

McDaniels testified in his deposition that the PSA is not a disguised purchase price, and that he knows of no basis for the allegation that the PSA is a disguised purchase price. (Neve Dec. at Ex. A; McDaniels Dep. at 71-72, 90-91, 99.) Specifically, McDaniels stated:

> Q    Mr. McDaniels, have you heard that there's an allegation in this proceeding that the Personal Services Agreement with Mr. Hecker is simply disguised purchase price?
>
> A.    Yes.
>
> Q.    What does that mean to you?
>
> A.    It's false.
>
> Q.    I appreciate that. But what does -- when you hear that there's an allegation that it's disguised purchase price, what does that mean to you?
>
> A.    To me, it's simply a legal argument where the creditors are attempting to find a way to get at the agreement.
>
> Q.    Do you think that this was a legitimate Personal Services Agreement, where the original buyer wanted Mr. Hecker's services to help make the dealership successful?
>
> A.    I know, for me, that it was a valid, enforceable Personal Services Agreement. I cannot speak for Mr. Hasselquist. I have seen nothing to make me believe that it was not.

(Neve Dec. Ex. A; McDaniels Dep. at 71-72.) Mr. McDaniels continued:

4

> Q.     And you disagree with the trustee's allegations that this was
>        disguised purchase price, don't you?
>
> A.     Yes.

(Neve Dec. Ex. A; McDaniels Dep. at 90-91.)   McDaniels was equally skeptical of

TFSB, TMCC and Chrysler's claims that the PSA was disguised purchase price and was

unaware of any evidence they had to support their claim:

> Q.     Do you know of any evidence that Chrysler Financial has that this
>        PSA was just disguised purchase price?
>
> A.     No.
>
> Q.     And what about Toyota Motor Credit?  Do they have any evidence
>        that this was disguised purchase price that you're aware of?
>
> A.     I don't know what they have.  No.

(Neve Dec. Ex. A; McDaniels Dep. at 99.)  Indeed, this is consistent with the facts that

have been developed in this case so far.  Chrysler has even stipulated that it has no

discoverable evidence and will not submit any evidence at the trial in this matter.  (Neve

Dec. Ex. B & C.)  Likewise, the Trustee, TFSB and TMCC have produced no evidence

that the PSA was disguised purchase price. (Neve Dec. ¶ 4.)

**B.     The Purported Settlement of the PSA**

Under the PSA, Hecker is entitled to $1,000,000.00 from Midwest Motors over the

course of four years under the PSA.  Hecker has received none of the payments that are

currently due and owing under the PSA.  By this Motion, the Trustee, TFSB, TMCC,

Chrysler, and Midwest Motors seek to force Hecker to accept a $100,000.00 loan

forgiveness and 2007 Toyota Tundra in lieu of the $1,000,000.00 that Midwest Motors

owes Hecker under the PSA.  (Docket No. 535; Proposed Settlement Agreement ¶ A-C.)

Under the baseless "settlement agreement," Midwest Motors would pay $500,000.00, to be divided among the Trustee, TFSB, TMCC, Chrysler, and Midwest Motors. None of the $500,000.00 payable under the "settlement agreement" would go to Hecker. (*Id.* at ¶ A.)

McDaniels testified in his deposition that the only reason why Midwest Motors agreed to the "settlement agreement" is so that Midwest Motors can pay $500,000.00 to resolve its obligations under the PSA. He testified:

Q.   Do you understand the terms of this settlement agreement?

A.   I understand my obligations on it, yes.

Q.   What are your obligations under this agreement?

A.   My obligations are to pay 500,000, to be divided how the creditors determine they are going to divide it, plus some other money that's involved.

Q.   And do you know who gets the $500,000?

A.   It's shared.

(Neve Dec. Ex. A; McDaniels Dep. at 105.) He continued:

Q.   Under this agreement, the trustee gets an amount of $65,000. Is that correct?

A.   I was not part of any of how the money is divided.

Q.   Okay.

A.   So I wasn't part of those discussions.

Q.   So your only decision related to this settlement agreement was "I want out, and I'll pay half a million dollars"? Is that a fair statement?

A.   Yes.

Q.   And you don't care who gets it –

A.   No.

Q.   – as long as you're out?

A.   Yes.

Q.   Okay. Is it your understanding that this will resolve Mr. Hecker's claim against your company?

A.   What claim is that?

Q.   That you owe him a million dollars under the PSA.

A.   Yes, if this goes through in the manner it was represented to me, it would resolve that.

(Neve Dec. Ex. A; McDaniels Dep. at 106.)  In another words, how the settlement money is purportedly distributed is completely arbitrary.  In fact, McDaniels has no objection to Hecker receiving the money:

Q.   If Denny Hecker got the entire half a million dollars, you wouldn't care?

A.   I am willing to pay the 500,000 to extricate myself from this situation that, in my view, is not of my own making.  I have not taken a position on who should get the money or who shouldn't.

(Neve Dec. Ex. A; McDaniels Dep. at 111.)

McDaniels and Midwest Motors take no position on who should receive that $500,000.00 payment.  (*Id.*)  Midwest Motors simply seeks to avoid a $1,000,000.00 obligation by paying $500,000.00.

## C.   Lack of Commercially Reasonable Efforts to Defend the Claims

Midwest Motors contends that they have properly terminated the PSA. (Docket No. 535; Ex. B to the Settlement Agreement.) Midwest Motors has done little to defend against the claims of the Trustee and the adverse creditors in this matter.   At most,

Midwest Motors has simply answered the Amended Complaint and sent out written discovery requests in this matter. (Neve Dec. ¶ 3.)

## ARGUMENT

## I. STANDARD FOR APPROVAL OF A SETTLEMENT AGREEMENT OVER A PARTY'S OBJECTION

Although in some cases a bankruptcy court may approve a settlement agreement over objection of a party, the court must first find that the settlement agreement is "in the best interest of the estate as a whole." *In re La'Teacha Tigue,* 363 B.R. 67, 71-72 (8th Cir. BAP, 2007) (*citing In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1138-39 (8th Cir. 1984). In order to determine whether a settlement is in the best interests of the estate, the court must consider: 1) the probability of success in the litigation; 2) the difficulties, if any, to be encountered in the matter of collection; 3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and 4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. In this case, none of these factors support confirmation of the settlement agreement purposed by the Trustee.

### A. The Trustee, TFSB, TMCC, and Chrysler Will Fail On The Merits Of Their Claims to The Funds Under the PSA

Before a bankruptcy court may approve a settlement agreement over objection, the bankruptcy court must evaluate the merits of the parties' claims. *In re Flight Transp. Corp. Securities Litigation*, 730 F.2d 1128, 1138-39 (8th Cir. 1984) (reversing bankruptcy court's approval of settlement agreement over the objection of defendants when there was insufficient evidence to evaluate the merits of the parties' claims).

In this case, the Trustee, Chrysler, TFSB, and TMCC have produced no evidence to support their unfounded assertion that the PSA was a disguised purchase price. Hecker has produced strong evidence that the PSA was a legitimate contract for Hecker's future services. Hasselquist, TCA's president who negotiated and executed the PSA on behalf of TCA, has testified via affidavit that TCA paid fair market value for the Dealership. (Hasselquist Aff. at ¶ 3-4.)  Hasselquist has also testified that the PSA was a legitimate contract for Hecker's services, and not a disguised purchase price.  (*Id.*)  McDaniels, the owner of Midwest Motors, similarly testified that the PSA was not a disguised purchase price, and that he is not aware of any basis for the assertion that the PSA is a disguised purchase price. (McDaniels Dep. at 71-72, 90-91, 99.)

Given the Trustee's and the bankruptcy creditors' low probability of success on the merits of their claims, the Court must deny confirmation of the "settlement agreement."  The evidence before the Court indicates that the funds due and owing under the PSA belong to Hecker, and not to Hecker's bankruptcy creditors.  At a minimum, a trial on the merit of Hecker's claim to the PSA funds is required.

### B.     Any Potential Difficulties With Collection Are Easily Remedied

There is no indication that Midwest Motors is unable to pay the amounts due and owing under the PSA.  In the event that the Court is concerned about collection, the Court could simply direct Midwest Motors to make payments under the PSA into escrow until the issue of entitlement to the funds is resolved on the merits.

### C. Given the Straightforward Legal Issues and the Weakness of the Trustee's Claim, This Case Will be Simple to Resolve

The primary issue in this adversary proceeding is whether the PSA is a legitimate contract for Hecker's services or whether it is a disguised purchase price. This is a simple and straightforward issue. There is not compelling reason to confirm a settlement over Hecker's objection.

### D. The Adversary Creditors Have No Right to the PSA Payments

As discussed above, the evidence before the Court indicates that the PSA is a legitimate contract for future service, and not a disguised purchase price. Therefore, the payments belong to Hecker, not to the bankruptcy creditors.

## II. NOTHING IN THE PSA ALLOWS MIDWEST MOTORS TO UNILATERALLY FORCE HECKER TO ACCEPT LESS THAN WHAT MIDWEST MOTORS OWES HIM UNDER THE PSA

In support of its Motion to Confirm the Settlement Agreement, the Trustee relies on Section 12(b) of the PSA. Section 12(b) of the PSA allows Midwest Motors to settle certain claims brought by third parties. Section 11 of the PSA, which defines the term "Claims," makes it clear that Section 12(b) only applies to claims by third parties, and not to claims between the parties to the contract. Section 12(b) also requires that Midwest Motors use "commercially reasonable efforts to defend" against such third party claims before settling.

In this case, there is no evidence in the record that Midwest Motors has used commercially reasonable efforts to defend against the claims made by the Trustee and the bankruptcy creditors that the PSA is a disguised purchase price. McDaniels testified that

he believes the Trustee's claim regarding the PSA is baseless. (McDaniels Dep. at 71-72, 90-91, 99.) In spite of the fact that the Trustee's claim is baseless, Midwest Motors has done nothing beyond serving written discovery to defend against the claims. (Neve Dec. ¶ 3.) Therefore, Midwest Motors has not used commercially reasonable efforts to defend.

There is no merit to the Trustee's claim that Midwest Motors has used commercially reasonable efforts merely because more than six months have passed since the filing of the adverse actions. The Trustee relies too heavily on the following language:

> For the avoidance of doubt the term commercially reasonable efforts in this context **shall include** that the Company will not settle any Claims for a period of at least six (6) months from the date a Claim is first asserted, in litigation or otherwise, and notice thereof has been provided to Hecker.

(Parker Aff. Ex. A.) (Emphasis added.) The term "shall include" means that Midwest Motors cannot settle claims before the expiration of the six month period, but it does not mean that it can unilaterally settle claims simply because the six month period has expired. There still must be a showing that Midwest Motors did in fact defend the claims in a commercially reasonable manner. The Trustee has made no such showing. Other than conclusory statements in the motion, the Trustee has presented no evidence showing that Midwest Motors satisfied this requirement. As a result, the motion should be denied.

Moreover, the proposed "settlement agreement" would unilaterally settle all claims that Hecker would have against Midwest Motors for payment under the PSA. In fact, McDaniels testified that his Midwest Motor's true purpose in agreeing to the "settlement agreement" is to get out of Midwest Motors' potential $1,000,000.00

obligation by paying only $500,000.00. (McDaniels Dep. at 105, 111.) Section 12(b) applies only to claims by third parties, not to Hecker's claims against Midwest Motors. (Parker Aff. ¶ 8 and Ex. A.) There is no merit to the Trustee's contention that Section 12(b) allows Midwest Motors to unilaterally force Hecker to settle his claims against Midwest Motors.

## CONCLUSION

As will be proven at trial, Midwest Motors rightfully owes money to Hecker under the PSA. The Trustee, Midwest Motors, and the bankruptcy creditors may not unilaterally deprive Hecker of those funds. The Trustee's Motion to Confirm the "settlement agreement" should be DENIED.

NEVE LAW, PLLC


_/e/ John R. Neve_____
John R. Neve (#278300)
8500 Normandale Lake Boulevard, Suite 1080
Minneapolis, MN  55437
Dated: June 11, 2010              (952) 929-3232

ATTORNEY FOR DEBTOR AND
DEFENDANT DENNIS E. HECKER

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MINNESOTA

---

In re:                                                    Bky No. 09-50779

Dennis E. Hecker,                                              Chapter 7

                              Debtor.

---

Randall L. Seaver, Trustee

                    Plaintiff,                        **DECLARATION OF**
                                                      **JOHN R. NEVE**

        vs.                                            Adv. No. 09-5045

Dennis E. Hecker, et al.,

                    Defendants.

---

I, John R. Neve, state as follows:

1.      I am an attorney representing the Debtor/Defendant Dennis E. Hecker ("Hecker") in the above-entitled adversary proceeding.

2.      I provide this Declaration in support of Hecker's Memorandum of Law in Opposition to Motion to Approve Settlement Agreement and For Expedited Relief.

3.      Based upon my review of this matter, Defendant Midwest Motors, LLC, has simply answered the Amended Complaint and sent out written discovery requests in this matter. I am unaware of any bona fide efforts to defeat the claims of the Trustee or the various creditors that assert that the PSA was disguised purchase price, even though there is no evidence to support those claims. Efforts to defeat those claims have been advanced primarily by Hecker former counsel, William Skolnick, and by me.

4.     I am unaware of any evidence produced by the Trustee, Toyota Financial Savings Bank, or Toyota Motor Credit Corporation that supports a finding that the PSA was disguised purchase price.

5.     Attached hereto as Exhibit A is a true and correct copy of excerpts of the Deposition of Steven McDaniels taken on May 28, 2010.

6.     Attached hereto as Exhibit B is a true and correct copy of correspondence from Steven F. Grinnell to William Skolnick dated February 22, 2010.

7.     Attached hereto as Exhibit C is a true and correct copy the Stipulation between Hecker and Defendant Chrysler Financial Services Americas, LLC, dated March 5, 2010.

The undersigned declares under penalty of perjury under the laws of the United States and the State of Minnesota that the foregoing facts stated in this Declaration are, to the best of my knowledge and belief, true and correct.

Executed on this 11th day of June 2010.

John R. Neve

# Exhibit A

1          UNITED STATES BANKRUPTCY COURT
               DISTRICT OF MINNESOTA
2
- - - - - - - - - - - - - - - - - - - - - - -
3                              File No. 09-50779-RJK
   In re:
4
   DENNIS E. HECKER,
5
            Debtor.
6
- - - - - - - - - - - - - - - - - - - - - - -
7  RANDALL L. SEAVER,

8            Plaintiff,

9  vs.

10 DENNIS E. HECKER, MIDWEST MOTORS
   LLC, LKMCD PROPERTIES, LLC, CHRYSLER
11 FINANCIAL SERVICES AMERICAS LLC,
   TOYOTA MOTOR CREDIT CORPORATION,
12 INVER GROVE MOTORS LLC d/b/a DENNY
   HECKER'S INVER GROVE TOYOTA, JACOB
13 HOLDINGS OF HIGHWAY 101 LLC, AND
   JACOB HOLDINGS OF AKRON AVENUE LLC,
14
            Defendants.
15
- - - - - - - - - - - - - - - - - - - - - - -
16

17                    DEPOSITION OF

18               STEPHEN J. McDANIELS

19                   MAY 28, 2010

20

21

22

23          CAROL DANIELSON BILLE, RPR
          DANIELSON COURT REPORTING, LLC
24  4660 ALLENDALE DRIVE, ST. PAUL, MINNESOTA 55127
          651-653-3758 * DULUTH 1-800-355-3758
25

1    trustee.

2  Q.  Okay.  It would be -- do you recall anything

3      else about the stipulation or the -- excuse

4      me, about the bankruptcy proceeding?

5  A.  No.

6  Q.  What -- well, let me find the document real

7      quick.

8          THE WITNESS:  Can I take a quick

9      break?

10          MR. NEVE:  Absolutely.

11          (Brief recess from approximately 2:12

12      p.m. to approximately 2:19 p.m.)

13  BY MR. NEVE:

14  Q.  Mr. McDaniels, have you heard that there's an

15      allegation in this proceeding that the

16      Personal Services Agreement with Mr. Hecker is

17      simply disguised purchase price?

18  A.  Yes.

19  Q.  What does that mean to you?

20  A.  It's false.

21  Q.  I appreciate that.  But what does -- when you

22      hear that there's an allegation that it's

23      disguised purchase price, what does that mean

24      to you?

25  A.  To me, it's simply a legal argument where the

1     creditors are attempting to find a way to get
2     at the agreement.
3  Q. Do you think that this was a legitimate
4     Personal Services Agreement, where the
5     original buyer wanted Mr. Hecker's services to
6     help make the dealership successful?
7  A. I know, for me, that it was a valid,
8     enforceable Personal Services Agreement.  I
9     cannot speak for Mr. Hasselquist.  I have seen
10    nothing to make me believe that it was not.
11 Q. And I just want to go over again when --
12         MR. NEVE:  Well, here.  Let's mark
13    this as Exhibit 7.  I'm going to go out of
14    order here.
15         (Whereupon, Exhibit Number 7 was
16    marked for identification.)
17         THE REPORTER:  Exhibit 7.
18 BY MR. NEVE:
19 Q. And, Mr. McDaniels, I'm going to represent
20    that this was simply a Web search that I did
21    yesterday, and you'll see the date on the
22    document is May 27th, where I searched for
23    Denny Hecker on the Star Tribune Web site.
24         I want you to turn to the third page
25    of the agreement, and you can see that these

1          enough.  We've got to terminate the PSA"?

2    A.    The negative attention was still constant

3          during that entire time.

4                  The specific event that exacerbated

5          the situation even more was when the trustee

6          filed a lawsuit alleging -- I believe it was

7          alleging that it was a diversion of assets and

8          not a Personal Services Agreement.

9    Q.    And that happened about this time.  Isn't that

10         correct?

11   A.    I would have to see.  I believe it's close.

12   Q.    Is it your testimony that it was the -- it was

13         the lawsuit by the trustee that was the straw

14         that broke the camel's back, so to speak?

15                 MR. MORATZKA:  Objection.  I don't

16         think that was his testimony.

17   A.    My testimony was that the -- the continuing

18         constant negativity surrounding Mr. Hecker,

19         Mr. Hecker's entities, his personal and

20         business life, and the criminal proceedings,

21         as well as the fact that the trustee now was

22         taking a legal stance against the Personal

23         Services Agreement being a Personal Services

24         Agreement, was what prompted the cancellation.

25   Q.    Okay.  And you disagree with the trustee's

1       allegations that this was disguised purchase

2       price, don't you?

3   A.  Yes.

4   Q.  Have you had any conversations or discussions

5       with Mr. Hecker since the termination of the

6       Personal Services Agreement?

7   A.  Not that I recall.

8           Let me retract that.  We did have a

9       settlement discussion after, I believe.

10          MR. MORATZKA:  (Nodding head.)

11  A.  Mr. Hecker was present.

12  BY MR. NEVE:

13  Q.  Were you advised by your counsel to have no

14      direct communication with Mr. Hecker since

15      June 19th, 2009?

16          MR. MORATZKA:  I'm going to object as

17      that's attorney-client privilege.  The advice

18      given by counsel is ...

19          MR. NEVE:  Do you want to mark that?

20          (Whereupon, Deposition Exhibit 11 was

21      marked for identification.)

22          THE REPORTER:  Exhibit 11.

23  A.  (Reviewing document.)

24  BY MR. NEVE:

25  Q.  Showing you what's been marked as Exhibit 11,

1          can?

2     A.   Yeah.

3     Q.   Mr. McDaniels, you just raised your finger in

4          the air like you were remembering something.

5     A.   I am.  I'm trying to.

6     Q.   Yeah.  If you do remember anything, please --

7     A.   One of the terms was that all the creditors

8          would have to agree and sign off all their

9          claims, future and present.

10    Q.   Do you know of any evidence that Chrysler

11         Financial has that this PSA was just disguised

12         purchase price?

13    A.   No.

14    Q.   And what about Toyota Motor Credit?  Do they

15         have any evidence that this was disguised

16         purchase price that you're aware of?

17    A.   I don't know what they have.  No.

18    Q.   Would you agree that you're probably in a

19         better position, being the one that entered

20         into -- or assumed the Personal Services

21         Agreement, that you would be in a better

22         position to have evidence on that rather than

23         those parties?

24    A.   Not better, since I didn't negotiate it at

25         all.

1    Q.   But Mr. Hasselquist did negotiate it.  Isn't
2         that correct?
3    A.   I don't know that.
4                   MR. NEVE:  Will you mark this?
5                   (Whereupon, Deposition Exhibit 12 was
6         marked for identification.)
7    BY MR. NEVE:
8    Q.   Showing you Exhibit 12, which is labeled the
9         affidavit of Peter Hasselquist, have you seen
10        this document before today, Mr. McDaniels?
11   A.   No.
12   Q.   I want you to turn to the second page, and in
13        paragraph number 4 -- I'll read it to you.
14                  "I am also the president of Twin
15        Cities Automotive, LLC.  It was always the
16        intention of TCA to honor the Personal
17        Services Agreement between TCA and Dennis E.
18        Hecker and to have Hecker perform personal
19        services and report to me directly."
20                  Did I read that accurately?
21                  MR. MORATZKA:  I think you messed up
22        the last few words in the sentence.
23   BY MR. NEVE:
24   Q.   "And to have Hecker perform personal services
25        and report to me directly" -- "report to me,"

1    period.  Not "directly."

2               MR. MORATZKA:  I object, Counsel, but

3    it says --

4    A.   It says, "report directly to me."

5    BY MR. NEVE:

6    Q.   Oh, sorry.

7    A.   With that point, yes, you read it correct.

8    Q.   With that correction, it's correct?

9    A.   (Nodding head.)

10   Q.   Do you have any reason to dispute Mr.

11        Hasselquist's statement?

12   A.   No.

13   Q.   He goes on and says, "The amount of $1 million

14        over four years for personal services was

15        never intended to be a portion of the overall

16        purchase price found in the APA for the

17        purchase of the assets of IGM."

18               Do you agree with that statement?  Or

19        do you have any reason to dispute that

20        statement?

21   A.   I do not.

22   Q.   I want you to turn back to the Personal

23        Services Agreement.  Let's read -- let's look

24        at provision 12(b).  12(b) says, "The company

25        and its affiliates will use commercially

1          reasonable efforts to defend against any

2          claims so long as Hecker is not in default

3          under the terms of this agreement."

4                    Did I read that correctly?

5     A.   You read what it said, yes.

6     Q.   And, Mr. McDaniels, I understand that you are

7          not a lawyer, but I'm going to ask you, in

8          your lay opinion, what do you think

9          "commercially reasonable efforts to defend"

10         means?

11                   MR. MORATZKA:  Well, I'm going to

12         object, to the extent that it's actually

13         defined in the next couple sentences.

14    A.   (Reviewing document.)

15    BY MR. NEVE:

16    Q.   You can answer the question.

17    A.   I would answer the question just how it's

18         written in the next couple of sentences.  If

19         you would like me to read it, I can.

20    Q.   Sure.  Go ahead.

21    A.   "For the avoidance of doubt, the term

22         commercially reasonable efforts in this

23         context shall include that the company will

24         not settle any claims for a period of at least

25         six months from the date a claim is first

1      asserted, in litigation or otherwise, and

2      notice thereof has been provided to Hecker."

3  Q.  Okay.  So is it your contention that

4      commercially reasonable efforts -- or

5      commercially reasonable efforts to defend

6      means you just have to wait six months before

7      you settle a claim?

8          MR. MORATZKA:  I object to the extent

9      it calls for a legal conclusion.

10  A.  I am not a lawyer on that, but we have been

11      defending it and are continuing to defend that

12      it is a legitimate PSA.

13  Q.  Okay.  And what --

14  A.  And that is the claim.

15  Q.  I understand.  To your knowledge, what have

16      you done to defend against the claim that it's

17      an invalid PSA?

18  A.  The claim that the trustee had made?

19  Q.  Right.

20  A.  Based on my communications with my attorneys,

21      they have used every opportunity that they've

22      had to communicate on that basis.  Whether

23      it's through the discovery process or whether

24      it's through interrogatories or whether it's

25      through just communication with the trustee's

1          lawyers, they have stated affirmatively that

2          it is not.

3     Q.   Anything else?

4     A.   I'm sure there is, but I would have to discuss

5          that to see exactly what steps we've taken.

6                    (Whereupon, Deposition Exhibit 13 was

7          marked for identification.)

8                    THE REPORTER:  Exhibit 13.

9     BY MR. NEVE:

10    Q.   Mr. McDaniels, handing you a document that's

11         entitled "Settlement Agreement and Release,"

12         are you familiar with this document?

13    A.   From a high level, yes.

14                    THE REPORTER:  From what?

15                    THE WITNESS:  From a -- from a high

16         level.

17    BY MR. NEVE:

18    Q.   And if you turn to -- at the top of the

19         document, there's, like, numbers, "Page 24 of

20         61."  Turn to page 24.

21    A.   (Reviewing document.)

22    Q.   Yeah, right up there.

23    A.   I'm getting there.  (Reviewing document.)

24    Q.   Okay.  Is that your signature on the bottom of

25         that page?

1    A.   Yes.

2    Q.   And you're signing on behalf of Midwest

3         Motors, LLC?

4    A.   Yes.

5    Q.   And then, on the next page, is that your

6         signature at the top of the page?

7    A.   Yes.

8    Q.   And you're signing on behalf of LKMCD

9         Properties, LLC?

10   A.   Yes.

11   Q.   Do you understand the terms of this settlement

12        agreement?

13   A.   I understand my obligations on it, yes.

14   Q.   What are your obligations under this

15        agreement?

16   A.   My obligations are to pay 500,000, to be

17        divided how the creditors determine they are

18        going to divide it, plus some other money

19        that's involved.

20   Q.   And do you know who gets the $500,000?

21   A.   It's shared.

22   Q.   And why don't you turn to -- I think it's

23        broken down on page -- it's page 18 of 61.

24   A.   Oh, 18 of 61.

25   Q.   It says "8" at the bottom.

1   A.   (Reviewing document.)

2   Q.   Under this agreement, the trustee gets an

3        amount of $65,000.  Is that correct?

4   A.   I was not part of any of how the money is

5        divided.

6   Q.   Okay.

7   A.   So I wasn't part of those discussions.

8   Q.   So your only decision related to this

9        settlement agreement was "I want out, and I'll

10       pay half a million dollars"?  Is that a fair

11       statement?

12  A.   Yes.

13  Q.   And you don't care who gets it --

14  A.   No.

15  Q.   -- as long as you're out?

16  A.   Yes.

17  Q.   Okay.  Is it your understanding that this will

18       resolve Mr. Hecker's claim against your

19       company?

20  A.   What claim is that?

21  Q.   That you owe him a million dollars under the

22       PSA.

23  A.   Yes, if this goes through in the manner it was

24       represented to me, it would resolve that.

25  Q.   And what in the Personal Services Agreement

1        allows you to unilaterally settle this case?

2               MR. MORATZKA:  I'm going to object.

3        It's calling for a legal conclusion.

4   BY MR. NEVE:

5   Q.   If you know.

6   A.   We are looking for a judge to settle it.

7        Because, through our efforts with all parties,

8        we have not been able to do it.  It's very

9        complicated, so we're looking for a judge to

10       make a decision.

11  Q.   Mr. McDaniels, do you believe that your

12       company owes any money under the PSA?

13              MR. MORATZKA:  I continue to object

14       for the reasons previously stated regarding

15       asking for Mr. McDaniel's legal interpretation

16       of a document.

17  A.   I believe that I do not.

18  BY MR. NEVE:

19  Q.   Why are you paying half a million dollars to

20       settle a claim that you don't believe you owe

21       any money on?

22  A.   Because the legal process is draining,

23       expensive, and there are so many parties

24       involved that I made a business decision on

25       the advice of counsel.  I'm trying to do it.

1    Q.   If this settlement doesn't resolve the claims

2         Mr. Hecker has against your company, would you

3         still pay the half a million dollars to these

4         parties?

5                   MR. MORATZKA:  Objection.  I think

6         it's a little unclear.  Do you mean the judge

7         doesn't approve the settlement, or that the

8         settlement is approved, but you're asserting

9         that Mr. Hecker still has a claim?

10   BY MR. NEVE:

11   Q.   If that were the result, that the settlement

12        is approved, but the litigation between you

13        and Mr. Hecker goes on, would you still want

14        to -- would you still pay half a million

15        dollars?

16   A.   I will pay the half million dollars when I am

17        completely out.

18   Q.   In other words, that amount of payment is only

19        good if you're done with this case?  It's

20        acceptable to you only if it completely

21        resolves this matter.  Correct?

22   A.   Correct.

23                   MR. NEVE:  All right.  Let's take a

24        two-minute break.  I'm going to step out --

25        why don't you guys stay here.  I'll step out

1    A.    True.

2    Q.    We can get a calculator, but it's --

3    A.    Well, I mean, that's what I -- because I

4          don't -- I just looked at this from an overall

5          perspective.

6    Q.    You didn't have anything to do with the

7          breakdowns between the individual recipients?

8    A.    No.  They made it clear that it is not my --

9          part of my issue.

10   Q.    If Denny Hecker got the entire half a million

11         dollars, you wouldn't care?

12   A.    I am willing to pay the 500,000 to extricate

13         myself from this situation that, in my view,

14         is not of my own making.

15               I have not taken a position on who

16         should get the money or who shouldn't.

17   Q.    This could be a good deal for you in that if

18         Mr. Hecker wins against you, you owe him a

19         million dollars, less the loan you gave him.

20         Correct?

21               MR. MORATZKA:  Objection.  I don't

22         know if that's a proper characterization of

23         what would happen.

24   BY MR. NEVE:

25   Q.    Well, if he wins in his claims, he's asking

1      for all the money under the PSA.  Is that your

2      understanding?

3  A.  Yes, if we -- if we go through the process and

4      Mr. Hecker prevails and all the creditors are

5      satisfied, which is a big "if," in my

6      understanding and interpretation of these

7      laws, he would get 20,833 a month for the four

8      years that's scheduled.  That is not a million

9      dollars.

10  Q.  Yeah.  Are you --

11  A.  The cash value is less.

12  Q.  Okay.  You're saying it would be -- the

13      present value is less than a million dollars?

14  A.  (Nodding head.)

15  Q.  I understand.  So as far as you know, the

16      breakdowns between Chrysler and the trustee

17      and Toyota Financial are completely arbitrary;

18      you have no idea?

19  A.  I was not involved in those discussions.

20  Q.  Do you know who did make the determinations as

21      to who gets what amount?

22  A.  No.

23  Q.  Do you find it odd that the settlement

24      agreement purports to, you know, consent to

25      this settlement on behalf of Mr. Hecker, even

1    though he doesn't?

2            MR. MORATZKA:  Objection.  I think

3        that mischaracterizes the document.

4    BY MR. NEVE

5    Q.  You can answer the question.

6            MR. MORATZKA:  Well (shrugging) ...

7            THE WITNESS:  Can I answer that?

8            MR. MORATZKA:  You sure can.

9            THE WITNESS:  Oh, I thought you

10       were -- I was waiting for your advice.

11   A.  (Continuing.)  This process has been extremely

12       complicated for eleven months, considering Mr.

13       Hecker's complicated financial matters with

14       his bankruptcy.

15           So what I have learned is that, when

16       you get a point like this, that that's not

17       necessarily odd; the trustee has a lot of

18       latitude to make determinations on behalf of a

19       debtor.

20   BY MR. NEVE:

21   Q.  Is it your understanding that the trustee

22       negotiated these payouts to Chrysler and

23       Toyota?

24           MR. MORATZKA:  Objection.  Asked and

25       answered.

1    A.    Yeah, I do not know who negotiated it.  I

2          would assume the trustee negotiated his

3          65,000.

4                 (REPORTER'S NOTE:  Sotto voce

5          conversation between Mr. Hecker and Mr. Neve.)

6    BY MR. NEVE:

7    Q.    Do you have any understanding whether Toyota

8          bank is a secured creditor in this dispute,

9          the PSA dispute?

10             MR. MORATZKA:  I'm going to object to

11          the extent it calls for a legal conclusion as

12          to Toyota Financial's legal status as a

13          creditor.

14    A.    My understanding is Toyota Financial and

15          Chrysler both believe they have claims, and

16          that they worked it out together, based on

17          their counsel.

18    BY MR. NEVE:

19    Q.    But you don't know if they were secured

20          claims, you know, with --

21    A.    I don't have any idea.

22    Q.    Yeah.

23             MR. NEVE:  I have no further

24          questions at this time.

25             I reserve the right to ask further

# Exhibit B



GRAY
PLANT
MOOTY

500 IDS CENTER
80 SOUTH EIGHTH STREET
MINNEAPOLIS, MN 55402-3796
MAIN: 612.632.3000
FAX: 612.632.4444

STEPHEN F. GRINNELL
ATTORNEY
DIRECT DIAL: 612.632.3070
DIRECT FAX: 612.632.4070
STEPHEN.GRINNELL@GPMLAW.COM

February 22, 2010

***Via E-Mail (wskolnick@skolnick-shiff.com and skolnicklaw@visi.com)
and U.S. Mail***
William R. Skolnick, Esq.
Skolnick & Shiff, P.A.
2100 Rand Tower
527 Marquette Avenue So.
Minneapolis, MN 55402-1308

Re:     Chrysler Financial Services Americas LLC v. Dennis E. Hecker
        Adv. Case No. 09-5019

        Randall L. Seaver v. Hecker, et al.
        Adv. Case No. 09-5045

Dear Mr. Skolnick:

    We are writing to request that you agree to withdraw your pending 30(b)(6) deposition notice and related discovery requests served on Chrysler Financial in Adversary Proceeding No. 09-05045 (the "PSA Case").

    We note that, as far as we are aware, the deposition and related discovery requests you have served on Chrysler Financial are the only discovery you have sought in the PSA Case. This fact raises questions regarding whether the real purpose for this deposition and discovery is to gather facts relevant to the PSA Case or, instead, is for some other reason. This concern is heightened because, as you must know, Chrysler Financial's interest in the PSA Case is limited to its claim to some or all of the proceeds payable to Mr. Hecker under the subject personal services agreement should such payments be determined in the PSA Case to be disguised purchase price paid (or to be paid) by the purchaser of the dealership and associated assets for such assets. Because Chrysler Financial does not claim a direct interest in any proper PSA payments—rather its interest in such payments would be merely as a currently unsecured creditor holding a non-dischargeable claim—we do not believe Chrysler Financial has any documents or information responsive to the discovery requests, or otherwise relevant to Mr. Hecker's position in the PSA Case, other than its loan and collateral documents, which you and Mr. Hecker already have in your possession.

    Finally, you have improperly noticed the 30(b)(6) deposition to take place in Minnesota rather than in or around Detroit, where any potential Chrysler Financial witness is located.

We believe you should withdraw your pending deposition notice and discovery requests in the PSA litigation that are directed against Chrysler Financial, and request that you notify us immediately to advise whether you are willing to do so. If you are not willing to withdraw this unnecessary discovery, then reserving all of its rights, Chrysler Financial will produce a 30(b)(6) witness in Detroit (or a mutually acceptable location in the Detroit area) on a date to be agreed upon, provided that, you agree that we may instruct the witness at such deposition not to answer any question that is not relevant to the PSA Case and the claims made by Mr. Hecker and Chrysler Financial, respectively, in that case. If you insist on proceeding with the deposition and discovery, but are not willing to agree to limit the proposed 30(b)(6) deposition in that manner, we will have no option but to seek yet another protective order. We hope that will not be necessary.

Please advise as regarding your position on these matters as soon as possible.

Very truly yours,

Stephen F. Grinnell

SFG:ckm
cc: Howard J. Roin, Esq.
    Stuart M. Rozen, Esq.
    Nicholas N. Nierengarten, Esq.

GP:2734039 v1

# Exhibit C

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Bankruptcy Case No: 09-50779-RJK |
| DENNIS E. HECKER, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| RANDALL L. SEAVER, TRUSTEE, | ) | Adversary Proceeding No.: 09-05045 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DENNIS HECKER, | ) | |
| MIDWEST MOTORS, LLC, | ) | |
| LKMCD PROPERTIES, LLC | ) | |
| CHRYSLER FINANCIAL SERVICES | ) | |
| AMERICAS LLC, | ) | |
| TOYOTA MOTOR CREDIT | ) | |
| CORPORATION, | ) | |
| INVER GROVE MOTORS, LLC D/B/A | ) | |
| DENNY HECKER'S INVER GROVE | ) | |
| TOYOTA, | ) | |
| JACOB HOLDINGS OF HIGHWAY | ) | |
| 110 LLC, and | ) | |
| JACOB HOLDINGS OF AKRON | ) | |
| AVENUE LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## STIPULATION

This Stipulation is made by and between Defendants Chrysler Financial Services

Americas LLC ("Chrysler Financial") and Dennis E. Hecker ("Hecker").

1

## RECITALS

A.     Randall L. Seaver, the trustee in Hecker's bankruptcy case, commenced this adversary proceeding seeking declarations, *inter alia*, that a certain "Personal Services Agreement" ("PSA") between Hecker and the buyer of real estate and personal property owned by entities affiliated with Hecker (the "Selling Entities") represents a diversion to Hecker of the purchase price of the assets sold, that Hecker has no interest in the proceeds of the PSA and that the proceeds of the PSA are subject to the claims of creditors of the Selling Entities.

B.     Chrysler Financial and Hecker have each answered the Trustee's Complaint.

C.     Hecker has served certain discovery on Chrysler Financial in this proceeding consisting of Interrogatories, Requests for Production of Documents and a Notice of Taking of Deposition of a Designee of Chrysler Financial pursuant to Fed.R.Civ.P. 30(b)(6) (the "Discovery").

D.     Chrysler Financial has determined that it does not intend to offer evidence at any trial of this adversary proceeding on the issue of whether the PSA represents a diversion to Hecker of a portion of the purchase price of the assets sold by the Selling Entities or instead is a *bona fide* personal services agreement subject to Hecker's interests.

E.     In light of this determination, Hecker is willing to withdraw the Discovery.

NOW THEREFORE, Chrysler Financial and Hecker stipulate and agree as follows:

## AGREEMENT

1.     Chrysler Financial will not offer evidence (either oral testimony or document evidence) at any trial of this adversary proceeding on the issue of the proper characterization of the PSA, namely, whether the PSA represents a *bona fide* personal services agreement or instead represents value properly attributable to the purchase price of the real and/or personal property

assets sold by the Selling Entities. Chrysler Financial reserves the right, however, to examine or cross-examine witnesses called by other parties to testify concerning such issue, and to submit oral and written arguments based upon the evidence submitted by other parties, both in this adversary proceeding and in any appeal.

2. The parties acknowledge and agree that Chrysler Financial intends to submit evidence establishing Chrysler Financial's claims against the Selling Entities, and its lien and security interests in the assets sold, in support of Chrysler Financial's claim to the proceeds of the PSA in the event the PSA is determined to constitute a portion of the purchase price for the assets sold.

3. Hecker withdraws the Discovery served upon Chrysler Financial in this adversary proceeding and agrees that he will not serve any discovery upon Chrysler Financial in this adversary proceeding in the future.

Dated: March _5_, 2010

GRAY, PLANT, MOOTY, MOOTY & BENNETT, P.A.

By _Stephen F. Grinnell_

Stephen F. Grinnell (#37928)
500 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Telephone: 612-632-3070
Facsimile: 612-632-4070

**ATTORNEYS FOR CHRYSLER FINANCIAL SERVICES AMERICAS LLC**

3

Dated: March 5, 2010

SKOLNICK & SHIFF, P.A.

By _____
William R. Skolnick (#137182)
LuAnn M. Petricka (#18505X
2100 Rand Tower
527 Marquette Avenue South
Minneapolis, Minnesota 55402
Telephone: 612-677-7600

**ATTORNEY FOR DENNIS E. HECKER**

GP:2738926 v1

| | |
|---|---|
| In re: | Bky No. 09-50779 |
| Dennis E. Hecker, | Chapter 7 |
| Debtor. | |

| | |
|---|---|
| Randall L. Seaver, Trustee | |
| Plaintiff, | **DECLARATION OF BRUCE J. PARKER** |
| vs. | Adv. No. 09-5045 |
| Dennis E. Hecker, et al., | |
| Defendants. | |

I, Bruce J. Parker, state as follows:

1.    I am currently and since 1977 have been an attorney licensed to practice law in the State of Minnesota.  I provide this Declaration in opposition to the Motion to Approve Settlement Agreement.

2.    I represented Dennis E. Hecker ("Hecker") in connection with the negotiation of the Personal Services Agreement ("PSA") between Hecker and Twin Cities Automotive, LLC ("TCA").   A copy of the PSA is attached as Exhibit A to this Declaration.

3.    The PSA was entered into at the same time as TCA entered into the asset purchase agreement dated April 16, 2009 (the "Purchase Agreement") with Inver Grove Motors LLC d/b/a Denny Hecker's Inver Grove Toyota ("IGM"), a company owned by Hecker and operating the Inver Grove Toyota dealership in Inver Grove, Minnesota, for

the purchase by TCA of the Toyota dealership assets of IGM.

4.    During the negotiation of the PSA, representatives of TCA stated that TCA wanted the services and advice of Hecker in connection with TCA's expanding ownership of automobile dealerships in the metropolitan Minneapolis/St. Paul area.

5.    At the time the PSA and Purchase Agreement were executed on or about April 16, 2009, Hecker's financial problems were well publicized in the media and TCA recognized that Hecker might be the subject of a bankruptcy or similar proceeding and claims by his creditors.

6.    TCA required that the PSA include certain protections for TCA in the event other parties claimed an interest in the payments to be made to Hecker under the PSA. Section 12(b) of the PSA was one of the provisions that TCA required for its protection. Section 12(b) provides as follows:

> The Company and its affiliates will use commercially reasonable efforts to defend against any Claims so long as Hecker is not in default under the terms of the Agreement. For the avoidance of doubt the term commercially reasonable efforts in this context shall include that the Company will not settle any Claims for a period of at least six (6) months from the date a Claim is first asserted, in litigation or otherwise, and notice thereof has been provided to Hecker. Buyer or Company, as applicable, shall present to Hecker any settlements it intends to enter into in advance for his approval, which settlements shall be deemed to be approved by Hecker unless the Company or Buyer has breached its obligations to use commercially reasonable efforts to defend.

7.    The operative term "Claims" as used in Section 12(b) is defined in Section 11 of the PSA as follows:

> . . . a third party asserts (a) any claim, whether in a bankruptcy action, foreclosure action or otherwise, that all or any portion of the Fees are or should have been characterized as consideration for the transactions

2

contemplated by the terms of the Asset Purchase Agreement, or any claims of a similar nature, or (b) any claim that the consideration paid by Buyer under the terms of the Asset Purchase Agreement was insufficient or inadequate or (c) any bankruptcy, preference, fraudulent conveyance or claims of a similar nature related to the transactions contemplated by the Asset Purchase Agreement (collectively, "Claims")."

8.     Section 12(b) was intended to enable TCA to settle *third party* claims that might be made against Hecker with respect to the payments owed to Hecker under the PSA after TCA had used commercially reasonable efforts to defend the payments owed to Hecker under the PSA, including incurring legal fees in defense of such payments to Hecker of up to $50,000 as provided in Section 12(a) of the PSA. Section 12(b) was not intended to permit TCA to settle disputes between TCA and Hecker regarding the PSA. Section 12(b) was not intended to permit TCA to agree unilaterally to a reduction in the amount payable by TCA under the PSA and thereby, for its own benefit, reduce the consideration it had agreed to pay under the PSA.

9.     I also represented Hecker in connection with the Amendment to Asset Purchase Agreement dated as of June 19, 2009 (the "Amendment") among Hecker, IGM and Midwest Motors, LLC ("Midwest Motors") pursuant to which Midwest Motors assumed the obligations of TCA under the PSA in connection with its assumption of the obligations of TCA under the Purchase Agreement and its purchase of the Toyota dealership assets of IGM. A copy of the Amendment is attached as Exhibit B to this Declaration. Pursuant to the Amendment, Hecker agreed to provide his services under the PSA to Midwest Motors.

The undersigned declares under penalty of perjury under the laws of the United States and the State of Minnesota that the foregoing facts stated in this Declaration are, to the best of my knowledge and belief, true and correct.

Executed on this 10th day of June 2010.

Bruce J. Parker

## PERSONAL SERVICES AGREEMENT

**THIS PERSONAL SERVICES AGREEMENT** (the "Agreement") is made and entered into effective upon the Effective Date (as defined below) by and between TWIN CITIES AUTOMOTIVE, LLC, a Delaware limited liability company (the "Company"), and DENNIS E. HECKER, an individual resident of the state of Minnesota ("Hecker").

**WHEREAS**, Hecker has owned, operated and managed numerous automotive dealerships and other businesses related to the automotive industry for more than 35 years, such that Hecker has developed a recognized understanding and expertise within the automotive industry; and

**WHEREAS**, the Company has recently underwent a period of significant growth and desires to have access to parties with experience and skills who will assist the Company manage and integrate its growing operations; and

**WHEREAS**, Hecker possesses the skill set and experience desired by the Company and, therefore, the Company desires to retain Hecker to render services to the Company on the terms and conditions set forth in this Agreement; and

**WHEREAS**, Hecker desires to be retained by the Company on such terms and conditions.

**NOW, THEREFORE,** in consideration of the premises and of the mutual covenants and agreements contained herein, the parties agree as follows:

1.    **Services and Performance of Duties.** The Company hereby retains Hecker to provide the Services (as defined below) to the Company. In providing the Services, Hecker shall devote such time, energy and skills as are reasonably necessary to discharge Hecker's duties hereunder. Hecker shall report to and be subject to the direction of the President of the Company. Hecker shall conduct the Services at such times as directed by the President of the Company. The Services shall include one or more of the following: assist in the integration and operation of the Company's affiliated automotive dealerships in the state of Minnesota, whether now owned or hereafter acquired (the "Dealerships"); assist in strategic planning for the Dealerships; assist and recommend advertising programs and strategies for the Dealerships; assist with manufacturer relationships for the Dealerships; develop and assist with fleet sales for the Dealerships; develop and assist in used car marketing and wholesale strategies for the Dealerships; assist in planning, development and construction of facilities and improvements for the Dealerships; assist in finding, analyzing and contracting dealerships for acquisition; and to provide such other services as are reasonably requested by the Company, and Hecker hereby agrees to provide the Services.

2.    **Term.** The term of this Agreement (the "Term") shall commence upon the Closing of the transactions contemplated by (and as such term is defined in) that certain Asset Purchase Agreement between Twin Cities Toyota, LLC ("Buyer"), Inver Grove Motors LLC, and Hecker dated of even date herewith (the "Asset Purchase Agreement," and such date, the "Effective Date") and shall continue for a period of four (4) years, unless earlier terminated in accordance with this Agreement. Notwithstanding anything in this Agreement to the contrary, if

**CONFIDENTIAL**

the Closing does not occur for any reason, this Agreement will not become effective and will be null and void ab initio. The Company may terminate this Agreement by written notice to Hecker:

(a)     in the event Hecker breaches any representation, warranty, or covenant made by Hecker hereunder;

(b)     in the event Hecker fails to provide the Services as set forth herein and such failure is not remedied within thirty (30) days following written notice from the Company regarding such failure; or

(c)     in the event Hecker takes any action that adversely impacts the business, reputation or goodwill of the Company or any of the Company's affiliates in any material manner.

3.     **Fees.**  As compensation for the Services rendered under this Agreement, the Company shall pay Hecker fees equal to One Million Dollars ($1,000,000) (the "Fees"), payable in forty-eight (48) equal, monthly installments of $20,833.33 commencing on the Effective Date. Fees paid under this Agreement shall not be subject to withholding for federal, state or local income or employment taxes, including withholding for FICA contributions. Hecker shall be solely responsible for any and all federal, state and local income taxes, FICA payments and other required deductions, payments or contributions.

4.     **Expense Reimbursement.**   The Company shall reimburse Hecker for all reasonable expenses, including reasonable travel expenses, incurred by Hecker on behalf of the Company during the Term of this Agreement, as approved by the Company in advance and upon submission of appropriate documentation of such expenses.

5.     **Nature of Relationship.**  Hecker is an independent contractor and neither Hecker nor any employee or agent of Hecker shall be deemed to be an employee of the Company for the purposes of any employee benefit programs, income tax withholding, FICA taxes, unemployment benefits, workers compensation benefits, or otherwise. Hecker shall not have any authority to assume or create any obligation, express or implied, on behalf of the Company.

6.     **Hecker's Warranties, Representations, and Covenants.**  Hecker represents, warrants, and covenants to the Company that (i) Hecker shall comply with and not violate any applicable laws in the performance of the Services under this Agreement; (ii) Hecker shall render the Services in a businesslike and professional manner in accordance with generally accepted standards for the nature of the work performed, and shall act in a manner reasonably calculated to protect the good name and business reputation of the Company; (iii) Hecker shall comply with the covenants set forth in Section 16 of the Asset Purchase Agreement; and (iv) no other party has exclusive rights to Hecker's services to be performed hereunder and Hecker is in no way compromising any rights or trust relationships between any other party and Hecker, or creating a conflict of interest or any possibility thereof, for Hecker or for the Company.

7.     **Nondisclosure.**  Except as permitted or directed by the Company, or as may be required in the proper discharge of Hecker's duties hereunder, Hecker shall not, during the Term or at any time thereafter, divulge, furnish or make accessible to anyone or use in any way any

2

confidential, trade secret or proprietary information of the Company, including without limitation, whether or not reduced to writing, customer lists, customer files or information, business planning and financial information, contracts, sales and marketing information, business strategy or opportunities for new or developing business (collectively, the "Confidential Information"), which Hecker has prepared, acquired or become acquainted with as a result of his relationship with the Company. Hecker acknowledges that the Confidential Information is the property of the Company, constitutes a unique and valuable asset of the Company and any disclosure or other use thereof, other than for the sole benefit of the Company, would cause irreparable harm to the Company. The foregoing obligations of confidentiality shall not apply to any knowledge or information the entirety of which is now published or subsequently becomes generally publicly known, other than as a direct or indirect result of the breach of this Agreement by Hecker or a breach of a confidentiality obligation owed to the Company by any third party.

8.    **Non-Solicitation**. Hecker agrees that, during the Term of this Agreement and for a period of eighteen (18) months following termination of this Agreement for any reason, Hecker will not directly or indirectly solicit, induce or attempt to induce any employee of the Company to terminate his or her employment with the Company.

9.    **Return of Property**. Upon the termination of this Agreement, or upon the Company's request, Hecker shall promptly return to the Company all documents, files or other Company property, including all copies thereof, then in Hecker's possession, control or influence, including without limitation all Confidential Information.

10.    **Injunctive Relief**. Hecker agrees that it would be difficult to compensate the Company fully for damages for any violation of the provisions of Sections 7 through 13 of this Agreement. Accordingly, Hecker specifically agrees that the Company shall be entitled to temporary and permanent injunctive relief to enforce Sections 7 through 13 of this Agreement and that such relief may be granted without the necessity of proving actual damages. This provision with respect to injunctive relief shall not, however, diminish the right of the Company to claim and recover damages in addition to injunctive relief. Hecker agrees that if the Company is the prevailing party, the Company shall be entitled to recover its costs of litigation and attorney fees incurred in enforcing this Agreement.

11.    **Suspension of Payments**. The Company shall have the right to suspend payment of the Fees in the event that a third party asserts (a) any claim, whether in a bankruptcy action, foreclosure action or otherwise, that all or any portion of the Fees are or should have been characterized as consideration for the transactions contemplated by the terms of the Asset Purchase Agreement, or any claims of a similar nature, or (b) any claim that the consideration paid by Buyer under the terms of the Asset Purchase Agreement was insufficient or inadequate or (c) any bankruptcy, preference, fraudulent conveyance or claims of a similar nature related to the transactions contemplated by the Asset Purchase Agreement (collectively, "Claims"). With respect to any Fees so suspended, the Company shall have the right to use or make payment of such Fees directly, or through the Buyer, (y) to any party that is determined by a court of competent jurisdiction, or by any receiver, trustee, or creditor appointed by a court of competent jurisdiction, to be legally entitled to receipt of such Fees or (z) as provided for in Section 12 hereof.

## 12. Specific Indemnity and Offsets.

(a)     In the event (i) it is determined by a court of competent jurisdiction, or a trustee, receiver, or creditor appointed by a court of competent jurisdiction, that the consideration paid by Buyer under the terms of the Asset Purchase Agreement was insufficient or inadequate, or (ii) Buyer or any affiliate of Buyer becomes obligated to pay, or agrees to pay, additional consideration or amounts (other than the consideration specified in the Asset Purchase Agreement) whether in connection with a court order, settlement or otherwise, which payment of additional consideration or amounts arises as a result of or related to any Claims, then the Company shall have the right to offset any future Fee payment obligations under this Agreement (including any payments suspended under Section 11) and apply such Fee payment obligations to satisfy in full or in part any liabilities, damages, losses, costs, and expenses incurred by Buyer or any of its affiliates in connection with any such Claims, including without limitation reasonable attorneys fees (in excess of $50,000 incurred by Buyer or any of its affiliates) and any amounts paid in settlement or other resolution of such Claims (collectively, "Losses"). In addition, Hecker shall indemnify, defend and hold harmless, the Company and any of its affiliates for any and all Losses incurred by the Company or any of its affiliates that are not offset by future Fee payment obligations as set forth above; provided, however, that in no event will such indemnification obligation be greater than the amount of the Fees actually paid to Hecker under the terms of this Agreement. The Company and Buyer are affiliates.

(b)     The Company and its affiliates will use commercially reasonable efforts to defend against any Claims so long as Hecker is not in default under the terms of this Agreement. For the avoidance of doubt the term commercially reasonable efforts in this context shall include that the Company will not settle any Claims for a period of at least six (6) months from the date a Claim is first asserted, in litigation or otherwise, and notice thereof has been provided to Hecker. Buyer or Company, as applicable, shall present to Hecker any settlements it intends to enter into in advance for his approval, which settlements shall be deemed to be approved by Hecker unless the Company or Buyer has breached its obligations to use commercially reasonable efforts to defend.

## 13. General Indemnity.
Hecker shall defend, indemnify and hold the Company harmless from and against any and all liabilities, damages, losses, costs, and expenses (including reasonable attorney fees) which the Company or any of its affiliates may incur or sustain or which may be claimed against the Company or any if its affiliates arising out of or relating to (a) Hecker's performance of the Services or a breach of Hecker's representations, warranties or covenants stated herein, or (b) any act or omission on the part of Hecker or any legal liability on the part of Hecker, in each case related to the performance of his obligations under this Agreement.

## 14. General Provisions.

**14.1     Waivers.**  No failure on the part of either party to exercise, and no delay in exercising, any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy granted hereby or by any related document or by law.

4

**14.2    Governing law.**  This Agreement shall be deemed to be a contract made under the laws of the State of Minnesota and for all purposes it, plus any related or supplemental documents and notices, shall be construed in accordance with and governed by the law of such state without regard to conflict of law provisions.

**14.3    Amendments.**  This Agreement may not be and shall not be deemed or construed to have been modified, amended, rescinded, canceled or waived in whole or in part, except by written instruments signed by the parties hereto.

**14.4    Entire Agreement.**  This Agreement constitutes the entire agreement and understanding between the parties regarding the provision of the Services.  All previous discussions, promises, representations and understandings between the parties relative to the subject matter of this Agreement, if any, have been merged into this document.

**14.5    Severability.**  To the extent that any provision of this Agreement shall be determined to be invalid or unenforceable, the validity and enforceability of the remainder of such provision and of this Agreement shall be unaffected.  If any particular provision of this Agreement shall be adjudicated to be invalid or unenforceable, the parties specifically authorize the tribunal making such determination to edit the invalid or unenforceable provision to allow this Agreement, and the provisions thereof, to be valid and enforceable to the fullest extent allowed by law or public policy.

**14.6    Notices.**  Any written notice required or permitted hereunder to either party shall be given in writing.  Such notice may be delivered by personal delivery, by deposit in the United States Mail, postage prepaid, by any national courier service or by electronically confirmed facsimile transmission with a mailed original.

**14.7    Assignment; Binding Nature.**  Hecker shall not assign or transfer this Agreement or any of his rights or duties hereunder to any other person or entity without the prior written consent of the Company.  All covenants, stipulations and promises in this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs and legal representatives.

**14.8    Intended Third Party Beneficiaries.**  The parties acknowledge and agree that Buyer and each of the affiliates of Buyer are intended third party beneficiaries of this Agreement.

**14.9    Survival of Terms.**  The obligations contained in Sections 7 through 14 shall survive the termination of this Agreement indefinitely.

[signature page follows]

2328527v8

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

Company:

By: _____

Name: Peter Hasselquist
Title: Chief Executive Officer

Hecker:

_____

Dennis E. Hecker

6

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

Company:

By: _____
Name: Peter Hasselquist
Title: Chief Executive Officer

Hecker: _____
Dennis E. Hecker

6

# AMENDMENT TO
## ASSET PURCHASE AGREEMENT

THIS AMENDMENT is entered into as of the _19th_ day of June, 2009, by and among Inver Grove Motors LLC, d/b/a Denny Hecker's Inver Grove Toyota, a Minnesota limited liability company ("Seller"), Midwest Motors, LLC, a Minnesota limited liability company ("Buyer") and Dennis E. Hecker, a Minnesota resident ("Hecker").

## RECITALS:

WHEREAS, Seller entered into an Asset Purchase Agreement dated April 16, 2009 (the "Asset Purchase Agreement") with Twin Cities Toyota, LLC (n/k/a Twin Cities Motors LLC), a Delaware limited liability company, for the purchase and sale of a motor vehicle sales and services dealership that sells Toyotas and Scions under the name "Denny Hecker's Inver Grove Toyota" and "Denny Hecker's Scion" (collectively, the "Dealership"), which conducts businesses at two parcels located at 1037 Highway 110, and 4600 Akron Avenue, Inver Grove Heights, Minnesota 55077 (together, the "Dealership Premises") pursuant to Dealer Sales and Service Agreements granted by Toyota and Scion.

WHEREAS, contemporaneous with the execution of the Asset Purchase Agreement, Twin Cities Automotive, LLC, an affiliate of Twin Cities Toyota, LLC, entered into a Personal Services Agreement with Hecker (the "Personal Services Agreement"), which is to become effective upon the closing of the transactions contemplated by the Asset Purchase Agreement; and

WHEREAS, the Asset Purchase Agreement included certain exhibits and related agreements, including two Lease and Option to Purchase Agreements between Twin Cities Toyota, LLC and landlords who are the owners of the Dealership Premises and who also are affiliated with the Seller (collectively, the "Related Agreements"); and

WHEREAS, pursuant to Seller's Toyota Dealer Agreement and applicable law, Toyota Motor Sales USA, Inc. ("TMS/USA") had a right of first refusal on any bona fide written agreement to sell stock and/or assets in the Seller upon the same terms and conditions as set forth in the Asset Purchase Agreement, the Related Agreements and the Personal Services Agreement and a right to assign such rights to any party; and

WHEREAS, TMS/USA exercised its right of first refusal with respect to the Asset Purchase Agreement and Related Agreements and has assigned its rights with respect to the Asset Purchase Agreement and Related Agreements to Stephen J. McDaniels pursuant to an Agreement dated May 7, 2009;

WHEREAS, Stephen J. McDaniels assigned his rights under the Assignment Agreement to Midwest Motors, LLC pursuant to an Assignment of Agreement dated May 29, 2009 with the consent and approval of TMS/USA; and

1

WHEREAS, Buyer and Seller wish to amend the Purchase Agreement to accurately reflect various appraisals and purchase price adjustments necessary as a result of the due diligence conducted by Buyer in connection with the Dealership and the Dealership Premises; and

WHEREAS, Seller has agreed to entered into this Amendment with Buyer to reflect the modifications and changes agreed to by the parties hereto.

NOW, THEREFORE, IT IS AGREED as follows:

1.      Seller hereby acknowledges Buyer's substitution as the Buyer and a successor party to the Asset Purchase Agreement, the Related Agreements and the Personal Services Agreement, and Seller hereby consents to the assignment by TMS/USA of the right of first refusal in favor of TMS/USA, the subsequent assignment of such right of first refusal to Stephen J. McDaniels, as well as the further assignment by Stephen J. McDaniels to Buyer.

2.      The introductory paragraph to 3.1 of the Asset Purchase Agreement is hereby amended in its entirety and shall hereinafter state as follows:

"3.1    Amount and Manner of Payment. The purchase price for the Dealership Assets will be the sum of the amounts set forth in Sections 1.1 through 1.6 **plus** $8,772,813 ("Purchase Price"). The Purchase Price will be payable as follows:"

3.      Paragraphs 10.1(e) and (f) are hereby amended in their entirety and shall hereinafter state as follows:

"(e)    LKMCD Properties, LLC and Jacob Holdings of Akron Avenue LLC shall have closed on the purchase and sale of the property located at 4600 Akron Avenue, Inver Grove Heights, Minnesota;

"(f)    LKMCD Properties, LLC and Jacob Holdings of Highway 110 LLC shall have closed on the purchase and sale of the property located at 1037 Highway 110, Inver Grove Heights, Minnesota;"

4.      Paragraphs 10.2(g) and (h) are hereby amended in their entirety and shall hereinafter state as follows:

"(g)    LKMCD Properties, LLC and Jacob Holdings of Akron Avenue LLC shall have closed on the purchase and sale of the property located at 4600 Akron Avenue, Inver Grove Heights, Minnesota;

"(h)    LKMCD Properties, LLC and Jacob Holdings of Highway 110 LLC shall have closed on the purchase and sale of the property located at 1037 Highway 110, Inver Grove Heights, Minnesota;"

2

5. Paragraph 11 of the Asset Purchase Agreement is deleted in its entirety and shall hereinafter read as follows:

"11. Purchase of Dealership Premises. As a condition to the Closing, LKMCD Properties, LLC shall simultaneously close on the purchase of the real properties identified above in paragraphs 10.1(e) and (f) above (the "Dealership Premises"). Seller hereby acknowledges and agrees that the earnest money payment made by Buyer to Seller pursuant to Section 3.1(a) shall be forfeited by Seller and returned to Buyer in immediately available funds in the event the mortgage holder and/or owner of any real property that comprises a portion of the Dealership Premises does not consent to the terms of the applicable real estate purchase agreements on terms reasonably acceptable to Buyer or otherwise fails to give its required consent to the closing thereof."

6. Paragraph 23 of the Asset Purchase Agreement is amended to provide that notices to Buyer be given as follows:

"If to Buyer: Midwest Motors, LLC
2873 Highway 61
Maplewood, MN 55109
Attn.: Stephen J. McDaniels

With a copy to: Mackall, Crounse & Moore, PLC
1400 AT&T Tower
901 Marquette Avenue South
Minneapolis, MN 55402-2859
Attn.: William J. O'Brien, Esq."

7. Effective as of the Closing, Buyer hereby assumes and agrees to pay and perform all of the obligations of Twin Cities Automotive, LLC, under the Personal Services Agreement.

3

Except as modified and amended herein, Buyer and Seller hereby ratify and confirm all terms and conditions of the Asset Purchase Agreement.

SELLER:

INVER GROVE MOTORS, LLC

By: _____

Name: Erik P. Dove

Its:      Manager and Vice President


BUYER:

MIDWEST MOTORS, LLC

By: _____

Stephen J. McDaniels

Its:  Chief Manager


The undersigned agrees to perform his services under the Personal Services Agreement from and after the Closing to and for the benefit of the Buyer.

HECKER:

_____

Dennis E. Hecker

Except as modified and amended herein, Buyer and Seller hereby ratify and confirm all terms and conditions of the Asset Purchase Agreement.

SELLER:

INVER GROVE MOTORS, LLC

By: _____
Name: Erik P. Dove
Its: Manager and Vice President


BUYER:

MIDWEST MOTORS, LLC

By: _____
Stephen J. McDaniels
Its: Chief Manager

The undersigned agrees to perform his services under the Personal Services Agreement from and after the Closing to and for the benefit of the Buyer.

HECKER:

_____
Dennis E. Hecker

WJO/jmt/1077255v3

4

**UNITES STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

In re:

DENNIS E. HECKER
        Debtor.

Case No. 09-50779-RJK

Chapter 7

---

RANDALL L. SEAVER,
        Plaintiff,

vs.

DENNIS E. HECKER, MIDWEST MOTORS
LLC, LKMCD PROPERTIES, LLC, CHRYSLER
FINANCIAL SERVICES AMERICAS LLC,
TOYOTA MOTOR CREDIT CORPORATION,
INVER GROVE MOTORS LLC D/B/A DENNY
HECKER'S INVER GROVE TOYOTA, JACOB
HOLDINGS OF HIGHWAY 101 LLC, AND
JACOB HOLDINGS OF AKRON AVENUE LLC,

        Defendants.

ADV Pro. No. 09-05045

---

**AFFIDAVIT OF PETER HASSELQUIST**

---

STATE OF MINNESOTA  )
               ) ss.
COUNTY OF HENNEPIN  )

    I, Peter Hasselquist, hereby depose and state as follows:

1.    That I am the President of Twin Cities Motors, LLC, formerly known as Twin Cities Toyota, LLC, a Delaware limited liability company, ("TCT") and I am the original party who extensively negotiated the purchase price together with other

terms and conditions for the purchase of the Toyota dealership owned by Inver

Grove Motors, LLC d/b/a Denny Hecker's Toyota ("IGM") during March / April

of 2009.

2.  On April 16, 2009 TCT, as buyer, and IGM, as seller, entered into an Asset

Purchase Agreement ("APA") for the purchase of the Toyota dealership owned by

IGM.

3.  The purchase price negotiated and agreed to in the APA represents, in my

opinion, the fair market value for the dealership as of April 2009.

4.  I am also the President of Twin Cities Automotive, LLC ("TCA"). It was always

the intention of TCA to honor the Personal Services Agreement ("PSA") between

TCA and Dennis E. Hecker ("Hecker"), and to have Hecker perform personal

services and report directly to me. The amount of $1,000,000 over four (4) years

for personal services was never intended to be a portion of the overall purchase

price found in the APA for the purchase of the assets of IGM.

5.  Had Toyota Motor Sales, USA, Inc. not exercised its Rights of First Refusal on

May 6, 2009, it was always the intention of TCA to honor the PSA.

FURTHER YOUR AFFIANT SAITH NOT.

_____
Peter Hasselquist

Subscribed and sworn to before me a
Notary Public this 16 day of
February 2010.

_____
Notary Public

Margaret Mary Dioguardi
Notary Public
Minnesota
My Commission Expires January 31, 2014

2468089v1

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

In re: Dennis E. Hecker,

Bky No. 09-50779

      Debtor.     Chapter 7

---

Randall L. Seaver, Trustee,

Adv. No. 09-5045

      Plaintiff,

vs.

Dennis E. Hecker, Midwest Motors, LLC,
LKMCD Properties, LLC, Chrysler Financial Services
Americas LLC, Toyota Motor Credit Corporation,
Inver Grove Motors LLC d/b/a Denny Hecker's
Inver Grove Toyota, Jacob Holdings of Highway 110 LLC,
and Jacob Holdings of Akrom Avenue LLC,

      Defendants.

---

## UNSWORN DECLARATION FOR PROOF OF SERVICE

---

John R. Neve, Neve Law, PLLC, attorney licensed to practice law in this court, with office address of 8500 Normandale Lake Blvd, Suite 1080, Minneapolis, MN 55437, declares that on the date set forth below, he caused the following documents:

> **Defendant and Debtor Dennis Hecker's Memorandum of Law in Opposition to Motion to Approve Settlement Agreement and For Expedited Relief; Declaration of John R. Neve with attached Exhibits; Declaration of Bruce Parket with attached exhibits; Affidavit of Peter Hasselquist; and Proposed Order**

to be filed electronically with the Clerk of Court through ECF, and that ECF will send an e-notice of the electronic filing to the following:

-   Patti H Bass       ecf@bass-associates.com
-   Daniel C. Beck     dbeck@winthrop.com, tcooke@winthrop.com
-   Matthew R. Burton   mburton@losgs.com, swood@losgs.com
-   Tyler D. Candee    tcandee@lapplibra.com, dwegler@lapplibra.com
-   Bruce H. Carlson   bruce.carlson@mlcfargolaw.com, tricia.fossen@mlcfargolaw.com
-   Monica L. Clark    clark.monica@dorseylaw.com
-   Gordon B. Conn    conn@kwgc-law.com

- Larry D. Espel     lespel@greeneespel.com, lbulson@greeneespel.com, sholenko@greeneespel.com
- David B Galle     dgalle@oppenheimer.com
- James A. Geske     jgeske@wilfordgeske.com, mroue-chambers@wilfordgeske.com; mpeterson@wilfordgeske.com
- Stephen F Grinnell     stephen.grinnell@gpmlaw.com
- Aaron R. Hartman     ahartman@aoblaw.com, lwilhelm@aoblaw.com
- Joshua A. Hasko     jhasko@messerlikramer.com, nkuhnly@messerlikramer.com
- Andrea M. Hauser     ahauser@losgs.com
- Robert J. Hennessey     rhennessey@lindquist.com, lsatriano@lindquist.com
- David L. Johnson     david.johnson@mlcfargolaw.com
- James M. Jorissen     jjorissen@losgs.com, vrittenbach@losgs.com
- Jeffrey D. Klobucar     jklobucar@foleymansfield.com
- Robert T. Kugler     robert.kugler@leonard.com, ma.xiong@leonard.com
- Jacqueline D. Kuiper     jacqueline@mantylaw.com, ecf@mantylaw.com
- Jordan S Kushner     kushn002@umn.edu
- Connie Lahn     connie.lahn@fmjlaw.com, Aong.Moua@fmjlaw.com
- Thomas Lallier     ECF_Notices@foleymansfield.com
- Joseph W. Lawver     jlawver@messerlikramer.com, kmilner@messerlikramer.com
- Seth Leventhal     seth.leventhal@fmjlaw.com, sherri.debettignies@fmjlaw.com
- Adam D. Maier     adam.maier@leonard.com, callie.sanford@leonard.com, ma.xiong@leonard.com
- Nauni J Manty     ecf@mantylaw.com
- Manty & Assoc. PA     ecf@mantylaw.com
- Barbara J May     babsjmay7@aol.com
- Steven Meshbesher     smeshmesh@aol.com, kgregorius@gmail.com
- Michael L Meyer     mlmeyer@ravichmeyer.com
- Ralph Mitchell     rmitchell@lapplibra, jpipp@lapplibra.com
- Andrew P. Moratzka     apm@mcmlaw.com, jef@mcmlaw.com;ldj@mcmlaw.com
- Nicholas N Nierengarten     nicholas.nierengarten@gpmlaw.com
- Timothy J Peters     tpeters@peterslawplc.com, peters.timothy.james@gmail.com; bfrank@peterslawplc.com
- Jamie R. Pierce     jpierce@hinshawlaw.com, akulbeik@hinshawlaw.com; mpocock@hinshawlaw.com; kmoore@hinshawlaw.com
- Steven R Qualley     steveq@gqlaw.net, squalley@gqlaw.net
- Recovery Management Systems Corp     claims@recoverycorp.com
- Craig E. Reimer     creimer@mayerbrown.com, samahdi@mayerbrown.com; srozen@mayerbrown.com; hroin@mayerbrown.com
- David E. Runck     david.runck@fmjlaw.com, Aong.Moua@fmjlaw.com
- Randall L. Seaver     rlseaver@fullerseaverramette.com, rseaver@ecf.epiqsystems.com
- Brad A Sinclair     bsinclair@serklandlaw.com, crohr@serklandlaw.com
- William R. Skolnick     wskolnick@skolnick-shiff.com, zpuchtel@skolnick-shiff.com; rcargill@skolnick-shiff.com; dlarson@skolnick-shiff.com; sshiff@skolnick-shiff.com
- Rebecca G. Sluss     rsluss@oppenheimer.com
- Kathleen K. Statler     kstatler@gr-espel.com, lrichart@greeneespel.com
- Mark D. Stephenson     marks@stephenson-sanford.com, chrish@sstmnlaw.com
- Michael R. Stewart     mstewart@faegre.com

| | |
|---|---|
| Gregory L. Taddonio | gtaddonio@reedsmith.com, kpalmer@reedsmith.com |
| Will R. Tansey | wrtansey@ravichmeyer.com |
| US Trustee | ustpregion12.mn.ecf@usdoj.gov |
| Nicholas J. Vivian | nvivian@eckberglammers.com, dneumann@eckberglammers.com |

I further certify that I caused a copy of the foregoing documents and the notice of electronic filing to be mailed by first class mail, postage paid, to the following non-ECF participants:

| | |
|---|---|
| MICHAEL W MALTER<br>BINDER & MALTER LLP<br>2775 PARK AVENUE<br>SANTA CLARA, CA 95050 | FREDRIKSON & BYRON PA<br>200 SOUTH SIXTH ST, STE 4000<br>MINNEAPOLIS, MN 55402 |
| FULLER SEAVER & RAMETTE<br>C/O RANDALL SEAVER<br>12400 PORTLAND AVE S, STE 132<br>BURNSVILLE, MN 55337 | LEONARD OBRIEN SPENCER GALE &<br>SAYRE LTD<br>100 SOUTH 5TH STREET, STE 2500<br>MINNEAPOLIS, MN 55376 |
| MICHAEL B. LUBIC<br>10100 SANTA MONICA BLVD<br>7TH FLOOR<br>LOS ANGELES, CA 90067 | |

And I declare, under penalty of perjury, that the foregoing is true and correct.


Dated: June 11, 2010　　　　　　　　Signed:___/e/ John R. Neve_____

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                          Bky No. 09-50779

Dennis E. Hecker,                                    Chapter 7

                          Debtor.

Randall L. Seaver, Trustee

                          Plaintiff,                 **ORDER**

          vs.                                 Adv. No. 09-5045

Dennis E. Hecker, et al.,

                          Defendants.

This case is before the court on the Trustee's Motion to Approve Settlement Agreement and For Expedited Relief.

Based on the motion and the file and the court being fully advised in the premises,

**IT IS ORDERED**:

1.     The Trustee's Motion to Approve Settlement Agreement and For Expedited Relief is DENIED.

                              **BY THE COURT:**

Dated: _____          _____
                                        Robert J. Kressel
                                        U.S. Bankruptcy Judge