## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

_____

In re:                                                          BKY No.:  09-50779

Dennis E. Hecker,                                                       Chapter 7

       Debtor.

_____

Randall L. Seaver, Trustee,                                    Adv. No.:  10-5___

       Plaintiff,

vs.                                                    **ADVERSARY COMPLAINT**

Cornerstone Bank, Royal Jewelers, Inc.,
Cornerstone Holding Company, Inc. and
Richard Olson,

       Defendants.

_____

Plaintiff Randall L. Seaver, Trustee (the "**Trustee**"), as and for his Complaint against Defendants Cornerstone Bank ("**Cornerstone Bank**"), Cornerstone Holding Company, Inc. ("**Cornerstone Holding**"), Royal Jewelers, Inc. ("**Royal Jewelers**") and Richard Olson, alleges and states as follows:

### INTRODUCTION

1.      This is an action to avoid prepetition transfers from the Debtor, Dennis E. Hecker ("**Hecker**" or the "**Debtor**") to Defendants Cornerstone Bank, Cornerstone Holding, Royal Jewelers, and Richard Olson, and for the subordination or disallowance of these Defendants' claims based on their overreaching both before and after the petition commencing this bankruptcy case was filed.  This action also seeks declaratory relief relating to the Hecker relationship to Cornerstone Bank.

2.      As the Denny Hecker automotive empire crumbled and Hecker slid inexorably toward bankruptcy, his insolvency threatened the very existence of Cornerstone Bank. Cornerstone Bank, prior to late 2008 had lent Hecker enormous sums of money through loans that were under-secured, and became non-performing and ultimately uncollectible. Cornerstone extended the loans at the behest of Richard Olson and his brother Brent, Hecker's long-time friends and business partners who also happened to be co-founders and insiders of Cornerstone Bank.

3.      By the fourth quarter of 2008, Cornerstone Bank's regulatory advisors warned the bank's management team that the distressed nature of the Hecker loans, if not remediated, portended the forced closure of Cornerstone by bank regulators. As Richard Olson stated in a December 20, 2008 email to Hecker, "[h]ad a board meeting yesterday a.m. Independ. Auditor going thru bank, former regulator dude, **says we are done if this 6.8m is not out of the bank. This will take bank down when regulators come Jan. This will take Greg, Brent and I down. Desperate for ideas!! Please help.!!"** A true and correct aggregation of copies of email correspondence is attached hereto as part of <u>Exhibit A</u> (email correspondence). Cornerstone Bank and Olson were "desperate" to somehow move the loans off the bank's books, and they pleaded with the Debtor for help.

4.      By the time Richard Olson asked the Debtor for help with the Cornerstone loan situation, Hecker had already forged a Stand-Still Agreement with Chrysler Financial Services Americas LLC ("**Chrysler**") (the "**Stand-Still Agreement**"). Pursuant to the Stand-Still Agreement, Hecker covenanted that he would not take on additional debt or pledge additional assets to secure existing debt.

5.      Despite their awareness of the Stand-Still Agreement, the Olsons and Cornerstone actively induced Hecker, in late December 2008 and January 2009 to enter into a series of transactions in which Cornerstone Bank – without advancing any new funds – gained millions of dollars of additional, unencumbered collateral from entities owned by Hecker and a blanket lien in many of Hecker's individual assets.

6.      These transfers of additional, unencumbered collateral appear to have enabled Cornerstone Bank to avoid regulatory scrutiny in relation to its improvident loans to Hecker. The earlier Hecker loans were scrubbed from the bank's books, as they were replaced with loans to borrower entities owned by the Debtor and supported by real collateral and then assigned to Cornerstone Holding and its newly-erected collection arm, Blackstone Financial LLC ("**Blackstone**").   Blackstone was created to keep the "Cornerstone" name out of the press. Exhibit B at p. 34 (Portion of Brent Olson 2004 Examination).

7.      During the course of these proceedings, Richard Olson and Royal Jewelers (owned by the Olson family) actively aided and abetted the Debtor's concealment from the bankruptcy estate of multiple wrist watches worth tens of thousands of dollars.

8.      These watches – which Richard Olson accepted from Hecker just days after Olson appeared under oath for his Rule 2004 examination in these proceedings – were turned over to the Trustee only *after* Defendants' counsel discovered that the Trustee had made written demand upon the Debtor for disclosure of the whereabouts of the watches.   Further, it appears that Hecker sent the watches to Richard Olson only after he was confronted about them at a bankruptcy rule 2004 examination conducted on February 19, 2010 in which Hecker asserted the Fifth Amendment privilege in response to virtually every question.

9.     In sum, as set forth more fully below, the prepetition transfers to Cornerstone Bank and the other Defendants were preferential or fraudulent transfers, and Defendants' conduct both before and after the filing of the bankruptcy case has been inequitable.  The transfers to Cornerstone and the other Defendants described herein are therefore avoidable, and Defendants' claims in the bankruptcy case should be disallowed or equitably subordinated to the claims of all other creditors.

**THE PARTIES**

10.     The Trustee is the duly appointed Chapter 7 trustee in the above-captioned bankruptcy case.

11.     Richard Olson is an adult resident of North Dakota.

12.     Cornerstone Bank is a North Dakota state bank with a business address of 2627 University Drive, Fargo, North Dakota 58103.  Cornerstone Bank is a wholly-owned subsidiary of Cornerstone Holding.

13.     Cornerstone Holding is a North Dakota corporation.  Cornerstone Holding was formed on February 27, 2006 under the lead of Brent Olson for the purpose of acquiring Citizen's Bank.  Cornerstone Holding thereafter acquired Citizen's Bank and changed its name to "Cornerstone Bank."  Richard Olson and his brother, Brent Olson, are shareholders of Cornerstone Holding and at times relevant served on the Cornerstone Bank board of directors. None of the Olsons are employees of Cornerstone Bank.

14.     Royal Jewelers is a North Dakota corporation located in Fargo, North Dakota, whose registered agent is Brent Olson.  Richard Olson's father, Charles Olson, purchased Royal Jewelers in 1974.  Richard Olson is an officer and director of Royal Jewelers.  He and his brothers, Greg and Brent Olson, currently comprise the ownership group of Royal Jewelers.

Brent Olson, a CPA, performs accounting services for Royal Jewelers and offices in Royal Jewelers' building.

15.     Blackstone is a North Dakota limited liability company formed by Brent Olson on December 22, 2008.  Upon information and belief, Blackstone is a wholly-owned subsidiary of Cornerstone Holding, and was formed to hold and collect non-performing loans of Cornerstone Bank.

## JURISDICTION AND VENUE

16.     The Trustee brings this Complaint under Federal Rule of Bankruptcy Procedure 7001.  This action arises under 11 U.S.C. §§510, 544, 547, 550, 551 and other applicable federal and state law.

17.     This Court has jurisdiction over this adversary proceeding, and this adversary proceeding is authorized, under 28 U.S.C. §§157 and 1334, Federal Rule of Bankruptcy Procedure 7001, and Local Rule 1070-1.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

18.     Venue is proper in this Court pursuant to 28 U.S.C. §1409(a).

## FACTUAL BACKGROUND

## I.     THE DEBTOR'S RELATIONSHIP WITH THE DEFENDANTS

19.     As detailed throughout this Complaint, each of the Defendants herein is an insider of the Debtor, as was Brent Olson.  The Defendants and Brent Olson had the ability to influence and control the Debtor and, as demonstrated herein, exercised such influence and control for Defendants' benefit and to the detriment of all other creditors.

20.     The Debtor is a long-time friend and close associate of the Olson family.  He is a significant and longstanding customer of Royal Jewelers.  At times relevant, the Debtor, both individually and through his numerous corporate entities, was a substantial customer of Cornerstone Bank.

### A.     The Olsons

21.     Richard Olson first met the Debtor more than 25 years ago.  Since that time, the Debtor and the Olson family have maintained a close personal and business relationship.  So close was the relationship that Olson family members were invited to and attended the wedding of one of the Debtor's children.

22.     Over the years, the Debtor and his spouse also frequently socialized with members of the Olson family, and joined Olson family members for events such as Christmas, birthdays and WE Fest (held in Detroit Lakes, Minnesota).  The Debtor and his spouse often stayed at the lake home of Charles Olson, Brent and Richard Olson's father, while partaking in these events.  Olson family members similarly spent time with the Debtor's family in the Twin Cities at football games, anniversary parties and the like.

23.     Both before and after his bankruptcy filing, the Debtor controlled tickets to professional sporting events in Minneapolis which he provided for free to members of the Olson family including, most recently, tickets to a September 20, 2009 Minnesota Vikings game which the Debtor gave to Richard Olson more than three months after the commencement of this case.

### B.     Royal Jewelers

24.     The Debtor has a predilection for expensive luxury watches.  At the time of his bankruptcy filing, the Debtor possessed or controlled over 20 luxury watches.  The location, identification and recovery of the watches has been a very public aspect of the Hecker

bankruptcy case.

25.     Richard Olson first met the Debtor while the Debtor was shopping at Royal Jewelers, and during the ensuing 25 year period, the Debtor repeatedly purchased Rolex watches and other expensive items from Royal Jewelers for himself, friends and his top salesmen.

26.     Royal Jewelers continued to do business with the Debtor even after the commencement of this bankruptcy case.

### C.     The Scottsdale Luxury Condominium Joint Venture

27.     The Debtor, Brent Olson and Richard Olson are also joint venture partners and co-owners of a luxury condominium in Scottsdale, Arizona (the "**Condominium**") located within the condominium project known as "The Waterfront."

28.     Hecker invited Brent and Richard Olson to join him in the venture in 2007, and they agreed.  Thereafter, Hecker acquired the Condominium through a limited liability company that he owned, Jacob Properties of Scottsdale LLC ("**JPS**").  Hecker and the Olsons arranged for financing to support the purchase through a loan to Hecker from Cornerstone Bank.

29.     In or around August 2008, Brent Olson, Richard Olson and Hecker formed Waterfront Properties, LLC ("**Waterfront**") to acquire the Condominium from JPS.  The ownership percentage of Waterfront was set at 50% Hecker and 25% each for Richard Olson and Brent Olson.  Hecker was elected President of Waterfront, Richard Olson the Secretary, and Brent Olson, was named Treasurer.  In September 2008, Waterfront purchased the Condominium from JPS for $2,950,000.00.

30.     Waterfront's members financed the purchase of the Condominium in large part utilizing financing obtained from Bremer Bank.  This was done to benefit Brent and Richard Olson, as, per Brent Olson, "Regulation O" restricts the ability of bank owners to borrow from

their own bank.  <u>Exhibit B</u> at p. 20.

31.     In excess of $300,000 of the original loan to Hecker remained with Cornerstone Bank (Loan No. 205384) as Hecker's individual obligation.  The portion of the loan that remained with Cornerstone in the aftermath of the Bremer financing transaction was wholly unsecured.

32.     Hecker's condominium loan with Cornerstone was also past due.  In a September 18, 2008 note regarding the Condominium loan to Erik Dove, the Debtor's chief assistant, Cornerstone Bank loan officer Kyle Froslie remarked that "[t]oday we have $289,613.85 principal and $45,448.77 interest due.  **We're looking at 70 days beyond maturity** and I need to clean it up in some fashion prior to quarter end."  <u>Exhibit C</u>.

33.     On October 20, 2008, Dove wrote to Cornerstone Bank and stated "I will send you a check tomorrow to payoff the balance owing on Denny's line with you (approximately $338M).  There will need to be a reconciliation between Denny, Richard and Brent relating to security and entertainment expenses paid by Denny that were installed in the unit."  *Id*.  According to the records of Cornerstone Bank, Hecker thereafter paid off the balance of this loan in full.

**D.     Cornerstone Bank**

34.     As noted above, in February 2006, Brent Olson led up the formation of Cornerstone Holding for the purpose of acquiring Citizen's bank, which would later become Cornerstone Bank.  At relevant times, Brent and Richard Olson served on Cornerstone Bank's board of directors.  Indeed, Brent Olson remains on the bank's board of directors and serves on its marketing committee and asset liability committee.

35.     Brent and Richard Olson introduced Hecker to Cornerstone Bank and, as the bank's loan files reflect, Cornerstone Bank viewed the Olson's relationship with Hecker as an important consideration in making multiple loans to Hecker as detailed herein.

### 1.     The DEH Funding LLC Loan

36.     On or about October 5, 2007, Cornerstone Bank made a loan (Loan #201709) to DEH Funding LLC ("**DEH Funding**") in the amount of $3,000,000.00.  The only collateral was the assets of DEH Funding and a personal guaranty of the Debtor.

37.     The loan file reflects that, "Cornerstone Bank owners Richard and Brent Olson referred Dennis Hecker into the bank," that the loan is "under secured" and that DEH Funding "has no real hard assets to speak of."  Exhibit D.

38.     DEH Funding loan had a maturity date of October 4, 2008.

39.     The loan was not repaid on its maturity date.  Accordingly, the maturity date was extended to December 15, 2008.

40.     A Cornerstone Bank report dated December 15, 2008 notes an extension of the maturity dates to March 15, 2009 and that the, "Extension allows bank to obtain additional collateral and assess the implications of Advantage Rent A Car's chapter 11 bankruptcy . . . ."

### 2.     The HogRider Loan

41.     On or about October 26, 2007, Cornerstone Bank made a loan (Loan #202059) to HogRider Investments, LLC in the amount of $4,000,000.00 with a maturity date of October 25, 2008.  The collateral for the loan was assignment of ownership in EagleRider, Inc. and a personal guaranty by the Debtor.[1]

42.     The HogRider loan was considered by Cornerstone to be under secured and was above Cornerstone Bank's internal lending limit.  Exhibit E.

---

[1] EagleRider, wholly owned by HogRider, is a motorcycle rental business for travel in the U.S. and Europe.

43.     On or about November 19, 2008, the maturity date was extended to December 15, 2008 by way of a new note (Loan No. 209185).  No additional collateral was requested or granted for this loan extension.

44.     On December 9, 2008, the loan officer noted that, **"November 13th it was reported that Dennis Hecker is suing Chrysler Financial for not honoring the floor plan line obligation and the negative impact it has had on his dealerships."**

45.     Cornerstone Bank's notes later reflect that "[t]he loan to HogRider Investments, LLC has been paid off in full by Cornerstone Holding as of 12/31/08."  This is untrue.

### *3.      The Rosedale Dodge Loan*

46.     On or about May 21, 2008, Cornerstone Bank made a loan (Loan #205706) to Rosedale Dodge, Inc. in the amount of $3,000,000.00 with a maturity date of July 21, 2008.  No collateral was taken for the loan except for the personal guaranty of the Debtor.

47.     The officer notes state that loan is "under secured," "exceeds internal bank lending limit," and that, **"Hecker is well known to the ownership group . . ."**  Exhibit F.

48.     Although Cornerstone Bank was under the impression that the Rosedale Dodge Loan would be paid on its maturity date, it was not satisfied by that date.  Consequently, On November 19, 2008, the Rosedale Dodge loan was extended to December 15, 2008.

49.     Officer notes dated December 9, 2008 have the action plan of **"[m]eet with Hecker Group to gather additional detail on the impact of shutting down dealerships and his law suit with Chrysler Financial and the short and long term structure for this credit."**

50.     Notes dated December 15, 2008 state that **"Borrower did not have the ability to refinance by year end, and therefore pledged his additional collateral to the bank to extend to 3/15/09."**

#### 4.    *The Aspen Loan*

51.     On November 20, 2007, Hecker, through his entity Jacob Holdings of Monarch LLC, borrowed $800,000.00 from Cornerstone Bank (Loan #202416) to finance, in part, earnest money for the new construction of a $6.85 million dollar luxury condominium in Aspen, Colorado (the "**Aspen Condominium**").

52.     The request was made, and approved, via e-mail.

53.     Hecker had one year to close his purchase of the Aspen Condominium or the purchase money would be forfeited.

54.     In late 2008, the Debtor was unable to close on the Aspen Condominium and the investment was forfeited leaving Cornerstone with a naked, unsecured, unpaid principal balance of $800,000 plus accrued interest on the Aspen Condominium loan.

## II.    THE CRISIS AT CORNERSTONE BANK

### A.    Hecker's Worsening Financial Condition

55.     By October of 2008, Cornerstone Bank and the Olsons were acutely aware of Hecker's severely strained financial condition.  His loans with Cornerstone were either past their original maturities or nearing maturity.

56.     In order to emphasize its concerns, on October 13, 2008, Cornerstone Bank sent a summary of outstanding loans to Hecker and his entities and noted that "[w]e, like most banks, are doing the best we can to plan for liquidity needs of the bank as we come under more strict supervision and regulation."  Among the loans identified was note 205384 (the remainder of the Scottsdale loan) with Hecker as borrower and an unpaid balance of $337,309.57.

57.     Because of the non-performing status of the substandard loans Cornerstone Bank had made to Hecker and his affiliated companies, in or around November 2008, Cornerstone

Bank faced the looming prospect of having to charge off the loans. Brent Olson, himself a member of Cornerstone Bank's board of directors, candidly testified that he was "shocked" that the Debtor "owed that much." <u>Exhibit B</u> at p. 26.

**B.      The Proposed Restructuring**

58.      On or about December 15, 2008, Kyle Freier (then bank President), Kyle Froslie (loan officer) and Dennis White (current bank President) met with Hecker and Erik Dove in Minneapolis. During the meeting, Hecker informed these representatives of Cornerstone Bank that Chrysler had commenced litigation and that he had a "Stand-Still Agreement" with Chrysler, through January 15, 2009, which prevented Hecker or his affiliates from creating more debt or pledging additional assets. Kyle Froslie reviewed a copy of the Stand-Still Agreement.

59      At the request of Cornerstone Bank's officers, Brent Olson also attended the meeting so that he could act as a "conduit for information." Following the meeting, on December 15, 2008, Cornerstone Bank President Kyle Freier wrote to Hecker to propose a restructuring of the loans and noted "I am confident that we can structure something with Toyota stores that will not violate your agreement with Chrysler." <u>Exhibit A</u> at p. 1.

**C.      Richard Olson's Intervention**

60      Given the magnitude of the crisis faced by Cornerstone Bank in its lending relationship with Hecker and an impending January 2009 bank examination, Cornerstone Bank enlisted the assistance of Hecker's long-time friend and business partner, Richard Olson, to serve as Cornerstone Bank's emissary in relation to the proposed restructuring.

61      The day after the Minneapolis meeting, October 16, 2008, Richard Olson sent an e-mail to Hecker, in which Olson noted that "[a]s you know, we came running with the loan upon your request and now need your help . . . . We will be totally screwed if this doesn't have

something solid behind it that makes sense when the regulators come early January. Your Pal, Richard." Hecker responded that that the "Toyota deal is a conflict of cfc [Chrysler] agreement." *Id*.

62.    That same day, Cornerstone Bank internally downgraded Hecker's loans from a 3 to a 4 due to the "visit and some recently publicized developments on our guarantor Dennis Hecker."

63.    On December 20, 2008, Richard Olson sent another urgent e-mail to Hecker in which he remarked that Cornerstone Bank "[h]ad a board meeting yesterday a.m. Independ. Auditor going thru bank, former regulator dude, **says we are done if this 6.8m is not out of the bank. This will take bank down when regulators come Jan. This will take Greg, Brent and I down. Desperate for ideas!! Please help.!!"** Exhibit A at p. 3.

64.    Later that day, Richard Olson again pressed Hecker to violate the Chrysler Stand-Still Agreement in order to fortify Cornerstone Bank's position in an e-mail in which he wrote: "Could you pay any of it maybe 1.8M? Collateralize the other 5M with real property, even if it is a 2nd. Maybe a couple of properties worth 5-6m and you only owe 2 on them? I really don't know what you have so need some direction from you. Any ideas?" *Id.*

65.    Hecker's December 20, 2008 response recited that "[w]ith Chryslers stand still its hard. I am willing to be creative but there 600m I want to resolve without an ambush . . . ." *Id.*

## III.    THE CORNERSTONE TRANSFERS

66.    As negotiations continued, Hecker's financial condition continued to worsen, and Cornerstone Bank knew it. On or about December 27, 2008, Cornerstone Bank learned that Community National Bank had sued Debtor for $1.1 million. The bank noted that, **"The financial condition of Mr. Hecker and his entities continues to deteriorate."**

67.     Despite the Stand-Still Agreement, Cornerstone Bank elected to appropriate as much collateral as it could from Hecker.

**A.      The Restructuring**

68.     Jacob Holdings of Stillwater LLC ("**Stillwater**") is a Minnesota limited liability company which was owned 99% by Hecker and 1% by Walden Investment Company (which was 100% owned by Hecker).   In December of 2008, Stillwater owned 18.6 acres of unencumbered real estate in Forest Lake, MN valued, at the time, excess of $1.8 million dollars.

69.     On or about December 29, 2009, Cornerstone Bank's notes evidence that a $1.8 million real estate loan was closed relating to Stillwater (but no new funds were advanced). Instead, debt was reduced on the Monarch (Aspen) loan ($800,000 to $0) and on the HogRider loan ($4 million to $3,109,400).   In other words, debt was shifted to a Hecker corporation that was a stranger to the prior transactions and which had valuable real estate holdings.

70.     Debtor attempted to give the assets of Stillwater to Cornerstone despite the existence of Stillwater's guaranty of Chrysler's multi-million dollar debt.

71.     The result of the Stillwater transaction was that Cornerstone Bank ended up with the first position on the Forest Lake property.   An owners and encumbrance report reflects the same and is attached hereto as <u>Exhibit G</u>.

72.     On April 21, 2009, Debtor purportedly executed a deed in lieu of foreclosure transferring all rights in the Forest Lake Property to Cornerstone.   The deed in lieu of foreclosure was recorded with the Washington County Recorder on May 26, 2009, a little over a week before Debtor filed for bankruptcy.   A copy of the deed in lieu of foreclosure is attached hereto as <u>Exhibit H</u>.

73.     Debtor also caused other entities that he controlled to grant mortgages to Cornerstone Bank.[2]

74.     Ultimately, Hecker entered into agreements with Cornerstone Bank whereby he transferred to the bank new notes, **a blanket security interest in his personal assets** and additional collateral held by Debtor's corporate entities.  Prior to this time, Cornerstone Bank did not have a blanket lien on the Debtor's assets.

75.     The exact timing of the transfers is unknown as documents were dated December 15, 2008 but not executed on that date.

76.     During the administration of the Hecker bankruptcy case, Cornerstone Bank has argued that it is in the first position of Debtor's assets due to their UCC filing (which was of record in Minnesota on January 19, 2009) obtained in either late December 2008 or January 2009.

77.     While most of the agreements with the Debtor regarding the crisis are dated December 15, 2008, they were not executed by that date.

78.     A summary of the "workout" between Cornerstone Bank and Hecker is as follows:

(a)     Hecker assigned his rights and interest in the following: a Donald Schroeder note, United States Rent-A-Car, Inc., Denny Hecker Real Estate Holding Company LLC, Denny Hecker Real Estate Company, Twin City Homes, LLC, Snapdragon

---

[2] Debtor had an interest in Jacob Properties of Rogers LCC ("**Rogers**") which owned investment real estate in Rogers, MN.  Rogers was wholly owned by Hecker & Holmers Holding Company LCC ("**H & H Holding**").  H & H Holding was owned 50% each by the Debtor and Todd Holmers.  Debtor also had an interest in H & H Realty of Delano LCC ("**H & H Realty**") which owned investment real estate in Delano, MN.  H & H Realty was owned entirely by Denny Hecker & Holmers Commercial Real Estate Company LLC which was 100% owned by H & H Holding.

As part of his effort to move value to Cornerstone, the Debtor caused each Rogers and H & H Realty to grant mortgages in favor of Cornerstone Bank.  Upon information and belief, the grant of these mortgages resulted in Cornerstone Bank receiving value from the lender in the first position on those properties.

Ventures, LLC, Denny Hecker & Holmers Commercial Real Estate Company, Hecker & Holmers Holding Company, LLC, Denny Hecker & Holmers Real Estate Company, LLC and Alien Technology Corporation to Cornerstone Bank. Hecker also caused DEH Funding to grant Cornerstone Bank a security interest in the same. The UCC-1 for this security was filed on January 19, 2009.

(b) Rogers and H&H Realty grant mortgages on their real estate to Cornerstone Bank to collateralize the DEH Funding loan.

(c) The Rosedale Dodge note was renewed with new collateral added including a security agreement (business assets of Rosedale Dodge Inc.) and a mortgage on highly valuable real estate in Forest Lake, MN owned by Stillwater, a stranger to the prior transactions with Cornerstone Bank. A new note was created between Cornerstone Bank and Stillwater, but no new funds were advanced. Instead, debt was reduced on Hogrider and Monarch (the Aspen condo loan).

(d) The Forest Lake real estate had an estimated value of $1.8 million dollars and Cornerstone Bank ended up with the first position on the same.

(e) A security agreement in the assets of the Debtor, personally, including general intangibles.

79. Hecker and Cornerstone had agreed to enter into an "Assumption and Release" which was designed to have Hecker personally assume the obligations previously guaranteed for the Hogrider Investment LLC loan and a release of claims to the Hogrider assets. The release was not a release of Hecker personally as he was to remain a guarantor or direct obligor with respect to those facilities.

80.     Hecker had given Cornerstone all of the mortgages (Delano, Rogers and Forest Lake) with the understanding that Cornerstone would hold them "in escrow" pending its agreement to the Assignment and Release.  Cornerstone, however, did not immediately sign the Assumption and Release.  However, it apparently went ahead and recorded the mortgages.  The recordation violated the intent of the restructure negotiated by the Olsons and Hecker.[3]  See, Exhibit A at p. 9.

81.     Subsequent to the deal with Cornerstone, Bremer Bank was going to foreclose on the Delano and Rogers development properties due to several months' non-payment.  At that time, Bremer negotiated with Cornerstone on a small payment to Cornerstone to release their second mortgages on the properties.  Upon information and belief, the payment by Bremer to Cornerstone to release the second mortgages was around $20,000.

**B.     Cornerstone Bank Scrubs Its Books via Transfers to Blackstone**

82.     On or about December 22, 2008, Brent Olson formed Blackstone as a North Dakota limited liability corporation.  The sole purpose of Blackstone was to collect the obligations of Debtor.

83.     Concern over the upcoming January 2009 bank examination caused the owners of Cornerstone Bank to move the loan from the bank to its holding company, Cornerstone Holding. This move was made at the direction of Cornerstone Bank's accounting service as the "loans needed to be taken out of the bank."  Exhibit B at pp. 34-35.

84.     In order to get the Hecker loans "off the bank's books" prior to the regulators having issues with them and questioning Cornerstone Bank's capitalization, an "Assignment of

---

[3] Upon information and belief, the Assumption and Release (or a similar document) was ultimately executed by the parties that released Hogrider Investments LLC and its collateral by the bank in mid-March 2009.

Interest" was created which transferred the loans to Cornerstone Holding for the sum of $10,864,327.56, the balance due under the Hecker obligations. The Assignment of Interest is attached hereto as <u>Exhibit I</u> and is dated December 31, 2008. Collection rights were assigned to Blackstone. <u>Exhibit J</u>.

85. In late December 2008 or early January 2009, Brent Olson personally drove paperwork to Minneapolis, Minnesota for Hecker to sign. It was highly unusual for Brent Olson to be involved in loan transactions. However, he was selected to drive to Hecker's location due to his influence on Hecker.

86. Although the Assignment of Interest was dated December 31, 2008, the sum was not paid to Cornerstone Bank on that date. Upon information and belief, had Cornerstone Bank been unable to obtain the additional collateral from Hecker, the Blackstone Assignment of Interest transaction would not have occurred.

87. Concurrent with Assignment of Interest, Cornerstone Holding assigned its rights of collection to Blackstone so that the "Cornerstone Bank" name would not be revealed in the media as collecting on Hecker-related debt. <u>Exhibit B</u> at p. 34. Having helped themselves to a substantial portion of Hecker's remaining unencumbered assets, Cornerstone Bank and its parent company now wanted to disassociate themselves from Hecker.

88. On or about January 29, 2009, the owners of Cornerstone Holding deposited, together, pursuant to a capital call, the sum of $10,800,000.00 into Cornerstone Holding's account at Cornerstone Bank. Upon deposit of the $10,800,000.00 on January 29, 2009, a transfer was made to Cornerstone Bank to satisfy notes 209185, 210123, 210116 and 210130. A copy of the bank statement evidencing these transactions is attached hereto as <u>Exhibit K</u>.

89.     Apparently, Debtor was willing to give Cornerstone additional collateral and expected the bank to execute an "Assumption and Release Agreement" as to Hogrider. Instead, at least initially, the bank recorded the mortgages and did not execute the Hogrider Agreement. This lead to Erik Dove complaining to Brent Olson as follows on February 3, 2009:

> Denny mentioned to me in passing this afternoon that the mortgages on Forest Lake and the real estate development projects may have been filed. As you and I discussed during our meeting on January 15th and confirmed in my email to you below, these mortgages and additional collateral pieces were part of an overall restructure that you and Denny had agreed to and were to be held in trust pending execution of the Assumption and Release that was forwarded with my e-mail. Have these mortgages been filed? If so, I would expect that you would execute the Assumption and Release as agreed. The overall restructure was not to be cherry-picked, but rather an all-in structure to improve the collateral structure for the bank with hard assets. If you are unwilling to execute the Assumption and Release, please let me know and we can go through the process of having the mortgages on the development properties and the loan against the Forest Lake property rescinded and released.

90.     On September 10, 2009, Cornerstone, Cornerstone Holding and Blackstone commenced an adversary proceeding against the Debtor seeking to except their claims from discharge. In their complaint, Defendants claim, among other things, that the Monarch loan remained unsatisfied and that Debtor induced Cornerstone into making a loan to Stillwater by way of false representations. Defendants claimed that their total due was $12,743,733.00. All of this was untrue.[4]

## IV.    THE PRE-PETITION TRANSFERS TO ROYAL JEWELERS AND RICHARD OLSON

### A.      Royal Jewelers

91.     As of the commencement of the case on June 4, 2009, the Debtor owed Royal Jewelers the sum of approximately $219,592.67 on his personal account.

---

[4] The exception to discharge action became moot when Debtor was denied his discharge.

92.     During the one year period prior to the commencement of the case, the Debtor personally paid Royal Jewelers the sum of $85,000 on account of antecedent debt (the "**Royal Transfers**").

93.     Royal Jewelers sold a $60,480.00 watch and charged it to the Debtor's account on or about July 29, 2008, which may, or may not, constitute "new value," as it is unknown whether the watch was actually delivered to the Debtor.

**B.      Richard Olson**

94.     On or about March 20, 2009, Hecker paid the sum of $10,980.86 to Richard Olson on account of an antecedent debt related to the Arizona Condominium.

**V.      DEFENDANTS' POST-PETITION CONDUCT**

95.     Subsequent to the commencement of this case, the Defendants have engaged in a series of activities, some of which appear to have been unlawful, aimed at enhancing their own positions and the position of the Debtor.

**A.      Concealment of Assets**

96.     Hecker filed his Chapter 7 bankruptcy petition on June 4, 2009. Schedules were filed on July 1, 2009. Shortly after the schedules were filed, the Trustee was able to ascertain that certain valuable watches owned by Hecker were not listed in the schedules. On July 13, 2009, the Trustee filed a complaint as ADV No. 09-5020 against Hecker seeking, among other things, turnover of additional watches. Hecker turned over additional watches after being sued. Hecker, however, even after being sued by the Trustee, retained and concealed several valuable watches and jewelry. The filing of the complaint and the Trustee's seeking of those watches were the topic of news stories by at least the Minneapolis Star-Tribune and the St. Paul Pioneer Press.

97.     Hecker was examined by the Trustee on Friday, February 19, 2010 about the location of watches that Hecker had still failed or refused to turnover and which were property of the estate. Copies of pages 1-3 to 53-68 of that examination and exhibits 237, 238 and 242 to 250 thereto are attached hereto as Exhibit L. (The photographs are from a law enforcement raid on Hecker's offices on June 17, 2009.)

98.     Exhibit 237 to the February 19, 2010 Hecker examination shows a black bag with cash, gift cards and several watches. At least three of those watches had not been turned over to the Trustee by February 22, 2010. The photograph which is Exhibit 237 to the Hecker deposition was taken by a member of a law enforcement agency on June 17, 2009, at 500 Ford Road, during the course of the execution of a search warrant. All the watches and other items in that photograph were returned to Hecker after the photograph was taken.

99.     At the February 19, 2010 examination of Hecker, the Trustee asked specific questions of Hecker about those watches. Hecker refused to answer any such questions asserting his Fifth Amendment rights to each question. See, Exhibit L.

100.    After the February 19, 2010 examination of Hecker, Richard Olson and Hecker communicated and during the week of February 22, 2010, Richard Olson met with Hecker in Minneapolis at the offices of Hecker's then attorney, William Skolnick.

101.    During the course of their meeting, although Hecker's well-publicized bankruptcy case had been pending for more than six months, Hecker presented Richard Olson the same black shaving kit which had contained watches as pictured in the June 17, 2009 photograph which had been shown to Hecker at this examination on February 19, 2010. That shaving bag had at least three of the watches which had been photographed on June 17, 2009 and about which the Trustee had made specific inquiry of Hecker on February 19, 2010. The black shaving kit

turned over to Richard Olson contained eight watches and two diamond cuff links having a total value in the tens of thousands of dollars. All of those items are property of the bankruptcy estate. Photographs of items retrieved from Richard Olson are attached hereto as Exhibit L2.

102.     Richard Olson took possession of these items of estate property but, at that time, did not notify the Trustee that he had received possession of valuable estate property.

103.     Richard Olson sat for his Rule 2004 examination on February 2, 2010.

104.     At his examination, Richard Olson testified that Royal Jewelers provided Debtor with a diamond ring valued at approximately $30,000.00 after the commencement of this case on credit. Debtor ultimately paid $5,000.00 toward the ring and then allegedly retuned it to Royal Jewelers.

105.     During the second week of March, 2010, Richard Olson and Royal Jewelers received a second box from Hecker containing two additional watches.

106.     According to counsel for Richard Olson and Royal Jewelers, Royal Jewelers had been informed that one of the watches, a ladies diamond Chanel "J12" Chronograph wristwatch, with a retail value of $36,500, was identified as the property of someone other than the Debtor. Remarkably, due to asserted "confidentiality" concerns, Richard Olson and Royal Jewelers refused to identify the person to whom the watch was sent in the absence of a subpoena.

107.     According to counsel, Royal Jewelers sent the Chanel "J12" Chronograph wristwatch to the person identified by the Debtor as being the owner of the watch. Upon information and belief, that person is Nita Singh Johnson.

108.     On March 29, 2010, the Trustee filed a motion in this case, seeking to compel disclosure of information related to the Debtor's post-petition transfers of watches.

109.     Several days later, after being provided a copy of the Trustee's motion, on April 6, 2010, Richard Olson and Royal Jewelers, through their attorney, first disclosed to the Trustee and his counsel that Royal Jewelers and Olson had taken possession of and were holding the watches and cuff links for the Debtor.  Shortly thereafter, a letter from the attorney for Richard Olson and Royal Jewelers was sent to the Trustee's attorney.  A copy of that letter is attached hereto as Exhibit M.

110.     By the time they felt compelled by the Trustee's motion to reveal their possession of valuable estate property, Richard Olson and Royal Jewelers had concealed that property for over a month.

111.     Upon information and belief, Richard Olson and Royal Jewelers knew that the Debtor was seeking to conceal the existence and location of the watches and cuff links from the Trustee, and these Defendants actively aided and abetted Hecker, Richard Olson's longtime friend, in secreting estate assets.

**B.      The Collection Actions**

112.     On about July 16, 2009, Blackstone sought relief from the automatic solely to pursue claims related to Clearwater Retail Center, LLC, Mikden of Minnetonka, LLC, Mikden of Stillwater, LLC, Michael Holdings of Baxter, LLC, and Mikden of Oakdale, LLC (the "**Relief Entities**").

113.     On or about September 18, 2009, an Order granting Blackstone, alone, stay relief as to the Relief Entities was entered by the Court.

114.     Nonetheless, Cornerstone, Cornerstone Holding and Blackstone, each as named parties, have commenced litigation in the Minnesota state courts, and perhaps elsewhere, to attempt, with Hecker's assistance, to realize on equity in Hecker-related entities which is

property of the bankruptcy estate. Among those actions are the following: Cornerstone Bank et al. v. Denny Hecker Real Estate Holding Co., LLC, et al. (Henn. County File 27-CV-10-1775); Cornerstone Bank et al. v. Hecker and Holmers Holding Company LLC, et al. (Henn. County Court File 27-CV-10-1776); Cornerstone Bank at al. v. Denny Hecker and Holmers Commercial Real Estate Co. (Henn. County Court File 27-CV-10-1629).

115.    Although all of these actions were commenced subsequent to the commencement of the case, and the Trustee had succeeded by operation of law to the Debtor's equitable interest in the properties at issue, Cornerstone Bank failed to notify the Trustee of the pendency of the actions.

116.    Indeed, documents obtained by the Trustee show that Cornerstone Bank served the Debtor's defendant entities with the summonses and complaints initiating these actions through the Debtor's personal attorney, William Skolnick.

117.    Neither the Trustee nor the Trustee's counsel was ever informed of the pendency of such actions until counsel received a telephone call from the Hennepin County District Court advising that Cornerstone Bank was requesting entry of default judgments in the pending actions.

## CLAIMS FOR RELIEF

## COUNT I – PREFERENCE

### (CORNERSTONE BANK AND CORNERSTONE HOLDING)

118.    The Trustee realleges the foregoing paragraphs of this Complaint in their entirety.

119.    In the year prior to commencement of this Chapter 7 case, Defendant Cornerstone Bank was the recipient of the following transfers on account of antecedent debt:

(a)    Assignment of Debtor's rights and interest in a Donald Schroeder note, United States Rent-A-Car, Inc., Denny Hecker Real Estate Holding Company LLC,

Denny Hecker Real Estate Company, Twin City Homes, LLC, Snapdragon Ventures, LLC, Denny Hecker & Holmers Commercial Real Estate Company, Hecker & Holmers Holding Company, LLC, Denny Hecker & Holmers Real Estate Company, LLC and Alien Technology Corporation to Cornerstone Bank. Debtor also caused DEH Funding to grant Cornerstone Bank a security interest in the same. The UCC-1 for this security was filed on January 19, 2009.

(b)     Debtor caused Rogers to grant a mortgage on its real estate to Cornerstone Bank to collateralize the DEH Funding loan. The mortgage was executed on January 15, 2009.

(c)     Debtor caused H & H Realty to grant a mortgage on its real estate to Cornerstone Bank to collateralize the DEH Funding loan.

(d)     The Rosedale Dodge note was renewed with new collateral added including a security agreement (business assets of Rosedale Dodge Inc.) and a mortgage on highly valuable real estate in Forest Lake, MN owned by Stillwater, a stranger to the prior transactions with Cornerstone Bank. The deed in lieu of foreclosure executed by Debtor was another transfer.

(e)     $11,246.77 on or about November 4, 2008 and credited the loan #201707.

(f)     $9,496.91 on or about November 4, 2008 pursuant to a past due notice on loan 201709.

(g)     $47,695.72 on October 24, 2008

(h)     October 2008 payment in excess of $348,000 related to the Scottsdale Condominium.

(i)     A blanket security agreement in the assets of the Debtor, personally, including

general intangibles.

(the "**Cornerstone Transfers**").

120. At the time of the Cornerstone Transfers, Cornerstone Bank was a creditor of the Debtor.

121. At the time of the Cornerstone Transfers, Cornerstone Bank was an insider of the Debtor. Evidence of Cornerstone Bank's insider status includes, but is not limited to, the following:

(a) Cornerstone Bank had unfettered access to the Debtor through the Olsons;

(b) Cornerstone Bank was able to exact transfers from the Debtor in the face of the Chrysler Stand-Still Agreement.

(c) Cornerstone Bank utilized the influence of the Olsons, who were not part of the bank's day to day operations, to influence the Debtor;

(d) The result of Cornerstone Bank's pressure on the Debtor and obtaining millions of dollars of collateral was astonishing to Debtor's business associates;

(e) Cornerstone made loans to Debtor outside of its normal lending practices and was then treated better than any other Hecker creditor.

(f) Debtor and Cornerstone cooperated to see that Cornerstone made a recovery.

(g) Hecker and the Olson representatives of Cornerstone Bank, were engaged in a joint business venture, the ownership of Waterfront Properties, LLC. Through that business entity, Hecker and Cornerstone's representatives had purchased a condominium in Scottsdale, AZ for $2,950,000.00.

(h) Hecker and the Cornerstone representatives (the Olsons) shared the use of $2,950,000.00 Scottsdale Condominium and the expenses of the Scottsdale

26

Condominium which they owned through Waterfront Properties, LLC.

(i) A Cornerstone Bank representative, Richard Olson, actively participated with the Debtor in concealing from the Trustee for many weeks, watches valued in the 10's of thousands of dollars.

(j) Even though two of the Olson's business entities, Cornerstone Bank, and Royal Jewelers, were owed millions of dollars by Hecker at the time of his bankruptcy filing, Cornerstone Bank's representative, Richard Olson, caused Royal Jewelers to extend further credit to the Debtor post-petition by delivering to the Debtor a $30,000.00 ring, for which the Debtor apparently made a down payment of only $5,000.00.

122. The Cornerstone Transfers constituted transfers of an interest of the Debtor in property.

123. The Cornerstone Transfers were on account of an antecedent debt owed by the Debtor to Cornerstone Bank.

124. The Debtor was insolvent at the time of the Cornerstone Transfers.

125. The Cornerstone Transfers enabled Cornerstone Bank to recover more than it would receive as a creditor in this bankruptcy case.

126. None of the exceptions to the Trustee's avoidance powers set forth in 11 U.S.C. §547(c) applies to the Cornerstone Transfers.

127. Pursuant to 11 U.S.C. §547(b), the Cornerstone Transfers are avoidable.

128. Pursuant to 11 U.S.C. §550(a), Plaintiff may recover from Cornerstone Bank and Cornerstone Holding the Cornerstone Transfers or their value.

## COUNT II – PREFERENCE (RICHARD OLSON)

129.    The Trustee realleges the foregoing paragraphs of this Complaint in their entirety.

130.    In the 90 days prior to commencement of this Chapter 7 case, Defendant Richard Olson was the recipient of $10,980.86 on or about March 31, 2009 (the "**Olson Transfer**").

131.    At the time of the Olson Transfer, Richard Olson was a creditor of the Debtor.

132.    The Olson Transfer constituted a transfer of an interest of the Debtor in property.

133.    The Olson Transfer was on account of an antecedent debt owed by the Debtor to Richard Olson.

134.    The Debtor was insolvent at the time of the Olson Transfer.

135.    The Olson Transfer enabled Richard Olson to recover more than he would receive as a creditor in this bankruptcy case.

136.    None of the exceptions to the Trustee's avoidance powers set forth in 11 U.S.C. §547(c) applies to the Olson Transfer.

137.    Pursuant to 11 U.S.C. §547(b), the Olson Transfer is avoidable.

138.    Pursuant to 11 U.S.C. §550(a), the Trustee may recover from Richard Olson the Olson Transfer.

## COUNT III – PREFERENCE (ROYAL JEWELERS)

139.    The Trustee realleges the foregoing paragraphs of this Complaint in their entirety.

140.    In the year prior to commencement of this Chapter 7 case, Defendant Royal Jewelers was the recipient of the Royal Transfers.

141.    At the time of the Royal Transfers, Royal Jewelers was a creditor of the Debtor.

142.    At the time of the Royal Transfers, Royal Jewelers was an insider of the Debtor. Evidence of Royal Jeweler's insider status includes, but is not limited to, the following:

(a)     Royal Jewelers, despite being owed in excess of $200,000 by the Debtor at the time of filing, extended the Debtor $30,000.00 in credit for a diamond ring after the commencement of this case;

(b)     Royal Jewelers is owned by the Olson family and Richard Olson is employed by the business.   As detailed in this Complaint, the Debtor's relationship with the Olson is a very close, personal relationship;

(c)     Royal Jewelers received valuable watches from the Debtor after the commencement of this case and only came forward with the same when they were concerned that the Trustee would learn of their possession of the same;

143.    The Royal Transfers constituted transfers of an interest of the Debtor in property.

144.    The Royal Transfers were on account of an antecedent debt owed by the Debtor to Royal Jewelers.

145.    The Debtor was insolvent at the time of the Royal Transfers.

146.    The Royal Transfers enabled Royal Jewelers to recover more than it would receive as a creditor in this bankruptcy case.

147.    None of the exceptions to the Trustee's avoidance powers set forth in 11 U.S.C. §547(c) applies to the Royal Transfers.

148.    Pursuant to 11 U.S.C. §547(b), the Royal Transfers are avoidable.

149.    Pursuant to 11 U.S.C. §550(a), the Trustee may recover from Royal Jewelers the Royal Transfers.

## COUNT IV - UNIFORM FRAUDULENT TRANSFER ACT

150.    The Trustee realleges the foregoing paragraphs of this Complaint in their entirety.

151.     The Cornerstone Transfers were made to Cornerstone Bank in violation of Minn. Stat. §513.45 (transfers fraudulent to present creditors) in that they were made by the Debtor at a time when creditors' claims existed and the Debtor made the Cornerstone Transfer to an insider for antecedent debt (the Debtor was insolvent at that time) and the Cornerstone Bank had reasonable cause to believe that the Debtor was insolvent.

152.     Pursuant to Minn. Stat. §§513.45 and 513.47 (Uniform Fraudulent Transfer Act), made applicable to this proceeding by 11 U.S.C. §544, and 11 U.S.C. §550, the Trustee seeks recovery from Cornerstone Bank and Cornerstone Holding of the value of the Cornerstone Transfers, plus prejudgment interest.

## COUNT V - UNIFORM FRAUDULENT TRANSFER ACT

153.     The Trustee realleges the foregoing paragraphs of this Complaint in their entirety.

154.     The Royal Transfers were made to Royal Jewelers in violation of Minn. Stat. §513.45 (transfers fraudulent to present creditors) in that they were made by the Debtor at a time when creditors' claims existed and the Debtor made the Royal Transfers to an insider for antecedent debt (the Debtor was insolvent at that time) and the Royal Jewelers had reasonable cause to believe that the Debtor was insolvent.

155.     Pursuant to Minn. Stat. §§513.45 and 513.47 (Uniform Fraudulent Transfer Act), made applicable to this proceeding by 11 U.S.C. §544, the Trustee seeks recovery from Royal Jewelers of the value of the Royal Transfers, plus prejudgment interest.

## COUNT VI - FRAUDULENT TRANSFER UNDER 11 U.S.C. §548

156.    The Trustee realleges the foregoing paragraphs of this Complaint in their entirety.

157.    The Debtor made the Cornerstone Transfers with actual intent to hinder, delay or defraud Chrysler Financial and other creditors of the Debtor that existed at the time of the Cornerstone Transfers.

158.    Cornerstone Bank may not avail itself of the "good faith" defense provided by 11 U.S.C. §548(c) as it was fully aware of Debtor's impending, or existing, insolvency and the magnitude of Debtor's creditors' claims.

159.    Pursuant to 11 U.S.C. §548(a)(1)(A), Plaintiff seeks to avoid the Cornerstone Transfers, or the value of the Cornerstone Transfers, together with prejudgment interest under 11 U.S.C. §550.

160.    The Trustee seeks recovery from Cornerstone Bank and from Cornerstone Holding as the immediate transferee pursuant to 11 U.S.C. §550(a).

161.    Neither Cornerstone Bank nor Cornerstone Holding is entitled to the "good faith" defense provided by 11 U.S.C. §550(e).

## COUNT VII – EQUITABLE SUBORDINATION

162.    The Trustee realleges the foregoing paragraphs of this Complaint in their entirety.

163.    Both before and after the commencement of the case, Defendants, acting in concert through and through their common agents, engaged in inequitable and, in some instances, unlawful conduct which includes, but is not limited to:

(a)    Knowingly procuring the Debtor's breach of the Stand-Still Agreement and tortuously interfering with same.

(b)     Aiding and abetting the Debtor's post-petition conversion and concealment of assets.

(c)     Knowingly violating 11 U.S.C. §362.

164.    Defendants' misconduct resulted in injury to Chrysler Financial and other creditors of the Debtor, and conferred an unfair advantage upon the Defendants in these bankruptcy proceedings.

165.    Defendants claims in these proceedings should be equitably subordinated to the claims of all other creditors pursuant to 11 U.S.C. §510(c)(1), and any liens securing Defendants' claims should be transferred to the bankruptcy estate pursuant to 11 U.S.C. §550(c)(2).

## COUNT VII – EQUITABLE DISALLOWANCE

166.    The Trustee realleges the foregoing paragraphs of this Complaint in their entirety.

167.    Both before and after the commencement of the case, Defendants, acting in concert through and through their common agents, engaged in inequitable and in some instances unlawful conduct which includes, but is not limited to:

(a)     Knowingly procuring the Debtor's breach of the Stand-Still Agreement and tortuously interfering with same.

(b)     Aiding and abetting the Debtor's post-petition conversion and concealment of assets.

(c)     Knowingly violating 11 U.S.C. §362.

168.    Pursuant to 11 U.S.C. §105 and principles of equity, the claims of the Defendants should be disallowed in their entirety in this bankruptcy proceeding.

## COUNT IX – DECLARATORY JUDGMENT (RESTRICTIVE COVENANTS) (ALTERNATIVE RELIEF)

169.    The Trustee realleges the foregoing paragraphs of this Complaint in their entirety.

170.     Some or all of the stock or membership interests of the Debtor in which Defendants claim to be in first position with respect to general intangibles contain restrictive legends on the backside of the Debtor's membership or stock certificates.

171.     The legends restrict encumbering the stock or units and prohibit such encumbrances.

172.     To the extent that such restrictive legends exist, Defendants do not have a lien in general intangibles as they could not obtain a better position than that held by the Debtor.

173.     The Trustee is entitled to declaratory relief pursuant to Minn. Stat. Ch. 555 and 11 U.S.C. §541 determining the nature of the general intangibles liens claimed by Defendants.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter an order and judgment against Defendants as follows:

1.     For a money judgment in an amount equal to the Cornerstone Transfers paid by the Debtor to Cornerstone Bank in the year prior to filing pursuant to Count I, and, in the alternative, avoidance and preservation of the same pursuant to 11 U.S.C. §§550 and 551.

2.     For a money judgment in the amount of $10,980.86 pursuant to Count II, against Richard Olson.

3.     For a money judgment in the amount of $85,000.00 pursuant to Count III, against Royal Jewelers.

4.     For judgment under Counts IV, V and VI, avoiding the Cornerstone Transfers and entering judgment in an amount to be proven at trial or, in the alternative, avoiding said transfers and preserving them for the benefit of the estate.

5.	For judgment under Count VII equitably subordinating the claims of all Defendants to the claims of all other creditors in this case and for the transfer of any liens securing Defendants' claims to the bankruptcy estate.

6.	In the alternative, for judgment under Count VIII disallowing Defendants claims in this bankruptcy case in their entirety pursuant to 11 U.S.C. §105.

7.	For judgment on Count IX determining the nature and extent, if any, of Defendants' general intangible liens.

8.	All costs, disbursements and attorneys' fees allowed by law; and,

9.	Such other relief as the Court deems just and equitable in the premises.

**LEONARD, O'BRIEN**
**SPENCER, GALE & SAYRE, LTD.**

/e/ Matthew R. Burton

Dated: June 21, 2010       By _____

Matthew R. Burton, #210018
James M. Jorissen, #262833
Attorneys for Plaintiff
100 South Fifth Street, Suite 2500
Minneapolis, Minnesota 55402-1216
(612) 332-1030

422646