# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                              Bky No. 09-50779

Dennis E. Hecker                                    Chapter 7

Debtor,

## DEBTOR DENNIS E. HECKER'S OBJECTION TO
## MOTION TO APPROVE SETTLEMENT

### INTRODUCTION

The proceeds of the Sales Commission Agreement ("SCA") constitute the exempt earnings of Debtor Dennis Hecker ("Hecker.")  As such, 75% of the SCA proceeds belong to Hecker himself, and are exempt from the bankruptcy estate and from collection by his creditors. Therefore, Hecker objects to the Trustee's proposed settlement.

### FACTUAL BACKGROUND

In 2005 Gelco Corporation ("GE Fleet") entered into the SCA with Hecker and two entities owned and controlled by Hecker, namely Walden Fleet Services II, Inc. ("Walden Fleet") and Denny Hecker's Automotive Group, Inc. ("Automotive Group.")  (Neve Dec. Ex. A; Hecker Dec. ¶ 1-3.)[1]  Hecker was the sole officer of Walden and Automotive Group.  Hecker was also the sole shareholder of both entities, with the possible exception that Hecker's childrens' trust may have owned approximately 1% of one or both entities. (Hecker Dec. ¶ 1.)  Walden Fleet and Automotive Group are collectively referred to in the SCA as the "Service Provider." (Neve Dec. Ex. A at 1.)

---

[1] Hecker is incarcerated in Duluth Federal Prison Camp, and only recently retained the undersigned. (Neve Dec. ¶ 3.)  Hecker's executed declaration was unavailable at the time of this filing.  It is anticipated that an executed version of the declaration will be submitted prior to or at the time of the hearing.

The Agreement provides for services in connection with GE Fleet's business operations. Although the SCA designates Automotive Group and Walden Fleet collectively as the "Service Provider," the terms of the SCA are actually an employment agreement for Hecker in his personal capacity.

Hecker was a party to the SCA in his personal capacity. The services required by the SCA are set forth in Schedule 2(i) to the SCA, which reads: "The term 'Services' shall mean the following duties performed <u>by Dennis E. Hecker</u> to the extent reasonably requested by GE Fleet." (Neve Dec. Ex. A; Schedule 2(i)) (Emphasis added.) The services that GE Fleet may demand that "Dennis E. Hecker" perform are quite broad, and include managing and developing GE Fleet's relationships with manufacturers, distributors, and customers, marketing GE Fleet's products, and negotiating purchase agreements and lease agreements on GE Fleet's behalf. (*Id.*) Furthermore, the SCA requires that "<u>Hecker</u> shall perform all Services under this Agreement in all cases in a manner consistent with <u>Hecker's</u> past practices, conduct and efforts." (Neve Dec. Ex. A at § 2.) (Emphasis added.) The Agreement goes on to provide that "payment shall not be made to the extent <u>Hecker</u> does not provide the Services." (*Id.* at § 3(e)) (Emphasis added.) Hecker did, indeed, personally perform all of the services rendered to GE Fleet under the SCA. (Hecker Dec. ¶ 3.) No other individual rendered any services to GE Fleet under the SCA. (*Id.*)

Under the SCA, GE Fleet retained significant control over pricing thresholds, guidelines, compliance policies, controls, management and operations, and restrictions and obligations with regard to transfers and leases. (Neve Dec. Ex. A at § 6.) Hecker reported directly to the President of GE Fleet, who gave Hecker specific instructions, which Hecker followed. (Hecker Dec. ¶ 4.)

The SCA contains a non-compete provision requiring Hecker to refrain from competing with GE Fleet. (Neve Dec. Ex. A at § 11.)  The SCA also contains a clause which provides that all intellectual property created by Hecker under the terms of the SCA "shall be deemed work made for hire . . . and shall be the exclusive property of GE Fleet." (*Id.* at § 10.)

The compensation that the SCA required GE Fleet to pay the "Service Providers" were in actuality, payments to Hecker, who wholly owned and controlled the "Service Providers."  The SCA provided that:

> Service Provider shall be entitled to assign its rights to payments under this Agreement to Hecker or any entity at least ninety percent owned and controlled by Hecker without the prior written consent of GE Fleet; provided that … any such assignment shall be null and void *ab initio* if Hecker or his estate no longer owns or controls at least 90% of such assignee.

(*Id.* at § 19.)

As the Trustee stated in his Motion, "the SCA … gave Hecker unfettered discretion to direct the flow of payments to himself or to any entities in which he possessed a 90% ownership interest." (Trustee Mot. to Approve Settlement ¶ 14.)  GE Fleet paid the compensation under the SCA to whomever Hecker directed. (Hecker Dec. ¶ 5.)

## ARGUMENT

The Trustee's proposed settlement must be rejected because it wrongfully treats exempt assets as though they were assets of the bankruptcy estate.  As shown below, a portion of the SCA proceeds constitutes exempt earnings under Minnesota law. Property that is subject to a State law exemption is exempt from the bankruptcy estate and instead belongs to the debtor.  11 U.S.C. § 522.

The Minnesota Constitution requires that "[a] reasonable amount of property shall be exempt from seizure or sale for the payment of any debt or liability. The amount of such

exemption shall be determined by law." Minn. Const. Art. I, § 12. To that end, Minnesota Statutes provide that 75% of a debtor's disposable earnings are exempt from execution by creditors. Minn. Stat. §§ 550.37 subds. 1 and 13, 571.922(a). A portion of the SCA proceeds fall within that exemption.

## I.     THE SCA WAS A *DE FACTO* EMPLOYMENT AGREEMENT BETWEEN GE FLEET AND HECKER

The SCA was, in substance, an employment agreement between GE Fleet and Hecker. The payments pursuant to the SCA were payments to Hecker for his personal efforts and labor. Therefore, Hecker is entitled to exempt 75% of the SCA proceeds.

The applicable statute defines "[e]arnings" as "compensation paid or payable to an employee for personal services whether denominated as wages, salary, commissions, bonus, or otherwise." Minn. Stat. § 571.921 (a). The applicable statute defines "[e]mployee" as "an individual who performs services subject to the right of the employer to control both what is done and how it is done." *Id.* at subd. (c).

In this case, the plain language of the SCA mandates that Hecker perform the services personally. (Neve Dec. Ex. A at §§ 2, 3(e) and Schedule 2(i)). Consequently, the services under the SCA were personal services to be performed by Hecker the individual. Hecker did indeed personally perform all of the services rendered under the SCA. (Hecker Dec. ¶ 3.)

Likewise, the payments under the SCA were compensation to Hecker for Hecker's services. The SCA payments were made to entities wholly owned and controlled by Hecker. The SCA allowed Hecker to assign the right to payment under the SCA to himself or to any entity of which he possessed at least 90% ownership and control. (SCA at § 19.) In the Trustee's own words, "the SCA … gave Hecker unfettered discretion to direct the flow of payments to himself or to any entities in which he possessed a 90% ownership interest." (Trustee Mot. to Approve

Settlement ¶ 14.) The SCA also allowed GE Fleet to withhold payment "to the extent that <u>Hecker</u> did not provide the Services." (SCA at § 3(e))(emphasis added.) The Trustee acknowledges that "[a]s of December 2008, payments under the SCA were being deposited directly into one of Hecker's personal bank accounts."

The SCA gave GE Fleet authority to control both what Hecker did and how he did it. Schedule 2(i) provides a broad range of duties that GE Fleet may "reasonably request" Hecker to perform while the Agreement is in effect. (Neve Dec. Ex. A at Schedule 2(i)). GE Fleet retained significant control over the GE Fleet business operations. (Neve Dec. Ex. A at § 6.) Hecker reported directly to the President of GE Fleet, who gave Hecker specific instructions. (Hecker Dec. ¶ 4.)

The compensation constitutes Hecker's earnings under Minn. Stat. § 571.921(a) and is therefore exempt pursuant to Minn. Stat. §§ 550.37 subds. 1 and 13, 571.922(a). On this record, the Court would commit error to approve the settlement over Hecker's objection.

## II. THE COURT SHOULD REVERSE PIERCE THE CORPORATE VEIL OF WALDEN FLEET AND AUTOMOTIVE GROUP IF NECESSARY TO EFFECTUATE THE EXEMPTIONS

As set forth above, public policy as expressed in the Minnesota Constitution and Minnesota statutes favors allowing an individual to exempt 75% of their disposable earnings. This Court should not allow the corporate form of Walden Fleet and Automotive Group to stand in the way of Hecker's ability to claim his exemption. Therefore, the Court should, if necessary, reverse pierce the corporate veil so as to give effect to the policies embodied in the exemption.

In the case of *In re Schwab,* 378 B.R. 854, 857-58 (Bankr. D. Minn. 2007), the Court held that accounts receivable for an LLC were actually earnings of the debtor. In *Schwab,* the debtor was the sole owner of the LLC and the accounts receivable represented compensation for

the debtor's labor. *Id.* The income of the LLC in *Schwab* was, in substance, earnings of the debtor. Therefore, the Court in *Schwab* reverse pierced the corporate veil so as to exempt the accounts receivable as earnings pursuant to Minn. Stat. § 550.37 subd. 13.

In *Cargill, Inc. v. Hedge,* 375 N.W.2d 477 (Minn. 1985), the Court reverse-pierced the corporate veil so as to allow a husband and wife to claim the homestead exemption over their farm even though a corporation technically owned the farm. The wife in *Cargill* was the sole owner of the corporation, and the family wholly controlled the corporation. The family operated the farm as their own and used it as their homestead. The Court emphasized that a reverse pierce was necessary so as to effectuate the purpose of the homestead exemption.

In *Roepke v. Western Nat'l Mut Ins. Co.,* 302 N.W.2d 350 (Minn. 1981), the Court reverse-pierced the corporate veil so as to allow the survivors of a decedent to recover on the no-fault insurance policy of a vehicle owned by a corporation of which the decedent was president and sole shareholder. The decedent had treated the vehicle as his own and used them for family purposes. The Court emphasized that a reverse-pierce would best serve the purposes of the no-fault act, which was to provide insurance for persons rather than vehicles.

Like in *Schwab, Roepke,* and *Cargill*, Hecker is the sole owner of the "Service Provider" entities (with the possible exception of a 1% interest in favor of Hecker's childrens' trust), and Hecker wholly controls the "Service Provider" entities. Like in *Schwab, Roepke,* and *Cargill,* the rights and obligations under the SCA were, in actuality, rights and obligations of Hecker. Like in *Schwab,* the payments under the SCA are compensation for Hecker's labor.

Hecker was required to personally provide the services, and GE Fleet had the right to withhold the payments in the event that Hecker did not provide them. Hecker was free to direct GE Fleet's payments under the SCA to himself, or to any entity in which he held a 90% interest.

The income of the entities under the SCA is, in substance, Hecker's earnings. Therefore, like in *Schwab,* the payments under the SCA should be treated as Hecker's earnings and exempted under Minn. Stat. § 550.37 subd. 13.

It would be unfair and inequitable – even despite Hecker's criminal conviction and other negative allegations against him – to deny Hecker his exemptions. *See, e.g., In re Olson*, 45 B.R. 501, 506 (Bankr. D. Minn. 1984) (taking advantage of state law exemptions is not fraudulent). Hecker earned the compensation by providing personal services, pursuant to a *de facto* employment agreement between himself and GE Fleet. Hecker, like any other debtor, is entitled to a 75% exemption for the fruits of his labor.[2]

## CONCLUSION

Because 75% of Hecker's earnings under the SCA are exempt, the Court should DENY the Trustee's Motion to Approve the Settlement.

NEVE LAW, PLLC

DATED: June 10, 2011

/e/ John R. Neve
 John R. Neve (278300)
 Evan H. Weiner (#389176)
8500 Normandale Lake Boulevard
Suite 1080
Minneapolis, MN 55437
(952) 929-3232

ATTORNEY FOR DEBTOR
DENNIS E. HECKER

---

[2] Counsel for Hecker was retained in this matter the day before this Objection was due. (Neve Dec. ¶ 3.) Due to this limited time to brief this issue, counsel request the opportunity to submit a supplemental objection to this motion after counsel has had an opportunity to meet with the Hecker.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

---

In re:                                                    Bky No. 09-50779

Dennis E. Hecker                                          Chapter 7

                            Debtor,

---

**DECLARATION OF JOHN R. NEVE**

---

I, John R. Neve, state as follows:

1.      I am one of the attorneys representing the Debtor Dennis E. Hecker ("Hecker") in the above-entitled matter.

2.      I provide this Declaration in support of Debtor's Objection to Motion to Approve Settlement.

3.      My firm was retained in this matter by Hecker the afternoon of June 9, 2011, which was one day before the objection to the proposed settlement was due. Based on this limited timeframe, no one at my firm was unable to meet with Hecker prior to the filing of this Objection. We request an opportunity to submit a supplemental objection to this motion after an attorney at my firm has had the opportunity to meet with Hecker. I anticipate that this will occur prior to the hearing on June 15, 2011.

4.      Attached hereto as Exhibit A is a true and correct copy of Sales Commission Agreement between Gelco Corporation, Walden Fleet Services II, Inc., Denny Hecker's Automotive Group, Inc. and Dennis E. Hecker.

The undersigned declares under penalty of perjury under the laws of the United States and the State of Minnesota that the foregoing facts stated in this Declaration are, to

the best of my knowledge and belief, true and correct.

Executed on this 10th day of June 2011.


/e/ John R. Neve
John R. Neve

# Exhibit A

## SALES COMMISSION AGREEMENT

This **SALES COMMISSION AGREEMENT** (this "Agreement") is made and entered into as of the 30th day of September, 2005 (the "Effective Date"), by and among **GELCO CORPORATION**, a Delaware corporation ("GE Fleet"), **WALDEN FLEET SERVICES II, INC.**, a Minnesota corporation ("Walden Fleet"), **DENNY HECKER'S AUTOMOTIVE GROUP, INC.**, a Minnesota corporation ("Automotive Group" and together with Walden Fleet, the "Service Provider") and **DENNIS E. HECKER**, an individual and resident of the State of Minnesota ("Hecker").

### WITNESSETH:

**WHEREAS**, GE Fleet desires to retain Service Provider to assist in the continued growth and prosperity of the Business (as defined below);

**WHEREAS**, Service Provider is willing to provide assistance to GE Fleet on the condition that its compensation be based on the volume of business generated by GE Fleet in the Business and is willing to make Dennis E. Hecker, Service Provider's senior officer, available to GE Fleet to provide such assistance;

**WHEREAS**, Service Provider wishes to provide to GE Fleet those services set forth in Section 2 hereof and GE Fleet wishes to compensate Service Provider for such services as set forth in Section 3 hereof; and

**WHEREAS**, concurrent with the execution and delivery of this Agreement, Service Provider has been paid seven million five hundred thousand ($7,500,000) dollars (the "Advance") as an advance on the Incentive (as defined below).

**NOW, THEREFORE**, in consideration of the premises and mutual promises contained herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1. Definitions. For the purposes of this Agreement:

"Accounting Principles" shall mean the accounting principles set forth on Schedule 1.1 attached hereto; provided that to the extent that any accounting topic, principle, practice or method is not addressed by Schedule 1.1, the term "Accounting Principles" shall mean GAAP with respect to such topic, principle, practice or method.

"Affiliate" shall mean, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, such specified Person.

"Agreement Year" shall mean each twelve (12) month period during the term of this Agreement ending, in each case, on an anniversary of the Effective Date.

ATL_IMANAGE-3867854

"Assignors" shall mean each of Rosedale Leasing and Walden. Fleet.

"Automotive Rental Fleet" shall mean the Motor Vehicles leased by any Assignor (or their Affiliates) on the date hereof pursuant to a Motor Vehicle Lease Agreement and Vehicle Lease Order as listed on the Final Portfolio Tape; provided that the defined term "Automotive Rental Fleet" shall not include any Motor Vehicle acquired through or owned by any Assignor pursuant to any "sale lease back" or similar transaction.

"Book Value" shall mean (i) with respect to any Motor Vehicle included in the Automotive Rental Fleet, the Net Capitalized Cost and (ii) with respect to any Motor Vehicle leased by GE Fleet in connection with the Business after the date hereof, the invoiced cost from the manufacturer of such Motor Vehicle less the sum of (A) all discounts, holdbacks, rebates, incentives, volume payments or similar payments from the manufacturer relating to such Motor Vehicle to or for the benefit of GE Fleet plus (B) the accumulated depreciation for such Motor Vehicle, in each case with respect to clause (ii), as shown on the books and records of GE Fleet, which books and records shall be maintained in accordance with GAAP.

"Business" shall mean the Financing or leasing of Motor Vehicles by GE Fleet Services to rental car companies (including but not limited to corporate rental car operations, franchised rental car operations and independent rental car operations).

"Business Day" shall mean any day except Saturday, Sunday or any day on which banks are generally not open for business in the City of New York, New York.

"Confidential Information" shall mean any data or information (other than Trade Secrets) which is used in or relates to the Business, including without limitation, general business information, industry information, analyses and other information of a proprietary nature (a) owned by or related to GE Fleet Services or any Assignor; (b) developed or compiled by GE Fleet Services or any Assignor or (c) obtained by GE Fleet Services from any Assignor.

"Contract" shall mean all contracts, undertakings, commitments, agreements, obligations, guarantees or warranties of any kind or nature.

"Final Portfolio Tape" shall mean the Preliminary Portfolio Tape (as defined in the Security Agreement) adjusted pursuant to Section 2.1 of the Security Agreement.

"Financed" or "Financing" shall mean any loan made by GE Fleet Services to any rental car company (including, but not limited to, corporate rental car operations, franchised rental car operations and independent rental car operations) which loan is primarily secured by Motor Vehicles or is used, or is intended to be primarily used, for the acquisition of Motor Vehicles by the obligor with respect to such loan.

"GAAP" shall mean United States generally accepted accounting principles in effect from time to time.

"GE Fleet Services" shall mean the United States fleet leasing and management services business operations of the GE Fleet Services unit of GE Fleet as reflected on the periodic profit and loss statements prepared, for management reporting purposes, by GE Fleet in accordance

with the practices of GE Fleet. For the avoidance of doubt, in the event that such business operations of GE Fleet are merged or reorganized, "GE Fleet Services" shall mean that portion of any such new organization that reflects as closely as possible those business operations which would have been reflected on such periodic profit and loss statements prior to such date.

"Governmental Entity" shall mean any federal, state or local or foreign government, any political subdivision thereof or any court, administrative or regulatory agency, department, instrumentality, body or commission or other governmental authority or agency, domestic or foreign.

"Laws" shall mean any statute, rule, code, regulation, restriction, ordinance, order, decree, approval, directive, judgment, injunction, writ, award and decree of, or issued by, any Governmental Entity.

"LIBOR" shall mean the one-month London inter-bank offered rate as published in the "Money Rates" section of The Wall Street Journal.

"Month End Net Earning Assets" or "MENEA" shall mean, for each month of any Agreement Year during the term of this Agreement, the aggregate of (1) the Book Value of the Motor Vehicles that are either (a) included in the Automotive Rental Fleet and set forth on the books of Rosedale Leasing or Walden Fleet on the last day of such month or (b) owned by GE Fleet Services in the conduct of the Business in the ordinary course and leased as of the last day of such month pursuant to a Motor Vehicle Lease Agreement and Vehicle Lease Order; (2) the then outstanding principal balance, as of the last day of such month, of any Financing; (3) as of the last day of such month, the Book Value (or similar appropriate measure reasonably determined by GE Fleet) of any Motor Vehicles subject to one or more Motor Vehicle Lease Agreements or the then outstanding principal amount of any Financing in each case acquired by GE Fleet Services after the date hereof outside of the ordinary course of the Business, if, but only if, Hecker (A) was significantly involved in the negotiations for or investigation of the transaction giving rise to such acquisition or (B) identified the acquisition candidate for such transaction and performed all actions reasonably requested by GE Fleet in connection with such acquisition; and (4) any amount due and payable pursuant to an OEM Agreement with respect to any Motor Vehicle sold or liquidated prior to such month end if interest is accruing and collectible on such amount; provided, however, that (x) with respect to clause (3)(B) no transactions or potential transactions GE Fleet is, as of the date hereof, pursuing shall be included and (y) any transaction with Hertz Corporation or its Affiliates shall be excluded from MENEA.

"Motor Vehicle Lease Agreement" shall mean (a) any Contract pursuant to which any Assignor currently leases one or more Motor Vehicles included in the Automotive Rental Fleet or (b) any Contract pursuant to which GE Fleet Services may, after the Effective Date, lease one or more Motor Vehicles to any Person in the conduct of the Business.

"Motor Vehicles" shall mean cars, light trucks and buses.

"Net Capitalized Cost" shall have the same meaning assigned to the term "Net Book Value" in the Security Agreement.

"Period" shall mean the period beginning on the Effective Date and ending on the second anniversary of the expiration or termination of this Agreement.

"Person" shall mean any individual, corporation, partnership, joint venture, limited liability company, trust, unincorporated organization, governmental entity or other legally recognized entity.

"Security Agreement" shall mean that certain Security Agreement of even date herewith by and among GE Fleet and the Assignors.

"Servicing Agreement" shall mean that certain Servicing Agreement of even date herewith by and among Rosedale Leasing, Walden Fleet and GE Fleet.

"Prime" means on any date, the "prime rate" as published in the "Money Rates" section of the Eastern edition of The Wall Street Journal published for such date. In the event The Wall Street Journal ceases publication of the "prime rate" or fails on any particular date to publish the "prime rate" the term "Prime" shall refer to the "prime rate" as announced by JPMorgan Chase as its "prime rate."

"Recourse Provisions" shall have the meaning assigned to it in the Security Agreement.

"Rosedale Leasing" shall mean Rosedale Dodge, Inc., a Minnesota corporation.

"Territory" shall mean the United States of America, such area being where any customer, or actively sought prospective customer, of GE Fleet (or its Affiliates that conduct the Business) is located.

"Trade Secrets" shall mean information of any Assignor or GE Fleet Services used in or related to the Business, without regard to form, including, but not limited to, technical or nontechnical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans or lists of actual or potential customers or suppliers which is not commonly known by or available to the public and which information: (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"Vehicle Lease Order" shall mean any Contract between any of Rosedale Leasing, Walden Fleet or GE Fleet Services and any customer of any of Rosedale Leasing, Walden Fleet or GE Fleet Services executed under a Motor Vehicle Lease Agreement and pursuant to which Rosedale Leasing, Walden Fleet or GE Fleet Services (as the case may be) agrees to deliver under lease, and such customer agrees to lease, one or more cars or light trucks owned by Rosedale Leasing, Walden Fleet or GE Fleet Services (as the case may be).

2. Scope and Quality of Services. Until the expiration or termination of this Agreement, Service Provider, through Hecker, shall furnish to GE Fleet the Services described on Schedule 2(i) attached hereto and incorporated herein (the "Services"). Hecker shall perform all Services under this Agreement in all cases in a manner consistent with Hecker's past practices, conduct

6                                                    ATL_IMANAGE-3867854

and efforts made with respect to the conduct of the business and operations of Rosedale Leasing and Walden Fleet prior to the Effective Date; provided that GE Fleet acknowledges that Hecker is actively engaged in a number of other businesses, including but not limited to automotive dealerships and fleet sales (other than Financing). Service Provider and Hecker shall comply with all applicable Laws that relate to the Services to be provided under this Agreement and shall conduct itself and himself at all times in an ethical manner and in accordance with those provisions of the General Electric Company's Policy "The Spirit & Letter of Our Commitment" applicable to outside consultants of the General Electric Company, a copy of which is attached hereto as Schedule 2(ii) and all other integrity or similar policies of GE Fleet Services that are generally applicable to consultants of GE Fleet Services and provided in writing to Consultant or Hecker during the term of this Agreement.

3. Compensation; Advance; and Expenses.

(a) As a material inducement for GE Fleet entering into this Agreement, Service Provider acknowledges the business, economic and organizational risks associated with Service Provider earning any Incentive (as defined below).

(b) As a draw against and advance on, the Base Incentive (as defined below) for the then current Agreement Year, GE Fleet shall pay $75,000 to Service Provider on the first Business Day of each of calendar month (commencing October 3, 2005) occurring during the term of this Agreement; provided that:

(i) no such payment shall be made if the payments of the Base Incentive (including any amounts paid pursuant to this Section 3(b)) exceed the limit set forth in clause (4) of Section 3(c)(i) below;

(ii) commencing with the second Agreement Year, such payment shall be reduced by the excess (if any) of $75,000 over the quotient obtained by dividing (1) an amount equal to the excess of 1.1% of the average MENEA for the immediately preceding twelve month period as of such payment date over the Advance Reduction to be applied in such Agreement Year pursuant to Section 3(c)(i)(2) below by (2) 12; and

(iii) commencing with the second Agreement Year, notwithstanding the provisions of Section 3(b)(ii), no such payment shall be made if the Advance Reduction to be applied in such Agreement Year pursuant to Section 3(c)(i)(2) below equals or exceeds 1.1% of the average MENEA for the immediately preceding twelve month period as of such payment date.

(c) Subject to the terms and conditions set forth herein (including, without limitation, Section 4), not later than the 45th day following the end of each Agreement Year (each, a "Payment Date"), GE Fleet shall pay to either Walden Fleet or Automotive Group (as designated by Service Provider) an amount (in each case, an "Incentive") determined as follows:

(i) for the applicable Agreement Year, (A) 1.1% of the average MENEA (the "Base Incentive"); provided that

(1) the payment of Base Incentive at the end of any Agreement Year shall be applied to reduce the aggregate of the payments made during such Agreement Year pursuant to Section 3(b);

(2) the payment of the Base Incentive at the end of any Agreement Year shall be applied to reduce (such reductions being the "Advance Reductions") the Advance until the full amount of the Advance has been applied against the Base Incentive, (provided that the Advance Reductions shall not exceed (A) in the first Agreement Year, $2,250,000; (B) in the second Agreement Year, $2,250,000 plus the excess of $2,250,000 over the actual Advance Reduction in the first Agreement Year; and (C) in the third Agreement Year, $3,000,000 plus the excess of $4,500,000 over the aggregate actual Advance Reduction in the first and second Agreement Years);

(3) the maximum Base Incentive paid with respect to any single Agreement Year shall not exceed $4,400,000; and

(4) in no event will the aggregate Base Incentive paid pursuant to this Agreement (including the Advance and any draw paid pursuant to Section 3(b)) be an amount such that the present value of such payments measured on a notional basis as of the date hereof and determined on a compounded annual basis at an interest rate of 4% per annum is greater than $19,887,500; and

(ii) for the applicable Agreement Year, 1.5% of the average MENEA in excess of $400,000,000 (the "Excess Incentive"); provided that in no event will the total Excess Incentive paid pursuant to this Agreement be an amount such that the present value of such payments measured on a notional basis as of the date hereof and determined on a compounded annual basis at an interest rate of 4% per annum is greater than $20,000,000.

(d) Subject to the provisions of Section 4, if the actual Base Incentive (as reduced by the Advance Reduction for such Agreement Year) for such Agreement Year is less than the aggregate of the amounts paid to Service Provider during such Agreement Year pursuant to Section 3(b), then Service Provider shall refund such over payment to GE Fleet by the earlier of (a) the 50th day following the end of such Agreement Year or (b) five (5) days after the determination of such Base Incentive.

(e), As an expense allowance for those particular activities set forth on Schedule 3(e) for Service Provider to use subject to the terms of this Agreement in connection with the Services to be provided by Service Provider, GE Fleet shall pay Service Provider the sum of $4,000 per month on the first day of each month during the term of this Agreement; provided that such payment shall not be made to the extent Hecker does not provide the Services. In addition, with the prior written approval of GE Fleet, Service Provider may incur additional expenses in connection with the Services hereunder and GE Fleet will either pay such expenses directly or promptly reimburse Service Provider for such approved expenses, to the extent not included in the monthly payment provided for in the preceding sentence or as part of the expenses paid by GE Fleet pursuant to the Servicing Agreement.

ATL_IMANAGE-3867854

(f)     Notwithstanding anything herein to the contrary, Service Provider shall pay to GE Fleet, by the earlier of (a) the 50th day following the end of the third Agreement Year or (b) five (5) days after the determination of the Base Incentive for the third Agreement Year, an amount equal to the excess (if any) of the Advance over the aggregate Base Incentive earned for the first three Agreement Years plus interest on such amount at a compound annual interest rate of 4% computed from the date hereof until the date of payment.

4.     Reporting; Review; and Dispute Procedures.

(a)     Within thirty (30) days after the end of each calendar month during term of this Agreement, GE Fleet shall submit to Service Provider a detailed report of the MENEA as of the end of such calendar month.  At least ten (10) days prior to each Payment Date, GE Fleet shall submit to Service Provider a certificate (the "GE Fleet Certificate") setting forth the calculation of the amount of the Incentive, if any, payable on such Payment Date together with a detail of the MENEA and related information sufficient to allow Service Provider and its representatives to verify the calculation of such Incentive.  GE Fleet shall permit Service Provider and its designated representatives to review the books and records of GE Fleet related to the calculation of the Incentive at reasonable times and upon reasonable notice for the purpose of verifying the information provided in the GE Fleet Certificate.  Notwithstanding anything herein to the contrary, GE Fleet shall not be in default for any failure to comply with the provisions of this Section 4(a) during the term of the Servicing Agreement if such failure is due to a delay or breach of the Servicing Agreement by Rosedale Leasing or Walden Fleet.

(b)     The calculation of the Incentive as set forth in the GE Fleet Certificate shall be binding on the parties hereto if Service Provider has not delivered to GE Fleet written notice of any objection to such calculations (an "Objection Notice") within twenty (20) days following receipt by Service Provider of the GE Fleet Certificate.  The Objection Notice shall specifically enumerate the items and calculations objected to, and GE Fleet and Service Provider will seek in good faith, for a period twenty (20) days following receipt by GE Fleet of such Objection Notice, to resolve promptly the matters set forth in therein.  From and after the date of any Objection Notice, and until a final determination of the Incentive to be paid for such Agreement Year, only the dollar amount of the Incentive which is mutually agreed upon by Service Provider and GE Fleet shall be paid to Service Provider, with any additional Incentive agreed upon pursuant to this Section 4(b) to be paid, together with interest at Libor from the date when such payment would have been made absent such dispute until the date of actual payment, within five (5) Business Days after a final determination has been made pursuant to this Section 4(b).

(c)     In the event that the parties are unable to resolve such differences during the period described in Section 4(b) above, and such differences solely involve matters related to the application of accounting principles, the parties will submit the matter for the review by an accounting firm mutually acceptable to them (or a nationally-recognized accounting firm chosen by lot in the event that the parties are unable to agree) (the "Review Accounting Firm"), and such review by the Review Accounting Firm shall be limited to (i) such items and calculations as were addressed in the Objection Notice that have not been resolved by the parties and (ii) any factual or mathematical errors contained in the GE Fleet Certificate or Objection Notice.  The parties shall cause the Review Accounting Firm to review, subject to the limitations of the immediately preceding sentence, as promptly as practicable, the calculation of the Incentive and to make, subject to the limitations of the immediately preceding sentence, such corrections thereto as it

9

deems appropriate, consistent with the terms hereof. The Review Accounting Firm shall issue a written report of its review, setting forth in reasonable detail its calculation of such Incentive. The determination of the Incentive as calculated by the Review Accounting Firm with respect to matters solely involving the application of accounting principles shall be conclusive and binding on the parties, and shall be the sole and exclusive means of resolving such disputes. Following a final determination of the Incentive, if any, together with interest at Libor from the date when such payment would have been made or was made (as the case may be) until the date of actual payment, shall be due and payable, and shall be promptly paid by GE Fleet or Service Provider (as the case may be).

(d)     In the event that GE Fleet and Service Provider submit any unresolved differences to the Review Accounting Firm for resolution as provided in Section 4(c) above, GE Fleet shall be responsible for the fees and expenses of the Review Accounting Firm in proportion to the percentage of the dollar amount of such unresolved differences as are resolved in favor of Service Provider, and Service Provider will be responsible for the remainder of such fees and expenses. In the event that such fees and expenses are unable to be so allocated, each of GE Fleet and Service Provider shall pay 50% of such fees and expenses.

(e)     Any dispute, claim or controversy arising out of or related to the agreements or procedures described in this Section 4, other than matters solely involving the application of accounting principles, shall be finally settled by arbitration conducted expeditiously in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") and in accordance with the following guidelines:

(i)     Within ten (10) Business Days of the receipt of a list of arbitrators from the AAA, the parties shall select a sole independent and impartial arbitrator (the "Arbitrator"). If the parties are unable to agree upon an Arbitrator within such ten (10) Business Day period, the AAA shall appoint an Arbitrator on the eleventh (11th) Business Day.

(ii)     The Arbitrator shall be a retired judge.

(iii)     The place of arbitration shall be Minneapolis, Minnesota.

(iv)     The Arbitrator shall use commercially reasonable efforts to complete its work within thirty (30) days following its engagement.

(v)     The Arbitrator shall issue findings of fact and conclusions of law to support its opinion.

(vi)     The Arbitrator shall only be empowered to award actual and direct compensatory contract damages (calculated solely in the manner contemplated by this Agreement), and shall not be empowered to award any special, consequential, incidental or punitive damage or any damages related to a tort or any other claim of any type or nature whatsoever.

(vii)     Judgment upon the award rendered by the Arbitrator (the "Award") may be entered by any court having jurisdiction thereof and enforced as any other judgment. Any party required to resort to litigation to enforce an Award shall be entitled to all

ATL_IMANAGE-3867854

costs of suit, including reasonable attorneys' fees, together with interest on the Award, calculated at the statutory rate for judgments commencing ten (10) days from the date of the Award.

(viii)   The Award shall only be appealable only upon a showing that it is, on its face, arbitrary, capricious, an abuse of discretion and/or clearly contrary to statutory or settled case law.  The party appealing the award shall, if such appeal is unsuccessful, be responsible for all costs of appeal, including reasonable attorneys' fees incurred by the other party.

(ix)   The Arbitrator shall have the power, but not the obligation, to hire an accounting firm or other professional within the financial services industry as an expert to assist the Arbitrator in issuing findings of fact.

(x)   The arbitration proceedings and all discovery related thereto shall be confidential and neither party shall release any decision rendered by the Arbitrator to any third party.

(xi)   The arbitration procedure shall be completed promptly and a decision rendered within four (4) months of the appointment of the Arbitrator unless extended by the Arbitrator due to circumstances beyond the control of the parties or the Arbitrator or as necessary, in the Arbitrator's sole discretion, to avoid manifest injustice.  Discovery shall be limited to that which is directly relevant to the claim or controversy, and to key documents and witnesses that are substantive and reasonably necessary to establish a party's claim or defense.  Whenever reasonably possible (and unless manifestly prejudicial or unfair), affidavits shall be substituted for direct testimony.

(xii)   The amount of any Award may not exceed the amount of the Incentive set forth by Service Provider in the Objection Notice (plus interest) and may not be less than the amount of the Incentive set forth in the GE Fleet Certificate.

(xiii)   Any party resorting to litigation in order to challenge the right or scope of arbitration shall, if unsuccessful, be responsible for the payment of all costs and expenses, including attorneys' fees incurred by the other party.  Any doubt related to the scope of issues which qualify for arbitration shall be resolved in favor of arbitration.

5.   Payment; Holdback.  Upon receipt and acceptance of any undisputed Incentive, Service Provider shall be deemed to have waived and released any and all claims of Service Provider against GE Fleet, or any Affiliate of GE Fleet, with respect to such undisputed Incentive, including with respect to the amount of such undisputed Incentive.

6.   Operations and Additional Assets.  During the term of this Agreement, GE Fleet covenants and agrees to, subject to the provisions of the following sentence, (i) utilize one or more employees of GE Fleet whose duties will include overseeing billing, collections, asset maintenance and tracking and remarketing; (ii) provide support to the Business from GE Fleet's "Risk Function" including the establishment of pricing thresholds and guidelines, such initial thresholds and guidelines being attached hereto as Schedule 6; provided, however, that any pricing thresholds and guidelines are subject to change at GE Fleet's sole discretion; and (iii) initiate compliance policies and controls for the Business.  Service Provider acknowledges and

agrees that nothing herein shall (i) limit the right of GE Fleet to manage and operate its business and operations, including, without limitation, the Business, in any manner as determined by GE Fleet in its sole and exclusive discretion, (ii) obligate or require GE Fleet to lease any vehicle to any current or potential customer, (iii) prohibit or restrict GE Fleet from ceasing to conduct, in whole or in part, the Business, (iv) restrict GE Fleet from selling, assigning, transferring, or otherwise exiting all or any portion of the Business, or (v) prohibit or restrict any reorganization of GE Fleet or its Affiliates.

7.    Additional Agreements.  Without limiting the generality of the provisions of Section 6:

(a)    the parties acknowledge and agree that certain performance targets with respect to the Business may not be achievable; and

(b)    the failure to achieve such performance targets shall not, in any event, form the basis for a dispute hereunder, but rather represent acceptable business risks which the parties recognize and accept as part of any business venture.

8.    Status; Taxes.

(a)    The status of Service Provider shall be that of an independent contractor and neither Service Provider nor Hecker or any employee, agent or representative of Service Provider shall, at any time or for any purpose, be deemed an agent or employee of GE Fleet.

(b)    Service Provider is responsible for all taxes, levies and duties that may accrue to Service Provider, Hecker or any employee, agent or representative of Service Provider by virtue of the compensation, reimbursements, or other payments to be paid or made hereunder. Except as may otherwise be required by applicable Law, GE Fleet shall make all undisputed payments due and payable hereunder without deduction or withholding of any taxes, levies or duties.

(c)    Service Provider shall be fully and solely responsible for the filing of any and all returns and reports and the withholding and/or payment of all applicable federal, state and local tax.

9.    Nondisclosure.

(a)    During the Period, Service Provider and Hecker each hereby covenants and agrees that Service Provider and Hecker each will hold in strict confidence all Confidential Information that comes into their possession or knowledge during the term of this Agreement and as a result of the consultancy with GE Fleet and will not disclose, publish or make use of such Confidential Information, on their own behalf or on behalf any other person or entity, other than in providing the Services to GE Fleet.

(b)    Service Provider and Hecker each agrees that Service Provider and Hecker each shall hold in strict confidence all Trade Secrets of GE Fleet that comes into their knowledge during the term of this Agreement and as a result of the consultancy with GE Fleet and shall not disclose, publish or make use of such Trade Secrets at any time after the date of this Agreement,

ATL_IMANAGE-3867854

on their own behalf or on behalf any other person or entity, other than in providing the Services to GE Fleet, for as long as the information remains a Trade Secret.

10.    Property and Proprietary Rights

(a)    All work produced by Service Provider or Hecker under the terms of this Agreement, including, without limitation, all inventions, creations, expressions, improvements, computer programs, specifications, operating instructions and all other documentation, whether patentable or unpatentable, which are first conceived or made or first actually or constructively reduced to practice during the term of the Agreement or within six (6) months following the expiration or termination thereof, and which are conceived or made in response to matters related to the Services provided under this Agreement or based in whole or in part on or derived from information supplied by GE Fleet (collectively, the "Work Product"), shall be deemed work made for hire and made in the course of Services rendered under the Agreement and shall be the exclusive property of GE Fleet. To the extent that title of such Work Product does not vest in GE Fleet by operation of law, Service Provider and Hecker hereby irrevocably transfers and assigns to GE Fleet in perpetuity all worldwide right, title and interest in and to the Work Product and to any and all intellectual property rights relating thereto, including, without limitation, all patent rights, copyrights, trade secrets and other proprietary rights. Service Provider and Hecker shall promptly disclose all Work Product to GE Fleet and execute and deliver to GE Fleet all documents requested by GE Fleet to evidence its ownership of the Work Product or as reasonably required by GE Fleet to obtain patent, copyright or any other intellectual property rights in the Work Product and to maintain and enforce GE Fleet's proprietary rights in the Work Product.

(b)    Service Provider and Hecker shall cooperate fully in (i) vesting in GE Fleet the ownership of the proprietary rights to the Work Product, and (ii) assisting GE Fleet in obtaining patent, copyright or any other intellectual property rights in the Work Product and in maintaining and protecting GE Fleet's proprietary rights, including, without limitation, executing any documents which GE Fleet reasonably deems necessary for such purpose.

11.    Noncompetition.

(a)    Acknowledgment. Service Provider and Hecker hereby acknowledges that GE Fleet conducts the Business throughout the Territory, and that to protect adequately the interest of GE Fleet in the Business and the goodwill of GE Fleet, it is essential that any non-competition covenant made with respect thereto cover the Business and the entire Territory for the duration of the Period.

(b)    Noncompetition. Service Provider and Hecker hereby acknowledge that GE Fleet conducts the Business throughout the Territory, and that to protect adequately the interest of GE Fleet in the Business and the goodwill of GE Fleet, it is essential that any noncompetition covenant with respect thereto cover all activities related to the Business and the entire Territory for the duration of the Period. Service Provider and Hecker hereby agree that during the Period, neither of them nor any of their respective Affiliates will (except in connection with the transactions contemplated by the Security Agreement and the Servicing Agreement), directly, indirectly or by assisting others, conduct the Business in the Territory or otherwise engage in, have an equity or profit interest in or render services (of an executive, marketing,

manufacturing, research and development, administrative, financing or financial, advisory or consulting nature) to any business that conducts the Business in the Territory; provided that Service Provider, Dennis E. Hecker or their respective Affiliates may provide sourcing of motor vehicles, leasing and Financing to Southwest-Tex Leasing, Inc. (d/b/a Advantage-Rent-A-Car) (or an entity whose operating assets are substantially all of the operating assets of Southwest-Tex Leasing, Inc.) ("Advantage"), Payless Car Rental Systems, Inc. (or an entity whose operating assets are substantially all of the operating assets of Payless Car Rental Systems, Inc.) ("Payless"), or PCR Ventures, LLC, a Delaware limited liability company (or any entity owned by PCR Ventures LLC) ("PCR Ventures") (a) if and only as long as Hecker, his estate or any trust created for the benefit of Dennis E. Hecker or his family members (the "Hecker Estate"), or any entity wholly owned and controlled by the Hecker Estate, owns in the aggregate 25% or more of the equity, profits and voting interest of Advantage, Payless and PCR Ventures, as the case may be, and (b) provided that Hecker or such entity owned and controlled by the Hecker Estate shall inform GE Fleet of the terms, pricing and conditions of any such sourcing, leasing or Financing and shall cause each of Advantage, Payless or PCR Ventures to accept such sourcing, leasing or Financing from GE Fleet if GE Fleet can provide sourcing, leasing or Financing on terms and pricing equal to or better than that to be provided by Service Provider, Hecker or their Affiliates. Notwithstanding anything in this Agreement to the contrary, nothing herein shall prohibit Service Provider or Hecker from (i) continuing to operate the automotive dealership and fleet sales businesses (other than Financing, which shall remain subject to the restrictions of this Section 11 and Sections 12 and 13) currently owned or hereafter acquired by Hecker or Service Provider; (ii) acquiring up to one percent (1%) of any entity whose common stock is publicly traded on a national securities exchange or in the over-the-counter market; or (iii) purchasing cars and light trucks for its or his own account or leasing or Financing any cars or light trucks to any entity wholly owned and controlled, directly or indirectly, by Hecker.

12. **Nonsolicitation.** Service Provider and Hecker each hereby covenant and agree that neither they nor any of their respective Affiliates shall, during the Period, without the prior written consent of GE Fleet solicit, directly or indirectly, the Business' customers (including without limitation, actively sought prospective customers with whom Hecker had previous contact during the term of this Agreement) for any product or service that is competitive or in competition with the Business.

13. **Recruitment of Personnel.** Service Provider and Hecker each hereby covenants and agrees that neither Service Provider nor Hecker will, during the Period, on its or his own behalf or on behalf any other person or entity, solicit or attempt to solicit the employment of any employee of the Business or GE Fleet with whom Service Provider or Hecker has had contact in connection with the relationship arising under this Agreement without the prior written consent of GE Fleet; provided that the foregoing restriction shall not apply to any person who has not been employed by GE Fleet within the last six months prior to such solicitation.

14. **Term and Termination.**

(a) This Agreement shall commence on the Effective Date and, subject to the following provisions of this Section 14, extend through the date which is the sixth anniversary of the Effective Date.

(b)     This Agreement may be terminated by GE Fleet for Cause (as hereinafter defined) by delivery of notice of termination to Service Provider, which notice shall set forth the basis for such termination.  Termination of this Agreement pursuant to this <u>Section 14(b)</u> shall be effective upon delivery of such notice.

(c)     This Agreement may be terminated by GE Fleet, upon thirty (30) days prior written notice to Service Provider, for any reason other than Cause.    Termination of this Agreement pursuant to this <u>Section 14(c)</u> shall be effective thirty (30) days after delivery of such notice.

(d)     This Agreement may be terminated by Service Provider, without prior notice, for Good Reason (as hereinafter defined), upon delivery of notice of termination to GE Fleet, which notice shall set forth the basis for such termination.  Termination of this Agreement pursuant to this <u>Section 14(d)</u> shall be effective upon delivery of such notice.

(e)     This Agreement may be terminated by Service Provider, upon thirty (30) days prior written notice, Without Reason.  Such termination of this Agreement pursuant to this <u>Section 14(e)</u> shall be effective thirty (30) days after delivery of such notice.

(f)     This Agreement may be terminated by Service Provider, without prior notice, in the event that (i) average MENEA for any consecutive twenty-four (24) month period is less than One Hundred Million Dollars ($100,000,000) and (ii) GE Fleet is no longer seeking new customers for the Business and is not accepting new orders for the Business from existing customers of the Business.  Termination of this Agreement pursuant to this <u>Section 14(f)</u> shall be effective upon delivery of such notice.

15.     <u>Payments following Termination, Death or Permanent Disability; Termination of Certain Restrictions.</u>

(a)     If this Agreement is terminated by GE Fleet Without Cause or by Service Provider for Good Reason, (x) the provisions of <u>Sections 11</u>, <u>12</u> and <u>13</u> shall thereupon terminate, and (y) GE Fleet shall, within five (5) Business Days after such termination, pay to Service Provider a lump sum payment equal to:

(i)     the Incentive for any Agreement Year then previously ended that has not been paid, <u>plus</u>

(ii)     an amount equal to the lesser of:

(1)     the amount necessary to make the present value, on a compounded annual basis, of (A) the Advance, (B) the Base Incentive actually paid pursuant to <u>Section 3</u> hereof, (C) the Base Incentive included in the payment made pursuant to clause (i) of this <u>Section 15(a)</u>, and (D) the payment to be determined by this <u>Section 15(a)(ii)(1)</u> equal to $19,887,500, determined on a notional basis as of the Effective Date using a 4% interest rate; or

15

(2)   the present value, determined as of the date of such termination on a compounded annual basis at an interest rate of 4%, of the unearned balance of the Base Incentive (less the amount of the Advance not applied against the Base Incentive and less and draws paid pursuant to Section 3(b)) for the number of Agreement Years remaining in the Term following the date upon which such termination occurs, assuming for the purpose of this calculation that in each of the remaining Agreement Years, the average MENEA for such Agreement Years is $400 million, plus

(iii)   an amount equal to the amount necessary to make the present value, on a compounded annual basis, of (1) the Excess Incentive actually paid pursuant to Section 3 hereof, (2) the Excess Incentive included in the payment made pursuant to clause (i) of this Section 15(a), and (3) the payment to be determined by this Section 15(a)(iii) equal to $20,000,000, determined on a notional basis as of the Effective Date using a 4% interest rate.

(b)   If this Agreement is terminated by GE Fleet for Cause, or by Service Provider Without Reason, Service Provider shall receive the Incentive, if any, for any Agreement Year then previously ended that has not been paid as of the date of termination and the provisions of Sections 11, 12 and 13 shall not terminate but shall continue in full force and effect; provided that Service Provider shall immediately pay to GE Fleet any amount of the Advance and any draws paid pursuant to Section 3(b) (including during the Agreement Year of termination) not applied against any Base Incentive as of the end of the preceding Agreement Year.

(c)   If Service Provider terminates this Agreement pursuant to Section 14(f), (x) the provisions of Sections 11, 12 and 13 shall thereupon terminate, and (y) GE Fleet shall, within five (5) Business Days after such termination, pay to Service Provider a lump sum payment equal to:

(i)   the Incentive for any Agreement Year then previously ended that has not been paid, plus

(ii)   an amount equal to the lesser of:

(1)   the amount necessary to make the present value, on a compounded annual basis, of (A) the Advance, (B) the Base Incentive actually paid pursuant to Section 2 hereof, (C) the Base Incentive included in the payment made pursuant to clause (i) of this Section 15(d), and (D) the payment to be determined by this Section 15(d)(ii)(1) equal to $19,887,500, determined on a notional basis as of the Effective Date using a 4% interest rate; or

(2)   the present value, determined as of the date of such termination on a compounded annual basis at an interest rate of 4%, of the unearned balance of the Base Incentive (less the amount of the Advance not applied against the

16

Base Incentive and less and draws paid pursuant to Section 3(b)) for the number of Agreement Years remaining in the Term following the date upon which such termination occurs, assuming for the purpose of this calculation that in each of the remaining Agreement Years, the average MENEA for such Agreement Years is $400 million.

(d)     The payment by GE Fleet of the amounts described in this <u>Section 15</u> shall relieve GE Fleet (and Service Provider's acceptance of such amounts shall be deemed to constitute a release by Service Provider) of all of GE Fleet's obligations, duties and liabilities under this Agreement upon a termination of this Agreement pursuant to <u>Section 14</u>.

(e)     In the event of Hecker's death or Permanent Disability, notwithstanding anything in this Agreement to the contrary, (i) Service Provider shall continue to be entitled to receive the Base Incentive provided in <u>Section 3(c)(i)</u> but shall, immediately from the date of such death or Permanent Disability not be entitled to receive any Excess Incentive (other than with respect to any Agreement Year completed prior to Hecker's death or Permanent Disability) and (ii) GE Fleet shall cease to pay the expense allowance called for in the first sentence of <u>Section 3(d)</u> immediately upon such death or Permanent Disability.

(f)     Nothwithstanding anything in this Agreement to the contrary, the payments required to be made by GE Fleet pursuant to <u>Section 3</u> shall be, at the sole option of GE Fleet, <u>reduced by and set off against any claims GE Fleet has or may have against Service Provider,</u> <u>Hecker or any of their respective Affiliates under or pursuant to</u> (i) that certain Guaranty by Hecker, dated the date hereof, in favor of GE Fleet, (ii) the Assignment, Assumption, Non-Competition and Non-Solicitation Agreement, dated the date hereof, by and among GE Fleet and the Assignors, (iii) the Recourse Provisions, and (iv) that certain Software License Agreement, dated the date hereof, by and among Rosedale Leasing, Charter Solutions, Inc. and GE Fleet <u>provided</u> that (A) GE Fleet shall pay interest at an annual rate equal to Prime plus 200 basis points from the date of such set off on such portion of the amount so set off as is required to be repaid by GE Fleet to Service Provider and (B) in the event that the right of set off is exercised hereunder and is subsequently challenged in a <u>proceeding brought in accordance with this</u> <u>Agreement,</u> the prevailing party in such proceeding shall be entitled to indemnification for and reimbursement of the reasonable <u>costs and expenses</u> incurred by the <u>prevailing party</u> in connection with such proceeding.

(g)'     As used in this Agreement:

(i)     "<u>Cause</u>" shall mean (A) that Service Provider or Hecker has (1) knowingly acted fraudulently or dishonestly in its or his relations with GE Fleet or any of its Affiliates or any client of GE Fleet or any of its Affiliates, (2) knowingly or recklessly breached or caused the breach by GE Fleet or any of its Affiliates of any material agreement between GE Fleet or any of its Affiliates and any of its clients, or (3) been convicted by a court or arbitration panel of, or been found liable for, pled guilty to or confessed to, any act of fraud, larceny, embezzlement, conversion or any act involving the misappropriation of funds <u>in the course of the</u> <u>services provided to GE Fleet under this Agreement,</u> (B) any material default or breach by Service Provider or Hecker under this Agreement, which failure is not cured within thirty (30) days after written notice to Service Provider and Hecker or such longer period as is

ATL_IMANAGE-3867854

reasonably necessary to cure such breach, so long as Service Provider and Hecker are diligently proceeding to effectuate such cure and GE Fleet is not materially prejudiced by such delay.

(ii) "Good Reason" shall mean any default or breach by GE Fleet under this Agreement, which failure is not cured within thirty (30) days after written notice to GE Fleet or such longer period as is reasonably necessary to cure such breach, so long as GE Fleet is diligently proceeding to effectuate such cure and Service Provider and Hecker are not materially prejudiced by such delay.

(iii) "Permanent Disability" shall mean the inability, by reason of physical or mental reasons, of Hecker to substantially fulfill the requirements of this Agreement for a period of not less than 180 days in any twelve-month period. Hecker agrees to cooperate with the GE Fleet in connection with any medical examinations requested in connection with making such determination.

(iv) "Without Cause" shall mean the termination by GE Fleet of this Agreement other than for Cause.

(v) "Without Reason" shall mean the termination by Service Provider of this Agreement other than for Good Reason.

16. Severability. If a judicial or arbitral determination is made that any provision of this Agreement constitutes an unreasonable or otherwise unenforceable restriction against Service Provider or Hecker, the provisions of this Agreement shall be rendered void only to the extent that such judicial or arbitral determination finds such provisions to be unreasonable or otherwise unenforceable with respect to Service Provider or Hecker. In this regard, Service Provider and Hecker hereby agrees that any judicial or arbitral authority construing this Agreement shall be empowered to sever, reform, reduce or restate any portion of the Territory, any prohibited business activity or any time period from the coverage of this Agreement (including the Period) and to apply the provisions of this Agreement to the remaining, reformed, reduced or restarted portion of the Territory, or to the business activities or time period not so severed, reformed, reduced or restated by such judicial or arbitral authority. Moreover, notwithstanding the fact that any provision of this Agreement is determined not to be specifically enforceable, GE Fleet shall nevertheless be entitled to recover monetary damages as a result of the breach of such provision by Service Provider or Hecker.

17. Indemnification. Service Provider and Hecker, jointly and severally, hereby agree to indemnify and hold harmless, to the fullest extent permitted by applicable Law, GE Fleet from, against and in respect of any and all losses, damages, deficiencies, awards, assessments, judgments, fines, penalties, costs and expenses (including, but not limited to, reasonable attorneys' fees and expenses) incurred as a result of any breach or default in the performance by Service Provider or Hecker or any of their Affiliates of any covenant or agreement contained herein. GE Fleet hereby agrees to indemnify and hold harmless, to the fullest extent permitted by applicable Law, Service Provider and Hecker from, against and in respect of any and all losses, damages, deficiencies, awards, assessments, judgments, fines, penalties, costs and expenses (including, but not limited to, reasonable attorneys' fees and expenses) incurred as a result of any breach or default in the performance by GE Fleet or any of his Affiliates of any covenant or agreement contained herein.

ATL_IMANAGE-3867854

18.     Injunctive Relief.  Service Provider and Hecker hereby agree that any remedy at law for any breach of the provisions contained in Sections 9, 10, 11 or 13 of this Agreement shall be inadequate and that GE Fleet shall be entitled to injunctive relief in addition to any other remedy GE Fleet might have under this Agreement.  Service Provider and Hecker specifically release GE Fleet from the requirement of posting bond in connection with temporary or interlocutory injunctive relief, to the extent permitted by applicable Law.

19.     Binding Effect.  Neither this Agreement nor any rights hereunder shall be assigned or assignable by any party hereto without the prior written consent of each of the other parties; provided, however, that Service Provider shall be entitled to assign its rights to payments under this Agreement to Hecker or any entity at least ninety percent owned and controlled by Hecker without the prior written consent of GE Fleet; provided that such assignment shall not relieve Service Provider or Hecker of any of their respective obligations hereunder and any such assignment shall be null and void *ab initio* if Hecker or his estate no longer owns or controls at least 90% of any such assignee.

20.     Headings.  The section and paragraph headings contained in this Agreement are for·reference purposes only and shall not affect the meaning or interpretation of this Agreement.

21.     Number.  Whenever the context so requires, the singular number shall include the plural and the plural shall include the singular.

22.     Notices.  Any notices or other communications required or permitted hereunder shall be deemed to have been properly given and delivered if in writing by such party or its legal representative and delivered personally or sent by nationally recognized overnight courier service guaranteeing overnight delivery, or registered or certified mail, postage prepaid, addressed as follows:

If to Service Provider or Hecker to:        c/o Dennis E. Hecker
                                            500 Ford Road
                                            Minneapolis, MN 55426
                                            Facsimile: (952) 512-8945

            With a copy to:                 Bruce J. Parker
                                            Kaplan, Strangis and Kaplan, P.A.
                                            5500 Wells Fargo Center
                                            90 South Seventh Street
                                            Minneapolis, MN 55402
                                            Facsimile: (612) 375-1143

If to GE Fleet, to:                         Gelco Corporation
                                            Three Capital Drive
                                            Eden Prairie, MN  55344
                                            Facsimile: (952) 828-2742
                                            Attention: General Counsel

ATL_IMANAGE-3867854

Unless otherwise specified herein, such notices or other communications shall be deemed given (i) on the date delivered, if delivered personally, (ii) one (1) Business Day after being sent by a nationally recognized overnight courier guaranteeing overnight delivery and (iii) five (5) Business Days after being sent, if sent by registered or certified mail. Each of the parties hereto shall be entitled to specify a different address by delivering notice as aforesaid to each of the other parties hereto.

23. <u>Entire Agreement; Modification</u>. This Agreement is intended by the parties hereto to be the final expression of their agreement with respect to the subject matter hereof and is the complete and exclusive statement of the terms thereof, notwithstanding any representations, statements or agreements to the contrary heretofore made. This Agreement may be modified only by a written instrument signed by each of the parties hereto.

24. <u>Construction</u>. No provision of this Agreement shall be construed against or interpreted to the disadvantage of Service Provider, Hecker or GE Fleet by any Governmental Entity by reason of Service Provider, Hecker or GE Fleet having or being deemed to have structured or drafted such provision of this Agreement.

25. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, including by facsimile, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

26. <u>Waiver of Jury Trial</u>. Each party hereto acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each such party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury in respect of any litigation directly or indirectly arising out of or relating to this Agreement or the transactions contemplated hereby. Each party hereto certifies and acknowledges that (i) no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver, (ii) each party understands and has considered the implications of this waiver, (iii) each party makes this waiver voluntarily, and (iv) each party has been induced to enter into this agreement by, among other things, the mutual waivers and certifications in this <u>Section 26</u>.

27. <u>Governing Law; Jurisdiction; Forum</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota, without regard to principles of conflicts or choice of laws. Any case, proceeding or action concerning any dispute arising out of or relating to this Agreement must be brought in a court situated in the State of Minnesota, and each party hereto consents and submits to the jurisdiction of any state or federal court sitting in the State of Minnesota for any such case, proceeding or action. Each party hereto waives any objection to the laying of venue in such courts and any claim that any such action has been brought in an inconvenient forum. To the extent permitted by applicable Law, any judgment in respect of a dispute arising out of or relating to this Agreement may be enforced in any other jurisdiction within or outside the United States by suit on the judgment, a certified copy of such judgment being conclusive evidence of the fact and amount of such judgment.

ATL_IMANAGE-3867854

IN WITNESS WHEREOF, GE Fleet, Service Provider and Hecker have duly executed this Agreement as of the day and year first above written.

GELCO CORPORATION


By:_____
Name: Richard J. Chenitz
Title: Senior Vice-President

WALDEN FLEET SERVICES II, INC.


By:_____
Name: Dennis E. Hecker
Title: President


DENNY HECKER'S AUTOMOTIVE GROUP, INC.


By:_____
Name: Dennis E. Hecker
Title: President


_____
Dennis E. Hecker

21

## SCHEDULE 2(i)

### Description of Services

The term "Services" shall mean the following duties performed by Dennis E. Hecker to the extent reasonably requested by GE Fleet under the provisions of and during the term of this Agreement:

1. Managing and developing the relationships of GE Fleet with the manufacturers and distributors ("OEMs") of Motor Vehicles to be acquired by GE Fleet in connection with the Business;
2. Managing and developing the relationships of GE Fleet with the car rental company customers of the Business;
3. Marketing the Motor Vehicle lease and Financing products of GE Fleet to the car rental companies in connection with the Business;
4. Negotiating the economic and other material terms of purchase agreements with OEMs, including volume of purchases, volume incentives, and repurchase obligations of OEMs, for Motor Vehicles to be acquire by GE Fleet in connection with the Business; and
5. Negotiating the economic and other material terms of Motor Vehicle Lease Agreements, Vehicle Lease Orders and other Financings with car rental company customers or prospective car rental company customers of the Business.

This **FIRST AMENDMENT TO SALES COMMISSION AGREEMENT** (this "Agreement") is made and entered into as of the 12th day of January, 2007, by and among **GELCO CORPORATION**, a Delaware corporation ("GE Fleet"), **WALDEN FLEET SERVICES II, INC.**, a Minnesota corporation ("Walden Fleet"), **DENNY HECKER'S AUTOMOTIVE GROUP, INC.**, a Minnesota corporation ("Automotive Group" and together with Walden Fleet, the "Service Provider") and **DENNIS E. HECKER**, an individual and resident of the State of Minnesota ("Hecker").

## WITNESSETH:

**WHEREAS,** GE Fleet, Service Provider and Hecker are parties to that certain Sales Commission Agreement dated September 30, 2005 (the "Sales Commission Agreement");

**WHEREAS,** Hecker directly or indirectly owns all of the outstanding capital stock or other equity interests in each of Walden Fleet and Automotive Group;

**WHEREAS,** GE Fleet, Rosedale Dodge, Inc., Rosedale Leasing, LLC and Southwest-Tex Leasing Co., Inc. (each an affiliate of Service Provider and directly or indirectly wholly owned by Hecker) are parties to that certain Master Lease Agreement dated January 12, 2007 (the "Lease");

**WHEREAS,** each of Walden Fleet and Automotive Group have executed and delivered that certain Corporate Guaranty Agreement dated January 12, 2007 pursuant to which Walden Fleet and Automotive Group each have jointly and severally guaranteed the obligations of Rosedale Dodge, Inc., Rosedale Leasing, LLC and Southwest-Tex Leasing Co., Inc. under and pursuant to the Lease (the "Corporate TRAC Lease Guaranty");

**WHEREAS,** Hecker has executed and delivered that certain Personal Guaranty Agreement dated January 12, 2007 pursuant to which Hecker has guaranteed the obligations of Rosedale Dodge, Inc., Rosedale Leasing, LLC and Southwest-Tex Leasing Co., Inc. under and pursuant to the Lease (the "Hecker TRAC Lease Guaranty"); and

**WHEREAS,** the parties hereto desire to amend the Sales Commission Agreement as provided herein.

**NOW, THEREFORE,** in consideration of the premises and mutual promises contained herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1. **Definitions.** For the purposes of this Agreement capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Sales Commission Agreement.

2. **Amendment to Section 11(b).** The proviso in the second sentence of Section 11(b) is hereby amended to read in its entirety as follows:

provided that Rosedale Leasing, Dennis E. Hecker or their respective Affiliates may provide sourcing of motor vehicles, leasing and Financing to (1) Southwest-Tex Leasing Co., Inc. (d/b/a Advantage-Rent-A-Car) (or an entity that is a direct or indirect subsidiary of Southwest-Tex Leasing Co., Inc.) ("Advantage"), Payless Car Rental Systems, Inc. (or an entity whose operating assets include substantially all of the operating assets of Payless Car Rental Systems, Inc.) ("Payless"), or PCR Ventures, LLC, a Delaware limited liability company (or any entity wholly owned by PCR Ventures LLC) ("PCR Ventures") (a) if and only as long as Dennis E. Hecker, his estate or any trust created for the benefit of Dennis E. Hecker or his family members ("Hecker") and any entity majority owned and controlled by Hecker effectively owns in the aggregate 50% or more of the equity, profits and voting interest of Advantage, Payless and PCR Ventures, as the case may be, and (b) if Hecker or any entity majority owned and controlled by Hecker effectively owns less than 50% but 25% or more of the equity, profits and voting interest of Advantage, Payless and PCR Ventures, as the case may be, Hecker or such entity shall inform GE Fleet of the terms, pricing and conditions of any such sourcing, leasing or Financing and shall cause each of Advantage, Payless or PCR Ventures to accept such sourcing, leasing or Financing from GE Fleet if GE Fleet can provide sourcing, leasing or Financing on terms and pricing equal to or better than that to be provided by Rosedale Leasing, Hecker or their Affiliates, which decision by GE Fleet shall be made within fourteen (14) business days after notification of such proposed sourcing, leasing or Financing by Hecker or such entity, and (2) during the twelve (12) months commencing January 15, 2007, Payless Car Rental locations at Las Vegas, Ft. Lauderdale, Orlando and Tampa that are owned and operated by Payless Car Rental System, Inc. or its affiliates (or an entity whose operating assets are substantially all of the operating assets of said entities) (jointly "Payless Locations") (unless any Payless Locations meets the ownership requirements set forth in clause (1) in which case clause (1) shall apply), provided that Hecker (or such entity owned and controlled by Hecker shall inform GE Fleet of the terms, pricing and conditions of any such sourcing, leasing or Financing to be provided to any of the Payless Locations, shall not provide such sourcing, leasing or Financing to Payless if GE Fleet can provide sourcing, leasing or Financing on terms and pricing equal to or better than that to be provided by Rosedale Leasing, Hecker or their Affiliates, and shall cause use its commercially

reasonable efforts to cause Payless to accept such sourcing, leasing or Financing from GE Fleet if GE Fleet can provide sourcing, leasing or Financing on terms and pricing equal to or better than that to be provided by Rosedale Leasing, Hecker or their Affiliates without any guaranties or other credit support provided by Rosedale Leasing, Hecker or their Affiliates, which decision by GE Fleet shall be made within fourteen (14) business days after notification of such proposed sourcing, leasing or Financing by Hecker or such entity.

3.　**Amendment to Section 15(f).** Section 15(f) of the Sales Commission Agreement is hereby amended to delete therefrom the word "and" immediately preceding clause (iv), to insert after the end of clause (iv) before the semicolon the following:

(v) that certain Corporate Guaranty Agreement dated January 12, 2007 made by each of Walden Fleet and Automotive Group in favor of GE Fleet pursuant to which each have jointly and severally guaranteed the obligations of Rosedale Dodge, Inc., Rosedale Leasing, LLC and Southwest-Tex Leasing Co., Inc. under and pursuant to that certain Master Lease Agreement dated January 12, 2007 (the "Master Lease Agreement") among GE Fleet and the customers (the "Customers") specified therein to wit Rosedale Dodge, Inc., Rosedale Leasing, LLC Southwest-Tex Leasing Co., Inc. in the event of a default and the initiation of legal proceedings due to a monetary default by the Customers under the Master Lease Agreement but only to the extent of such monetary default, and (vi) that certain Personal Guaranty Agreement dated January 12, 2007 made by Hecker in favor of GE Fleet pursuant to which Hecker has guaranteed the obligations of Rosedale Dodge, Inc., Rosedale Leasing, LLC and Southwest-Tex Leasing Co., Inc. under and pursuant to that certain Master Lease Agreement in the event of a default and the initiation of legal proceedings due to a monetary default by the Customers under the Master Lease Agreement but only to the extent of such monetary default

4.　**No Additional Amendments.** Except as expressly provided in this Agreement, the Sales Commission Agreement is, and shall continue to be, in full force and effect in accordance with its terms, without amendment thereto, and is, in all respects, ratified and confirmed.

5.　**Headings.** The section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

6. **Entire Agreement; Modification.** This Agreement is intended by the parties hereto to be the final expression of their agreement with respect to the subject matter hereof and is the complete and exclusive statement of the terms thereof, notwithstanding any representations, statements or agreements to the contrary heretofore made. This Agreement may be modified only by a written instrument signed by each of the parties hereto.

7. **Construction.** No provision of this Agreement shall be construed against or interpreted to the disadvantage of Service Provider, Hecker or GE Fleet by any Governmental Entity by reason of Service Provider, Hecker or GE Fleet having or being deemed to have structured or drafted such provision of this Agreement.

8. **Counterparts.** This Agreement may be executed in any number of counterparts, including by facsimile, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

9. **Governing Law; Jurisdiction; Forum.** This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota, without regard to principles of conflicts or choice of laws.

*The remainder of this page intentionally left blank.*
*Signature page follows.*

IN WITNESS WHEREOF, GE Fleet, Service Provider and Hecker have duly executed this Agreement as of the day and year first above written.

GELCO CORPORATION

By:_____
Name: _____
Title: _____

WALDEN FLEET SERVICES II, INC.

By: _____
Name: Dennis E. Hecker
Title: President

DENNY HECKER'S AUTOMOTIVE GROUP, INC.

By: _____
Name: Dennis E. Hecker
Title: President

_____
Dennis E. Hecker, individually

This **FIRST AMENDMENT TO ASSIGNMENT, ASSUMPTION, NON-COMPETITION AND NON-SOLICITATION AGREEMENT** (this "Agreement") is made and entered into as of the 12th day of January, 2007, by and among Gelco Corporation (d/b/a GE Fleet Services), a Delaware corporation ("Assignee"), and each of (i) Rosedale Dodge, Inc., (d/b/a Rosedale Leasing and d/b/a Rosedale Leasing, Inc.), a Minnesota corporation ("Rosedale Leasing"); (ii) Walden Fleet Services II, Inc., a Minnesota corporation ("Walden Fleet" and together with Rosedale Leasing, the "Assignors"); (iii) Walden Leasing Inc., a Minnesota corporation; (iv) Walden Fleet Sales Group, Inc. (d/b/a Walden Automotive), a Minnesota corporation; (v) Rosedale Leasing of Minnesota LLC, a Delaware limited liability company; and (vi) Rosedale Leasing of Minneapolis LLC, a Minnesota limited liability company ((iii) through (vi) being collectively the "Additional Assignors").

## W I T N E S S E T H:

**WHEREAS**, Assignee, Assignors and Additional Assignors are parties to that certain Assignment, Assumption, Non-Competition and Non-Solicitation Agreement dated September 30, 2005 (the "Assignment and Assumption Agreement");

**WHEREAS**, the parties hereto desire to amend the Assignment and Assumption Agreement as provided herein.

**NOW, THEREFORE**, in consideration of the premises and mutual promises contained herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1. **Definitions.** For the purposes of this Agreement capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Assignment and Assumption Agreement.

2. **Amendment to Section 3.1.** The proviso in the second sentence of Section 3.1 is hereby amended to read in its entirety as follows:

> provided that Rosedale Leasing, Dennis E. Hecker or their respective Affiliates may provide sourcing of motor vehicles, leasing and Financing to (1) Southwest-Tex Leasing Co., Inc. (d/b/a Advantage-Rent-A-Car) (or an entity that is a direct or indirect subsidiary of Southwest-Tex Leasing Co., Inc.) ("Advantage"), Payless Car Rental Systems, Inc. (or an entity whose operating assets include substantially all of the operating assets of Payless Car Rental Systems, Inc.) ("Payless"), or PCR Ventures, LLC, a Delaware limited liability company (or any entity wholly owned by PCR Ventures LLC) ("PCR Ventures") (a) if and only as long as Dennis E. Hecker, his estate or any trust

created for the benefit of Dennis E. Hecker or his family members ("Hecker") and any entity majority owned and controlled by Hecker effectively owns in the aggregate 50% or more of the equity, profits and voting interest of Advantage, Payless and PCR Ventures, as the case may be, and (b) if Hecker or any entity majority owned and controlled by Hecker effectively owns less than 50% but 25% or more of the equity, profits and voting interest of Advantage, Payless and PCR Ventures, as the case may be, Hecker or such entity shall inform GE Fleet of the terms, pricing and conditions of any such sourcing, leasing or Financing and shall cause each of Advantage, Payless or PCR Ventures to accept such sourcing, leasing or Financing from GE Fleet if GE Fleet can provide sourcing, leasing or Financing on terms and pricing equal to or better than that to be provided by Rosedale Leasing, Hecker or their Affiliates, which decision by GE Fleet shall be made within fourteen (14) business days after notification of such proposed sourcing, leasing or Financing by Hecker or such entity, and (2) during the twelve (12) months commencing January 15, 2007, Payless Car Rental locations at Las Vegas, Ft. Lauderdale, Orlando and Tampa that are owned and operated by Payless Car Rental System, Inc. or its affiliates (or an entity whose operating assets are substantially all of the operating assets of said entities) (jointly "Payless Locations") (unless any Payless Locations meets the ownership requirements set forth in clause (1) in which case clause (1) shall apply), provided that Hecker (or such entity owned and controlled by Hecker shall inform GE Fleet of the terms, pricing and conditions of any such sourcing, leasing or Financing to be provided to any of the Payless Locations, shall not provide such sourcing, leasing or Financing to Payless if GE Fleet can provide sourcing, leasing or Financing on terms and pricing equal to or better than that to be provided by Rosedale Leasing, Hecker or their Affiliates, and shall cause use its commercially reasonable efforts to cause Payless to accept such sourcing, leasing or Financing from GE Fleet if GE Fleet can provide sourcing, leasing or Financing on terms and pricing equal to or better than that to be provided by Rosedale Leasing, Hecker or their Affiliates without any guaranties or other credit support provided by Rosedale Leasing, Hecker or their Affiliates, which decision by GE Fleet shall be made within fourteen (14) business days after notification of such proposed sourcing, leasing or Financing by Hecker or such entity.

2

3. **Amendment to Section 7.4.** The first sentence of Section 7.4 is hereby amended by adding the following proviso at the end:

> Provided, however, that Assignee has assigned, and may assign, it rights to purchase certain automobiles and light trucks (as defined under "Asset Class" 00.22 and 00.241 respectively, pursuant to Rev. Proc. 87-56,1987-2 CB 674) to APEX Fleet and anything in this sentence to the contrary notwithstanding, Assignee shall have no obligation to order through Rosedale Leasing or an Affiliate under such an ordering dealer subcode agreement any cars and light trucks used in the Business the purchase rights for which have been assigned to Apex Fleet.

4. **No Additional Amendments.** Except as expressly provided in this Agreement, the Assignment and Assupmtion Agreement is, and shall continue to be, in full force and effect in accordance with its terms, without amendment thereto, and is, in all respects, ratified and confirmed.

5. **Headings.** The section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

6. **Entire Agreement; Modification.** This Agreement is intended by the parties hereto to be the final expression of their agreement with respect to the subject matter hereof and is the complete and exclusive statement of the terms thereof, notwithstanding any representations, statements or agreements to the contrary heretofore made. This Agreement may be modified only by a written instrument signed by each of the parties hereto.

7. **Construction.** No provision of this Agreement shall be construed against or interpreted to the disadvantage of Assignee, Assignors or Additional Assignors by reason of Assignee, Assignors or Additional Assignors having or being deemed to have structured or drafted such provision of this Agreement.

8. **Counterparts.** This Agreement may be executed in any number of counterparts, including by facsimile, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

9. **Governing Law; Jurisdiction; Forum.** This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota, without regard to principles of conflicts or choice of laws.

*The remainder of this page intentionally left blank.*
*Signature page follows.*

**IN WITNESS WHEREOF,** each of the parties hereto has caused this Agreement to be executed on its behalf by its officers or representatives thereunto duly authorized, as of the date first above written.

**GELCO CORPORATION**

By:_____
    Name:  Richard J. Chenitz
    Title: Senior Vice President

**ROSEDALE DODGE, INC.**

By:_____
    Name:  Dennis E. Hecker
    Title:  President

**WALDEN FLEET SERVICES II, INC.**

By:_____
    Name:  Dennis E. Hecker
    Title:  President

**WALDEN LEASING, INC.**

By:_____
    Name:  Dennis E. Hecker
    Title:  President

**WALDEN FLEET SALES GROUP, INC. (d/b/a WALDEN AUTOMOTIVE)**

By:_____
    Name:  Dennis E. Hecker
    Title:  President

**ROSEDALE LEASING OF MINNESOTA LLC**

By: _Dennis E. Hecker_
    Name: Dennis E. Hecker
    Title: President and Chief Manager


**ROSEDALE LEASING OF MINNEAPOLIS
LLC**

By: _Dennis E. Hecker_
    Name: Dennis E. Hecker
    Title: President and Chief Manager

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

In re:                                                  Bky No. 09-50779

Dennis E. Hecker                                        Chapter 7

                              Debtor,

## DECLARATION OF DENNIS EARL HECKER

I, Dennis Earl Hecker, state as follows:

1.      Prior to the Trustee's actions, I was for all relevant times the sole owner of Walden Fleet Services II, Inc. ("Walden Fleet") and Denny Hecker's Automotive Group, Inc. ("Automotive Group"), with the possible exception that my children's trust may have owned approximately 1% of one or both entities.

2.      At all times, I was the sole officer of Walden Fleet and Automotive Group, and I wholly controlled both entities.

3.      I personally performed all of the services rendered to Gelco Corporation ("GE Fleet") under the Sales Commission Agreement ("SCA"). No other individual rendered any services to GE Fleet under the SCA.

4.      I faithfully performed my obligations under the Agreement. I reported directly to the President of GE Fleet, whom gave me specific instructions, which I followed.

5.      GE Fleet paid the compensation under the Agreement to whomever I directed them to pay it.

The undersigned declares under penalty of perjury under the laws of the United States and the State of Minnesota that the foregoing facts stated in this Declaration are, to the best of my knowledge and belief, true and correct.

Executed on this _____th day of June 2011.


_____
Dennis E. Hecker

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re: Dennis E. Hecker,                                                    Bky No. 09-50779

       Debtor.       Chapter 7

## UNSWORN DECLARATION FOR PROOF OF SERVICE

John R. Neve, Neve Law, PLLC, attorney licensed to practice law in this court, with office
address of 8500 Normandale Lake Blvd, Suite 1080, Minneapolis, MN 55437, declares that on
the date set forth below, he caused the following documents:

> **Debtor Dennis E. Hecker's Objection to Motion to Approve Settlement;
> Declaration of John R. Neve with attached Exhibit; Declaration of Dennis E.
> Hecker (unexecuted); and Proposed Order**

to be filed electronically with the Clerk of Court through ECF, and that ECF will send an e-
notice of the electronic filing to the following:

- Patti H Bass     ecf@bass-associates.com
- Daniel C. Beck     dbeck@winthrop.com, tcooke@winthrop.com
- Matthew R. Burton     mburton@losgs.com, swood@losgs.com
- Tyler D. Candee     tcandee@lapplibra.com, dwegler@lapplibra.com
- Bruce H. Carlson     bruce.carlson@mlcfargolaw.com, tricia.fossen@mlcfargolaw.com
- Monica L. Clark     clark.monica@dorseylaw.com
- Gordon B. Conn     conn@kwgc-law.com
- Larry D. Espel     lespel@greeneespel.com, lbulson@greeneespel.com, sholenko@greeneespel.com
- David B Galle     dgalle@oppenheimer.com
- James A. Geske     jgeske@wilfordgeske.com, mroue-chambers@wilfordgeske.com; mpeterson@wilfordgeske.com
- Stephen F Grinnell     stephen.grinnell@gpmlaw.com
- Aaron R. Hartman     ahartman@aoblaw.com, lwilhelm@aoblaw.com
- Joshua A. Hasko     jhasko@messerlikramer.com, nkuhnly@messerlikramer.com
- Andrea M. Hauser     ahauser@losgs.com
- Robert J. Hennessey     rhennessey@lindquist.com, lsatriano@lindquist.com
- David L. Johnson     david.johnson@mlcfargolaw.com
- James M. Jorissen     jjorissen@losgs.com, vrittenbach@losgs.com
- Jeffrey D. Klobucar     jklobucar@foleymansfield.com
- Robert T. Kugler     robert.kugler@leonard.com, ma.xiong@leonard.com
- Jacqueline D. Kuiper     jacqueline@mantylaw.com, ecf@mantylaw.com
- Jordan S Kushner     kushn002@umn.edu
- Connie Lahn     connie.lahn@fmjlaw.com, Aong.Moua@fmjlaw.com
- Thomas Lallier     ECF_Notices@foleymansfield.com

- Joseph W. Lawver    jlawver@messerlikramer.com, kmilner@messerlikramer.com
- Seth Leventhal    seth.leventhal@fmjlaw.com, sherri.debettignies@fmjlaw.com
- Adam D. Maier    adam.maier@leonard.com, callie.sanford@leonard.com,
  ma.xiong@leonard.com
- Nauni J Manty    ecf@mantylaw.com
- Manty & Assoc. PA    ecf@mantylaw.com
- Barbara J May    babsjmay7@aol.com
- Steven Meshbesher    smeshmesh@aol.com, kgregorius@gmail.com
- Michael L Meyer    mlmeyer@ravichmeyer.com
- Ralph Mitchell    rmitchell@lapplibra.com, jpipp@lapplibra.com
- Andrew P. Moratzka    apm@mcmlaw.com, jef@mcmlaw.com;ldj@mcmlaw.com
- Nicholas N Nierengarten    nicholas.nierengarten@gpmlaw.com
- Timothy J Peters    tpeters@peterslawplc.com, peters.timothy.james@gmail.com;
  bfrank@peterslawplc.com
- Jamie R. Pierce    jpierce@hinshawlaw.com, akulbeik@hinshawlaw.com;
  mpocock@hinshawlaw.com; kmoore@hinshawlaw.com
- Steven R Qualley    steveq@gqlaw.net, squalley@gqlaw.net
- Recovery Management Systems Corp    claims@recoverycorp.com
- Craig E. Reimer    creimer@mayerbrown.com, samahdi@mayerbrown.com;
  srozen@mayerbrown.com; hroin@mayerbrown.com
- David E. Runck    david.runck@fmjlaw.com, Aong.Moua@fmjlaw.com
- Randall L. Seaver    rlseaver@fullerseaverramette.com, rseaver@ecf.epiqsystems.com
- Brad A Sinclair    bsinclair@serklandlaw.com, crohr@serklandlaw.com
- William R. Skolnick    wskolnick@skolnick-shiff.com, zpuchtel@skolnick-shiff.com;
  rcargill@skolnick-shiff.com; dlarson@skolnick-shiff.com;
  sshiff@skolnick-shiff.com
- Rebecca G. Sluss    rsluss@oppenheimer.com
- Kathleen K. Statler    kstatler@gr-espel.com, lrichart@greeneespel.com
- Mark D. Stephenson    marks@stephenson-sanford.com, chrish@sstmnlaw.com
- Michael R. Stewart    mstewart@faegre.com
- Gregory L. Taddonio    gtaddonio@reedsmith.com, kpalmer@reedsmith.com
- Will R. Tansey    wrtansey@ravichmeyer.com
- US Trustee    ustpregion12.mn.ecf@usdoj.gov
- Nicholas J. Vivian    nvivian@eckberglammers.com, dneumann@eckberglammers.com


I further certify that I caused a copy of the foregoing documents and the notice of electronic filing to be mailed by first class mail, postage paid, to the following non-ECF participants:



And I declare, under penalty of perjury, that the foregoing is true and correct.


Dated: June 10, 2011                     Signed:___/e/ John R. Neve_____

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                   Bky No. 09-50779

Dennis E. Hecker,                                Chapter 7

                         Debtor.

## ORDER

     This case is before the court on the Trustee's Motion to Approve Settlement [Docket No. 771].

     Based on the motion and the file and the court being fully advised in the premises,

     **IT IS ORDERED**:

1.     The Trustee's Motion to Approve Settlement is DENIED.

**BY THE COURT:**

Dated: _____          _____
                                        Robert J. Kressel
                                        U.S. Bankruptcy Judge